## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

EMPIRICAL FOODS, INC.,                )
                                      )         Case No. 8:19-cv-00457
    Plaintiff,               )
                                      )
    v.                       )
                                      )
PRIMUS BUILDERS, INC.,                )       **PRIMUS BUILDERS, INC.'S**
                                      )       **THIRD-PARTY COMPLAINT**
    Defendant, Plaintiff in   )
    Counterclaim, and Third-Party )
    Plaintiff,               )       **DEMAND FOR JURY TRIAL**
                                      )
    v.                       )
                                      )
SWISSLOG LOGISTICS, INC.,             )
                                      )
    Third-Party Defendant.   )

Defendant, Plaintiff in Counterclaim, and Third-Party Plaintiff Primus Builders, Inc. ("Primus") files this Third-Party Complaint against Third-Party Defendant Swisslog Logistics, Inc. ("Swisslog") based upon the claims and allegations asserted in the "Complaint And Demand For Jury Trial" ("Complaint") filed by Plaintiff empirical foods, inc. f/k/a Beef Products, Inc. ("empirical"). A true and correct copy of the Complaint is attached as Exhibit "A" and a copy of the Answer and Counterclaim is attached as Exhibit "B".

## <u>OVERVIEW</u>

This dispute arises out of the design and construction of a fully automated, refrigerated, food logistics facility located at 360 164th Street, South Sioux City, Nebraska 68776 used for the storage and distribution of meat products ("Freezer

01658317-2

Facility"). Primus designed and constructed the Freezer Facility for the owner, empirical, who selected, approved, and mandated the use of Swisslog to prepare the designs, manufacture certain equipment, develop certain software ("Swisslog Software"), and then install, test, commission and integrate the Swisslog equipment with the Swisslog Software to operate as an automated storage and retrieval system ("ASRS System"). After the Freezer Facility was constructed, various issues arose regarding the operation and functionality of the ASRS System, causing disputes between Primus, empirical, and Swisslog (collectively, the "Parties") under the Contract Documents.

Importantly, on the same day this lawsuit was filed (October 18, 2019), the Parties reached a global settlement of their disputes, followed by the submission of a plan to test, commission and debug the ASRS System. Nonetheless, empirical has now reneged upon the settlement between the Parties and contends the $14 million ASRS System must be demolished, removed and replaced, whereas Swisslog contends the ASRS System is substantially complete and Swisslog should be allowed to demonstrate its ability to perform.

## **PARTIES**

1.    **Primus**. Primus is a Georgia corporation, maintaining its principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189. Primus is a general contractor, which among other things, designs and builds

commercial refrigerated warehouses and freezer facilities for companies engaged in the production and distribution of food products.

2.      **Swisslog**.  Swisslog is a Virginia corporation, maintaining principal places of business at 161 Enterprise Drive, Newport News, Virginia 23603 and at 10825 East 47th Avenue, Denver, Colorado 80239.  Swisslog is an equipment supplier and software developer, which among other things, designs and manufactures equipment, develops and deploys software, and installs, tests, and commissions ASRS Systems used in the production, storage, and distribution of food products at commercial freezer facilities.  Swisslog can be served with process by serving its registered agent for service at CSC-Lawyers Incorporating Service Company, 233 South 13th Street, Suite 1900, Lincoln, Nebraska 68508.

3.      **Empirical**.  Empirical, formerly known as Beef Products, Inc., is a Nebraska corporation, maintaining its principal place of business at 891 Two Rivers Drive, Dakota Dunes, South Dakota 57049.  Empirical is engaged in the production, storage and distribution of meat products for wholesale in the food industry. Empirical filed the Complaint seeking to hold Primus responsible for various alleged defects within the ASRS System that was designed, manufactured, and installed by Swisslog, and is now awaiting testing and commissioning by Swisslog at the Freezer

Facility.

## JURISDICTION & VENUE

4.     **Subject Matter Jurisdiction**.   This Court has subject matter jurisdiction over this Third-Party Complaint pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Parties, the amounts in controversy exceed $75,000, and the claims asserted in this Third-Party Complaint arise from the same disputes and controversies identified in the Complaint, namely alleged defects within the ASRS System installed by Swisslog at the Freezer Facility.

5.     **Personal Jurisdiction**.   This Court has personal jurisdiction over Swisslog because the allegedly defective ASRS System was installed by Swisslog at the Freezer Facility and the various contracts among and between the Parties provide that all resulting disputes shall be governed by the laws of Nebraska.

6.     **Venue**.  The venue over this dispute is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the allegedly defective ASRS System was installed by Swisslog at the Freezer Facility.

## FACTS

7.     **The Dispute.**   This dispute arises from a complex business and contractual relationship between empirical and Swisslog, that not only blurred the formal contractual lines of authority alleged in the Complaint, but also gives direct rise to the claims and allegations now asserted against Primus.  Empirical claims the

ASRS System is incomplete, defective, must be ripped out and replaced, and refuses to allow Swisslog to test and commission the ASRS System. Swisslog claims the ASRS System is substantially complete and would be fully functional and operational but for the refusal of empirical to allow Swisslog the opportunity to perform additional testing, commission, and debug the ASRS System installed within the Freezer Facility.

8.    **The ASRS System**. The ASRS System is a fully automated, computer controlled, storage and retrieval system, that provides the backbone for operation of the Freezer Facility. Empirical selected Swisslog based upon its international reputation as the manufacturer and installer of the "Cadillac" of ASRS Systems throughout North America and Europe. Another critical factor in the selection of Swisslog, was its ability to provide a unique ASRS System that could handle materials of both large pallet sized loads and smaller case sized loads. According to Swisslog, it had successfully installed hundreds of ASRS systems using its standard proprietary software, controlling automated equipment handling both pallet and case sized loads and this same standard Swisslog software was to control the equipment within the ASRS System at the Freezer Facility. While the standard prepackaged Swisslog software can be customized, the resulting modifications often introduce unintended consequences that ripple throughout the operation and functionality of

the overall ASRS System requiring extensive debugging.

9.    **Software Interface.**    The ASRS System was further complicated because its operation and functionality, about which empirical now complains, is controlled by the integration of two independent software systems: one provided by Swisslog, the other provided by empirical.    Swisslog provided its standard Warehouse Management System software package, "WMS" or SynQ that was installed and customized in conjunction with empirical ("Swisslog Software"). Empirical provided an Enterprise Resource Planning System software package, "Microsoft Dynamics," or ERP that was installed and customized by empirical ("empirical Software").   While the Swisslog Software controlled equipment within the ASRS System that stored and retrieved product within the Freezer Facility, the empirical Software directs orders to the Swisslog Software by identifying the product that was to be stored or retrieved, including the quantity, location, type and date restriction of the product.    According to Swisslog, the empirical Software served as the "master" and the Swisslog Software served as the "servant," with empirical being responsible for integrating the two software packages per the Contract Documents.  Thus, it would be empirical who would be responsible for ensuring that the empirical Software communicated with the Swisslog Software resulting in an operational and functional ASRS System.

10.    **Project BPI**.   Empirical selected Swisslog to provide the ASRS

System, after conducting its own due diligence background review, including: the preparation of designs, the manufacturing and installation of the equipment, the development of the software, and then the testing, commissioning and integration of the software and equipment required to operate the ASRS System.  Over the course of 16 months—from January of 2015 to April of 2016—the Parties participated in multiple meetings, design sessions, schedule reviews, and pricing exercises, to collectively develop a design and budget for the Freezer Facility utilizing Primus and Swisslog.  Neither Swisslog, nor Primus were or have ever been compensated by empirical for any of the investigative design work performed during this 16-month planning period.

11.   **ASRS Design.**   In April of 2016, empirical executed a design agreement with Swisslog, the Swisslog/empirical Agreement, to design and prepare technical specifications defining the operation and functionality of the ASRS System.  Primus was not a party to the Swisslog/empirical Agreement.  Empirical also executed a separate agreement with Primus, in which Primus agreed to design and prepare specifications for the Freezer Facility structure in which the ASRS System would be housed.  At the time, it was understood empirical would enter into a contract directly with Swisslog to supply the ASRS System followed by a separate contract directly with Primus to construct the Freezer Facility.  Upon information and belief, the initial design for the ASRS System, about which empirical now

complains, was prepared under the Swisslog/empirical Agreement.

12.   **Value Engineering**.  Over a three (3) month period—from April 2016 through June 2016—empirical required Swisslog to "value engineer" the ASRS System designed under the Swisslog/empirical Agreement in order to reduce costs ("Value Engineering Changes").  As a result of these Value Engineering Changes, the pricing for the ASRS System was reduced by at least $10,898,890 resulting in a lower level of operation and functionality than empirical originally sought.  Primus did not prepare and was not involved in the Value Engineering Changes under the Swisslog/empirical Agreement.

13.   **The Continuing Impacts of Value Engineering Changes.**  The Value Engineering Changes eliminated many functions empirical initially requested, such as automated blast freezing and storage capacity in both the pallet and mini-load sections of the ASRS systems.  These functions and operations were eliminated at empirical's request, in order to align the costs of the ASRS System with empirical's overall budget for the Freezer Facility and they resulted in an ASRS System, with fewer functions and operations than empirical originally sought.  After installation of the ASRS System began, empirical required Swisslog to add back many of the functions and operations that had been deleted through Value Engineering Changes. Many of the additional functions and operations that had been deleted by Value Engineering Changes, only to be added back after installation began, were not

documented by Swisslog and empirical.   Nor were the Contract Documents contemporaneously adjusted for the cost and time impacts from adding back these functions and operations.

14.   **The Swisslog Specifications.**   The initial design and technical specifications for the ASRS System about which empirical now complains, were developed under the Swisslog/empirical Agreement.  It was empirical, not Primus, who reviewed, approved, accepted and adopted the technical specifications for the design, operation and functionality of the ASRS System.   These technical specifications are set forth in a 250 page document, entitled "Swisslog Proposal 4720, Version 5, dated August 30, 2016" and are referred to herein as the Swisslog Specifications.  The Swisslog Specifications were later adopted into the tri-party contractual arrangement and served as the basis for the design, furnishing and installation and commissioning of the ASRS System and provided criteria for testing its performance.

15.   **Contract Negotiations**.  In accordance with its original contracting scheme, empirical negotiated one contract with Swisslog to supply, install and commission the ASRS System and a second contract with Primus to construct the Freezer Facility.  Primus did not participate in the negotiation of contract terms between empirical and Swisslog.  Similarly, Swisslog did not participate in the negotiation of contract terms between empirical and Primus.  Empirical ultimately

presented Primus with fully negotiated contract terms and a completed design and directed Primus to enter into a contract with Swisslog on behalf of empirical. Primus had no opportunity to negotiate any independent contract terms with Swisslog.

16.     **2016 – The New Contracting Scheme**. After empirical had negotiated and agreed upon terms under separate contracts with Swisslog and Primus, empirical elected to change its contracting scheme. Empirical abandoned its original plan of entering into a direct contract with Swisslog to provide the ASRS System designed and specified under the Swisslog/empirical Agreement. In June of 2016, empirical requested Primus to execute (on behalf of empirical) the contract that empirical had negotiated with Swisslog to provide the ASRS System while simultaneously executing a contract with Primus to construct the Freezer Facility.

17.     **Base Contract for Project BPI**. Primus, on behalf of empirical, executed the "Base Contract for Project BPI," dated September 2, 2016, ("Base Contract") with Swisslog, thereby creating a tri-party agreement. The Base Contract was executed in reliance upon the Swisslog Specifications prepared under the Swisslog/empirical Agreement providing a complete and final design for the ASRS System. Consequently, the Base Contract incorporated the Swisslog Specifications prepared under the Swisslog/empirical Agreement, and required Swisslog to design and manufacture the equipment, develop the software, and then install, test, commission and integrate the software and equipment for the ASRS System in

accordance with the Swisslog Specifications. The Base Contract further required that the performance and functionality of the ASRS System be evaluated based upon criteria identified by the Swisslog Specifications. A true and correct copy of the Base Contract inclusive of Exhibits I thru V, is attached hereto as Exhibit "C".

18. **GMS Contract**. Primus next executed the "Guaranteed Maximum Sum Contract," dated September 2, 2016, ("GMS Contract") with empirical in reliance upon the Base Contract negotiated by empirical and the design and Swisslog Specifications for the ASRS System prepared under the Swisslog/empirical Agreement. Article 25 of the GMS Contract expressly recognizes the tri-party Base Contract as "that certain Contract for Owner, dated concurrently herewith, by and among Owner [empirical], Builder [Primus] and Swisslog." Since the Base Contract was executed on behalf of empirical, the GMS Contract incorporates the Base Contract and the Swisslog Specifications, requires Swisslog to provide an ASRS System in accordance with the Swisslog Specifications, and requires the performance and functionality of the ASRS System be evaluated in accordance with the Swisslog Specifications. A true and correct copy of the GMS Contract with partial Exhibits A thru I is attached hereto as Exhibit "D".

19. **The Contract Documents**. The ASRS System was therefore to be designed and installed by Swisslog in accordance with a variety of contract documents, including the GMS Contract, the tri-party Base Contract, the Swisslog

Specifications, and other documents identified and incorporated therein, including Exhibits "A" through "I" as identified in these contracts (collectively the "Contract Documents"). In this regard, Article 25 of the GMS Contract provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all." Consequently, all Contract Documents must be read and interpreted in conjunction and equally with each other, without giving preference to the GMS Contract as is now alleged by empirical.

20. **Blurred Lines of Authority**. Despite the new contracting scheme and subsequent Base Contract, ostensibly between Swisslog and Primus, empirical continued to deal directly with Swisslog concerning the ASRS System just as they had done under the Swisslog/empirical Agreement. From 2016 through 2019, empirical conducted various meetings, discussions, and negotiations directly with Swisslog, during which, empirical and Swisslog made changes to the design of the ASRS System, the Swisslog Specifications, and the Contract Documents. Many of these transactions were conducted without participation by Primus who only later was informed of the decisions and changes reached directly between Swisslog and empirical.

21. **Changes to the ASRS System Development**. Development of the ASRS System was intended to proceed in a sequential manner that would allow for proper integration of the material handling equipment with the Swisslog Software

package as follows:

    i.)     Design of the ASRS System;

    ii.)    Development of the Swisslog Software;

    iii.)   Manufacturing of the material handling equipment;

    iv.)    Installation of the material handling equipment;

    v.)     Factory acceptance of the Swisslog Software;

    vi.)    Integration testing of the material handling equipment;

    vii.)   Deployment of the Swisslog Software;

    viii.)  Completion of the ASRS System;

    ix.)    Provisional acceptance testing of the ASRS System;

    x.)     Acceptance of the ASRS System; and

    xi.)    Commissioning and debugging of the ASRS System.

Empirical and Swisslog deviated from the planned development of the ASRS System in multiple respects, including but not limited to: a.) failing to agree upon functional specifications for the ASRS System software prior to execution of the Contract Documents, b.) deleting factory acceptance testing, c.) deploying ASRS System software prior to integration testing of the material handling equipment, and d.) failing to agree upon a definition for completion of the ASRS System.  Upon information and belief, the cumulative effects of these changes to the ASRS System supports and requires an adjustment of the substantial completion date under the

Contract Documents until the Winter of 2020, if not later.

22. **Changes to the Swisslog Software**.  Empirical and Swisslog made multiple changes to the ASRS System software thereby changing the Swisslog Specifications and standard software package after execution of the Contract Documents.  Those changes to the ASRS System which are currently known to Primus include:

i.)     Stack Induction: New RF mobile application functionality;

ii.)    Dump Station: New SynQ screen for dump locations;

iii.)   Rework Reject: New SynQ screen to rework/reject pallet information;

iv.)    Blast Freezer Pick-Up: New blast freezer functionalities;

v.)     Shipping: New shipping functionalities;

vi.)    Goods-to-Person Workstation: New SynQ screens for GTP;

vii.)   Task Management: New SynQ cockpit dashboards;

viii.)  Functional Specification Rewrite: rewriting and confirming the new functional specification;

ix.)    Host Interface Contacts Addition: New host interface messages;

x.)     Host Interface finProd Updates: New host interface changes;

xi.)    Palletizer Development, Install, and Testing: pushing the palletizer install and testing to occur after GO LIVE; and

xii.)   Palletizer: Palletizer end-effector changes based around new egg-shell sheets.

Upon information and belief, the cumulative effects of these software changes supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

23.   **2017 – Changes to the Contract Documents**.  After the GMS Contract was executed, and throughout 2017, empirical and Swisslog made changes to the Contract Documents that impacted completion of the ASRS System, including but not limited to:

i.)   In August of 2017, Swisslog submitted a functional specification to empirical based upon the Swisslog Specifications and standard software package for the ASRS System;

ii.)   On September 17, 2017, empirical and Swisslog met in Newport News, Virginia during which empirical requested modifications to the standard software package identified with the functional specification;

iii.)   On October 17, 2017, empirical and Swisslog met in Shippensburg, Pennsylvania to inspect an ASRS System completed by Swisslog at a facility operated by Schreiber Foods; and

iv.)   Following the October 17, 2017, site visit between Swisslog and empirical, additional changes were made to the standard software

package and Swisslog Specifications.

Upon information and belief, the cumulative effects of these changes to the Contract Documents supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

24. **2018 – More Changes to the Contract Documents.** Empirical continued to deal directly with Swisslog throughout 2018, making further changes to the Contract Documents that impacted completion of the ASRS System, including but not limited to:

i.) On January 10 through 11, empirical and Swisslog deleted the factory acceptance test ("FAT") for the software supporting the ASRS System;

ii.) Deletion of the FAT changed both the Swisslog Specifications and the Base Contract and eliminated a test that would have revealed the alleged software defects about which empirical now complains;

iii.) On February 5, 2018, Swisslog submitted a functional software specification reflecting the software changes required by empirical which differed from and made changes to the Swisslog Specifications;

iv.) On February 6, 2018, Swisslog informed empirical (who did not

object) that the completion date for the ASRS System under the revised Swisslog Specifications would be extended until August 30, 2018;

v.)   In April of 2018, Swisslog and empirical agreed the completion date for revised, customized software supporting the ASRS System would be extended until July 6, 2018, and substantial completion of the ASRS System extended until August 16, 2018;

vi.)   On May 4, 2018, empirical presented Primus with a change order to the GMS Contract reflecting the agreement reached directly between empirical and Swisslog in April 2018; and

vii.)   On November 21, 2018, Swisslog informed empirical (who once again did not object) that the completion date for the ASRS System under the revised Swisslog Specifications would be extended until December 10, 2018.

Upon information and belief, the cumulative effects of these changes to the Contract Documents supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

25.   **2019 – Still More Changes to the Contract Documents.**   Empirical continued to deal directly with Swisslog throughout 2019, making even further changes to the Contract Documents that impacted completion of the ASRS System,

including but not limited to:

    i.)    Between August 2018 and March 2019, empirical made 13 changes to the GMS Contract, many of which changed the operation and functionality of the ASRS System under the Base Contract;

    ii.)    On March 22, 2019, Swisslog informed empirical (who did not object) that the ASRS System was complete and ready to "go live" as of April 15, 2019;

    iii.)    On March 27, 2019, Swisslog informed empirical that the ASRS System satisfied the provisional acceptance test ("PAC Test") under the performance standards established by the Swisslog Specifications;

    iv.)    On April 11, 2019, empirical, with support from Primus, informed Swisslog the ASRS System did not satisfy the PAC Test under the revised Swisslog Specifications;

    v.)    On April 18, 2019, Swisslog informed empirical (who did not object) the ASRS System was complete and ready for end to end testing on April 22, 2019, based upon the revised Swisslog Specifications;

    vi.)    On April 26, 2019, Swisslog informed empirical (who once again

-18-

did not object) the ASRS System was complete and ready for end

to end testing on April 29, 2019, based upon the revised Swisslog

Specifications;

vii.) On May 14, 2019, Swisslog informed empirical (who once again

did not object) the ASRS System was to be completed no later

than May 27, 2019, based upon the revised Swisslog

Specifications; and

viii.) On July 29, 2019, Swisslog informed empirical the ASRS

System could be tested, commissioned and debugged no later

than November 16, 2019, based upon the revised Swisslog

Specifications.

Between the dates stated in the subparagraphs above, empirical directed further

changes to the functionality of the ASRS System.  Upon information and belief, the

cumulative effects of these changes to the Contract Documents supports and requires

an adjustment of the substantial completion date under the Contract Documents until

the Winter of 2020, if not later.

26.   **Testing the ASRS System.**   Swisslog claims the ASRS System

installed at the Freezer Facility, the design of which was approved, reviewed and

revised by empirical, meets or exceeds the initial testing requirements under the

Contract Documents and is therefore substantially complete.  According to Swisslog,

the ASRS System met the requirements of both a second "provisional acceptance test" and "trial operational testing" no later than July 23 through July 24 of 2019. Swisslog has also indicated that empirical refused to observe, participate or approve the testing performed upon the ASRS System by Swisslog or to otherwise accept the ASRS System as being substantially complete.

27.   **Disputes Over Substantial Completion**.   Despite making numerous changes to the ASRS System development, ASRS System software, Contract Documents, and the Swisslog Specifications, empirical and Swisslog never reached an agreement over defining criteria for establishing achievement of substantial completion of the ASRS System.   On the one hand, empirical contends the ASRS System is incomplete and defective, the delayed completion is inexcusable, and the ASRS System will not be complete until fully functional, operational and debugged. On the other hand, Swisslog contends the ASRS System is substantially complete and ready for testing and commissioning, delayed completion is excusable, and operational and functionality issues must be resolved post substantial completion during testing, commissioning and debugging.   Empirical and Swisslog therefore disagree over whether the ASRS System is substantially complete and this disagreement reached its breaking point on August 1, 2019, when empirical banned Swisslog from the Freezer Facility.

28.   **Notice of Termination of the Contracts**.   On August 8, 2019,

empirical notified Primus that it considered the ASRS System to be defective and incomplete and purported to terminate both the GMS Contract and Base Contract. Since the date of the purported termination, the Parties have discussed various options for making the ASRS System operational, including testing, commissioning and debugging by Swisslog or takeover by a third-party vendor. Throughout these discussions, empirical continued to claim the ASRS System was defective and incomplete—while Swisslog continued to claim the ASRS System was substantially complete and ready for testing and commissioning. Whichever entity was correct, throughout these discussions the Parties acknowledged the only practical commercial solution was for Swisslog to make the ASRS System operational with empirical's cooperation.

29. **Settlement Agreement**. Between October 14th and 18th of 2019, senior representatives of the Parties discussed a global settlement of all disputes regarding the ASRS System. On October 18, 2019, representatives of the parties met in person at empirical's principal office in Dakota Dunes, South Dakota and agreed upon the settlement of all disputes, including the following material terms ("Settlement Agreement"):

i.) Swisslog would debug the software to support the ASRS System, including all changes and deviations to the Contract Documents required by empirical no later than December 2, 2019;

-21-

ii.)   Swisslog would test, commission and debug the ASRS System and turn it over to empirical no later than March 27, 2020;

iii.)   Primus would establish and deposit $500,000.00 into an escrow account to ensure Swisslog would debug the ASRS System;

iv.)   Swisslog would reduce its contract amount by $1 million with a corresponding credit issued to empirical;

v.)   The contractual cap of $1 million upon liquidated damages against Swisslog would be removed;

vi.)   Swisslog would provide one (1) year of software support to empirical free of charge;

vii.)   All Parties agreed that the operation of the ASRS System was critical; and

viii.)   All disputes between the Parties would be resolved so long as the Parties performed under the Settlement Agreement.

At the close of the meeting on Friday, October 18, 2019, after the settlement was agreed upon, empirical requested and Swisslog agreed to submit a schedule and "road map" for operation of the ASRS System. Swisslog originally anticipated submitting the information to empirical on October 21, 2019; however, Swisslog required additional time to assemble the schedule and "road map." The information requested by empirical was submitted by Swisslog on Tuesday, October 22, 2019,

and further supplemented as requested by empirical on Wednesday October 23, 2019.

30.   **Empirical's Conflicting Positions**.  Unbeknownst to Primus, as the Parties agreed upon the settlement of all disputes regarding the ASRS System on October 18, 2019, counsel for empirical was filing the complaint giving rise to this lawsuit.  As Swisslog prepared, submitted and supplemented the schedule and "road map" as requested by empirical on October 22 and 23, 2019, the lawsuit had already been filed by empirical.  Not only has empirical reneged upon the Settlement Agreement by filing this lawsuit, it now disavows the only commercially practical solution for operation of the ASRS System.  Upon information and belief, empirical now contends the Swisslog software must be abandoned and the entire $14 million ASRS System, both equipment and software, must be removed and replaced.

31.   **The Complaint**.  Having reneged on the Settlement Agreement, empirical now attempts to assert various claims and allegations in its Complaint that Primus is responsible for alleged defects in the operation and functionality of the software supporting the ASRS System without regard to various acts and omissions on the part of empirical including: (i.) empirical's background due diligence research on Swisslog and the selection, approval and eventual mandate to Primus to execute, on behalf of empirical, the tri-party Base Contract with Swisslog, (ii.) the development of the ASRS System design and Swisslog Specifications under the

Swisslog/empirical Agreement, (iii.) empirical's review, approval, acceptance and adoption of the Swisslog Specifications defining operation and functionality of the ASRS System, (iv.) the negotiation of the Base Contract between Swisslog and empirical, (v.) the execution of the tri-party Base Contract with Swisslog, with Primus executing on behalf of empirical, (vi.) the incorporation of the Base Contract and Swisslog Specifications into the GMS Contract, (vii.) empirical's agreement to evaluate the operation and functionality of the ASRS System in accordance with the Swisslog Specifications, (viii.) Swisslog's and empirical's changes to the ASRS System development, ASRS System software, Contract Documents, and Swisslog Specifications, without contemporaneous involvement by Primus, (ix.) the inability of empirical to integrate the empirical Software or ERP with the Swisslog Software or SynQ to satisfy empirical's wants and needs, and (x.) empirical's agreement for a global settlement of all disputes regarding the ASRS System.  Upon information and belief, the cumulative impact of these acts and omissions on the part of empirical imposed major impacts upon operation and functionality of the ASRS System, delayed completion of the ASRS System, and caused and created the alleged damages now sought by empirical.

## CLAIMS

### COUNT I
### Breach of the Settlement Agreement

32.     **Common Allegations**.  Primus incorporates herein by reference the

allegations from paragraphs 1 through 31 into Count I.

33.   **Duty**.   The Parties reached an oral Settlement Agreement on October 18, 2019, under which all disputes arising from the ASRS System would be resolved based upon definitive commercial terms.

34.   **Breach**.   If and to the extent Swisslog caused empirical to renege upon the Settlement Agreement, then Swisslog breached the Settlement Agreement by failing to perform its duties and obligations thereunder.

35.   **Causation**.   If Primus is found liable to empirical for damages under the Complaint that would have been otherwise barred by the Settlement Agreement, such liability would result directly from a breach of the Settlement Agreement by Swisslog.

36.   **Damages**.   Swisslog is responsible for all costs and damages assessed against Primus that would have otherwise been barred by the Settlement Agreement as well as costs and attorney's fees incurred by Primus in association with such claims.

37.   **Conditions Precedent**.   Primus has performed all conditions precedent and substantially performed its duties and obligations under the Settlement Agreement or has otherwise been excused from all conditions precedent based upon

the acts and omissions of Swisslog.

## COUNT II
## Breach of Contract

38.   **Common Allegations**.  Primus incorporates herein by reference the allegations from paragraphs 1 through 31 into Count II.

39.   **Duty**.  Swisslog undertook various express duties and obligations to design, manufacture, install, test, and commission the ASRS System in accordance with the Base Contract ostensibly between Swisslog and Primus, including the Swisslog Specifications incorporated into the Contract Documents.

40.   **Breach**.  If and to the extent the allegations within the Complaint filed by empirical are proven to be true, then Swisslog breached its express duties and obligations under the Base Contract, including to the extent Swisslog has violated or otherwise deviated from the Swisslog Specifications incorporated into the Contract Documents.

41.   **Causation.**  If Primus is found liable to empirical for damages under the Complaint, such liability would result directly from the acts and omissions of Swisslog in breaching its express duties and obligations under the Base Contract, ostensibly executed between Swisslog and Primus.

42.   **Damages.**  Primus is entitled to recover against Swisslog all costs and damages assessed against Primus under the Complaint plus all costs, expenses and attorney's fees incurred by Primus in association with such claims and including

prejudgment interest.

43.   **Conditions Precedent.**  Primus has performed all conditions precedent and substantially performed its duties and obligations under the Base Contract or has otherwise been excused from all conditions precedent based upon the acts and omissions of Swisslog.

<div align="center">

**COUNT III**
**Breach of Duty of Good Faith & Fair Dealing**

</div>

44.   **Common Allegations**.  Primus incorporates herein by reference the allegations from paragraphs 1 through 43 into Count III.

45.   **Duty**.  Swisslog had an implied duty of good faith and fair dealing when designing, manufacturing, and developing/deploying software, and when installing, testing, and commissioning the ASRS System for the Freezer Facility.

46.   **Breach**.  If and to the extent the allegations within the Complaint filed by empirical are proven to be true, then Swisslog breached its implied duty of good faith and fair dealing by failing to deliver a functioning and operational ASRS System that met the requirements of empirical, including all deviations from the Base Contract and the Contract Documents.

47.   **Causation**.  If Primus is found liable to empirical for damages under the Complaint, such liability would result directly from the acts and omissions of Swisslog in breaching its implied duty of good faith and fair dealing.

48.   **Damages.**  Primus is entitled to recover against Swisslog all costs and

damages assessed against Primus under the Complaint as well as all costs and attorney's fees incurred by Primus in association with such claims and all corresponding prejudgment interest.

### COUNT IV
### Unjust Enrichment

49.   **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 48 into Count IV.

50.   **Overpayment**.   If and to the extent the allegations within the Complaint filed by empirical are proven to be true, and the ASRS System is not substantially complete and does not comply with the Contract Documents, then Swisslog has been paid nearly $14,200,000 for an ASRS System that fails to meet the justifiable expectations or requirements of empirical and Primus.  Under such circumstances, it would be inequitable, unjust, unfair, unconscionable, or otherwise improper to permit Swisslog to receive and retain the benefit of these payments.

51.   **Causation**.  If Primus is found liable to empirical for damages and costs and expenses under the Complaint, such liability is the direct and proximate result of Swisslog's unjust enrichment.

52.   **Damages.**  Primus is entitled to recover against Swisslog all costs and damages assessed against Primus under the Complaint as well as all costs, expenses and attorney's fees incurred by Primus in association with such claims, all due to

Swisslog's unjust enrichment.

<div align="center">

**COUNT V**
**Breach of Warranty**

</div>

53.   **Common Allegations**.  Primus incorporates herein by reference the allegations from paragraphs 1 through 52 into Count V.

54.   **Warranty**.  Swisslog furnished an express warranty to "remedy any defect in the Works [ASRS System] resulting from faulty design, materials or workmanship."

55.   **Breach**.  If and to the extent the allegations within the Complaint filed by empirical are proven to be true, and the ASRS System is not substantially complete or does not comply with the Contract Documents, then Swisslog breached its express warranty by failing to timely deliver a functioning ASRS System free from faulty design, materials and workmanship.

56.   **Causation**.  If Primus is found liable to empirical for damages under the Complaint, such liability would result directly from the acts and omissions of Swisslog in breaching its express warranty under the Base Contract.

57.   **Damages**.  Swisslog is responsible for all costs and damages assessed against Primus under the Complaint as well as all costs and attorney's fees incurred

by Primus in association with such claims.

<div align="center">

**COUNT VI**
**Fraud – Pre-Contract**

</div>

58.   **Common Allegations**.   Primus incorporates herein by reference the allegations from paragraphs 1 through 31 into Count VI.

59.   **Representations.**   Swisslog made various representations of existing material fact and/or promises of future performance regarding the design, operation, functionality and completion of the ASRS System prior to September 2, 2016, seeking to induce Primus to enter into the Base Contract, including but not limited to, the following:

i.)   The ASRS System design and Swisslog Specifications prepared under the Swisslog/empirical Agreement identified a fully functional and operational ASRS System;

ii.)   Swisslog had available and would provide software engineers and technicians with the requisite skill and technical ability to design, manufacture, install and commission the ASRS System defined within the Swisslog Specifications;

iii.)   Swisslog had reached an agreement with empirical regarding the operation and functionality characteristics of the ASRS System imposed by empirical;

iv.)   The Swisslog Specifications would not be changed or modified

without the express written consent of Primus;

v.)   The Swisslog Specifications met or exceeded the operation and functionality requirements imposed by empirical;

vi.)   The ASRS System satisfied the requirements of the Contract Documents; and

vii.)   Swisslog would complete the ASRS System based upon the Swisslog Specifications on or before December 13, 2017.

60.   **Reliance.**  Swisslog made these representations with the intent that Primus would rely on them and for the purpose of inducing Primus to enter into the Base Contract and Primus reasonably relied, to its detriment, upon the representations made by Swisslog when executing the Base Contract with Swisslog and the GMS Contract with empirical.

61.   **Scienter.**  If and to the extent the allegations in the Complaint are proven to be true, and the ASRS System is not substantially complete and does not comply with the Contract Documents, Swisslog's representations were false.  With respect to Swisslog's statements of *existing* material fact, if and to the extent various of the allegations within the Complaint are proven to be true, then Swisslog either knew its statements of existing material fact were false and misleading when made, or it made the representations recklessly without knowledge of their truth and as a positive assertion.  With respect to Swisslog's promises of *future* material fact, if

and to the extent various of the allegations in the Complaint are proven to be true, then Swisslog made such representations with respect to future events that were within its control, and it either made the representations fraudulently with the intent to deceive Primus, or it purported to have special knowledge that Primus did not likewise have with respect to the ASRS System and Swisslog's representations related thereto, and/or Swisslog had a special reason to expect that Primus would rely on Swisslog's representations.

62. **Proximate Cause.** If Primus is found liable to empirical for damages under the Complaint and/or defects within the ASRS System, the direct and proximate cause of such liability results from the fraudulent misrepresentations made by Swisslog prior to execution of the Contract Documents.

63. **Damages.** Primus is entitled to recover against Swisslog all costs and damages assessed against Primus caused by the untrue and fraudulent misrepresentations Swisslog made to Primus, plus all costs, expenses and attorney's fees incurred by Primus in association with empirical's claims, and punitive damages so as to deter similar future conduct.

## COUNT VII
## Fraud – Post Substantial Completion

64. **Common Allegations**. Primus incorporates herein by reference the allegations from paragraphs 1 through 31 into Count VII.

65. **Representations.** Swisslog made various representations of existing

material fact and/or promises of future performance regarding the operation, functionality and substantial completion of the ASRS System between December 13, 2017 and October 17, 2019, seeking to induce Primus to allow Swisslog to continue with the installation and commissioning of the ASRS System, including but not limited to, the following:

i.)     Swisslog would not remove or otherwise relieve key personnel from development and deployment of software required to support the ASRS System;

ii.)    On February 6, 2018, Swisslog represented the ASRS System would be completed by August 30, 2018;

iii.)   On November 21, 2018, Swisslog represented the ASRS System would be completed by December 10, 2018;

iv.)    On March 27, 2019, Swisslog represented that the ASRS System had passed the PAC Test;

v.)     On April 18, 2019, Swisslog represented that the ASRS System would be ready for end-to-end testing on April 22, 2019;

vi.)    On April 26, 2019, Swisslog represented the ASRS System would be ready for end-to-end testing starting April 29, 2019;

vii.)   On May 8, 2019, Swisslog represented that the ASRS System would be ready for end-to-end testing starting May 13, 2019;

viii.)   On May 14, 2019, Swisslog represented the ASRS System would

be tested and commissioned by May 27, 2019; and

ix.)   On July 29, 2019, Swisslog represented the ASRS System would

be tested and commissioned by November 26, 2019.

66.   **Reliance**.   Swisslog made these representations with the intent that
Primus would rely on them and for the purpose of inducing Primus to allow Swisslog
to continue with installation and commissioning of the ASRS System and Primus
reasonably relied, to its detriment, upon the representations Swisslog made by
allowing Swisslog to continue with installation and commissioning work and
devoting Primus' own resources to the completion of the ASRS System, and which
has in turn resulted in this lawsuit.

67.   **Scienter**.   If and to the extent the allegations in the Complaint are
proven to be true, and the ASRS System is not substantially complete and does not
comply with the Contract Documents, Swisslog's representations were false.   With
respect to Swisslog's statements of existing material fact, if and to the extent various
of the allegations within the Complaint are proven to be true, then Swisslog either
knew its statements of existing material fact were false and misleading when made,
or it made the representations recklessly without knowledge of their truth and as a
positive assertion.   With respect to Swisslog's promises of future material fact, if
and to the extent various of the allegations in the Complaint are proven to be true,

then Swisslog made such representations with respect to future events that were within its control, and it either made the representations fraudulently with the intent to deceive Primus, or it purported to have special knowledge that Primus did not likewise have with respect to the ASRS System and Swisslog's representations related thereto, and/or Swisslog had a special reason to expect that Primus would rely on Swisslog's representations.

68.   **Proximate Cause**.  If Primus is found liable to empirical for damages under the Complaint, the proximate cause of such liability results from Swisslog's fraudulent representations inducing Primus to allow Swisslog to continue with the completion, testing and commissioning of the ASRS System.  Swisslog's fraudulent representations also proximately caused Primus to incur substantial additional and unexpected costs and expenses in connection with permitting Swisslog to continue its performance of work.

69.   **Damages.**  Primus is entitled to recover against Swisslog all costs and damages assessed against Primus that are caused by Swisslog's fraudulent misrepresentations, all costs and attorney's fees incurred by Primus in association with this dispute and lawsuit, as well as Primus' own substantial and additional expenses associated with permitting Swisslog to continue its performance of work, and punitive damages so as to deter similar future conduct.

-35-

## COUNT VIII
### Indemnity

70.     **Common Allegations**.  Primus incorporates herein by reference the allegations from paragraphs 1 through 69 into Count VIII.

71.     **Indemnity Obligation**.  Swisslog has a legal duty to indemnify Primus for all costs and damages resulting from its acts and omissions during the design, manufacture, installation, testing, and commissioning of the ASRS System.

72.     **Causation**.  If Primus is found liable to empirical for damages under the Complaint for defects within the ASRS System, then Swisslog is obligated to indemnify Primus to the extent such damages are attributable to acts and omissions on the part of Swisslog.

73.     **Damages.**  Primus is entitled to recover against Swisslog all costs and damages assessed against Primus caused by the acts and omissions of Swisslog as well as all costs, expenses and attorney's fees incurred by Primus in association with empirical's claims.

### RELIEF SOUGHT

WHEREFORE, Defendant and Third-Party Plaintiff Primus prays as follows:

a.     Entry of judgment against Swisslog for recovery of all damages assessed against Primus under the Complaint, recovery of additional and unexpected costs and expenses incurred by Primus in connection with Swisslog's continued performance of work in excess of what would have been incurred if Swisslog had

complied with its obligations, and all pre-judgment interest, all post-judgment interest, all costs and attorney's fees, and punitive damages to deter any future tortious conduct on the part of Swisslog; and

b.      Such further and other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Third-Party Plaintiff Primus Builders, Inc. respectfully requests a trial by jury on all claims triable under the Third-Party Complaint, to be held in Omaha, Nebraska.

Dated this 7th day of January, 2020.

> *s/ Joel D. Heusinger*
> Joel D. Heusinger, Neb. No. 18326
> Kari A.F. Scheer, Neb. No. 24870
> Woods Aitken LLP
> 301 South 13th Street, Suite 500
> Lincoln, NE 68508-2578
> Telephone:      (402) 437-8500
> Fax:             (402) 437-8558
> jheusinger@woodsaitken.com
> kscheer@woodsaitken.com

STEPHEN L. WRIGHT
Georgia Bar No. 778747, *pro hac vice motion pending*
JEFFREY J. NIX
Georgia Bar No. 544776, *pro hac vice motion pending*
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone:   (770) 434-6868
Facsimile:   (770) 434-7376
swright@taylorenglish.com
jnix@taylorenglish.com

*Counsel for Defendant and Third-Party Plaintiff Primus Builders, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of January, 2020, I electronically filed the

foregoing **THIRD-PARTY COMPLAINT & DEMAND FOR JURY TRIAL**

with the Clerk of Court using the CM/ECF system which will automatically send e-

mail notification to the following counsel of record:

J. Daniel Weidner, Esq.
John V. Matson, Esq.
Koley Jessen PC, LLO
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, Nebraska 68124-1079
daniel.weidner@koleyjessen.com
john.matson@koleyjessen.com
*Counsel for Plaintiff*

J. Erik Connolly, Esq.
Nicole E. Weigley, Esq.
Kathryn E. Clausing, Esq.
Benesch, Friedlander, Coplan
& Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
econnolly@beneschlaw.com
mwrigley@beneschlaw.com
kclausing@beneschlaw.com
*Counsel for Plaintiff*

*s/ Joel D. Heusinger*
Joel D. Heusinger

01658317

-39-

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

EMPIRICAL FOODS, INC.     )
                                )
           Plaintiff,    )
                                )
     v.                  )     **COMPLAINT AND DEMAND**
                                )        **FOR JURY TRIAL**
PRIMUS BUILDERS, INC.,    )
                                )
          Defendant.    )
                                )
                                )

Plaintiff empirical foods, inc., ("empirical"), for its Complaint against Defendant, Primus Builders, Inc. ("Primus"), states and alleges as follows:

## PARTIES

1.     empirical is a Nebraska corporation with its principle place of business at 891 Two Rivers Drive, Dakota Dunes, South Dakota. empirical is a privately held corporation.[1]

2.     Primus is a Georgia corporation with its principle place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia. Primus transacts business in the state of Nebraska. Primus is a privately held corporation.

## JURISDICTION & VENUE

3.     This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332. This is a civil action between a Nebraska corporation with its principal place of business in South Dakota and a Georgia corporation with its principal place of business in Georgia. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.     This court has personal jurisdiction over Primus because a substantial part of the events giving rise to the Complaint took place in Nebraska. Specifically, Primus performed the

---

[1] At the time it entered into the GMS Contract (as defined below), empirical was known as Beef Products, Inc.


Exhibit A

work that is the subject matter of this dispute at empirical's facility in South Sioux City, Nebraska. empirical has also incurred damages from Primus's breaches in Nebraska.

5.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Complaint occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because there is no other district in this State in which this action may be brought and Primus is subject to this Court's personal jurisdiction.

6.      The GMS Contract (defined below), which is the basis for this lawsuit, also includes an applicable law provision. Paragraph 32 states that the "terms and provisions of this Contract shall be construed in accordance with the laws of the state in which the New Facility is to be situated." Exhibit 1 at ¶ 32. As established by the GMS Contract, the site for the New Facility is in Nebraska. *Id.* at Ex. C.

## FACTUAL BACKGROUND

7.      empirical and its related entities produce and sell a number of beef products, including Lean Ground Beef; boxed beef produced under Two Rivers Chophouse, Two Rivers Certified Tender, and Two Rivers Reserve trademarks; as well as Dos Rios Taco Meat and other fully cooked meats.

8.      The boxed beef business is based on purchase and sale of both fresh and frozen beef in "primal" form or sized portions. In support of its boxed beef business, empirical relies on and requires both freezer facilities (for frozen products) and cooler facilities (for fresh/non-frozen products). In 2016, in order to better support those operations and eliminate business risks associated with third-party handling and/or storage of its products, empirical sought to build a new freezing facility to handle its increasing inventory and its growing business—the New Facility.

9.      empirical considered a number of contractors to construct the New Facility. It ultimately decided to give the work to Primus, based on Primus's assurances it could construct the type of facility needed by empirical, and its assurances that sub-contractors like Swisslog could deliver the crucial automated distribution system needed for empirical's business.

10.     On or about September 2, 2016, empirical and Primus entered a Guaranteed Maximum Sum Contract ("GMS Contract") where, among other things, Primus agreed to design and construct a freezer building and a cooler building (collectively, the "New Facility") to add to empirical's existing meat packing facility (consisting of various intake facilities, processing facilities, refrigeration and freezer facilities, and shipping areas). A true and correct copy of the GMS Contract is attached hereto and incorporated herein as Exhibit 1.

11.     Under the GMS Contract, the parties agreed that the maximum sum that empirical would be obligated to pay Primus for performance under the agreement was $33,845,991 (the "Guaranteed Maximum Sum"). As a result of Change Orders agreed to between the parties, the guaranteed maximum sum under the agreement was increased to $35,534,824.80.

12.     Pursuant to the GMS Contract, Primus agreed to "furnish reasonable skill and judgment in furthering the interests of [empirical] to build the New Facility," and to "furnish efficient business administration and superintendence and to use reasonable efforts at all times to cause the Work . . . to be performed in a sound, expeditious and economical manner consistent with the interests of [empirical]." Exhibit 1 at ¶ 1.

13.     Pursuant to Paragraph 2(a) of the GMS Contract, Primus agreed that it would be "responsible for the acts and omissions of all parties retained by, through or under [Primus] in connection with the design and construction of the Work."

3

14.     In order to complete its work under the GMS Contract, Primus retained a number of subcontractors to perform work at the New Facility. Primus retained Primus Design Services, LLC to perform the design services required to build the New Facility. Primus also retained Swisslog Logistics, Inc. ("Swisslog") to perform the design and construction of the automatic components, the cranes, the racking, and associated support for a complete operation system to be installed in the New Facility. empirical and Primus agreed that the Guaranteed Maximum Sum included all fees payable by Primus to Swisslog, which were in the amount of $14,200,000. As a result of Change Orders agreed to between the parties, the amount to be paid to Swisslog under the agreement was increased to $15,743,940.16.

15.     Swisslog's duties and responsibilities for the New Facility were governed by the Base Contract for Project empirical entered into by Primus and Swisslog on September 2, 2016 ("Base Contract").

16.     Swisslog was contracted by Primus to design, furnish, install, and commission the New Facility's automated distribution facility, including automated storage and retrieval systems ("the System"). Swisslog's commissioning obligations included constructing and testing the entire System. This is the most crucial part of the New Facility that empirical required for its business. The New Facility was designed to operate in a very "automated" fashion with very limited handling of boxes or pallets of product manually by individual workers or by workers using forklifts. The storage box is constructed in a very efficient configuration with product moved and stored without manual involvement by individuals or forklifts. Such a design and configuration is critical to allow the New Facility's computer-based warehouse management system to coordinate product storage and retrieval with limited manual intervention and greatly limits the physical building space, equipment, and human resources needs of the operation.

4

17.     Pursuant to Paragraph 2(a) of the GMS Contract, the term "Work" is defined as "the construction of the New Facility, all in accordance with the plans and specifications set forth on Exhibit A attached [to the GMS Contract] (the "Plans and Specifications").

18.     Pursuant to Paragraph 2(c) of the GMS Contract, Primus agreed to substantially complete construction of all of the Work on or before December 13, 2017.

19.     Under Paragraph 4 of the GMS Contract, empirical was responsible for paying Primus for any invoices submitted by Swisslog to Primus.  Primus would forward all Swisslog invoices to empirical, and empirical would pay Primus for the amount of such invoices, plus a fee for Primus.  Exhibit 1 at ¶ 4(f).  As a result, empirical paid $13,887,431.76 to Primus for Swisslog's work.

20.     Primus also provided a number of warranties under the GMS Contract.  Primus specifically warranted that "all Work done under this Contract shall be free of faulty materials and workmanship and agrees immediately upon discovery [of] such faulty materials or workmanship, or receiving notification from [empirical], to remedy, repair or replace all defects or imperfections which may appear as a result of faulty materials or workmanship, at any time, or from time to time, during a period beginning with commencement of construction of the Work and ending twelve months after the construction of the Work has been substantially completed."  Exhibit 1 at ¶ 6.

21.     This warranty also extended to the work of any subcontractors hired by Primus, including Swisslog: "The foregoing warranty of [Primus] applies to the remedy, repair or replacement of defects or imperfections which may appear as a result of faulty designs prepared by [Primus] and/or by any party retained by, through or under [Primus] in connection with the design of the Work." *Id.*

22.     Pursuant to Paragraph 21 of the GMS Contract, empirical and Primus agreed that if Primus did not substantially complete the Work within the time set forth in the GMS Contract, Primus would pay empirical liquidated damages in the amount of $3,000 per day for each day after sixty days after the date established for substantial completion that Primus has not substantially completed the work.

23.     On or about October 5, 2016, empirical, Primus and Swisslog participated in a project kickoff meeting.  From that date forward until August 8, 2019, Primus unsuccessfully attempted to complete the Work and obtain substantial completion as required by the GMS Contract.

24.     To date, Primus, along with Swisslog, has been unable to deliver what empirical contracted for—a functioning freezer facility and cooling facility necessary for its growing business.  The New Facility, as currently constructed, is not usable for empirical's business.  A crucial component of this is the failure of Swisslog to provide a functioning System.  It has now been more than a year and a half since the New Facility was to be completed pursuant to the terms of the GMS Contract.

25.     To date, Swisslog has entirely failed to achieve satisfactory testing results for the System, and thereby failed to achieve provisional acceptance or taking-over under the Base Contract between Primus and Swisslog.  The System as of today is incapable of performing as specified and of providing empirical with service free of defect as required and expressly promised by Primus and Swisslog.  Swisslog's failures include, but are not limited to:

        a.      Swisslog's failure to demonstrate the execution of sending raw materials for
                one production order for one production line;

        b.      Swisslog's failure to execute an entire empirical production schedule
                delivered to one production line;

6

c.    Swisslog's failure to execute an entire empirical production schedule delivered to multiple production lines;

d.    Swisslog's failure to execute one single-SKU sales order on a one-stop shipment;

e.    Swisslog's failure to execute one multi-SKU sales order on a one-stop shipment;

f.    Swisslog's failure to execute one multi-stop shipment with multiple sales orders containing multiple SKUs;

g.    Swisslog's failure to execute a full-days' worth of sales orders;

h.    Swisslog's failure to induct and/or retrieve one load of ground beef using ASN receiving into the System;

i.    Swisslog's failure to induct and retrieve full-pallet quantities of blast-freeze product;

j.    Swisslog's failure to induct and retrieve full-pallet quantities of KC Steak boxes without data errors;

k.    Swisslog's failure to induct and retrieve full-pallet quantities of taco meat, including failing to put the pallet on the conveyor to go to the cranes;

l.    Swisslog's failure to retrieve full-pallet quantities of finished steak boxes without data errors and crane errors;

m.    Swisslog's failure to induct one load of finished primals;

n.    Swisslog's failure to execute certain inventory adjustments, including the ability to split case for sample order;

o.    Swisslog's failure to execute a hard hold and hold release for pallets in the System;

p.    Swisslog's failure to execute a grade update for cooked and ground beef inventory;

q.    Swisslog's failure to correct UFOs from the induction process;

r.    Swisslog's failure to execute a full-days' worth of quality assurance and/or operational support orders; and

s.    Swisslog's failure to execute error recovery trials.

26. Primus has acknowledged in writing to empirical that Swisslog failed to obtain Go Live Takeover/Provisional Acceptance for Operational Use.

27. Primus's subcontractor Swisslog failed to meet the PAC requirements of the Base Contract between Primus and Swisslog.

28. Primus's subcontractor Swisslog was unable to establish demonstrable performance of the system as required by the Base Contract.

29. Primus breached the GMS Contract when its subcontractor Swisslog was unable to deliver the System required by the GMS Contract and Base Contract.

30. These material breaches were raised to Primus and Swisslog on a number of occasions, resulting in a Change Order amending the GMS Contract dated May 4, 2018. In addition, empirical notified Primus and Swisslog of additional failures and failure to achieve Provisional Acceptance and Operational Use of the New Facility and empirical's desire to receive assurances that the Work would be completed. Primus and Swisslog were given multiple opportunities to correct and complete the work. Yet despite additional time, Swisslog failed to provide sufficient and qualified personnel and the necessary resources to completely operationalize the entire System.

31. On July 5, 2019, empirical provided Primus and Swisslog with another notice of empirical's significant concerns regarding Primus's ability to complete the GMS Contract and Swisslog's ability to complete its scope of work under the Base Contract. Despite empirical's repeated attempts to convey its concerns, and its devotion of significant empirical resources to attempt to bring the project to completion, Primus and Swisslog have continually failed to complete the New Facility.

8

32.     Primus and Swisslog proposed vague and abstract plans to finish the New Facility. While empirical considered these proposals, it determined that none of them provided the confidence empirical needed that it would result in a functional New Facility.

33.     Primus failed to supply enough properly skilled workmen to complete the Work as required by the GMS Contract.

34.     Primus failed to obtain substantial completion of the Work as required by the GMS Contract.

35.     Swisslog failed to complete the scope of work required by the Base Contract it had with Primus.

36.     Primus owes empirical $1,000,000.00 in liquidated damages.

37.     Before or during the term of the GMS Contract, Primus lost faith in Swisslog's ability to fulfill its obligations under the GMS Contract and Base Contract. However, Primus did not voice its concerns about Swisslog to empirical. This caused empirical to accrue additional damages that could have been avoided if Primus had informed empirical about its concerns with Swisslog earlier.

38.     On August 8, 2019, empirical terminated the GMS Contract with Primus.

39.     empirical is now forced to spend a significant amount of money to complete the construction of the New Facility in the condition and manner as promised under the GMS Contract, and that Primus failed to deliver.

40.     Primus's actions constitute material breaches of the GMS Contract.

41.     With this action, empirical seeks an award of the damages caused by Primus's breaches of the GMS Contract, including but not limited to costs associated with hiring a new contractor to construct the New Facility.

## COUNT 1
## BREACH OF CONTRACT

42.　empirical re-alleges and incorporates by reference paragraphs 1 to 41 as if fully set forth herein.

43.　empirical and Primus entered into the GMS Contract.

44.　The GMS Contract is a valid and enforceable contract which, among other things, required Primus to design and construct a functioning New Facility to empirical's specifications.

45.　Primus failed to perform its work timely and diligently.

46.　empirical performed all conditions precedent and substantially performed its duties under the GMS Contract or was excused from other conditions precedent due to Primus's material breaches of the GMS Contract.

47.　empirical complied with all of its obligations pursuant to the GMS Contract by, among other things, making substantial payments to Primus for its work and the work of its subcontractors, including Swisslog.

48.　Primus materially breached the GMS Contract in one or more of the following ways:

a.　Failing to prosecute the Work in a good and workmanlike manner;

b.　Failing to prosecute the Work under the GMS Contract in a timely manner;

c.　Failing to have the appropriate capability, experience, expertise and means required to perform its scope of work under the GMS Contract;

d.　Failing to construct a functioning New Facility for empirical;

e.　Hiring a subcontractor, Swisslog, that failed to provide a functional crane system or operating system for the New Facility; and/or

f.　Failing to meet the scheduled completion date.

10

49. empirical has suffered substantial damages as a direct and proximate result of Primus's material breach of the GMS Contract. Among other things, empirical has incurred significant costs related to finding an appropriate solution to get the New Facility constructed as it intended under the GMS Contract.

50. empirical is entitled to recover liquidated damages in the amount of $1,000,000.00 as a result of Primus's failure to timely complete the Work.

51. empirical has been and will continue to be damaged in an amount to be established at trial as a result of Primus's breach of the GMS Contract.

## COUNT 2
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

52. empirical re-alleges and incorporates by reference paragraphs 1 to 41 as if fully set forth herein.

53. The GMS Contract is a binding contract supported by consideration.

54. empirical has performed under the GMS Contract, and justifiably expected that Primus would comply with its terms, including Paragraphs 1 and 6.

55. Primus's bad faith conduct in failing to deliver a functioning New Facility and in hiring Swisslog when it was unable to deliver a functioning crane system or operating system has deprived empirical of the benefits of the GMS Contract, in violation of the implied covenant of good faith and fair dealing.

56. As a direct and proximate result of Primus's material breaches, empirical has suffered and will continue to suffer harm and monetary damages.

11

## COUNT 3
## UNJUST ENRICHMENT

57.     empirical re-alleges and incorporates by reference paragraphs 1 to 56 as if fully set forth herein.

58.     Primus has been paid under the GMS Contract upwards of $33,342,253.61 by empirical, yet Primus has failed to deliver a functioning New Facility.

59.     As a result, Primus has been unjustly enriched in an amount to be determined at trial, plus ongoing interest, costs, and fees.

## COUNT 4
## BREACH OF WARRANTY

60.     empirical re-alleges and incorporates by reference paragraphs 1 to 41 as if fully set forth herein.

61.     Pursuant to Paragraph 6 of the GMS Contract, Primus warranted that "all Work done under this Contract shall be free of faulty materials and workmanship and agrees immediately upon discovery [of] such faulty materials or workmanship, or receiving notification from [empirical], to remedy, repair or replace all defects or imperfections which may appear as a result of faulty materials or workmanship, at any time, or from time to time, during a period beginning with commencement of construction of the Work and ending twelve months after the construction of the Work has been substantially completed." Exhibit 1 at ¶ 6. Primus further warranted that "[t]he foregoing warranty of [Primus] applies to the remedy, repair or replacement of defects or imperfections which may appear as a result of faulty designs prepared by [Primus] and/or by any party retained by, through or under [Primus] in connection with the design of the Work." *Id.*

62.     Primus breached the warranty contained in Paragraph 6 by, among other things, failing to deliver a usable New Facility and in a workmanlike manner consistent with the GMS Contract.

63.     As a proximate result of Primus's breach, empirical has suffered damage in an amount to be proven at trial, but not limited to, the cost of repairing and/or replacing the New Facility, plus interest, costs, and fees.

WHEREFORE, Plaintiff empirical prays for judgment against Primus as follows:

  a.  A judgment awarding damages to empirical in an amount to be proven at trial as well as pre- and post- judgment interest at the maximum rate allowed by law;

  b.  An award of such other and further relief as the Court deems just and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

64.     empirical hereby demands trial by jury on all claims so triable.

65.     Pursuant to U.S. District Court of Nebraska Local Rule 40.1(b), empirical requests the trial be held in Omaha, Nebraska.

Dated this _18th_ day of October 2019.

EMPIRICAL FOODS, INC., Plaintiff

By: _____

J. Daniel Weidner, #23738
John V. Matson, #25278
KOLEY JESSEN P.C., L.L.O.
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124-1079
(402) 390-9500
(402) 390-9005 (facsimile)
daniel.weidner@koleyjessen.com
john.matson@koleyjessen.com

J. Erik Connolly (*pro hac vice pending*)
Nicole E. Wrigley (*pro hac vice pending*)
Kathryn E. Clausing (*pro hac vice pending*)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF, LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 212-4949
(312) 767-9192 (facsimile)
econnolly@beneschlaw.com
nwrigley@beneschlaw.com
kclausing@beneschlaw.com

*Attorneys for Plaintiff*

4836-8140-2024.6

14

**GUARANTEED MAXIMUM SUM CONTRACT**

dated as of September 2, 2016

by and between

**BEEF PRODUCTS, INC.**

and

**PRIMUS BUILDERS, INC.**

**EXHIBIT 1**

**TABLE OF CONTENTS**

Page

1. Duties and Status of Builder ................................................................ 1
2. Work, Guaranteed Maximum Sum, Time of Completion ................................. 1
3. Savings and Cost of the Work ............................................................... 3
4. Progress Payments............................................................................. 5
5. Final Payment ................................................................................... 6
6. Correction of Work; Warranty ............................................................... 7
7. Permits and Regulations...................................................................... 7
8. Protection of Persons and Property......................................................... 8
9. Inspection of Work ............................................................................. 8
10. Supervision ..................................................................................... 9
11. Changes in the Work .......................................................................... 9
12. Allowances and Claims...................................................................... 10
13. Subcontractors ................................................................................ 11
14. Mutual Responsibility of Contractors .................................................... 12
15. Separate Contracts ........................................................................... 12
16. Use of Premises............................................................................... 12
17. Cleaning Up .................................................................................... 12
18. Site Representations.......................................................................... 12
19. Concealed, Unknown and/or Unforseeable Conditions ............................... 13
20. Title to Work................................................................................... 13
21. Liability of Builder; Liquidated Damages ............................................... 13
22. Waiver of Breach .............................................................................. 13
23. Insurance ....................................................................................... 14
24. Accounting Records........................................................................... 16
25. Contract Documents .......................................................................... 16
26. Right of Owner to Terminate Contract.................................................... 16
27. Right of Builder to Stop Work or Terminate Contract.................................. 17
28. Contract Modifications ....................................................................... 17
29. Notices .......................................................................................... 18
30. Assignment ..................................................................................... 18
31. Headings ........................................................................................ 18
32. Applicable Law ................................................................................ 18
33. Succession of Rights and Obligations .................................................... 18
34. Additional Documents ....................................................................... 18

Exhibit "A"   Plans, Specifications and Automation Documents
Exhibit "B"   SwissLog Contract Documents
Exhibit "C"   Location of New Facility
Exhibit "D"   Design Services
Exhibit "E"   Construction Schedule
Exhibit "F"   Cost of Work
Exhibit "G"   Form of Partial Waiver of Lien and Indemnity Agreement
Exhibit "H"   Final Form of Partial Waiver of Lien and Indemnity Agreement
Exhibit "I"   Form of Warranty

**EXHIBIT 1**

## GUARANTEED MAXIMUM SUM CONTRACT

THIS GUARANTEED MAXIMUM SUM CONTRACT (the "Contract") is made as of the 2nd day of September 2016, by and between Beef Products, Inc. (hereinafter referred to as "Owner"), a corporation organized under the laws of the State of South Dakota with a principal place of business at 891 Two Rivers Drive, Dakota Dunes, SD 57049, and Primus Builders, Inc. (hereinafter referred to as "Builder"), a corporation organized under the laws of the State of Georgia with a principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189.

WHEREAS, Owner owns and operates a meat packing facility consisting of various intake facilities, slaughter areas, processing facilities, refrigeration and freezer facilities, shipping areas and other improvements necessary for the operation of Owner's full-service processing plant (the "Current Facility");

WHEREAS, Owner desires to expand the Current Facility by adding a freezer building (with rack supported structure) and a cooler building (with non-structural racking) (collectively, the "New Facility");

WHEREAS, Builder is experienced in the design and construction of the type of New Facility desired by Owner and has submitted to Owner a certain proposal to perform said design and construction work, all as more fully set forth hereinbelow;

WHEREAS, Builder has entered into an agreement with Swisslog Logistic, Incorporated, a Virginia corporation, with its principal address at 161 Enterprise Drive, Newport News, Virginia 23603 (hereinafter referred to as "Swisslog"), whereby Builder shall utilize Swisslog for installing certain equipment in the New Facility; and

WHEREAS, Owner desires to engage Builder to construct the New Facility, all in accordance with the terms set forth in this Contract, and Builder desires to construct the New Facility for Owner, all in accordance with the terms of this Contract.

NOW, THEREFORE, in consideration of the above recitals and the agreements and covenants hereinafter contained, Owner and Builder agree as follows:

1.      Duties and Status of Builder.    Builder accepts the contractual relationship established between Builder and Owner by this Contract, and Builder covenants with Owner to furnish reasonable skill and judgment in furthering the interests of Owner to build the New Facility, all in accordance with the Plans and Specifications (as defined herein). Builder agrees to furnish efficient business administration and superintendence and to use reasonable efforts at all times to cause the Work (as defined herein) to be performed in a sound, expeditious and economical manner consistent with the interests of Owner.

2.      Work, Guaranteed Maximum Sum, Time of Completion.

a.      Work.  The term "Work" as used herein shall mean the construction of the New Facility, all in accordance with the plans and specifications set forth on Exhibit "A" attached hereto (the "Plans and Specifications") and made a part hereof.  The Work shall include all labor necessary to produce the design and construction required by the Contract Documents (as defined in Paragraph 25) and all materials and equipment incorporated or to be incorporated in such design and construction of the New Facility. The New Facility described in the Plans and Specifications is or is to be located at the

**EXHIBIT 1**

north end of the Current Facility, all as shown on Exhibit "C" attached hereto. Unless otherwise expressly stipulated, Builder shall, in accordance with the Contract Documents, perform all Work and pay for all materials, labor, tools and equipment necessary for the proper execution and completion of the Work.

Builder has retained Primus Design Services, LLC (hereinafter referred to as "Engineer") to perform the design services required to build the New Facility as described in this Contract, and it is specifically understood and agreed that the Guaranteed Maximum Sum, as hereinafter defined, includes all fees payable by Builder to Engineer for design services required to be performed to build said New Facility. Design fees payable to Engineer are $430,746. Builder has also retained Swisslog to perform the design and construction of the automated components, the cranes, the racking and associated support for a complete operation system to be installed in the New Facility, and it is specifically understood and agreed that the Guaranteed Maximum Sum includes all fees payable by Builder to Swisslog. The fees payable to Swisslog are $14,200,000, all as set forth and described in the Swisslog contract documents listed on Exhibit "B" attached hereto.

As used herein the term "subcontractor" shall mean any party who has a direct contract with Builder to perform any of the Work, including without limitation Engineer; Primus Panels Division, and Swisslog, and it is specifically understood and agreed that Builder shall be responsible for the acts and omissions of all parties retained by, through or under Builder in connection with the design and construction of the Work.

Unless otherwise specified, all materials incorporated into the Work shall be new and both workmanship and materials incorporated into the Work shall be of first class quality. Builder shall, if requested by Owner, furnish satisfactory evidence as to the kind and quality of materials incorporated into the Work.

b.      Guaranteed Maximum Sum.  Builder agrees that the maximum sum that Owner shall be obligated to pay to Builder for the performance hereunder of the Work is thirty three million eight hundred ninety nine thousand seven hundred eighty dollars ($33,845,991), as such sum may be increased or decreased as set forth herein (said sum as so increased or decreased hereinafter referred to as the "Guaranteed Maximum Sum"), and it is specifically understood and agreed that Owner shall pay to Builder for the performance hereunder of the Work the Guaranteed Maximum Sum less any savings as set forth in Paragraph 3.

c.      Time of Completion.  Builder has prior to the date hereof proceeded with the design services required to build the New Facility described in Exhibit "D" and Builder shall complete said design services and proceed with the construction of the Work with due diligence, due regard being given to interruptions resulting from any cause beyond the reasonable control of Builder, and Builder agrees to substantially complete the construction of all of the Work required hereunder to be performed by Builder on or before December 13, 2017, as said date may be extended for such periods of time as Builder is prevented from proceeding with or completing the Work for any cause beyond the reasonable control of Builder or not reasonably foreseen by Builder.

A schedule setting forth the expected dates for commencement and completion of each of the various stages of the design and construction of the Work required to build the New Facility described in this Contract is annexed hereto as Exhibit "E" and made a part hereof (the "Construction Schedule").  In the event that Builder determines, at any

**EXHIBIT 1**

time, that the Construction Schedule, in the aggregate, will be delayed by more than one (1) week, Builder shall provide prompt written notice of the same to Owner, along with an explanation for any such delays. Similarly, in the event that the Construction Schedule is accelerated, Builder shall notify Owner in writing of any anticipated changes to such Construction Schedule. In either such case, the Construction Schedule shall be updated by Builder as necessary, and revisions in said schedule shall be furnished to Owner, Engineer and Swisslog, it being specifically understood and agreed that Owner shall be entitled to rely upon and shall utilize said Construction Schedule as said Construction Schedule is revised from time to time to determine final dates upon which to make decisions Owner must make with respect to the Work.

In the event that the performance and/or completion of the Work is delayed at any time by any act or omission of Owner or of any employees, agents or tenants of Owner, by any separate contractor employed by Owner, by changes or alterations in the Work not caused by any fault or omission of Builder, by strikes, by lockouts, by fire, by embargoes, by windstorm, by flood, by earthquake, by acts of war, by changes in public laws, regulations or ordinances enacted after the date of execution of this Contract, by acts of public officials not caused by any fault or omission of Builder, by an inability to obtain materials or equipment not caused by any fault or omission of Builder, by concealed, unknown and/or unforeseeable conditions as described in Paragraph 19 or by any other cause beyond the reasonable control of or not reasonably foreseeable by, Builder, the aforesaid date for substantial completion of construction of the Work shall be extended for a reasonable period as a consequence of such delay.

The terms "substantial completion", "substantially complete" and "substantially completed" as used herein shall mean completed in such fashion as to enable Owner, upon performance of any separate work to be done by Owner, to take possession of the New Facility described in this Contract and to commence operations therein with minimal interference from either Builder or any party retained by, through or under Builder in connection with the design or construction of the Work and that the design and construction of the Work is completed except for so-called punch list items of a minor nature. The terms "full completion" and "fully completed" as used herein shall mean that the Work, including punch list items, has been completed in accordance with the Contract Documents.

3.    Savings and Cost of the Work. In the event that the sum of the Cost of the Work, as hereinafter defined, and Builder's Fee, as hereinafter defined, is less than the Guaranteed Maximum Sum, as finally adjusted, ninety percent (90%) of the difference shall be deemed to be a savings hereunder, and ten percent (10%) shall be paid to Builder as a bonus for creating such savings. Any said savings shall be determined at the time of final payment hereunder and shall decrease the Guaranteed Maximum Sum payable hereunder by Owner to Builder as set forth in Paragraph 2(b), it being specifically understood and agreed that, if and to the extent that any said savings shall exceed such final payment such excess shall be paid promptly by Builder to Owner.

The term "Cost of the Work" as used herein shall mean costs reasonably and necessarily incurred in the proper performance of the Work and paid or to be paid by Builder. Such costs shall be at rates not higher than the standard paid in the locality of the Work, except with the consent of Owner, and shall include the items set forth hereinbelow in items (a) through (p):

**EXHIBIT 1**

a. compensation paid for labor in the direct employ of Builder in the performance of the Work, including such welfare or other benefits, if any, as may be payable with respect thereto;

b. compensation of employees of Builder working on the project and/or when stationed at the field office in whatever capacity employed, it being specifically understood and agreed that employees of Builder, including the general managers, project executives, program managers and the project manager of Builder, engaged in planning, estimating, programming, scheduling, purchasing, managing, administering or accounting for the Work or in expediting the production or transportation of materials or equipment incorporated into the Work shall be considered as a cost of work and their compensation paid for;

c. cost of contributions, assessments or taxes for such items as unemployment compensation and social security insofar as such cost is based on compensation or other remuneration paid to employees of Builder included in the Cost of the Work;

d. reasonable transportation, traveling, meal and hotel expenses of Builder or of the employees of Builder incurred in discharging duties connected with the Work;

e. cost of all materials, supplies and equipment incorporated into the Work, including reasonable costs of transportation thereof;

f. expenses incurred pursuant to this Contract by Builder in respect to subcontractors, materialmen and/or other parties retained by, through or under Builder for Work required to be performed to design or construct the New Facility described in this Contract;

g. cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities and hand tools which are not owned by workmen and which are consumed in the performance of the Work, and cost less salvage value in respect to such items which are used but not consumed and which remain the property of the Builder;

h. rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from Builder or others, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area of the Work;

i. the cost of liability insurance that Builder is required hereunder to purchase and/or maintain in order to carry out the Work and the additional cost of all builders risk insurance if Owner has requested is included, bonds, guarantees and/or warranties which Builder is required hereunder to obtain in connection with the design and/or construction of the Work; provided, however, in no event shall such liability insurance costs exceed 0.55% of the costs of the Work;

j. sales, use or similar taxes related to the Work and for which Builder is liable imposed by any governmental authority;

-4-

EXHIBIT 1

k.     overhead allocations of 1.15% of the cost of work are included for home office support personnel working on the project;

l.     permit fees, royalties, damages for infringement of patents and costs of defending suits therefor and deposits lost for causes other than the negligence of Builder;

m.     expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such expenses and/or costs have resulted from causes other than the fault or omission of Builder, it being specifically understood and agreed that such expenses and/or costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war-risk";

n.     cost of removal of all debris;

o.     cost incurred due to an emergency affecting the safety of persons and property, unless such emergency was caused by Builder not following the applicable laws, rules or regulations applicable to the construction site for the New Facility in performance of the Work; and

p.     other costs incurred in the performance of the Work if and to the extent such costs are approved in writing by Owner.

Each item set forth above for the Costs of Work is further delineated on Exhibit "F" attached hereto.

Except as otherwise provided herein, the term "Cost of the Work" shall not include any of the items set forth hereinbelow in items (q) through (t):

q.     salaries or other compensation of the marketing executives, general managers or auditors of Builder at the principal office or branch offices of Builder, along with any other salaries or compensation of other employees, officers or agents of Builder unless specifically set forth in items (a) through (p) above;

r.     expenses of the principal or branch offices of Builder other than the field office at the site of the Work;

s.     any part of the capital expenses of Builder, including interest on capital of Builder employed for the Work; and

t.     general administrative or other indirect overhead expenses of any kind, except as may be expressly included hereinabove in items a through p.

The term "Builder's Fee" as used herein shall mean an amount equal to four percent (4%) of the Cost of the Work (excluding Swisslog), as finally adjusted, including without limitation any Cost of the Work attributable to any change in the Work.  The Builder's Fee for Swisslog costs is two percent (2%).

**EXHIBIT 1**

All cash discounts received by Builder shall accrue for the benefit of Owner as a credit against the Cost of the Work. All trade discounts, rebates and refunds and all returns from the sale of surplus materials and equipment shall accrue to Owner as a credit against the Cost of the Work, and Builder shall secure such discounts, rebates, refunds and returns if and to the extent commercially available.

    4.    <u>Progress Payments</u>. Progress payments shall be made by Owner to Builder upon receipt by Owner of an application for payment therefor, as follows:

    a.    Except as otherwise provided in this Paragraph 4 as to Swisslog, Builder shall submit to Owner on or about the fifth day of each month an application for payment covering all labor, materials and other Work furnished during the preceding month, including a reasonable portion of Builder's Fee earned as a result of the performance of such Work, based upon the schedule of values of the various parts of the Work annexed hereto as Exhibit "F" and made a part hereof. Except for any items objected to by Owner in accordance with Paragraph 4(d) below, ninety-five percent (95%) of all Work included in any such application for payment and attributable to construction performed by subcontractors retained by Builder, and one hundred percent (100%) of all other Work included in any such application for payment, shall be paid to Builder within twenty (20) days after the receipt of any such application for payment by Owner.

    b.    Builder shall certify as to the actual cost incurred by Builder for labor, materials and other Work included in any application for payment under this Contract.

    c.    Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner. Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Partial Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "G" or in such other form as may be required by Owner's lender and/or any title company involved in confirming lien waivers and making payments from Owner to Builder.

    d.    All applications for payment under this Contract, including the application for final payment, shall be subject to the approval of Owner and/or, if required by Owner, to the approval of Owner's representatives. Owner shall cause all applications for payment under this Contract, including the application for final payment, which such applications for payment are reasonably in accordance with the Contract Documents to be approved by Owner and, if required by Owner, to be approved by Owner's representatives forthwith upon receipt thereof by Owner, it being specifically understood and agreed that Owner and Owner's representatives shall not be entitled to withhold any approval of any application for payment under this Contract if such application for payment is reasonably in accordance with the Contract Documents and payment of the amount shown in such application for payment is due to Builder pursuant to the terms and provisions of this Contract. To the extent Owner does not agree with any portion of Work and/or fees charged for such Work in an application for payment, Owner may withhold such portion and make written objection to Builder with regard to the same.

-6-

**EXHIBIT 1**

Builder and Owner shall then work in good faith to resolve any issues with regard to the portion of Work questioned by Owner with regard to the payment request.

e.      A schedule of values of the various parts of the Work aggregating the Guaranteed Maximum Sum is annexed hereto as Exhibit "F" and made a part hereof, and it is specifically understood and agreed that Builder shall use said schedule in calculating the amount of any progress payment required to be made by Owner in accordance with this Paragraph 4 except with respect to payment requests submitted by Swisslog.

f.      As an exception to other payment procedures set forth in this Paragraph 4, amounts to be paid to Swisslog shall be handled as set forth in this subparagraph. Swisslog will invoice Builder upon achievement of certain milestones and amounts as set forth in the Swisslog Base Contract dated July 9, 2016, paragraph 11 and the schedule therein.  Builder will forward to Owner all Swisslog invoices and Owner shall pay to Builder via wire transfer the entire invoice amount plus Builder's corresponding fee, as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract.  Retainage that may otherwise apply to payment to be made to Builder shall not apply as to amounts invoiced by Swisslog.

5.      <u>Final Payment</u>.  Builder shall submit to Owner a final application for payment immediately after substantial completion of construction of the Work.  Except as otherwise provided in this Paragraph 5 as to Swisslog, final payment is due and payable by Owner within forty-five (45) days after substantial completion of construction of the Work in accordance with the Contract Documents unless Builder has failed to fully complete the Work within such forty-five (45) day period, in which case final payment shall be due and payable by Owner in two installments, the first installment being equal to such final payment less an amount equivalent to 150% of the value of any uncompleted Work and being due and payable by Owner upon the expiration of such forty-five (45) day period, and the second installment being equal to the balance of such final payment and being due and payable by Owner promptly upon full completion of construction of the Work.

Except as to final payment to Swisslog, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner.  Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Final Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "H."

Upon receipt of invoice from Swisslog upon the occurrence of Provisional Acceptance or start of beneficial use by Owner of the systems furnished by Swisslog as set forth in the Swisslog Base Contract dated July 9, 2016, Builder shall forward such invoice to Owner.  Owner shall make payment to Builder for the entire amount of Swisslog's invoice plus Builder's fee as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract.  Final payment to Swisslog shall be treated and made as separate from other conditions of final payment to Builder as set forth elsewhere in this Contract.

**EXHIBIT 1**

6.    Correction of Work; Warranty.    No payment hereunder by Owner and no provision in the Contract Documents shall relieve Builder of responsibility for faulty materials or workmanship incorporated into the Work.    Builder warrants that all Work done under this Contract shall be free of faulty materials and workmanship and agrees, immediately upon discovery such faulty materials or workmanship, or receiving notification from Owner, to remedy, repair or replace all defects or imperfections which may appear as a result of faulty materials or workmanship, at any time, or from time to time, during a period beginning with commencement of construction of the Work and ending twelve months after the construction of the Work has been substantially completed. Builder shall provide Owner with a signed warranty in the form attached hereto as Exhibit "I" after completion of the New Facility (the "Warranty").    The foregoing warranty of Builder applies to the remedy, repair or replacement of defects or imperfections which may appear as a result of faulty designs prepared by Builder and/or by any party retained by, through or under Builder in connection with the design of the Work, but the foregoing warranty of Builder does not guarantee against damage to or defects in the Work arising out of or resulting from abuse, lack of normal maintenance and/or improper operation of the Work by Owner and/or by any agents, employees or tenants of Owner or as a result of changes or additions to the Work made or done by persons not directly responsible to Builder, except where such changes or additions are made in accordance with the directions of Builder. Except as set forth hereinabove or as set forth on Exhibit "I", no guarantee furnished by a party other than Builder with respect to equipment manufactured or supplied by such party shall relieve Builder from the obligations of Builder in respect to the foregoing warranty. The warranty period set forth hereinabove shall not apply to latent defects, and with respect to such defects, the applicable statute of limitations shall apply.

7.    Permits and Regulations. Any building permits necessary for the construction of the Work and required to be obtained from any governmental authorities shall be secured and paid for by Builder, the cost of said permits being included in the Cost of the Work. It shall be the responsibility of Builder to make certain that the Work complies with all applicable building codes and all bulk and dimensional requirements set forth in any applicable zoning ordinances, provided however that it shall be the responsibility of Owner, and not of Builder and/or Engineer, to make certain that the New Facility described in this Contract is permitted to be used for the purpose intended in the zoning district in which said New Facility is situated.

Builder shall give all notices required by any governmental authorities in connection with the performance of the Work and shall comply with all laws, ordinances, rules, regulations and orders of any governmental authorities bearing on the performance of the Work. Without in any way limiting the responsibilities of Builder set forth herein, if Builder observes that any of the Contract Documents are at variance in any respect with any such laws, ordinances, rules, regulations or orders, Builder shall promptly notify Owner in writing and any necessary changes in the Work caused thereby shall be adjusted by appropriate modification. If Builder performs any Work knowing it to be contrary to such laws, ordinances, rules, regulations or orders and without notice to Owner, Builder shall assume full responsibility therefor and shall bear all costs attributable thereto.

8.    Protection of Persons and Property.  Builder shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the construction of the Work. Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

a.    all employees on the Work and all other persons who may be affected thereby;

**EXHIBIT 1**

      b.    all Work and all materials and equipment to be incorporated therein, whether in storage on or off the site of the Work, under the care, custody, or control of Builder or its subcontractors; and

      c.    other property at the site of the Work or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Builder shall at all times enforce strict discipline and good order among those performing the Work and shall not permit any unfit person or anyone not skilled in the task assigned to be employed on the Work.

Builder shall comply with all applicable laws, ordinances, rules, regulations and orders of any governmental authorities having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. Builder shall maintain and implement, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, and shall promulgate and publish safety regulations pertaining to the Work. Builder shall designate a responsible employee of Builder stationed at the site of the Work whose duty shall be the prevention of accidents. Such person shall be the superintendent of Builder unless otherwise designated in writing by Builder to Owner.

In any emergency affecting the safety of persons or property, Builder shall act at its discretion to prevent threatened damage, injury or loss. Any additional compensation or extension of time claimed by Builder on account of any such emergency shall be determined by mutual agreement between Owner and Builder.

      9.    Inspection of Work. Owner and Owner's representatives shall at all times have access to the Work wherever it is in preparation or progress, and Builder shall provide proper facilities for such access and for inspection of the Work.

If the drawings, the specifications, the timely-given instructions of Owner or any governmental authorities shall require any Work to be specially tested or approved, Builder shall give Owner timely notice of its readiness for inspection and, if the inspection is to be performed by a party other than Owner, of the date fixed for such inspection. Inspections by Owner shall be promptly made, and, where practicable, shall be at the source of supply. If any Work required to be inspected by the drawings, the specifications, the timely-given instructions of Owner or any governmental authority should be covered up without the approval or consent of Owner, it must, if required by Owner, be uncovered for examination at the expense of Builder.

Re-examination and/or replacement of questioned Work may be ordered by Owner and if so ordered, the Work shall be uncovered and replaced by Builder. If such Work is found to be in accordance with the Contract Documents or if such Work is not in accordance with the Contract Documents but such nonconformity has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work, Owner shall pay the cost of such re-examination and replacement in addition to the Guaranteed Maximum Sum. If such Work is not in accordance with the Contract Documents, Builder shall pay the cost of such re-examination and replacement unless such nonconformity in the Work has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work.

**EXHIBIT 1**

10.     Supervision.  Builder shall keep at the New Facility during progress of the Work a competent project manager and any necessary assistants, all reasonably satisfactory to Owner.  Such project manager shall represent Builder and all directions given by Owner to such project manager shall be as binding as if given to Builder.  Important directions by Owner to Builder shall be confirmed in writing to Builder.  Other directions by Owner to Builder shall be so confirmed upon written request of Builder in each case.

Builder shall give efficient supervision to the Work, using reasonable skill and attention, and shall cause working drawings and specifications pertaining to the Work to be carefully prepared and promptly submitted to Owner.  Following acceptance by Owner of said working drawings and specifications, Builder shall perform the Work described in said working drawings and specifications in accordance with Contract Documents.  Notwithstanding the foregoing, Builder may from time to time make minor and insignificant changes in said working drawings and specifications and perform the Work in accordance with such changed drawings and specifications without the consent of the Owner, provided that (i) Builder shall provide such changed drawings and specifications to Owner for review and (ii) any such Work performed by Builder in accordance with such changed drawings and specifications shall be consistent with that specifically required to be performed by Builder under the Contract Documents.

11.     Changes in the Work.  Owner, without invalidating this Contract, may order extra Work or make changes by altering, adding to, or deducting from the Work, the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, being equitably adjusted accordingly.  Unless otherwise specified, all such Work shall be executed under the conditions of this Contract and any claim for extensions of time caused thereby shall be equitably adjusted at the time of ordering such change.

Any change in the Guaranteed Maximum Sum resulting from a change in the Work shall be determined in one or more of the following ways:

a.     by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

b.     by unit prices stated in the Contract Documents or subsequently agreed upon;

c.     by cost to be determined in a manner agreed upon by Owner and Builder and by an increase or decrease in the Guaranteed Maximum Sum based upon such cost and an adjustment in Builder's Fee consistent with that contemplated by Paragraph 3 in the event of a change in Work; or

d.     by the method provided hereinbelow in this Paragraph.

If Owner requests that a change be made in the Work and none of the first three methods set forth hereinabove in items (a), (b) or (c) for determining any change in the Guaranteed Maximum Sum resulting from such change in the Work is mutually agreed upon, then Builder, provided Builder receives a written change order signed by Owner, shall promptly proceed to cause the change in the Work requested to be performed.  The change in the Guaranteed Maximum Sum shall then be determined on the basis of the sum of any increase and/or decrease in the Cost of the Work attributable to the change and any increase and/or decrease in Builder's Fee attributable to the change.  In such case, Builder shall keep and present to Owner an itemized accounting, together with appropriate supporting data, of the Cost

EXHIBIT 1

of the Work attributable to the change. Unless otherwise provided herein, the Cost of the Work attributable to the change shall include and be limited to the Cost of the Work directly attributable to the change. Pending final determination of the change in the Guaranteed Maximum Sum, payments on account of the change shall be made based upon an application for payment covering actual expenditures of Builder attributable to the change. The amount of credit to be allowed by Builder to Owner for any deletion or change which results in a net decrease in the Guaranteed Maximum Sum shall be determined on the basis of a reasonable estimate of the Cost of the Work deleted or changed. When both additions and credits covering related Work or substitutions are involved in any one change which results in a net increase in the Guaranteed Maximum Sum, the change in the Guaranteed Maximum Sum shall include an increase in Builder's Fee computed only upon the basis of the net increase in the Cost of the Work attributable to the change.

The Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 should Builder incur costs of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such costs have resulted from causes other than the fault or neglect of Builder or anyone for whom Builder may be liable. Such expenses and costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war risk". In the event that any such reconstruction, replacement and/or repair is required and Builder is placed in charge thereof, Builder shall be paid for said reconstruction, replacement and/or repair services and work a reasonable Builder's Fee consistent with that set forth in Paragraph 3, said Builder's Fee on account of said reconstruction, replacement and/or repair services and work being payable by Owner to Builder in addition to the Guaranteed Maximum Sum.

12.    Allowances and Claims.  If Builder claims that any instructions provided by Owner and/or any act or omission of Owner or of any employee, agent or tenant of Owner involve extra cost and/or that, in accordance with Paragraph 11, the Guaranteed Maximum Sum should be increased as a result of Builder having incurred expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies, and/or that, in accordance with Paragraph 19, concealed, unknown and/or unforeseeable conditions have been encountered, Builder shall give written notice and explanation thereof within a reasonable time after the receipt of such instructions, the occurrence of such act or omission and/or the incurring of such expenses and/or costs and, provided that such claim is reasonable and supported by clear evidence, such claim shall be treated as a change in the Work for which the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, shall be equitably adjusted. No such claim shall be valid unless so made. Notwithstanding the foregoing provisions of this Paragraph 12, Builder acknowledges and agrees that it shall not incur and pay any additional expenses and/or costs which fall outside of the Guaranteed Maximum Sum without Owner's prior written consent.

Builder has included within the Guaranteed Maximum Sum all allowances stated in the Contract Documents. Items covered by said allowances shall be supplied for such amounts and by such parties as Owner may direct, but Builder shall not be required to employ any parties against whom Builder makes a reasonable objection. Unless otherwise expressly provided:

a.    said allowances do not include a Builder's Fee attributable to items covered by said allowances, but, in determining the Guaranteed Maximum Sum, a

EXHIBIT 1

Builder's Fee consistent with that set forth in Paragraph 3 on account of said allowances has been included in the Guaranteed Maximum Sum; and

b.     whenever the Cost of the Work attributable to items covered by an allowance differs from the specific allowance, the difference shall be treated as a change in the Work and the Guaranteed Maximum Sum and Builder's Fee shall be adjusted in respect to such difference as set forth in Paragraph 11.

13.     Subcontractors.  Unless otherwise specified or unless the Contract Documents state that a specific party has been designated to perform a certain portion of the Work, Builder shall cause bidding documents with respect to each major portion of the Work to be submitted to qualified parties for the purpose of obtaining bids in connection with the performance of each such portion of the Work.  As soon as practicable thereafter Builder shall furnish to Owner in writing the names of those parties from whom bids with respect to each such portion of the Work were elicited, the amounts of any bids received and the names of those parties proposed for each such portion of the Work.  Owner, within seven (7) days after receiving the name of any party proposed for any portion of the Work, shall notify Builder in writing if Owner has any objection to and does not accept such party.  Failure of Owner to make objection to any party as set forth hereinabove shall constitute acceptance of such party.  Builder shall not let any contract in connection with the construction of a principal portion of the Work if the party proposed for such portion of the Work has been rejected by Owner as set forth hereinabove, and Builder shall not make any substitution for any party who has been accepted by Owner unless the substitution is reasonably acceptable to Owner.  Builder shall not be required hereunder to contract with any party against whom Builder has a reasonable objection.

If Owner refuses to accept any party proposed by Builder as a subcontractor, Builder shall submit an acceptable substitute, and the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such substitution, provided however that no such increase in the Guaranteed Maximum Sum shall be allowed hereunder for any such substitution unless Builder has acted properly and responsively in submitting to Owner for acceptance the name of such party.   If Owner requires a change of any proposed party who has been previously accepted by Owner, the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such change.

14.     Mutual Responsibility of Contractors.  Should Builder cause damage to the work or property of any other contractor employed by Owner in connection with the construction of the Work, Builder shall, upon receipt of written notice thereof, settle with such other contractor by agreement, if such other contractor will so settle.   If such other contractor sues Owner on account of any damage alleged to have been so sustained as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Owner shall promptly notify Builder in writing of such suit.  If and to the extent that any such other contractor has been damaged as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Builder shall indemnify, hold harmless and defend Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from any such fault or omission.

15.     Separate Contracts.  Owner reserves the right to let other contracts in connection with the construction of portions of the Work the construction of which are not being performed hereunder by Builder.   Builder shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall properly connect and coordinate the Work with the work of such other contractors.

**EXHIBIT 1**

If the proper execution of any part of the Work depends upon the work of any such other contractor, Builder shall inspect and promptly report to Owner any apparent discrepancies in such work that render it unsuitable for such proper execution and results. Failure of Builder so to inspect and report shall constitute an acceptance of such other contractor's work as fit and proper to receive the Work, except as to latent defects and defects which may develop in such work after the execution of such work.

16.    Use of Premises.  Builder shall confine operations at the site of the Work to areas permitted by law, ordinances, permits and the Contract Documents and shall prevent the site of the Work from being unreasonably encumbered with any materials or equipment.  Builder shall not permit any part of the Work to be loaded with a weight so as to endanger the safety of persons or property at the site of the Work.  Builder acknowledges that Owner shall maintain operations in the Current Facility while Builder is performing the Work on the New Facility. Accordingly, Builder shall work in good faith to minimize any disruption to the Current Facility when constructing the New Facility in order to allow Owner to continue utilizing the Current Facility to the greatest extent possible.

17.    Cleaning Up.  Builder shall at all times keep the site of the Work free from accumulations of waste material or rubbish caused by the performance of the Work by Builder, and at the completion of construction of the Work, Builder shall remove from the site of the Work all rubbish and all tools, scaffolding and surplus materials caused by, used in or resulting from the Work and shall leave the Work "broom clean", or its equivalent, unless more exactly specified hereunder.

18.    Site Representations.  Owner warrants and represents that Owner has, and will continue to retain at all times during the course of construction of the Work, legal title to the land upon which the New Facility is to be constructed and that such land is properly subdivided and zoned so as to permit the construction and use of said New Facility.  Owner further warrants and represents that such land is free of any easements, conditions, limitations, special permits, variances, agreements or restrictions which would prevent, limit or otherwise restrict the construction or use of said New Facility.  Owner has provided all necessary site information to Builder, including information with respect to soil conditions, existing buildings and structures, easements, restrictions and utility locations, and Builder has relied upon such information as well as the aforementioned representations in designing said New Facility and determining the Guaranteed Maximum Sum.  Owner shall indemnify and hold harmless Builder from any losses, expenses or damages Builder may sustain in connection with the design or construction of said New Facility because of differences between existing conditions and those conditions represented hereinabove to Builder.

19.    Concealed, Unknown and/or Unforseeable Conditions.    Should concealed, unknown and/or unforeseeable conditions below the surface of the ground or in an existing structure encountered in the performance of the Work be at variance with the conditions indicated by the Contract Documents or differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents, the Guaranteed Maximum Sum and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 upon claim within a reasonable time after the first observance of such conditions.

20.    Title to Work.  Title to all Work completed or in the course of construction and paid for by Owner and title to all materials on account of which payment has been made by Owner shall vest in Owner.  Builder agrees that any drawings or specifications prepared hereunder by Builder or Engineer or Swisslog to be used in connection with the design or

EXHIBIT 1

construction of the New Facility described in this Contract or in connection with the design or construction of the New Facility are the property of Owner, and Owner may utilize such Plans and Specifications in the future as desired by Owner without the prior written approval of Builder or Engineer or Swisslog; provided, however, Owner acknowledges that any future use of the Plans and Specifications are at Owner's own risk (except to the extent Owner relies on the same when maintaining or repairing the New Facility and references the Plans and Specifications for information about the materials or equipment located in the New Facility).

21.     Liability of Builder; Liquidated Damages.     Builder shall indemnify and hold harmless Owner and the agents and employees of Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (a) is attributable to Builder's breach of the terms of this Contract, (b) is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property related to the Work and (c) is caused in whole or in part by any negligent act, intentional act or omission of Builder, anyone directly employed by Builder or anyone for whose acts Builder may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. In the event that any attachments or liens shall be placed upon the property of Owner to secure or enforce any such claims arising as aforesaid, Builder shall forthwith upon written request of Owner cause such attachments or liens to be dismissed or discharged. Notwithstanding anything to the contrary set forth herein, neither Builder nor Owner shall be liable to the other for any indirect or consequential losses or damages, whether arising in contract, warranty, tort, strict liability or otherwise, arising out of or in connection with this Contract and/or the Work.

If Builder has not substantially completed the Work within the time set forth in this Contract, Builder agrees to pay to Owner liquidated damages, being understood this is Owner's sole and exclusive remedy, in the amount of $3,000 per day for each day after January 1, 2018, that Builder has not substantially completed the Work. The maximum damage assessed will be $1,000,000. This amount of liquidated damages represents the parties' good faith estimate of the damages which Owner will suffer as a result of the failure of Builder to substantially complete the Work by said date, is not a penalty, and is lieu of all other damages recoverable by Owner from Builder as a result of such delay. The February 15, 2018 deadline for substantial completion of the Work shall be extended for certain matters as set forth in this Contract.

22.     Waiver of Breach.     The failure of Owner or Builder at any time to require performance of any provision of this Contract with respect to a particular matter shall in no way affect the right of Owner or Builder to enforce such provision at a later date with respect to another matter; nor shall the waiver by Owner or Builder of any breach of any provision hereof be taken or held to be a waiver with respect to any succeeding breach of such provision or as a waiver of the provision itself unless such waiver with respect to such succeeding breach or such waiver of such provision itself shall be in writing and signed by the party making such waiver. Notwithstanding the foregoing, the making of final payment hereunder shall constitute a waiver of all claims by Owner except those arising from:

    a.      unsettled liens,

    b.      faulty or defective Work appearing after the date of substantial completion of construction of the Work,

    c.      failure of the Work to comply with the requirements of the Contract Documents,

-14-

EXHIBIT 1

    d.    terms of any special guarantees required by the Contract Documents,

    e.    terms of the warranty set forth in Paragraph 6 or Exhibit "I", or

    f.    latent defects,

and the acceptance of final payment shall constitute a waiver of all claims by Builder except those previously made in writing and still unsettled.

    23.    <u>Insurance</u>.

    a.    <u>Builder's Liability Insurance</u>.  Builder shall maintain such insurance as will protect Builder and Owner from those claims set forth hereinbelow which may arise out of or result from the operations of Builder under this Contract, whether such operations be by Builder, by anyone directly or indirectly employed by Builder or by anyone for whose acts Builder may be liable:

    i.    claims under workmen's compensation, disability benefit and other similar employee benefit acts;

    ii.    claims for damages because of bodily injury, occupational sickness, disease or death of any employees of Builder;

    iii.    claims for damages because of bodily injury, sickness, disease or death of any person other than an employee of Builder;

    iv.    claims for damages because of injury to or destruction of tangible property (including the Work itself);

    v.    claims for damages arising after the construction of the Work is completed; and

    vi.    claims for damages arising out of any negligent acts, errors and/or omissions committed in connection with the design of the Work by Builder, Engineer or Swisslog.

    The aforesaid insurance required to be maintained by Builder shall not be written for less than any limits of liability specified in the Contract Documents or less than any limits required by law, whichever limits are greater.  The worker's compensation insurance required hereunder to be maintained by Builder shall be in an amount not less than any amount required by law and the employer's liability insurance required hereunder to be maintained by Builder, the commercial general liability insurance, including without limitation coverage for premises operations, independent contractors and completed operations, required hereunder to be maintained by Builder and the automobile liability insurance required hereunder to be maintained by Builder shall be in an amount not less than $2,000,000 on account of any one occurrence and not less than $2,000,000 on account of annual aggregate occurrences.  The aforesaid insurance required hereunder to be maintained by Builder may be written under an umbrella form.

    Certificates evidencing that Builder has obtained the aforesaid insurance required to be maintained by Builder shall be provided to Owner prior to commencement of construction of the Work.  Such certificates shall be in form and substance reasonably

-15-

**EXHIBIT 1**

satisfactory to Owner, shall indicate that Owner has been named as an additional insured with respect to all of such coverages, other than coverages relating to employer's liability, worker's compensation and professional errors and omissions insurance, and shall contain a provision that coverages afforded by the aforesaid insurance shall not be materially changed or canceled until at least thirty (30) days prior written notice has been given to Owner.

   b.  <u>Owner's Liability Insurance</u>. Owner shall be responsible for purchasing and maintaining its own liability insurance and, at its option, may purchase and maintain such insurance as will protect it against claims which may arise from operations under this Contract.

   c.  <u>Property Insurance</u>. Owner shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof. Such insurance shall include the interests of Owner, Builder and all parties retained by, through or under Builder as insureds in respect to the Work, shall insure against all perils normally covered in an "all risk" form and shall contain an acknowledgment by the insurer which bars all rights of subrogation against the parties insured, it being specifically understood and agreed that all rights of Builder and Owner against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Paragraph 23(c) are waived and that Owner shall pay in addition to the Guaranteed Maximum Sum any costs not covered because of any minimum deductible contained in any property insurance policy required hereunder to be maintained by Owner.

   Owner shall have the right to adjust and settle any loss covered by the aforesaid property insurance unless Builder shall object, in which case Owner and Builder shall work in good faith to jointly adjust and settle any such loss. Any proceeds received on account of a loss covered by the aforesaid property insurance shall be paid to Owner as trustee for the insureds, as their interests may appear, and shall, after receipt by Owner, be deposited in a segregated bank account established for the purpose of holding such proceeds and be distributed promptly to the insureds, as their interests may appear and as such interests are determined by Owner.

   A certificate evidencing that Owner has obtained the aforesaid property insurance and, if requested by Builder, a copy of such property insurance policy shall be provided to Builder prior to commencement of construction of the Work. Such certificate and policy shall be in form and substance reasonably satisfactory to Builder and shall contain a provision that coverages afforded under such policy shall not be materially changed or canceled until at least thirty days prior written notice has been given to Builder. If Owner does not intend to purchase the aforesaid property insurance, Owner shall inform Builder in writing prior to commencement of the Work, and Builder may then effect such property insurance as will protect the interests of Builder, subcontractors and sub-subcontractors in the Work, the cost of such property insurance in such case being payable by Owner to Builder in addition to the Guaranteed Maximum Sum. If Builder is damaged by the failure of Owner to purchase or maintain the aforesaid property insurance, then Owner shall bear all damages, loss and expenses properly attributable thereto.

   24.  <u>Accounting Records</u>. Builder shall check all materials, equipment and labor entering into the Work and shall keep such full and detailed accounts as may be necessary for proper financial management under this Contract. Owner and/or Owner's representatives shall be afforded access at all reasonable times to all of the records, books, correspondence,

**EXHIBIT 1**

instructions, drawings, receipts, vouchers, memoranda and similar data of Builder relating to this Contract, and Builder shall (i) provide copies of the same to Owner after construction of the New Facility is complete and (ii) preserve all such records for a period of two (2) years after Owner has made the final payment hereunder.

25. Contract Documents. The "Contract Documents" which form the entire Contract by and between Owner and Builder consist of this Guaranteed Maximum Sum Contract, Exhibit "A", Exhibit "B", Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F", Exhibit "G", Exhibit "H" and Exhibit "I" and that certain Contract for Owner, dated concurrently herewith, by and among Owner, Builder and Swisslog.

The Contract Documents shall be executed, and/or initialed as appropriate, in duplicate by Owner and Builder. The Contract Documents are complementary, and what is required by any one shall be as binding as if required by all. The intention of the Contract Documents is to include all labor and materials reasonably necessary for the proper execution of the Work. Builder shall supply hereunder only that Work which is either specifically required to be supplied by Builder in accordance with the Contract Documents or is reasonably inferable from the Contract Documents as being necessary to produce the intended results. Any instruments with respect to changes in the Work ordered by Owner in accordance with Paragraph 11, which such changes in the Work are required hereunder to be performed by Builder shall be deemed to be annexed to this Contract and made a part hereof. Words which have well-known technical or trade meanings are used herein in accordance with such recognized meanings. Mutual agreement shall be reached with respect to words which do not have a well-known technical or trade meaning and the definition of which come into question.

Should the drawings conflict with the specifications, the drawings shall govern. In the case of discrepancies between any of the drawings and/or the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog and approved by Owner, those approved drawings or specifications bearing the latest date shall govern. All changes to the drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be dated and sequentially recorded. The drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be interpreted in conformity with this Contract, which shall govern, unless otherwise specified herein.

26. Right of Owner to Terminate Contract. If Builder should be adjudged bankrupt, or if Builder should make a general assignment for the benefit of creditors, or if Builder persistently or repeatedly refuses or fails, except in cases for which an extension of time is provided hereunder, to supply enough properly skilled workmen or proper materials, or if Builder should fail without reasonable cause to make prompt payment either to subcontractors or for labor, materials or other Work, or if Builder persistently disregards laws or ordinances or the instructions of Owner given in a valid manner pursuant to the Contract Documents or if Builder is otherwise guilty of a substantial violation of a provision of the Contract Documents, then Owner may, without prejudice to any other right or remedy of Owner and after giving Builder seven (7) days written notice, terminate the employment of Builder and take possession of the Work and of all materials, tools and appliances at the site of the Work and finish the Work by whatever method Owner may deem expedient. In such case Builder shall not be entitled to receive any further payment until the Work is finished. If the expense incurred by Owner to complete the Work exceeds the unpaid balance of the Guaranteed Maximum Sum, Builder shall promptly pay the difference to Owner upon demand. If requested by Builder, the costs incurred by Owner as herein provided shall be certified by an independent certified public accountant.

**EXHIBIT 1**

Notwithstanding the foregoing provisions of this Paragraph 26, Owner shall also have the right to terminate this Contract, including termination of the Builder, Engineer and/or Swisslog, and take possession of the Work in its then-current form for any (or no) reason desired by Owner. In the case of any such termination, Owner shall pay Builder a final fee equal to (i) any Work completed by Builder prior to Owner's termination of this Contract, plus (ii) the Builder's Fee based upon the entire Guaranteed Maximum Sum, minus a credit for any such Builder's Fee previously paid by Owner to Builder. By entering into this Contract, Builder acknowledges and agrees that any early termination by Owner shall not result in Builder having any additional rights under this Contract except for payment of any Work then performed and full payment of the Builder's Fee.

27.     Right of Builder to Stop Work or Terminate Contract. Notwithstanding anything to the contrary set forth in this Contract, if the Work should be stopped under an order of any court or other governmental authority for a period of thirty (30) days or more through no fault or omission of Builder or of anyone employed by Builder, or if Owner should fail to pay Builder for any uncontested Work within thirty (30) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may, upon fifteen (15) days written notice to Owner, stop the Work or terminate this Contract and recover from Owner payment for all Work executed and for any proven loss sustained upon any materials, equipment, tools, construction equipment and machinery, including reasonable profit and damages. Further, in the event that Owner has failed to pay Builder for any uncontested Work within forty-five (45) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may assess a late charge against Owner equal to one and one-half percent (1.5%) of said payment for each month, or portion thereof, for which said payment is delinquent, said assessment being in addition to the Guaranteed Maximum Sum. Should Owner for any reason breach this Contract by failing to pay any application for payment submitted in accordance with the Contract Documents and should Builder be required to retain an attorney to collect such payment, Owner shall indemnify Builder for and on account of any attorneys' fees expended by Builder in connection with the collection of such payment.

Notwithstanding the foregoing provisions of this Paragraph 27, Builder acknowledges that Owner may dispute all or any portion of an application for payment as set forth in Paragraph 4(d) above, and Builder's right to stop the Work or terminate the Contract shall not apply to any unpaid Work from Owner if such unpaid Work is subject to a dispute between Owner and Builder.

28.     Contract Modifications. No waiver, alteration or modification of any of the provisions of this Contract shall be binding upon either Owner or Builder unless the same shall be in writing and signed by both Owner and Builder.

29.     Notices.

All communications in writing between Owner and Builder, including without limitation, applications for payment, shall be deemed to have been received by the addressee if delivered to the person for whom such communications are intended or if sent by certified mail, return receipt requested, or by telegram or by an express mail service addressed as follows:

    If to Owner:          Beef Products, Inc.
                          891 Two Rivers Drive
                          Dakota Dunes, SD 57049
                          Attention: Mr. David Berghult

**EXHIBIT 1**

|  |  |
|---|---|
| With a copy to: | Koley Jessen P.C., L.L.O.<br>One Pacific Place, Suite 800<br>1125 South 103rd Street<br>Omaha, NE 68124<br>Attention: Thomas F. Ackley |
| If to Builder: | Primus Builders, Inc.<br>8294 Highway 92, Suite 210<br>Woodstock, Georgia 30189<br>Attention: Mr. Erik Gunderson |

For the purpose of directions, the representative of Builder shall be Erik Gunderson and the representative of Owner shall be David Berghult unless otherwise specified in writing.

30.  Assignment.  Neither Owner nor Builder shall assign this Contract or sublet obligations hereunder in respect to the Work as a whole without the written consent of the other.

31.  Headings.  The headings contained herein are inserted only as a matter of convenience and reference and are not meant to define, limit or describe the scope or intent of the Contract Documents or in any way to affect the terms and provisions set forth herein.

32.  Applicable Law.  The terms and provisions of this Contract shall be construed in accordance with the laws of the state in which the New Facility is to be situated.

33.  Succession of Rights and Obligations.  All rights and obligations under this Contract shall inure to and be binding upon the respective successors and assigns of Owner and Builder.

34.  Additional Documents.  Builder agrees to execute and deliver a conditional assignment of this Contract and whatever reasonable additional documents which any lender or governmental authority may require from time to time in order to effectuate, confirm and/or implement the terms of this Contract and/or any loan made to Owner in connection with the Work required to be performed hereunder by Builder.

**[The Remainder of This Page Intentionally Left Blank; and Signature Page Follows]**

**EXHIBIT 1**

IN WITNESS WHEREOF, Owner and Builder have, by their duly authorized representatives, executed this Contract, in duplicate, as of the day, month and year first above written.

OWNER:

Beef Products, Inc.

By: _____
Its: _____

BUILDER:

Primus Builders, Inc.

By: Erik Gunderson
Its: Executive Vice President

**EXHIBIT 1**

EXHIBIT "A"

PLANS, SPECIFICATIONS, AND AUTOMATION DOCUMENTS

The specifications and the drawings listed hereinbelow are by reference annexed to and made a part of a Guaranteed Maximum Sum Contract dated as of September 2, 2016 between Beef Products, Inc. and Primus Builders, Inc.

Specifications:

The facility will be designed and built around the Preliminary Outline Specifications dated August 24, 2016.

Drawings:

- Reference Drawing C-1.0       Conceptual Site Plan
- Reference Drawing A-1.0       Overall Floor Plan
- Reference Drawing A-1.1       Mezzanine Floor Plan
- Reference Drawing A-2.1       Exterior Elevations
- Reference Drawing A-3.0       Roof Plan
- Reference Drawing S-1.1       Conceptual foundation
- Reference Drawing S-2.        Conceptual framing

**EXHIBIT 1**

EXHIBIT "B"

SWISSLOG CONTRACT DOCUMENTS

Swisslog General terms and conditions version 1.1, dated August 30, 2016.

Swisslog Base Contract dated August 6, 2016.

Swisslog proposal 4720 Ver. 5.0 dated August 30, 2016 including the following:

| | |
|---|---|
| Design Data | Chapter 01 |
| Description of Operation | Chapter 02 |
| Scope of Supply | Chapter 03 |
| Warehouse Management | Chapter 04 |
| Project Implementation | Chapter 05 |
| Acceptance Procedures | Chapter 06 |
| Customer Support | Chapter 07 |
| Investment | Chapter 08 |
| | |
| Vectura SRM | Appendix 01 |
| Tornado SRM | Appendix 02 |
| ProMove Conveyor | Appendix 03 |
| Case Conveyor | Appendix 04 |
| Palletizing System | Appendix 05 |
| Freezer & Fresh Racking | Appendix 06 |
| System Drawings | Appendix 07 |
| Division of Work | Appendix 08 |
| Codes and Standards. | Appendix 09 |
| Transport & Load Units……………..…Enclosure C1 | |

**EXHIBIT 1**

# EXHIBIT "C"

## LOCATION OF NEW FACILITY

360 164th St, South Sioux City, NE 68776

**EXHIBIT 1**

EXHIBIT "D"

DESIGN SERVICES

The design work will be performed by Primus Design Services, LLC and will consist of design drawings and specifications prepared using the latest CADD technology. In addition the design team will review submittal documents and will conduct periodic site inspections and a final site inspection prior to occupancy. The design disciplines include the following:

- Site Planning, Civil and Utility Engineering Design
- Architectural Design
- Structural Engineering Design
- Industrial Engineering and Material Handling Design by Swisslog.
- Mechanical Engineering Design – through Design/Build trade contractors.
- Plumbing Engineering Design – through Design/Build trade contractors.
- Fire Protection Engineering Design – through Design/Build trade contractors.
- Refrigeration Engineering Design – through Design/Build trade contractors.
- Electrical Engineering Design – through Design/Build trade contractors.

**EXHIBIT 1**

EXHIBIT "E"

## CONSTRUCTION SCHEDULE

Expected Dates for Commencement and Completion of Each of the Various Stages of the
Design and Construction of the Work

See attached schedule dated September 2, 2016 titled: pro.sched.BPI.09.02.16

**EXHIBIT 1**



| ID | | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 1 | | Kick Off + Design Phase | 223 days | Tue 9/6/16 | Thu 7/13/17 |
| 2 | | Beef Product Issues NTP | 1 day | Tue 9/6/16 | Tue 9/6/16 |
| 3 | | Structural Engineering for Foundation | 10 days | Wed 9/7/16 | Tue 9/20/16 |
| 4 | | Architectural | 30 days | Wed 9/7/16 | Tue 10/18/16 |
| 5 | | Civil | 10 days | Wed 9/7/16 | Tue 9/20/16 |
| 6 | | Refrigeration | 20 days | Wed 9/7/16 | Tue 10/4/16 |
| 7 | | Electrical | 25 days | Wed 9/7/16 | Tue 10/11/16 |
| 8 | | Submit for Civil + Foundation | 1 day | Wed 9/21/16 | Wed 9/21/16 |
| 9 | | Owner Review Meeting | 8 days | Wed 10/19/16 | Wed 6/7/17 |
| 10 | | City issues demo + grading + foundation | 5 days | Thu 9/22/16 | Wed 9/28/16 |
| 11 | | Coordinate Drawings | 5 days | Thu 6/8/17 | Wed 6/14/17 |
| 12 | | Complete Building Permit Set | 5 days | Thu 6/15/17 | Wed 6/21/17 |
| 13 | | City Review | 15 days | Thu 6/22/17 | Wed 7/12/17 |
| 14 | | Obtain Building Permit | 1 day | Thu 7/13/17 | Thu 7/13/17 |
| 15 | | Construction Phase | 316 days | Thu 9/29/16 | Thu 12/14/17 |
| 16 | | Demolition | 10 days | Thu 9/29/16 | Wed 10/12/16 |
| 17 | | Erosion Control | 5 days | Thu 9/29/16 | Wed 10/5/16 |
| 18 | | Grading | 10 days | Thu 10/13/16 | Wed 10/26/16 |
| 19 | | Test Pile | 1 day | Thu 9/29/16 | Thu 9/29/16 |
| 20 | | Pile Installation | 30 days | Thu 10/13/16 | Wed 11/23/16 |
| 21 | | Foundations | 25 days | Thu 11/10/16 | Wed 12/14/16 |
| 22 | | Mat Slab | 10 days | Thu 12/15/16 | Wed 12/28/16 |

Project: pro sched BPI 09 02 16
Date: Fri 9/2/16

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Task | | Progress | | Summary | | External Tasks | | Deadline | |
| Split | | Milestone | | Project Summary | | External Milestone | | | |

beef products inc.

PRIMUS swisslog

**EXHIBIT 1**

4815-6275-5890.4

8:19-cv-00457-RFR-CRZ Doc # 1 Filed: 10/18/19 Page 83 of 275 - Page ID # 423

**PRIMUS Swisslog**

beef products inc

4815-6275-5890.4

**EXHIBIT 1**

EXHIBIT "F"

COST OF THE WORK

Schedule of Values of the Various Parts of the Work Aggregating the Guaranteed Maximum Sum

See attached 3 page pricing summary dated August 13, 2016 and named est.BPI.08.13.16

**EXHIBIT 1**

**PRIMUS** swisslog

**AS/RS Expansion for Beef Products, Inc.**
**South Sioux City, NE**
**June 20, 2016 GMP Proposal**

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 4 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| COOLER DOCK, CONVEYOR AND MEZZANINES: | 23,287 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 65,512 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **1** | **GENERAL REQUIREMENTS** | |
| | SUPERVISION | 850,575 |
| | GENERAL CONDITIONS | 87,727 |
| | OVERHEAD | 338,460 |
| | **TOTAL DIVISION 1** | **1,276,762** |
| 1a | **INSURANCE** | 228,453 |
| 1b | **PERMITS - Not Included** | 0 |
| | | |
| **2** | **SITEWORK** | |
| | EARTHWORK | 434,201 |
| | INTERIOR DEMOLITION | 10,000 |
| | STORM DRAINAGE | 93,750 |
| | SANITARY SEWER | 18,750 |
| | DOMESTIC WATER | 0 |
| | EXTERIOR FIRE PROTECT | 150,000 |
| | LANDSCAPING ALLOWANCE | 20,000 |
| | SITE CONCRETE AND PAVING | 350,650 |
| | **TOTAL DIVISION 2** | **1,079,351** |
| | | |
| **3** | **CONCRETE** | |
| | DEEP FOUNDATIONS | 1,017,960 |
| | FOUNDATIONS | 446,209 |
| | CONCRETE SLABS | 1,734,843 |
| | PRECAST CONCRETE | 0 |
| | TILT-UP CONCRETE | 0 |
| | **TOTAL DIVISION 3** | **3,199,013** |
| | | |
| **4** | **MASONRY** | **0** |
| | | |
| **5** | **METALS** | |
| | STRUCTURAL STEEL | 1,555,998 |
| | MISC STEEL | 158,000 |
| | **TOTAL DIVISION 5** | **1,713,998** |
| | | |
| **6** | **WOODS & PLASTICS** | |
| | ROUGH CARPENTRY | 0 |
| | FINISH CARPENTRY | 0 |
| | **TOTAL DIVISION 6** | **0** |

est.BPI.08.13.16-FINAL GMP

**EXHIBIT 1**

## ₽ PRIMUS swisslog

**beef products inc.**

**AS/RS Expansion for Beef Products, Inc.**
South Sioux City, NE
June 20, 2016 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| OGLER DOCK, CONVERYOR AND MEZZANINES: | 23,287 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 65,512 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **7** | **THERMAL & MOISTURE** | |
| | WATERPROOFING | 0 |
| | CAULKING | 49,928 |
| | FIREPROOFING | 0 |
| | DRYVIT SYSTEMS | 0 |
| | METAL SIDING | 0 |
| | INSULATED WALL PANELS AND UNDER FLOOR INSULATION | 1,761,046 |
| | ROOFING | 670,542 |
| | **TOTAL DIVISION 7** | **2,481,516** |
| **8** | **DOORS AND WINDOWS** | |
| | COLD STORAGE DOORS | 259,910 |
| | INDUSTRIAL DOORS | 6,500 |
| | SMALL DOORS | 0 |
| | WINDOW SYSTEMS | 0 |
| | **TOTAL DIVISION 8** | **266,410** |
| **9** | **FINISHES** | |
| | DRYWALL SYSTEMS | 0 |
| | ACOUSTICAL CEILING | 0 |
| | TILE AND COATINGS | 0 |
| | CARPET & FLOORING | 0 |
| | PAINT & WALL COVER | 11,691 |
| | **TOTAL DIVISION 9** | **11,691** |
| **10** | **SPECIALTIES** | **0** |
| **11** | **DOCK EQUIPMENT+BLAST RACK** | **78,809** |
| **12** | **FURNISHINGS** | **0** |
| **13** | **SPECIAL CONSTRUCT** | **0** |
| **14** | **CONVEYING SYSTEMS - SWISSLOG** | |
| | COSTS INCLUDED FOR SWISSLOG | 14,200,000 |
| | **TOTAL DIVISION 14** | **14,200,000** |

csti.BPI 08.13.16-FINAL GMP

-2-

**EXHIBIT 1**



| | | |
|---|---|---|
| **AS/RS Expansion for Beef Products, Inc.** | **PALLET POSITIONS:** | |
| **South Sioux City, NE** | **NUMBER OF CRANES:** | **6** |
| **June 20, 2016 GMP Proposal** | **ABILITY TO EXPAND:** | **Yes** |

| | | |
|---|---|---|
| | **BUILDING AREAS:** | |
| | **DRY WAREHOUSE:** | **0** |
| | **FREEZERS - AS/RS & BLAST FREEZING:** | **29,241** |
| | **COOLERS:** | **12,984** |
| | **OOLER DOCK, CONVEYOR AND MEZZANINES:** | **23,287** |
| | **OFFICE:** | **0** |
| | **SUPPORT/ENGINE ROOM:** | **0** |
| | **TOTAL SF:** | **65,512** |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **15** | **MECHANICAL** | |
| | FIRE PROTECTION | 1,030,925 |
| | PLUMBING | 25,000 |
| | H.V.A.C. | 6,500 |
| | REFRIGERATION | 4,822,900 |
| | | |
| | **TOTAL DIVISION 15** | **5,885,325** |
| | | |
| **16** | **ELECTRICAL ALLOWANCE** | **1,803,057** |
| | | |
| **17** | **MISCELLANEOUS** | **0** |
| **SUBTOTAL SITE** | | **1,079,351** |
| **SUBTOTAL BUILDING** | | **29,634,819** |

| | RECAP | |
|---|---|---|
| **SUBTOTAL BUILDING & SITE (C.O.W.)** | | **30,714,170** |
| | | |
| **TOTAL BUILDING, SITE & GENERAL REQUIREMENTS** | | **32,221,585** |
| | | |
| 0.0% | Winter Conditions Allowance | 300,000 |
| | | |
| 2.75% | FEE | 894,344 |
| | | |
| **SUBTOTAL PROJECT** | | **33,415,928** |
| | | |
| 1.2% | ENGINEERING | 390,966 |
| 10% | ENGINEERING REIMBURSABLES | 39,097 |
| 0.0% | ENGINEERING - CONSULTANTS | 0 |
| | SUB-TOTAL | 430,063 |
| | | |
| **GRAND TOTAL PROJECT (Building Only)** | | **33,845,991** |

e10.BPI.08.13.16-FINAL GMP

Exhibit "G"

## PARTIAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, subject to the reservation set forth hereinbelow and upon receipt of _____ dollars ($_____) representing the amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the period commencing _____ and ending _____, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby reserve, and does not hereby waive or release, any lien or right of lien which Builder has pursuant to the laws of the State of _____ to the extent of _____ dollars ($_____) representing retainage applicable to services rendered, work performed and/or materials furnished by Builder prior to and during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the aforementioned period, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

This Partial Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Partial Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____
Its:_____

4815-6275-5890.4

**EXHIBIT 1**

STATE OF GEORGIA )
)ss.
County of _____ )

On _____ day of _____, 2016, then personally appeared the above-named
_____, _____ of Builder, and
acknowledged the foregoing instrument to be the free act and deed of Builder, before me.

_____
Notary Public
My commission expires:

**EXHIBIT 1**

Exhibit "H"

## FINAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, upon receipt of _____ dollars ($_____) representing the final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of _____ by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

This Final Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Final Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____
Its:_____
Hereunto duly authorized

STATE OF GEORGIA          )
                                              ) ss.
County of _____          )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Builder, and acknowledged the foregoing instrument to be the free act and deed of Builder, before me.

_____
Notary Public
My commission expires:

4815-6275-5890.4                                                                                      **EXHIBIT 1**

EXHIBIT "I"

FORM OF WARRANTY

All workmanship, materials and equipment are guaranteed for a period of one year after the date established as the date of substantial completion of the Work for any defects which may appear or arise as a result of faulty materials, equipment or workmanship.  In addition to the one year warranty on all workmanship, materials and equipment the following extended warranties are included:

- The roofing warranty is for a period of thirty (30) years.
- Equipment Warranties provided with more than 1 year will be extended to Owner

**EXHIBIT 1**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| EMPIRICAL FOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 8:19-cv-00457 |
| | ) | |
| v. | ) | **PRIMUS BUILDERS, INC.'S** |
| | ) | **ANSWER AND** |
| PRIMUS BUILDERS, INC., | ) | **COUNTERCLAIM** |
| | ) | |
| Defendant and Plaintiff in | ) | **DEMAND FOR JURY TRIAL** |
| Counterclaim. | ) | |

Defendant Primus Builders, Inc. ("Primus") answers the claims and allegations asserted in the Complaint and Demand for Jury Trial (Doc. 1) ("Complaint") filed by Plaintiff empirical foods, inc. f/k/a/ Beef Products, Inc. ("empirical"), which if proven to be true, are the direct responsibility of Swisslog Logistics, Inc. ("Swisslog"), as set forth below. Primus additionally asserts its Counterclaim against empirical as stated herein.

## OVERVIEW

This dispute arises out of the design and construction of a fully automated, refrigerated, food logistics facility located at 360 164th Street, South Sioux City, Nebraska 68776 used for the storage and distribution of meat products ("Freezer Facility"). Primus designed and constructed the Freezer Facility for the owner, empirical, who selected, approved, and mandated the use of Swisslog to prepare the



designs, manufacture the Swisslog equipment, develop the certain software ("Swisslog Software"), and then install, test, commission and integrate the Swisslog equipment with the Swisslog Software to operate as an automated storage and retrieval system ("ASRS System").  After the Freezer Facility was constructed, various issues arose regarding the operation and functionality of the ASRS System, causing disputes between Primus, empirical, and Swisslog (collectively, the "Parties") under the contract documents.

Importantly, on the same day this lawsuit was filed (October 18, 2019), the Parties reached a global settlement of their disputes, to be followed by the submission of a plan to test, commission and debug the ASRS System.  Nonetheless, empirical has now reneged upon the settlement agreement between the Parties and contends the $14+ million ASRS System must be demolished, removed and replaced, whereas Swisslog contends the ASRS System is substantially complete and Swisslog should be allowed to demonstrate its ability to perform.

## **ANSWER**

Primus denies each and every allegation within Plaintiff's Complaint not expressly admitted below and incorporates Paragraphs 7 through 31 of its Counterclaim into this Answer.

## I.     Parties

1.     Based upon a review of public records, the allegations in Paragraph 1 of the Complaint appear to be true.

2.     Primus admits the allegations in Paragraph 2 of the Complaint.

## II.     Jurisdiction and Venue

3.     Primus admits the allegations in Paragraph 3 of the Complaint.

4.     Primus admits the allegations in Paragraph 4 of the Complaint.

5.     Primus admits the allegations in Paragraph 5 of the Complaint.

6.     Primus admits the allegations in Paragraph 6 of the Complaint.

## III.     Factual Background

7.     Primus admits empirical produces and sells meat products, but lacks sufficient information to either admit or deny the remaining allegations in Paragraph 7 of the Complaint.

8.     Primus admits empirical first sought to construct the Freezer Facility in January of 2015, but lacks sufficient information to either admit or deny the remaining allegations in Paragraph 8 of the Complaint.

9.     Primus denies the allegations in Paragraph 9 of the Complaint and states that empirical selected Swisslog to design, manufacture, install and commission the ASRS System that supplies and retrieves product within the Freezer Facility.  The

Swisslog Specifications governing the design, operation and functionality of the ASRS System were prepared under a direct agreement between empirical and Swisslog ("Swisslog/empirical Agreement") and were created, reviewed, approved, accepted and adopted by empirical as the basis for evaluating performance of the ASRS System. After empirical selected Swisslog, Primus executed the "Base Contract for Project BPI," dated September 2, 2016, ("Base Contract") with Swisslog, on empirical's behalf, in reliance upon empirical's review, approval, acceptance and adoption of the tri-party Base Contract and the Swisslog Specifications.

10.     Primus admits to executing the "Guaranteed Maximum Sum Contract," dated September 2, 2016, ("GMS Contract") with empirical, in which Primus agreed to construct the Freezer Facility, in reliance upon empirical's review, approval, acceptance and adoption of the Base Contract and the Swisslog Specifications. The GMS Contract incorporates the Base Contract and the Swisslog Specifications, requires Primus and Swisslog to provide an ASRS System in accordance with the Swisslog Specifications, and requires the performance and functionality of the ASRS System be evaluated in accordance with the Swisslog Specifications. Primus denies that Exhibit 1 is a complete copy of the GMS Contract because: (1) it is missing copies of various exhibits, including the Base Contract and Swisslog Specifications, which are expressly incorporated therein, and (2) empirical directed

multiple changes to the contract documents (both documented and undocumented). Primus denies all remaining allegations within Paragraph 10 of the Complaint.

11.     Primus admits the original price under the GMS Contract was $33,845,991, but denies all remaining allegations within Paragraph 11 of the Complaint.

12.     Primus denies the allegations in Paragraph 12 of the Complaint on the basis the GMS Contract and exhibits incorporated therein, including, but not limited to, the Base Contract and Swisslog Specifications, (collectively, the "Contract Documents"), speak for themselves.  Article 25 of the GMS Contract further provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."  The language empirical cites in Paragraph 12 of the Complaint must therefore be read in conjunction with the other Contract Documents, including the Base Contract and the Swisslog Specifications.

13.     Primus denies the allegations in Paragraph 13 of the Complaint on the basis the Contract Documents speak for themselves.  Article 25 of the GMS Contract further provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."  The language empirical cites in Paragraph 13 of the Complaint must therefore be read in conjunction with and complimentary to the other Contract Documents, including the Base Contract

and Swisslog Specifications.

14.     Primus admits to executing various agreements in connection with the GMS Contract, including an agreement with Primus Design Services, LLC to design the Freezer Facility.  Unlike these agreements, Primus executed the tri-party Base Contract to design, manufacture, install, commission, test and warrant the ASRS System with Swisslog on empirical's behalf.  Article 25 of the GMS Contract expressly defines the Base Contract as "that certain Contract for Owner [empirical], dated concurrently herewith, by and among Owner [empirical], Builder [Primus] and Swisslog."  Primus denies all remaining allegations in Paragraph 14 of the Complaint.

15.     Primus denies the allegations in Paragraph 15 of the Complaint on the basis the Contract Documents speak for themselves.  Article 25 of the GMS Contract further defines the Base Contract as "that certain Contract for Owner [empirical], dated concurrently herewith, by and among Owner [empirical], Builder [Primus] and Swisslog."  Primus denies all remaining allegations in Paragraph 15 of the Complaint.

16.     Primus admits the ASRS System was intended to support a fully automated system with limited need for manual labor and forklifts.  Primus denies all remaining allegations in Paragraph 16 of the Complaint on the basis the Contract Documents define the various responsibilities between the Parties as well as the

functionality of the ASRS System.

17.    Primus admits Paragraph 2(a) of the GMS Contract contains a definition for "Work."  Primus denies that this definition captures the complete definition of "Work" required under the Contract Documents.  The Contract Documents consist of the GMS Contract, Base Contract, Swisslog Specifications, and a host of other documents, which further define the term "Work."  Article 25 of the GMS Contract further provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."  The definition of Work empirical cites in Paragraph 17 of the Complaint must therefore be read in conjunction with and complimentary to the other Contract Documents, including the Base Contract and Swisslog Specifications.  Primus denies all remaining allegations in Paragraph 17 of the Complaint.

18.    Primus states the date for substantial completion of the Freezer Facility ("Substantial Completion Date") is defined differently throughout the Contract Documents.  Primus admits Article 2(c) of the GMS Contract indicates the Substantial Completion Date is December 13, 2017.  However, Article 21 of the GMS Contract defines the Substantial Completion date as both January 21, 2018 and February 15, 2018, which "shall be extended for certain matters as set forth in this Contract."  Moreover, all Contract Documents are to be read in a complimentary fashion.  Primus denies the "Substantial Completion Date" cited in Paragraph 18 is

binding upon the Parties, on the basis empirical made multiple changes to the Contract Documents (both documented and undocumented), including 64 change orders that empirical issued in 2017, 2018 and 2019. The changes that empirical directed require an extension of the Substantial Completion Date under the Contract Documents out until the Winter of 2020, if not later. Primus denies the remaining allegations in Paragraph 18 of the Complaint.

19.     Primus denies the allegations in Paragraph 19 of the Complaint on the basis it fails to accurately describe the payment process between the Parties under the Contract Documents which must be read together in a complimentary fashion. Empirical negotiated the terms of the Base Contract directly with Swisslog, including but not limited to: the initial price to be paid to Swisslog of $14,200,000.00, the amount of milestone payments issued to Swisslog, the Swisslog schedule, and expressly required that all Swisslog invoices be forwarded directly to empirical.

20.     Primus denies the allegations in Paragraph 20 of the Complaint on the basis the Contract Documents speak for themselves. Article 25 of the GMS Contract further provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all." The "warranty" language empirical cites in Paragraph 20 of the Complaint must therefore be read in conjunction with and complimentary to related provisions, including other warranty

language, in the other Contract Documents, including the Base Contract and Swisslog Specifications.

21.     Primus denies the allegations in Paragraph 21 of the Complaint on the basis the Contract Documents speak for themselves.  Article 25 of the GMS Contract further provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."  The "warranty" language empirical cites in Paragraph 21 of the Complaint must therefore be read in conjunction with and complimentary to pertinent provisions in the other Contract Documents, including the Base Contract and Swisslog Specifications.

22.     Primus admits Article 21 of the original GMS Contract allowed for imposition of liquidated damages in the amount of $3,000/day if the Freezer Facility was not substantially complete on or before the Substantial Completion Date. Primus denies that the Substantial Completion Date is binding upon the Parties, on the basis empirical made multiple changes to the Contract Documents (both documented and undocumented) including 64 change orders issued during 2017, 2018 and 2019 that require an extension of the substantial completion date under the Contract Documents out until the Winter of 2020, if not later.  Primus denies all remaining allegations in Paragraph 18 of the Complaint.

23.     Primus admits the Parties met on or about October 5, 2016 to discuss construction of the Freezer Facility and installation of the ASRS System, but denies

all remaining allegations in Paragraph 23 of the Complaint. Primus states that the ASRS System is substantially complete and was just weeks away from operation at the time empirical elected to ban Swisslog from the Freezer Facility thereby preventing Swisslog from testing, commissioning and debugging the ASRS System as of August 1, 2019.

24. Primus denies the allegations in Paragraph 24 of the Complaint. Primus states that the ASRS System is substantially complete and was just weeks away from operation at the time empirical elected to ban Swisslog from the Freezer Facility thereby preventing Swisslog from testing, commissioning and debugging the ASRS System as of August 1, 2019.

25. Primus denies the allegations in Paragraph 25 of the Complaint. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing Swisslog performed upon the ASRS System or to otherwise accept the ASRS System as being substantially complete. Moreover, items a through s listed in Paragraph 25 of the Complaint are not contractual requirements necessary to satisfy substantial completion of the ASRS System, but were unilaterally imposed by empirical.

26. Primus admits the ASRS System failed the first provisional acceptance

test in March of 2019. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing Swisslog performed upon the ASRS System or to otherwise accept the ASRS System as being substantially complete. Primus denies all remaining allegations in Paragraph 26 of the Complaint.

27.    Primus denies the allegations in Paragraph 27 of the Complaint. The Base Contract is a tri-party agreement between empirical, Primus and Swisslog, and Swisslog was not a "subcontractor" of Primus. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing Swisslog performed upon the ASRS System or to otherwise accept the ASRS System as being substantially complete.

28.    Primus denies the allegations in Paragraph 28 of the Complaint. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing

Swisslog performed upon the ASRS System or to otherwise accept the ASRS System as being substantially complete.

29.     Primus denies the allegations in Paragraph 29 of the Complaint. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing Swisslog performed upon the ASRS System or to otherwise accept the ASRS System as being substantially complete.

30.     Primus admits empirical issued Change Order #47, dated May 4, 2018 to the GMS Contract, but denies the characterization of the change offered by empirical, along with all other allegations in Paragraph 30 of the Complaint. Change Order #47 adjusted the various substantial completion date(s) under the GMS Contract to account for some of the multiple changes to the ASRS System that had been negotiated directly between empirical and Swisslog. Change Order #47 also clarified certain of empirical's rights and remedies directly against Swisslog under the GMS Contract, including the "right to assess liquidated damages" against Swisslog and "withhold" payments from Swisslog. Empirical issued multiple other change orders to the ASRS System, both documented and undocumented, after Change Order #47, which Swisslog and Primus contend require adjustments of the

Contract Documents, including an extension of the substantial completion date until the Winter of 2020, if not later. Primus denies the remaining allegations in Paragraph 30 of the Complaint.

31.   Primus admits to receiving an e-mail from empirical on or about July 5, 2019, but denies the characterization of the e-mail empirical has provided, along with all other allegations in Paragraph 31 of the Complaint. The e-mail contained demands empirical made concerning "minimum performance requirements" for the ASRS System, that according to Swisslog were neither based upon nor required by the Contract Documents. Swisslog has informed Primus that between July 8th and 23rd of 2019 the ASRS System passed all tests necessary to establish substantial completion, including the second provisional acceptance test and the trial operations test. Swisslog has also indicated that empirical refused to observe, participate or approve the testing performed upon the ASRS System by Swisslog or to otherwise accept the ASRS System as being substantially complete.

32.   Primus admits the Parties have discussed multiple plans regarding completion of the ASRS System, but denies the characterization of these plans offered by empirical, along with all other allegations in Paragraph 32 of the Complaint. The most recent plans the Parties discussed occurred on October 18, 2019, when empirical, Primus and Swisslog met in person in Dakota Dunes, South Dakota and reached a settlement of all disputes amongst and between them.

Nonetheless, that same afternoon empirical reneged on the oral settlement reached between the Parties when it filed the Complaint giving rise to this lawsuit.

33.    Primus denies the allegations in Paragraph 33 of the Complaint.

34.    Primus denies the allegations in Paragraph 34 of the Complaint.

35.    Primus denies the allegations in Paragraph 35 of the Complaint.

36.    Primus denies the allegations in Paragraph 36 of the Complaint.  Primus further states that empirical expressly agreed under Change Order #47 that any liquidated damages assessed by empirical in connection with the ASRS System would be withheld from Swisslog, not Primus.

37.    Primus admits to expressing dissatisfaction with Swisslog's performance under the Contract Documents from time to time, but denies empirical's characterization of any views about Swisslog's performance along with all other allegations in Paragraph 37 of the Complaint.  Primus conducted monthly control meetings with empirical during which concerns were to be voiced to empirical; however, empirical directed that these meetings be cancelled as of October, 2018.  Empirical made frequent and multiple changes to the Swisslog Specifications and other Contract Documents, both documented and undocumented, which empirical often communicated directly to Swisslog and of which Primus was often not aware, that generally gave rise to empirical's purported dissatisfaction.

38.    Primus admits empirical sent a communication purporting to terminate

the GMS Contract and Base Contract on August 8, 2019.  Since the Freezer Facility was substantially complete, empirical's purported termination of the GMS Contract was improper, wrongful, and constitutes a breach of the duties and obligations empirical owed to Primus under the GMS Contract.  Since, according to Swisslog, the ASRS System was substantially complete, empirical's purported termination of the Base Contract was improper, wrongful, and constitutes a breach of the duties and obligations empirical owed to Swisslog (and Primus) under the Base Contract and GMS Contract.

39.    Primus denies the allegations in Paragraph 39 of the Complaint. According to Swisslog, the $14+ million ASRS System is substantially complete, just weeks away from being operational, and all costs empirical incurs in removing and replacing the ASRS System constitute economic waste for which empirical is solely responsible.

40.    Primus denies the allegations in Paragraph 40 of the Complaint. The work under the GMS Contract and tri-party Base Contract were substantially complete and both contracts were wrongfully terminated by empirical.  However, if there was a material breach, then it is the responsibility of Swisslog under the tri-party Base Contract between empirical, Primus and Swisslog.

41.    Primus denies the allegations in Paragraph 41 of the Complaint. According to Swisslog, the $14+ million ASRS System is substantially complete,

just weeks away from being operational, and all costs empirical incurs in removing and replacing the ASRS System constitute economic waste for which empirical is solely responsible.

## Count 1
## Breach of Contract

42.    Primus incorporates the responses from paragraphs 1 through 41 of the Answer as if fully incorporated into its response to Count I of the Complaint.

43.    Primus admits to executing the GMS Contract with empirical; however, the GMS Contract incorporates multiple Contract Documents, including the Base Contract and the Swisslog Specifications, all of which must be read together to define the duties and obligations of empirical, Primus and Swisslog.  Article 25 of the GMS Contract provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."

44.    Primus admits the GMS Contract was initially a binding agreement but denies all remaining allegations in Paragraph 44 of the Complaint, including that empirical never had a specification for the Freezer Facility.  To the extent empirical wrongfully terminated the GMS Contract and Base Contract, empirical is no longer entitled to enforce the Contract Documents against Primus.   Primus denies all

remaining allegations in Paragraph 44 of the Complaint.

45.   Primus denies the allegations in Paragraph 45 of the Complaint.

46.   Primus denies the allegations in Paragraph 46 of the Complaint.

47.   Primus admits empirical made certain payments owed to Primus under the GMS Contract and to Swisslog under the Base Contract, but denies all remaining allegations in Paragraph 47 of the Complaint.

48.   Primus denies the allegations in Paragraph 48 of the Complaint.

49.   Primus denies the allegations in Paragraph 49 of the Complaint.

50.   Primus denies the allegations in Paragraph 50 of the Complaint.

51.   Primus denies the allegations in Paragraph 51 of the Complaint.

## <u>Count 2</u>
## <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

52.   Primus incorporates the responses from paragraphs 1 through 51 of the Answer as if fully incorporated into its response to Count 2 of the Complaint.

53.   Primus admits the GMS Contract was initially a binding agreement but denies all remaining allegations in Paragraph 53 of the Complaint.  Since empirical wrongfully terminated the GMS Contract and Base Contract, empirical is no longer

entitled to enforce the Contract Documents against Primus.

54.    Primus denies the allegations in Paragraph 54 of the Complaint.

55.    Primus denies the allegations in Paragraph 55 of the Complaint.

56.    Primus denies the allegations in Paragraph 56 of the Complaint.

<div align="center">

**Count 3**
**Unjust Enrichment**

</div>

57.    Primus incorporates the responses from paragraphs 1 through 56 of the Answer as if fully incorporated into its response to Count 3 of the Complaint.

58.    Primus admits empirical has paid approximately $33.34 million under the GMS Contract, part of which was paid directly to Primus and part of which was paid for the benefit of Swisslog, but denies all remaining allegations in Paragraph 58 of the Complaint.

59.    Primus denies all allegations in Paragraph 59 of the Complaint. According to Swisslog, the $14+ million ASRS System is substantially complete, just weeks away from being operational, and all costs empirical incurs in removing and replacing the ASRS System constitute economic waste for which empirical is solely responsible.

<div align="center">

**Count 4**
**Breach of Warranty**

</div>

60.    Primus incorporates the responses from paragraphs 1 through 51 of the

Answer as if fully incorporated into its response to Count 4 of the Complaint.

61. Primus admits the GMS Contract contains an Article 6, but denies empirical's characterization of Article 6, along with all remaining allegations in Paragraph 61 of the Complaint. The GMS Contract incorporates multiple Contract Documents, including the Base Contract and the Swisslog Specifications, all of which must be read together to define the duties and obligations of empirical, Primus and Swisslog. Article 25 of the GMS Contract provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."

62. Primus denies the allegations in Paragraph 62 of the Complaint. According to Swisslog, the $14+ million ASRS System is substantially complete, just weeks away from being operational, and all costs empirical incurs in removing and replacing the ASRS System constitute economic waste for which empirical is solely responsible.

63. Primus denies the allegations in Paragraph 62 of the Complaint. According to Swisslog, the $14+ million ASRS System is substantially complete, just weeks away from being operational, and all costs empirical incurs in removing and replacing the ASRS System constitute economic waste for which empirical is

solely responsible.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim against Primus upon which relief may be granted based upon the various acts, omissions and misdeeds of empirical.

## SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by reason of the allegations contained within the Counterclaims asserted against empirical by Primus.

## THIRD AFFIRMATIVE DEFENSE.

The Complaint is barred in totality by reason of the settlement agreement reached between empirical, Primus and Swisslog on October 18, 2019 at a face-to-face meeting of authorized representatives that took place in Dakota Dunes, South Dakota.

## FOURTH AFFIRMATIVE DEFENSE

The Complaint fails to join an indispensable party, namely Swisslog, the entity empirical selected to design, manufacture, install, commission, test and warrant the ASRS System under the Guaranteed Maximum Sum Contract ("GMS Contract") about which empirical now claims to be defective.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred in whole or in part because the ASRS System was designed under a direct agreement between empirical and Swisslog

(Swisslog/empirical Agreement") under which "Swisslog Proposal 4720, Version 5, dated August 30, 2016" ("Swisslog Specifications") was created, reviewed, approved and accepted by empirical as the basis for evaluating the operation, performance and testing of the ASRS System that empirical now claims to be defective.

## SIXTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint have been waived, in whole or in part, by virtue of unilateral changes empirical made to the Contract Documents, including the Swisslog Specifications, that, according to Swisslog, impacted performance, operation, functionality and testing of the ASRS System under the Contract Documents.

## SEVENTH AFFIRMATIVE DEFENSE.

The damages sought in the Complaint are barred, in whole or in part, because, if the $14+ million ASRS System is substantially complete and just weeks away from operation as Swisslog claims, then empirical's decision to remove and replace most, if not all, of the ASRS System constitutes "economic waste" for which empirical is solely responsible.

## EIGHTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because if empirical's allegations against Swisslog are true, then empirical was negligent in selecting Swisslog to design, manufacture, install, commission, test and warrant the ASRS System under the GMS Contract.

## NINTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because if the ASRS System was controlled and directed by software to be provided and integrated by empirical as Swisslog claims, then the alleged failure of the ASRS System to satisfy empirical's business needs is the sole responsibility of empirical.

## TENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because empirical has waived its rights and causes of action against Primus or is estopped by the doctrine of laches from asserting any causes of action against Primus by reason of empirical's failure to timely pursue its claims when Primus allegedly failed to complete its work, including the ASRS System, by the date empirical contends such completion as required. Empirical instead knowingly allowed Primus to change its position and continue to devote more resources to perform work after such date and knowingly accepted the benefit of Primus' continued performance.

## __Prayer For Relief__

**WHEREFORE**, Primus respectfully requests the Court grant the following:

a.      The Complaint filed by empirical be dismissed;

b.      Empirical recover nothing;

c.      All costs and expenses of this action incurred by Primus and its attorney's fees be cast upon empirical as permitted by law; and

d.      Primus be granted all other relief as this Court deems just and proper.

## COUNTERCLAIM OF PRIMUS BUILDERS, INC.
## AGAINST EMPIRICAL FOODS, INC.

Defendant Primus Builders, Inc. ("Primus") asserts this compulsory counterclaim against Plaintiff empirical foods, inc. f/k/a Beef Products, Inc. ("empirical") and states its claims as set forth herein.  All other terms herein shall have the same meaning as those in Primus's Answer to the empirical Complaint, set forth above.

### Parties

1.      **Primus**.  Primus is a Georgia corporation, maintaining its principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189. Primus is a general contractor, which among other things, designs and builds commercial refrigerated warehouses and freezer facilities for companies engaged in the production and distribution of food products.

2.      **Empirical**.  Empirical, formerly known as Beef Products, Inc., is a Nebraska corporation, maintaining its principal place of business at 891 Two Rivers Drive, Dakota Dunes, South Dakota 57049.  Empirical is engaged in the production, storage and distribution of meat products for wholesale in the food industry. Empirical filed the Complaint and may therefore be served through its counsel of record.

3.      **Swisslog**.  Swisslog is a Virginia corporation, maintaining principal places of business at 161 Enterprise Drive, Newport News, Virginia 23603 and at

10825 East 47th Avenue, Denver, Colorado 80239.  Swisslog is an equipment supplier and software developer, which among other things, designs and manufactures equipment, develops and deploys software, and installs, tests, and commissions ASRS systems used in the production, storage, and distribution of food products at commercial freezer facilities.  Swisslog designed and installed the ASRS System at the heart of this dispute.

### Jurisdiction & Venue

4.      **Subject Matter Jurisdiction**.   This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Parties, the amounts in controversy exceed $75,000, and the claims asserted in this Counterclaim arise from the same disputes and controversies identified in the Complaint, namely alleged defects within the ASRS System Swisslog designed and installed at the Freezer Facility.

5.      **Personal Jurisdiction**.   This Court has personal jurisdiction over empirical because it initiated this lawsuit alleging defects in the ASRS System Swisslog installed at the Freezer Facility and the various contracts among and between the Parties provide that all resulting disputes shall be governed by the laws of Nebraska.

6.      **Venue**.  The venue over this dispute is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Swisslog installed the allegedly defective ASRS

System at the Freezer Facility.

## Facts

7.     **The Dispute.**    This dispute arises from a complex business and contractual relationship between empirical and Swisslog, that not only blurred the formal contractual lines of authority alleged in the Complaint, but also gives direct rise to the claims and allegations now asserted against Primus.  Empirical claims the ASRS System is incomplete, defective, must be ripped out and replaced, and refuses to allow Swisslog to perform additional testing and commission the ASRS System. Swisslog claims the ASRS System is substantially complete and would be fully functional and operational but for the refusal of empirical to allow Swisslog the opportunity to perform additional testing, commission, and debug the ASRS System installed within the Freezer Facility.

8.     **The ASRS System**.  The ASRS System is a fully automated, computer controlled, storage and retrieval system, that supports the operation of the Freezer Facility.  Empirical selected Swisslog based upon its international reputation as the manufacturer and installer of the "Cadillac" of ASRS Systems throughout North America and Europe.  Another critical factor in the selection of Swisslog, was its ability to provide a unique ASRS System that could handle product large pallet sized loads as well as smaller case sized loads.  According to Swisslog, it had successfully installed hundreds of ASRS systems using its standard proprietary software,

controlling automated equipment handling both pallet and case sized loads and this same standard Swisslog software was to control the equipment within the ASRS System at the Freezer Facility. While the standard prepackaged Swisslog software can be customized, the resulting modifications often introduce unintended consequences that ripple throughout the operation and functionality of the overall ASRS System requiring extensive debugging.

      9.    **Software Interface.** The ASRS System was further complicated because its operation and functionality, about which empirical now complains, is controlled by the integration of two independent software systems: one provided by Swisslog, the other provided by empirical. Swisslog provided its standard Warehouse Management System software package, "WMS" or SynQ that was installed and customized in conjunction with empirical ("Swisslog Software"). Empirical provided an Enterprise Resource Planning software package, "Microsoft Dynamics," or ERP that was installed and customized by empirical ("empirical Software"). While the Swisslog Software controlled equipment within the ASRS System that stored and retrieved product within the Freezer Facility, the empirical Software directs orders to the Swisslog Software by identifying the product that was to be stored or retrieved, including the quantity, location, type and date restriction of the product. According to Swisslog, the empirical Software served as the "master" and the Swisslog Software served as the "servant," with empirical being responsible

for integrating the two software packages per the Contract Documents. Thus, it would be empirical who would be responsible for ensuring that the empirical Software communicated with the Swisslog Software resulting in an operational and functional ASRS System.

10. **Project BPI**. Empirical selected Swisslog to provide the ASRS System, after conducting its own due diligence background review, including: the preparation of designs, the manufacturing and installation of the equipment, the development of the software, and then the testing, commissioning and integration of the software and equipment required to operate the ASRS System. Over the course of 16 months—from January of 2015 to April of 2016—the Parties participated in multiple meetings, design sessions, schedule reviews, and pricing exercises, to collectively develop a design and budget for the Freezer Facility utilizing Primus and Swisslog. Neither Swisslog nor Primus were or have ever been compensated by empirical for any of the investigative design work performed during this 16-month planning period.

11. **ASRS Design.** In April of 2016, empirical executed a design agreement with Swisslog, the Swisslog/empirical Agreement, to design and prepare technical specifications defining the operation and functionality of the ASRS System. Primus was not a party to the Swisslog/empirical Agreement. Empirical also executed a separate agreement with Primus, in which Primus agreed to design

and prepare specifications for the Freezer Facility structure in which the ASRS System would be housed.  At the time, it was understood empirical would enter into a contract directly with Swisslog to supply the ASRS System followed by a separate contract directly with Primus to construct the Freezer Facility.  Upon information and belief, the initial design for the ASRS System, about which empirical now complains, was prepared under the Swisslog/empirical Agreement.

12.   **Value Engineering**.  Over a three (3) month period—from April 2016 through June 2016—empirical required Swisslog to "value engineer" the ASRS System designed under the Swisslog/empirical Agreement in order to reduce costs ("Value Engineering Changes").  As a result of these Value Engineering Changes, the pricing for the ASRS System was reduced by at least $10,898,890 resulting in a lower level of operation and functionality than empirical originally sought.  Primus did not prepare and was not involved in the Value Engineering Changes under the Swisslog/empirical Agreement.

13.   **The Continuing Impacts of Value Engineering Changes.**  The Value Engineering Changes eliminated many functions empirical initially requested, such as automated blast freezing and storage capacity in both the pallet and mini-load sections of the ASRS System.  These functions and operations were eliminated at empirical's request, in order to align the costs of the ASRS System with empirical's overall budget for the Freezer Facility, and they resulted in an ASRS System with

fewer functions and operations than empirical originally sought.  After installation of the ASRS System began, empirical directed Swisslog to add back many of the functions and operations that had been deleted through Value Engineering Changes.  Many of the additional functions and operations that had been deleted by Value Engineering Changes, only to be added back after installation began, were not documented by Swisslog and empirical.   Nor were the Contract Documents contemporaneously adjusted for the cost and time impacts resulting from adding back functions and operations.

14.   **The Swisslog Specifications.**    The initial design and technical specifications for the ASRS System about which empirical now complains, were developed under the Swisslog/empirical Agreement.  It was empirical, not Primus, who created, reviewed, approved, accepted, adopted and constantly changed the technical specifications for the design, operation and functionality of the ASRS System.  These technical specifications are set forth in a 250 page document, entitled "Swisslog Proposal 4720, Version 5, dated August 30, 2016," and are referred to herein as the Swisslog Specifications.   The Swisslog Specifications were later adopted into the tri-party contractual arrangement and served as the basis for the design, furnishing and installation and commissioning of the ASRS System and provided criteria for testing its performance.

15.   **Contract Negotiations**.  In accordance with its original contracting

scheme, empirical negotiated one contract with Swisslog to supply, install and commission the ASRS System and a second contract with Primus to construct the Freezer Facility.  Primus did not participate in the negotiation of contract terms between empirical and Swisslog.  Similarly, Swisslog did not participate in the negotiation of contract terms between empirical and Primus.   Empirical ultimately presented Primus with fully negotiated contract terms and a completed design and directed Primus to enter into a contract with Swisslog on behalf of empirical.  Primus had no opportunity to negotiate any independent contract terms with Swisslog.

16.     **2016 – The New Contracting Scheme**.  After empirical had negotiated and agreed upon terms under separate contracts with Swisslog and Primus, empirical elected to change its contracting scheme.  Empirical abandoned its original plan of entering into a direct contract with Swisslog to provide the ASRS System designed and specified under the Swisslog/empirical Agreement.  In June of 2016, empirical requested Primus to execute (on behalf of empirical) the contract that empirical had negotiated with Swisslog to provide the ASRS System while empirical would simultaneously execute a contract with Primus to construct the Freezer Facility.

17.     **Base Contract for Project BPI**.   Primus, on behalf of empirical, executed the "Base Contract for Project BPI," dated September 2, 2016, ("Base Contract") with Swisslog  thereby creating a tri-party agreement.  The Base Contract was executed in reliance upon Swisslog Specifications prepared under the

Swisslog/empirical Agreement providing a complete and final design for the ASRS System.  Consequently, the Base Contract incorporated the Swisslog Specifications prepared under the Swisslog/empirical Agreement, and required Swisslog to design and manufacture the equipment, develop the software, and then install, test, commission and integrate the software and equipment for the ASRS System in accordance with the Swisslog Specifications.  The Base Contract further required that the performance and functionality of the ASRS System be evaluated based upon criteria identified by the Swisslog Specifications.  A true and correct copy of the Base Contract, including Exhibits I through V, but excluding certain exhibits referenced therein, is attached hereto as Exhibit "A".

18.  **GMS Contract**.  Primus next executed the "Guaranteed Maximum Sum Contract," dated September 2, 2016, ("GMS Contract") with empirical in reliance upon the Base Contract negotiated by empirical and the Swisslog Specifications for the ASRS System prepared under the Swisslog/empirical Agreement.  Article 25 of the GMS Contract expressly recognizes the tri-party Base Contract as "that certain Contract for Owner, dated concurrently herewith, by and among Owner [empirical], Builder [Primus] and Swisslog."  Since the Base Contract was executed on behalf of empirical, the GMS Contract incorporates the Base Contract and the Swisslog Specifications, requires Swisslog to provide an ASRS System in accordance with the Swisslog Specifications, and requires the

performance and functionality of the ASRS System be evaluated in accordance with the Swisslog Specifications.  A true and correct copy of the GMS Contract with partial Exhibits A through I is attached hereto as Exhibit "B".

19.    **The Contract Documents**.  The ASRS System was therefore to be designed and installed by Swisslog in accordance with a variety of contract documents, including the GMS Contract, the tri-party Base Contract, the Swisslog Specifications, and other documents identified and incorporated therein, including the Exhibits "A" through "I" as identified in these contracts (collectively the "Contract Documents").  In this regard, Article 25 of the GMS Contract provides that "[t]he Contract Documents are complimentary, and what is required by any one shall be as binding as if required by all."  Consequently, all Contract Documents must be read and interpreted in conjunction and equally with each other, without giving preference to the GMS Contract as is now alleged by empirical.

20.    **Blurred Lines of Authority**.  Despite the new contracting scheme and subsequent tri-party Base Contract, ostensibly between Swisslog and Primus, empirical continued to deal directly with Swisslog concerning the ASRS System just as they had done under the Swisslog/empirical Agreement.  From 2016 through 2019, empirical conducted various meetings, discussions, and negotiations directly with Swisslog, during which, empirical and Swisslog made changes to the design of the ASRS System, the Swisslog Specifications, and the Contract Documents.  Many

of these transactions were conducted without participation by Primus who only later

was informed of the decisions and changes reached directly between Swisslog and

empirical.

21. **Changes to the ASRS System Development**.  Development of the

ASRS System was intended to proceed in a sequential manner that would allow for

proper integration of the material handling equipment with the Swisslog Software

package as follows:

    i.)    Design of the ASRS System;

    ii.)    Development of the Swisslog Software;

    iii.)    Manufacturing of the material handling equipment;

    iv.)    Installation of the material handling equipment;

    v.)    Factory acceptance of the Swisslog Software;

    vi.)    Integration testing of the material handling equipment;

    vii.)    Deployment of the Swisslog Software;

    viii.)    Completion of the ASRS System;

    ix.)    Provisional acceptance testing of the ASRS System;

    x.)    Acceptance of the ASRS System; and

    xi.)    Commissioning and debugging of the ASRS System.

Empirical and Swisslog deviated from the planned development of the ASRS System

in multiple respects, including but not limited to: i.) failing to agree upon functional

specifications for the Swisslog Software prior to execution of the Contract Documents, ii.) deleting factory acceptance testing, iii.) deploying Swisslog Software prior to integration testing of the material handling equipment, and iv.) failing to agree upon a definition for completion of the ASRS System.  Upon information and belief, the cumulative effects of these changes to the ASRS System supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

22.     **Changes to the Swisslog Software**.  Empirical and Swisslog made multiple changes to the Swisslog software thereby changing the Swisslog Specifications and standard software package after execution of the Contract Documents.  Those changes to the Swisslog Software which are currently known to Primus include:

    i.)      Stack Induction: New RF mobile application functionality;

    ii.)     Dump Station: New SynQ screen for dump locations;

    iii.)    Rework Reject: New SynQ screen to rework/reject pallet information;

    iv.)    Blast Freezer Pick-Up: New blast freezer functionalities;

    v.)     Shipping: New shipping functionalities;

    vi.)    Goods-to-Person Workstation: New SynQ screens for GTP;

    vii.)   Task Management: New SynQ cockpit dashboards;

    viii.)  Functional Specification Rewrite: rewriting and confirming the new functional specification;

    ix.)    Host Interface Contacts Addition: New host interface messages;

x.)   Host Interface finProd Updates: New host interface changes;

xi.)   Palletizer Development, Install, and Testing: pushing the palletizer install and testing to occur after GO LIVE; and

xii.)   Palletizer: Palletizer end-effector changes based around new egg-shell sheets.

Upon information and belief, the cumulative effects of these software changes supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

23.   **2017 – Changes to the Contract Documents**.  After the GMS Contract was executed, and throughout 2017, empirical and Swisslog made changes to the Contract Documents that impacted completion of the ASRS System, including but not limited to:

i.)   In August of 2017, Swisslog submitted a proposed functional specification to empirical based upon the Swisslog Specifications and standard software package for the ASRS System;

ii.)   On September 17, 2017, empirical and Swisslog met in Newport News, Virginia during which empirical requested modifications to the standard software package identified with the functional specification;

iii.)   On October 17, 2017, empirical and Swisslog met in Shippensburg, Pennsylvania to inspect an ASRS System completed by Swisslog at a facility operated by Schreiber Foods;

and

iv.)      Following the October 17, 2017, site visit between Swisslog and empirical, additional changes were made to the standard software package and Swisslog Specifications.

Upon information and belief, the cumulative effects of these changes to the Contract Documents supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

24.      **2018 – More Changes to the Contract Documents.**    Empirical continued to deal directly with Swisslog throughout 2018, making further changes to the Contract Documents that impacted completion of the ASRS System, including but not limited to:

i.)      On January 10 through 11, empirical and Swisslog deleted the factory acceptance test ("FAT") for the Swisslog Software supporting the ASRS System;

ii.)      Deletion of the FAT changed both the Swisslog Specifications and the Base Contract and eliminated a test that would have revealed the alleged software defects about which empirical now complains;

iii.)      On February 5, 2018, Swisslog submitted a functional software specification reflecting the software changes required by

empirical which differed from and made changes to the Swisslog Specifications;

iv.) On February 6, 2018, Swisslog informed empirical (who did not object) that the completion date for the ASRS System under the revised Swisslog Specifications would be extended until August 30, 2018;

v.) In April of 2018, Swisslog and empirical agreed the completion date for revised, customized software supporting the ASRS System would be extended until July 6, 2018, and substantial completion of the ASRS System extended until August 16, 2018;

vi.) On May 4, 2018, empirical presented Primus with a change order to the GMS Contract reflecting the agreement reached directly between empirical and Swisslog in April 2018; and

vii.) On November 21, 2018, Swisslog informed empirical (who once again did not object) that the completion date for the ASRS System under the revised Swisslog Specifications would be extended until December 10, 2018.

Upon information and belief, the cumulative effects of these changes to the Contract Documents supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

25. **2019 – Still More Changes to the Contract Documents.** Empirical continued to deal directly with Swisslog throughout 2019, making even further changes to the Contract Documents that impacted completion of the ASRS System, including but not limited to:

i.) Between August 2018 and March 2019, empirical made 13 changes to the GMS Contract, many of which changed the operation and functionality of the ASRS System under the Base Contract;

ii.) On March 22, 2019, Swisslog informed empirical (who did not object) that the ASRS System was complete and ready to "go live" as of April 15, 2019;

iii.) On March 27, 2019, Swisslog informed empirical that the ASRS System satisfied the provisional acceptance test ("PAC Test") under the performance standards established by the Swisslog Specifications;

iv.) On April 11, 2019, empirical, with support from Primus, informed Swisslog the ASRS System did not satisfy the PAC Test under the revised Swisslog Specifications;

v.) On April 18, 2019, Swisslog informed empirical (who did not object) the ASRS System was complete and ready for end to end

testing on April 22, 2019, based upon the revised Swisslog Specifications;

vi.) On April 26, 2019, Swisslog informed empirical (who once again did not object) the ASRS System was complete and ready for end to end testing on April 29, 2019, based upon the revised Swisslog Specifications;

vii.) On May 14, 2019, Swisslog informed empirical (who once again did not object) the ASRS System was to be completed no later than May 27, 2019, based upon the revised Swisslog Specifications; and

viii.) On July 29, 2019, Swisslog informed empirical the ASRS System could be tested, commissioned and debugged no later than November 16, 2019, based upon the revised Swisslog Specifications.

Between the dates stated in the subparagraphs above, empirical directed further changes to the functionality of the ASRS System. Upon information and belief, the cumulative effects of these changes to the Contract Documents supports and requires an adjustment of the substantial completion date under the Contract Documents until the Winter of 2020, if not later.

26. **Testing the ASRS System.** Swisslog claims the ASRS System

installed at the Freezer Facility, the design of which was approved, reviewed and revised by empirical, meets or exceeds the initial testing requirements under the Contract Documents and is therefore substantially complete. According to Swisslog, the ASRS System met the requirements of both a second "provisional acceptance test" and "trial operational testing" no later than July 23 through July 24 of 2019. Swisslog has also indicated that empirical refused to observe, participate or approve the testing performed upon the ASRS System by Swisslog or to otherwise accept the ASRS System as being substantially complete.

27. **Disputes Over Substantial Completion**. Despite making numerous changes to the ASRS System development, Swisslog Software, Contract Documents, and the Swisslog Specifications, empirical and Swisslog never reached an agreement over defining criteria for establishing achievement of substantial completion of the ASRS System. On the one hand, empirical contends the ASRS System is incomplete and defective, the delayed completion is inexcusable, and the ASRS System will not be complete until fully functional, operational and debugged. On the other hand, Swisslog contends the ASRS System is substantially complete and ready for testing and commissioning, delayed completion is excusable, and operational and functionality issues must be resolved post substantial completion during testing, commissioning and debugging. Empirical and Swisslog therefore disagree over whether the ASRS System is substantially complete and this

disagreement reached its breaking point on August 1, 2019, when empirical banned Swisslog from the Freezer Facility.

28.     **Notice of Termination of the Contracts**.   On August 8, 2019, empirical notified Primus that it considered the ASRS System to be defective and incomplete and purported to terminate both the GMS Contract and Base Contract. Since the date of the purported termination, the Parties have discussed various options for making the ASRS System acceptable to empirical, including additional testing, commissioning and debugging by Swisslog or the possible takeover by a third-party vendor acceptable to empirical.  Throughout these discussions, empirical continued to claim the ASRS System was defective and incomplete—while Swisslog continued to claim the ASRS System was substantially complete and ready for additional testing, commissioning and debugging.  Whichever entity was correct, throughout these discussions the Parties acknowledged the only practical commercial solution was for Swisslog to make the ASRS System operational with empirical's cooperation.

29.     **Settlement Agreement**.  Between October 14th and 18th of 2019, senior representatives of the Parties discussed a global settlement of all disputes regarding the ASRS System.  On October 18, 2019, representatives of the parties met in person at empirical's principal office in Dakota Dunes, South Dakota and agreed upon the settlement of all disputes, including the following material terms ("Settlement

Agreement"):

    i.)    Swisslog would debug the software to support the ASRS System, including all changes and deviations to the Contract Documents required by empirical no later than December 2, 2019;

    ii.)    Swisslog would test, commission and debug the ASRS System and turn it over to empirical no later than March 27, 2020;

    iii.)    Primus would establish and deposit $500,000.00 into an escrow account to ensure Swisslog would debug the ASRS System;

    iv.)    Swisslog would reduce its contract amount by $1 million with a corresponding credit issued to empirical;

    v.)    The contractual cap of $1 million upon liquidated damages against Swisslog would be removed;

    vi.)    Swisslog would provide one (1) year of software support to empirical free of charge;

    vii.)    All Parties agreed that the operation of the ASRS System was critical; and

    viii.)    All disputes between the Parties would be resolved so long as the Parties performed under the Settlement Agreement.

At the close of the meeting on Friday, October 18, 2019, after the settlement was agreed upon, empirical requested and Swisslog agreed to submit a schedule and "road map"

for operation of the ASRS System. Swisslog originally anticipated submitting the information to empirical on October 21, 2019; however, Swisslog required additional time to assemble the schedule and "road map." The information requested by empirical was submitted by Swisslog on Tuesday, October 22, 2019, and further supplemented as requested by empirical on Wednesday October 23, 2019.

30. **Empirical's Conflicting Positions**. Unbeknownst to Primus, at the very same time the Parties agreed upon a settlement of all disputes regarding the ASRS System on October 18, 2019, counsel for empirical was filing the Complaint giving rise to this lawsuit. As Swisslog prepared, submitted and supplemented the schedule and "road map" as requested by empirical on October 22 and 23, 2019, the lawsuit had already been filed by empirical. Not only has empirical reneged upon the Settlement Agreement by filing this lawsuit, it now disavows the only commercially practical solution for operation of the ASRS System. Upon information and belief, empirical now contends the Swisslog Software must be abandoned and the entire $14 million ASRS System, both equipment and software, must be demolished, removed and replaced.

31. **The Complaint**. Having reneged on the Settlement Agreement, empirical now attempts to assert various claims and allegations in its Complaint that Primus is responsible for alleged defects in the operation and functionality of the ASRS System without regard to various acts and omissions on the part of empirical

including: (i.) empirical's background due diligence research on Swisslog and the
selection, approval and eventual mandate to Primus to execute, on behalf of
empirical, the tri-party Base Contract with Swisslog, (ii.) the development of the
ASRS System design and Swisslog Specifications under the Swisslog/empirical
Agreement, (iii.) empirical's review, approval, acceptance and adoption of the
Swisslog Specifications defining operation and functionality of the ASRS System,
(iv.) the negotiation of the Base Contract between Swisslog and empirical, (v.) the
execution of the tri-party Base Contract with Swisslog, with Primus executing on
behalf of empirical, (vi.) the incorporation of the Base Contract and Swisslog
Specifications into the GMS Contract, (vii.) empirical's agreement to evaluate the
operation and functionality of the ASRS System in accordance with the Swisslog
Specifications, (viii.) Swisslog's and empirical's changes to the ASRS System
development, Swisslog Software, Contract Documents, and Swisslog Specifications,
without contemporaneous involvement by Primus, (ix.) the inability of empirical to
integrate the empirical Software or ERP with the Swisslog Software or SynQ to
satisfy its wants and needs, and (x.) empirical's express agreement for a global
settlement of all disputes regarding the ASRS System.  Upon information and belief,
the cumulative impact of these acts and omissions on the part of empirical imposed
major impacts upon operation and functionality of the ASRS System, delayed
completion of the ASRS System, and caused and created the alleged damages now

sought by empirical.

## CLAIMS

## COUNT I
## Breach of the Settlement Agreement

32.   **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 31 into Count I.

33.   **Duty**.   The Parties reached an oral Settlement Agreement on October 18, 2019, under which all disputes arising from the ASRS System would be resolved based upon definitive commercial terms.

34.   **Breach**.   Empirical breached the Settlement Agreement by filing this Complaint and failing and refusing to perform its duties and obligations under the Settlement Agreement.

35.   **Causation**.   Empirical's breach of the Settlement Agreement proximately caused damages to Primus including, but not limited to, any damages for which Primus is found liable for damages in this lawsuit that would have been otherwise barred by the Settlement Agreement and all costs and expenses incurred in connection with the lawsuit, including attorney's fees, such liability and additional costs and expenses of litigation resulting directly from a breach of the Settlement Agreement by empirical.

36.   **Damages**.   Primus is entitled to recover against empirical all damages proximately caused by breach of the Settlement Agreement including, but not

limited to, all costs, expenses, liability and damages assessed against Primus that would have otherwise been barred by the Settlement Agreement as well as costs and expenses of litigation, including attorney's fees, incurred by Primus in association with this lawsuit.

37. **Conditions Precedent**. Primus has performed all conditions precedent and substantially performed its duties and obligations under the Settlement Agreement or has otherwise been excused from all conditions precedent to its recovery of damages based upon the acts and omissions of empirical.

## COUNT II
## Wrongful Termination of the GMS Contract.

38. **Common Allegations.** Primus incorporates the allegations from paragraphs 1 through 31 into Count II.

39. **Substantial Completion.** Primus substantially completed the design and construction of the Freezer Facility in accordance with the Contract Documents, and turned the Freezer Facility over to empirical on May 31, 2018 for subsequent completion of the ASRS System under the tri-party Base Contract. Once substantial completion of the Freezer Facility was achieved, the GMS Contract was no longer subject to termination, and any attempt to do so by empirical would be improper, unlawful and an intentional breach of the Contract Documents.

40. **Termination.** Empirical wrongfully and unlawfully terminated the GMS Contract on August 8, 2019 in direct violation of the Contract Documents and

despite Primus having substantially completed the Freezer Facility in accordance with the Contract Documents.

41.   **Causation.**   The wrongful termination of the GMS Contract by empirical has caused severe injury to Primus including but not limited to: lost revenues and profit under the GMS Contract, injuries to reputation and standing in the industry, and the costs and expenses incurred in connection with this lawsuit, including attorney's fees.

42.   **Damages.**   Empirical is responsible for all direct and consequential damages incurred by Primus as a result of the wrongful termination of the GMS Contract in amounts to be proven at trial, plus the costs and expenses of litigation, including reasonable attorney's fees.

<div align="center">

**COUNT III**
**Wrongful Termination of the Base Contract.**

</div>

43.   **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 31 and 38 through 42 into Count III.

44.   **Substantial Completion**.   According to Swisslog, it substantially completed the design and installation of the ASRS System in accordance with the Contract Documents, as established by the second "provisional acceptance test" and "trial operational testing" on July 23 through July 24 of 2019.   Swisslog has also indicated that empirical refused to observe, participate or approve the testing performed upon the ASRS System by Swisslog or to otherwise accept the ASRS

System as being substantially complete.  Once substantial completion of the ASRS System was achieved, the Base Contract was no longer subject to termination, and any attempt to do so by empirical would be improper, unlawful and an intentional breach of the Contract Documents.

45.  **Wrongful Termination**.  If Swisslog is correct and the ASRS System is substantially complete, then Empirical wrongfully and unlawfully terminated the Base Contract on August 8, 2019 in direct violation of the Contract Documents and despite Swisslog having substantially completed the ASRS System in accordance with the Contract Documents.

46.  **Causation**.  Empirical's wrongful termination of the Base Contract proximately caused damages to Primus including, but not limited to, any damages for which Primus is found liable to Swisslog due to the wrongful termination of the Base Contract, as well as costs and expenses of this lawsuit, including Primus' attorney's fees, that result directly from the acts and omissions of empirical. Empirical's wrongful termination also directly resulted in the withholding of payments and compensation from Primus that were otherwise owed by empirical.

47.  **Damages.**  Empirical is responsible for damages proximately caused by its wrongful termination of the Base Contract including, but not limited to, all costs, expenses, liability and damages assessed against Primus as a result of wrongful termination of the Base Contract, as well as costs and attorney's fees

incurred by Primus in association with such claims.

<div align="center">

## COUNT IV
### Breach of the Contract Documents

</div>

48.   **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 31 and 38 through 47 into Count IV.

49.   **Payment**.  Empirical was obligated by the Contract Documents to issue both progress and final payments to Primus for all costs and fees to construct the Freezer Facility and the ASRS System, including amounts invoiced by Swisslog under the tri-party Base Contract, subject to the Guaranteed Maximum Sum, as adjusted pursuant to changes to the Contract Documents.

50.   **Changes.**  Empirical was also obligated by the Contract Documents to "equitably adjust" or modify the Guaranteed Maximum Sum (including the Primus fee) and date of Substantial Completion to account for changes made by empirical to the Contract Documents.

51.   **Breach**.  Empirical failed to issue payments or to equitably adjust or modify the Guaranteed Maximum Sum and date of Substantial Completion as required by the Contract Documents, thereby breaching both the GMS Contract and the Base Contract.  Empirical also breached its contractual obligations by failing to participate in, obstructing and frustrating the performance of testing, debugging, training, instruction, and other completion activities required for the ASRS System.

52.   **Causation.**  The failure and refusal of empirical to issue payments in

accordance with the Contract Documents and to equitably adjust or modify the Guaranteed Maximum Sum and date of Substantial Completion to reflect the impacts of changes made by empirical to the Contract Documents (both documented and undocumented) have directly resulted in financial harm to Primus in the form of unpaid and unreimbursed costs and expenses and fees and also rendered Primus potentially liable to Swisslog for damages for uncompensated work Swisslog performed.

53.     **Damages.**  Empirical is responsible for all costs, expenses, lost fees and for all liability and damages assessed against or incurred by Primus resulting from empirical's breaches of the Contract Documents as well as costs and attorney's fees incurred by Primus in association with such claims.

54.     **Conditions Precedent.**  Primus has performed all conditions precedent and substantially performed its duties and obligations under the Base Contract or has otherwise been excused from all conditions precedent based upon the acts and omissions of empirical.

<div align="center">

**COUNT V**
**Breach of Duty of Good Faith & Fair Dealing**

</div>

55.     **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 54 into Count V.

56.     **Duty**.  Empirical had an implied duty of good faith and fair dealing which applies to both its duties and obligations under the Contract Documents as

well as its commitments under the Settlement Agreement.

57.   **Breach**.  Empirical acted in bad faith and breached its duty of good faith and fair dealing by: (i) failing to allow Primus to issue invoices to empirical, (ii.) failing to equitably adjust or modify the Guaranteed Maximum Sum to account for changes made by empirical, (iii.) failing to adjust the date of Substantial Completion to reflect changes made by empirical, and (iv.) failing to participate in and to refrain from impeding performance of testing, commissioning and debugging necessary to achieve substantial completion or otherwise allow final completion of the ASRS System and thus actively interfered with performance of the Base Contract, and (v.) reneging upon the Settlement Agreement by filing the Complaint on the very same day a global settlement was agreed upon between the Parties.

58.   **Causation**.  The failure and refusal of empirical to honor its implied duty of good faith and fair dealing has directly caused financial harm to Primus.

59.   **Damages.**  Primus has incurred substantial damages in an amount to be proven at trial, plus ongoing pre-judgment interest, attorney's fees, and costs.

## COUNT VI
## Unjust Enrichment

60.   **Common Allegations**.   Primus incorporates the allegations from paragraphs 1 through 59 into Count VI as if fully incorporated herein.

61.   **Underpayment**.   Empirical fully knew and expected it would compensate Primus for its performance of work on the Project including completion

of the Freezer Facility and the ASRS System.  If the ASRS System is substantially complete as Swisslog contends, then empirical has grossly underpaid for the value of the ASRS System it has received by refusing to compensate Primus for its work. Under such circumstances, it would be inequitable, unjust, unfair, unconscionable, or otherwise improper to permit empirical to knowingly receive and retain the benefit of the Freezer Facility and its ASRS System without making proper payments.

62.  **Causation**.  Empirical's unjust enrichment proximately caused substantial damages to Primus including substantial costs and expenses.

63.  **Damages.**  Empirical has been unjustly enriched in an amount to be proven at trial thus entitling Primus to recovery of its just and full compensation for work performed for the Freezer Facility and the ASRS System it contains, plus ongoing interest, attorney's fees, and costs.

<div align="center">

**COUNT VII**
**Breach of Warranty**

</div>

64.  **Common Allegations**.  Primus incorporates the allegations from paragraphs 1 through 63 into Count VII as if fully incorporated herein.

65.  **Warranty**.  Empirical is obligated by the Contract Documents to allow Swisslog to remedy any alleged defects within the ASRS System that fail to comply with the Contract Documents for a period of 12 months following substantial

completion which, according to Swisslog, was achieved in July of 2019.

66. **Breach**.  If and to the extent empirical removes, replaces, or destroys any part of the ASRS System without allowing Swisslog to perform its warranty obligations, then empirical has breached the warranty terms for the ASRS System under the Contract Documents.

67. **Causation**.  If empirical fails and refuses to allow Swisslog the opportunity to repair or replace portions of the ASRS System that fail to comply with the Contract Documents, then the warranty is deemed null and void.

68. **Damages**.  Primus is entitled to recover from Empirical all costs, expenses and damages incurred as a result of its failure to allow Swisslog to repair or replace portions of the ASRS System that fail to comply with the Contract Documents.

<div align="center">

**COUNT VIII**
**Fraud – Pre-Contract**

</div>

69. **Common Allegations**.  Primus incorporates the allegations from paragraphs 1 through 31 into Count VIII as if fully incorporated herein.

70. **Representations.**  Empirical made various representations of existing material fact and/or promises of future performance regarding the design, operation, functionality and completion of the ASRS System prior to September 2, 2016, seeking to induce Primus to enter into the GMS Contract, including but not limited

to, the following:

i.)    The ASRS System design and Swisslog Specifications prepared under the Swisslog/empirical Agreement identified a fully functional and operational ASRS System that satisfied empirical's business needs or requirements;

ii.)   Empirical expressly represented to Primus that if the Freezer Facility, including the ASRS System, was built according to the Contract Documents, and especially the Swisslog Specifications, then empirical would pay Primus all compensation and any other amounts due and owed under the GMS Contract and other Contract Documents;

iii.)  Empirical had and would provide software engineers and technicians with the requisite skill and technical ability to integrate the empirical Software or ERP with the Swisslog Software or SynQ to satisfy empirical's business needs;

iii.)  Empirical had reached an agreement with Swisslog regarding the operation and functionality characteristics of the ASRS System imposed by empirical;

iv.)   The Swisslog Specifications would not be changed or modified without the express written consent of Primus;

v.)    The Swisslog Specifications met or exceeded the operation and functionality requirements imposed by empirical;

vi.)    The ASRS System as reflected in the Swisslog Specifications satisfied the requirements of the Contract Documents; and

vii.)    empirical would not make material changes to the Contract Documents without adjusting the Substantial Completion date for the ASRS System.

71.    **Reliance.**  Empirical made these representations with the intent that Primus would rely on them and for the purpose of inducing Primus to enter into the GMS Contract and Primus reasonably relied, to its detriment, upon the representations made by empirical when executing the Base Contract, on behalf of empirical with Swisslog, by executing the GMS Contract with empirical, and by furnishing substantial and costly resources to perform work on the Facility Freezer and ASRS System for empirical's benefit, which benefit empirical has put to use and accepted.

72.    **Scienter.**  With respect to empirical's statements of existing material fact, empirical either knew its statements of existing material fact were false and misleading when made, or it made the representations recklessly without knowledge of their truth and as a positive assertion.  With respect to empirical's promises of future material fact, empirical made such representations with respect to future

events that were within its control, and it either made the representations fraudulently with the intent to deceive Primus, or it purported to have special knowledge that Primus did not likewise have with respect to the ASRS System and empirical's representations related thereto, and/or empirical had a special reason to expect that Primus would rely on empirical's representations.

73.   **Proximate Cause.**  If Primus is found liable for damages in connection with the ASRS System, the direct and proximate cause of such liability are the fraudulent misrepresentations made by empirical prior to execution of the Contract Documents.  Additionally, empirical's fraudulent misrepresentations induced and proximately caused Primus to suffer other injuries including, but not limited to, substantial costs and expense in performance of its work pursuant to the Contract Documents from which empirical has received substantial benefit without having compensated Primus therefor.

74.   **Damages.**  Primus is entitled to recover against empirical all costs and damages incurred by Primus caused by the untrue and fraudulent misrepresentations empirical made to Primus, all costs and attorney's fees incurred by Primus in association with empirical's claims, and punitive damages so as to deter similar future conduct.

## COUNT IX
## Indemnity

75.   **Common Allegations**.   Primus incorporates the allegations from

paragraphs 1 through 74 into Count IX as if fully incorporated herein.

76. **Indemnity Obligation**.  Empirical has a legal duty to indemnify Primus for all costs and damages resulting from its acts and omissions  in connection with the design, manufacture, installation, testing, and commissioning of the ASRS System and failure of payment to Swisslog or others for their work on the ASRS System.

77. **Causation**.  If Primus is found liable in connection with work performed on the ASRS System under the tri-party Base Contract, then empirical is obligated to indemnify Primus to the extent such damages are attributable to acts and omissions on the part of empirical.

78. **Damages.**  Primus is entitled to recover against empirical all costs and damages assessed against Primus caused by the acts and omissions of empirical as well as all costs and attorney's fees incurred by Primus in association with such claims.

## RELIEF SOUGHT

WHEREFORE, Defendant Primus prays as follows:

a.    Entry of judgment against empirical for all amounts proven at trial and if damages are assessed, all pre-judgment interest, all post-judgment interest, all costs and attorney's fees, and punitive damages to deter any future tortious conduct on the part of empirical; and

b.      Such further and other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Defendant Primus Builders, Inc. respectfully requests a trial by jury on all claims triable under the Answer and Counterclaim, to be held in Omaha, Nebraska.

Dated this 7th day of January, 2020.

<div style="text-align: right">

*s/ Joel D. Heusinger*
Joel D. Heusinger, Neb. No. 18326
Kari A.F. Scheer, Neb. No. 24870
Woods Aitken LLP
301 South 13th Street, Suite 500
Lincoln, NE 68508-2578
Telephone:      (402) 437-8500
Fax:               (402) 437-8558
jheusinger@woodsaitken.com
kscheer@woodsaitken.com

STEPHEN L. WRIGHT
Georgia Bar No. 778747, *pro hac vice motion pending*
JEFFREY J. NIX
Georgia Bar No. 544776, *pro hac vice motion pending*
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone:   (770) 434-6868
Facsimile:   (770) 434-7376
swright@taylorenglish.com
jnix@taylorenglish.com

*Counsel for Defendant and Third-Party Plaintiff Primus Builders, Inc.*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2010, I electronically filed the foregoing **ANSWER, COUNTERCLAIM & DEMAND FOR JURY TRIAL** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification to the following counsel of record:

| | |
|---|---|
| J. Daniel Weidner, Esq. | J. Erik Connolly, Esq. |
| John V. Matson, Esq. | Nicole E. Weigley, Esq. |
| Koley Jessen PC, LLO | Kathryn E. Clausing, Esq. |
| One Pacific Place, Suite 800 | Benesch, Friedlander, Coplan |
| 1125 South 103rd Street | & Aronoff LLP |
| Omaha, Nebraska 68124-1079 | 71 South Wacker Drive, Suite 1600 |
| daniel.weidner@koleyjessen.com | Chicago, Illinois 60606 |
| john.matson@koleyjessen.com | econnolly@beneschlaw.com |
| *Counsel for Plaintiff* | mwrigley@beneschlaw.com |
| | kclausing@beneschlaw.com |
| | *Counsel for Plaintiff* |

*s/ Joel D. Heusinger*
Joel D. Heusinger

01658302

# BASE CONTRACT FOR "PROJECT BPI"

This Base Contract for "Project BPI" (called the "Contract") is made the 2nd day of September, 2016, by and between Primus Builders, Inc., a Georgia corporation, with its principal place of business at 8294 Highway 92, Suite 210, Woodstock, GA 30189 ("Builder") and Swisslog Logistics, Inc., a Virginia corporation with its principal address at 161 Enterprise Drive, Newport News, VA 23603 ("Swisslog" or "Contractor").

WHEREAS, Beef Products, Inc., a South Dakota corporation ("Owner") has entered into that certain Guaranteed Maximum Sum Contract (the "GMS Agreement"), dated concurrently herewith, by and between Owner and Builder, whereby Builder has agreed to construct a New Facility (as defined in the GMS Agreement) for Owner in accordance with the terms thereof;

WHEREAS, as part of the New Facility, Owner has contracted with Builder to have Builder provide an automated distribution facility (the "System") designed, manufactured, delivered, installed, tested and warranted by Contractor at the New Facility;

WHEREAS, in accordance with the GMS Agreement, Builder shall utilize Contractor to design and install the System in the New Facility;

WHEREAS, Owner and Builder have approved the attached specifications (the "Specifications") of Contractor for the design, manufacture, delivery to site, installation, testing and completion of the System as part of the New Facility;

WHEREAS, Contractor has agreed to contract with Builder to design, manufacture, and install the System at the New Facility, test and remedy any defects in the System in accordance with the terms and conditions of this Contract (including the Terms and Conditions attached hereto), in exchange for payment of the amounts set forth herein by Builder in accordance with the schedule set forth in the Terms and Conditions; and

WHEREAS, the Builder has agreed to assume all obligations and responsibilities of the Owner to the extent set forth in this Contract.

NOW, THEREFORE, in consideration of the above recitals and the other promises and agreements set forth herein, the parties hereby agree as follows:

1.    Contractor acknowledges and agrees that it shall work as a subcontractor for Builder and perform certain work for Builder with regard to the System in accordance with the Specifications, all as set forth in this Contract.

2.    The following Exhibits are a material part of this Contract:

| | |
|---|---|
| EXHIBIT I | The General Terms and Conditions |
| EXHIBIT II | The Project Specifications, 4720 BPI V5 dated August 30, 2016 |
| EXHIBIT III | Time Schedule |
| EXHIBIT IV | Insurance Terms |
| EXHIBIT V | Interim lien waiver form |


Exhibit A

3. The Contract hereby incorporates the insurance terms as set forth in the Exhibit IV. Such Insurance Terms shall be the sole and exclusive insurance obligation upon Contractor.

4. The System shall be constructed and/or assembled at the New Facility, all as defined in the Specifications.

5. Any notice to be provided by Builder or Contractor to each other shall be at the addresses set forth in the opening paragraph of this Contract.

6. Builder shall, in consideration for Contractor's promise to design and construct the System in accordance with the Specifications and to perform its obligations hereunder, Builder shall pay Contractor the sum of US *$14,213,200* (AMOUNT US-dollars) (hereafter called "the Contract Price"), all in accordance with the terms and provisions of this Contract.

7. The Payment Schedule set forth in the Terms and Conditions apply with detail milestones as defined below.

Contractor will invoice the Builder as Contractor reaches each of the following milestones toward the completion of the System to be paid on a net 30 basis with exception of the down payment that is paid on net 10 days. Notwithstanding the forgoing, if Owner withholds payment from Builder based upon any act or omission of Contractor, Builder may withhold an equivalent payment from Contractor (to the extent that such deduction would otherwise be permitted under this Agreement).

| Incremental Percentage | Payments of the contract price | Payments due within |
|---|---|---|
| 30% | Down payment upon execution of this Contract | 10 days |
| 20% | Upon submittal of detailed engineering documents | 30 days |
| 20% | Upon first major receipt of material to site | 30 days |
| 10% | Upon substantial completion of mechanical installation | 30 days |
| 10% | Upon start of Integration testing | 30 days |
| 10% | Upon Provisional Acceptance (PAC, Taking Over) or start of Beneficial Use | 30 days |

**[The Remainder of This Page Intentionally Left Blank; Signature Page Follows]**

IN WITNESS whereof, the parties hereto have caused this Contract to be entered into in the manner required by their respective constitutions or by-laws.

Primus Builders Inc.

By: _____

Name: Erik Gunderson
Title: Executive Vice President

Swisslog Logistics, Inc.

By: _____

Name: Markus Schmidt
Title: President WDS Americas

By: _____

Name: Stephan Jutz
Title: VP Finance and Controlling

{00801542.DOC /2 }3

# Exhibit I

# General Terms and Conditions

**Terms and Conditions**

## PREAMBLE

1.	The following Terms and Conditions (the "Conditions") shall apply to all contracts between Contractor and Builder, including but not limited to any sales of goods and/or services. Any modifications of or deviations from these Conditions shall not be valid unless mutually agreed to in writing by Contractor and Builder. The Builder assumes all obligations and responsibilities of the Owner to the extent set forth expressly or impliedly in this Contract.

## DEFINITIONS

2.	In these Conditions the following terms shall have the meanings herein assigned to them.

**"Builder"** shall mean Primus Builders, Inc.

**"Contract"** shall mean the written contract between the parties concerning the supply and erection of the System (as that term is defined herein) including these Conditions and all appendices, and including agreed amendments and additions to the said documents. No document shall be deemed a part of this Contract unless Contractor and Builder have agreed to such document in writing.

In the event of any conflict between any documents relating to the Contract, such conflict shall be resolved in favor of the following documents in order of precedence:

a)	The parties' written and executed document incorporating these Conditions and the Specifications,

b)	The Project Specifications, 4720 BPI V5 dated August 30, 2016,

c)	These General Terms and Conditions

d)	Time Schedule set forth in Exhibit III

e)	Insurance Terms set forth in Exhibit IV.

Notwithstanding the foregoing, in the event that any Contract document (including appendices) expressly states that that the parties intend for such document to take precedence over any other document, such expression shall be honored.

**"Contractor"** shall mean Swisslog Logistics Incorporated.

**"Contract Price"** shall mean the payment to be made for the Works (as that term is defined herein). The Contract Price shall be reasonably adjusted in case the Work (as defined in the Specification) is changed due to conditions found at the New Facility which were not reasonably foreseeable by Contractor when developing the Specifications.

**"Cost"** shall mean that whenever by the Contract Contractor is entitled to be paid cost, such cost shall be properly incurred and shall include overhead charges. Contractor shall, in addition, be entitled to be paid a reasonable profit.

**"Demonstrable Performances"** shall mean the performances to be demonstrated after installation of the System and before Taking Over as defined in the Test on Completion.

**"Final Delivery"** is the date upon which Contractor has delivered all required Works (including documentation) in compliance with the Contract's Specifications

**"GMS Agreement"** shall mean that certain Guaranteed Maximum Sum Contract, dated concurrently herewith, by and between Owner and Builder.

**"In Writing"** shall mean either by document signed by the parties or by letter, telefax, telegram or telex, identifying the sender.

"Owner" shall mean Beef Products, Inc

"Parties" shall mean Primus Builders, Inc. and Swisslog Logistics, Inc., each of whom individually shall be referred to herein as a "Party."

"Site" shall mean the place where the System is to be erected, including as much of the surrounding area as is necessary for unloading, storage and internal transport of the System and erection equipment.

"Specifications" shall mean the technical specification of the System included as Exhibit II to the Contract and any later modification thereof in accordance with the Contract

"System" shall mean all machinery, apparatus, materials and articles to be supplied by the Contractor under the Contract in accordance with the Specifications.

"Tests on Completion" shall mean the tests to be performed before the Works are taken over by the Owner which shall demonstrate that the Works achieved the Demonstrable Performances.

"Time Schedule" shall mean the Time Schedule as per Exhibit III to the Contract.

"Works" shall mean the Specifications and System, including the erection and other work to be carried out by the Contractor under the Contract If the Works according to the Contract shall be taken over by separate sections intended to be used independently from each other, these conditions shall apply to each section separately The term "Works" shall then refer to the section in question.

## PRODUCT INFORMATION

3.   All information and data contained in product brochures and price lists are binding only to the extent that they are by reference expressly included in the Contract.

## SOIL CONDITIONS

4.   Contractor shall under no circumstances be responsible for any subsoil and other unforeseen conditions at Owner's Site.

Should conditions encountered in performance of the Work which could not have been reasonably anticipated by Contractor; or which are at variance with the conditions indicated by the Contract, including but not limited to any subsurface conditions, utilities, or other conditions as be encountered which differ materially from those expected by Contractor or recognized as inherent in the Work of the character provided for in this Contract The schedule for completion and the Contract Price due to Contractor shall be equitably adjusted by change order upon claim by Contractor, which equitable adjustment shall be made within a reasonable time after the first observance of such differing conditions. Contractor, however, shall under no circumstances be responsible for the removal of any contaminated soil, spoil, waste, etc.

## DRAWINGS AND DESCRIPTIONS

5.   Contractor, at its own expense, shall defend any suit that is brought against the Builder in a court of competent jurisdiction and is based on a claim that any equipment used in the Works or any part thereof constitutes an infringement of any patent issued As a condition precedent to such indemnification, the Builder shall give the Contractor prompt written notice of the institution of any suit and shall provide information and assistance that the Contractor reasonably deems necessary for the defense thereof. The Contractor shall pay any judgment for damages rendered against the Builder in such suit and if the equipment or any part thereof is held to constitute an infringement and its use is enjoined Contractor at its option shall:

a)   procure for the Owner the right to continue using the equipment, or

b)   replace it with non-infringing equipment; provided, however, any such replacement equipment shall be consistent with the Specifications and of equal or better quality than the previously infringing equipment, or

c) modify it so it becomes non-infringing, provided, however, any such modifications shall be consistent with the intent of the Specifications

> The Contractor does not assume any liability for infringement due to.

i) changes in the equipment made by or at the request of the Owner or Builder, or

ii) engineering designs furnished by the Owner or Builder, or

iii) the particular use of the equipment by the Owner (if such use is not as contemplated by Owner when Contractor developed the Specifications), or

iv) operation of the equipment not in accordance with the Contractor instructions.

6. All drawings and technical documents relating to the Works submitted by one Party to the other, prior or subsequent to the formation of the Contract, shall remain the property of the submitting Party

> Drawings, technical documents or other technical information received by one Party shall not, without the consent of the other Party, be used for any other purpose than erection of the System and commissioning, operation or maintenance of the Works. They may not, without the consent of the submitting Party, otherwise be used or copied, reproduced, transmitted or communicated to a third party other than the Owner.

7. At the start of the period referred to in Clause 53 the Contractor shall, if so requested by the Builder, free of charge provide information and drawings which are necessary to permit the Owner to commission, operate and maintain the System in accordance with the Specifications. Such information and drawings shall be supplied in the number of copies agreed upon or at least one copy of each. The Contractor shall not be obliged to provide

manufacturing drawings for the System or spare parts or to provide the source code of any software

> Conditioned upon payment of all sums due hereunder, Owner shall be granted a non-exclusive royalty free single site license to use the software delivered by Contractor under this Contract. Such license may be revoked by Contractor if Owner shall attempt to decompile, reverse engineer, or make any use of the Software other than the operation of the System as specified, or otherwise breach any obligation placed upon it under this Contract. The use of such software shall be restricted exclusively to the use in relation to the intended use of the Works. All and any rights, including all proprietary rights shall always remain with the Contractor. Owner is not entitled to copy, reproduce, transmit or otherwise communicate or disclose such software and related information to any third party.

## TESTS BEFORE SHIPMENT

8. If tests before shipment are provided for in the Contract they shall, unless otherwise agreed, be carried out at the place of manufacture during normal working hours. If the Contract does not specify the technical requirements, the tests shall be carried out in accordance with general practice of the Contractor

9. The Contractor shall notify the Owner of these tests in sufficient time to permit the Owner to be represented at the tests. If the Owner is not represented, the test report shall be sent to the Owner and shall be deemed accepted as accurate by both Builder and Owner unless an objection is made by Owner within thirty (30) days after receiving such test report.

10. If the tests show the System not to be in accordance with the Specifications, the Contractor shall remedy any material deficiencies in order to ensure that the System materially complies with the Specifications. New tests shall then be carried out to confirm that the deficiency was remedied.

11. If tests before shipment are agreed in the Contract, the Contractor shall bear all costs for tests carried out at the place of manufacture. The Owner shall however bear all traveling and living expenses for Owner's representatives in connection with such tests or repeat tests

## PREPARATORY WORK AND WORKING CONDITIONS

12. The Contractor shall provide drawings showing the manner in which the System is to be erected, together with all information reasonably required for preparing suitable foundations, for providing access to the New Facility and any necessary equipment to the point where the System is to be erected, and for making the necessary connections to the Works The Builder shall promptly provide the Contractor with any information necessary for such drawings, and Builder shall ensure that other contractors, subcontractors, and employees cooperate with any reasonable request from Contractor for information.

13. The Builder shall within the Time Schedule provide all installations, and make available the conditions necessary for the erection of the System and for the correct operation of the Works This shall not apply to preparatory work that according to the Contract shall be expressly performed by the Contractor. In the event that the Builder or Owner delays in providing any necessary information to Contractor, Contractor shall provide written notice to Builder with regard to any adjustment to the Time Schedule or Contract Price. Contractor shall be entitled to an equitable adjustment to the Contract Price and schedule to reflect any additional costs, time or both required due to the Builder's or Owner's delays

14. The preparatory work, including civil work where applicable, shall be carried out by the Builder in accordance with the drawings, information and the time schedule provided by the Contractor

under Clause 12. The work shall be completed on time. In any case, the Builder shall ensure that the foundations are structurally sound. The Contractor is responsible for transporting the System to the Site.

15. If an error or omission in the drawings or information referred to in Clause 12 is discovered and notified to the Contractor promptly following discovery, the cost of any necessary remedial work shall be borne by the Contractor. Builder shall inspect and review any drawings presented to it by Contractor and shall promptly notify Contractor of any perceived problems and/or deficiencies; provided, however, in the event that Builder does not detect any errors or omissions in the drawings. Contractor will remain responsible for the Specifications and System being properly designed and constructed.

16. The Builder shall ensure that the following conditions are satisfied:

a) The Contractor's personnel shall be able to start work in accordance with the agreed time schedule and to work during normal working hours. Work may be performed outside normal working hours to the extent deemed necessary by the Contractor provided that the Builder has been given notice in reasonable time.

b) Before erection is started, the Builder shall inform the Contractor of all relevant safety regulations in force at the Site. The erection shall not be carried out in unhealthy or dangerous surroundings. All the necessary safety and precautionary measures shall have been taken before erection is started and shall be maintained by Builder Contractor shall notify Builder if it is aware of any violations of any safety laws or regulations with the surroundings where the Works shall take place and any safety or precautionary measures it might require to address the same.

c) If not agreed otherwise the Builder shall, free of charge, make available to the

Contractor at the proper time on the Site all necessary electricity, heating, and lighting.

d) Contractor shall be allowed to store any equipment and material necessary for the Works at the New Facility; Builder shall be responsible for any theft or damage occurring to such materials.

e) The access routes to the Site shall be suitable for the required transport of the System, or parts of it, and equipment.

f) The Builder shall ensure adequate security such that any Works in progress are not damaged or disturbed prior to completion and Owner's acceptance of same.

g) Builder shall perform its obligations under the Contract strictly as per the Time Schedule.

### BUILDERS OR OWNER'S DEFAULT

17. If the Builder or Owner (as applicable) anticipates that it will be unable to comply with the conditions of Clauses 13, 14 and/or 16 or to receive the System on the Site and/or to allow the Works to be completed in time, it shall promptly notify the Contractor, In Writing, stating the reason and, if possible, the time when it will be able to comply with its obligations. The provisions of Clause 18 shall apply.

18. If the Owner or Builder fails to materially comply with Clauses 13, 14 and/or 16, unless completion of the Works is prevented by any such circumstance as mentioned in Clause 71, the Contractor may, by notice In Writing, require the Builder to remedy his default within a final reasonable period and shall be entitled to an equitable extension of time and cost.

   If, for any reason for which the Contractor is not responsible, the Owner or Builder fails to materially remedy its default under Clauses 13, 14 and/or 16 within such period, the Contractor shall notify the Builder and Owner of such continuing default. If Builder and Owner

(i) fail to cure any such continuing default within forty-five (45) days after receiving notice from Contractor, or (ii) for defaults which reasonably cannot be cured within forty-five (45) days, fail to commence and diligently pursue a cure within such forty-five (45) day period, Contractor may, by notice In Writing, terminate the Contract.

   If the Contractor terminates the Contract pursuant to this Paragraph 19, or pursuant to Paragraph 48 below, The Contractor shall then be entitled to compensation for the loss he suffers because of the default hereunder of the Builder, Owner or both, which loss shall be (i) costs incurred as of the date of such Notice of termination, minus amounts paid to Contractor as of such date; and (ii) any anticipated profit for the project in the amount of ten percent (10%) of the Contract Price remaining unpaid at the time of the Notice of termination. The compensation shall not exceed the Contract Price.

19. Intentionally Omitted.

### LOCAL LAWS AND REGULATIONS

20. The Contractor shall ensure that the Works are carried out and are in accordance with any laws, regulations and rules that are applicable to the Works at the date of Contractor's execution of this Contract.

21. The Contractor shall carry out any variation work caused by changes in laws, regulations and rules referred to in Clause 20, or in their generally accepted interpretation, after the date of Contractor's execution. The Builder shall bear the costs and other consequences resulting from such changes, including variation work, and Contractor shall be entitled to an equitable adjustment of the Contract Price and Schedule. Notwithstanding the foregoing, Contractor shall not be required to undertake any change that would constitute a cardinal change in the project or that would substantially alter the nature or scope of the project.

22.  If the parties are unable to agree on the extra costs and other consequences of changes in laws, regulations and rules, referred to in Clause 20, the Contractor shall be compensated on a time basis for any variation work until the dispute has been settled in accordance with Clause 77.

## VARIATIONS

23.  Subject to the provisions of Clause 27, the Builder is entitled to require reasonable variations to the scope, design and construction of the Works until the Works have been taken over. Such reasonable variations shall not require Contractor to perform additional work where Contractor estimates that the cost would exceed 10% of the original Contract Price (exclusive of any change orders). In the event that Builder requests variations that the Contractor estimates would exceed 10% of the original Contract Price, the parties shall negotiate in good faith to reach an equitable solution.

24.  Requests for variations shall be submitted to the Contractor In Writing and shall contain an exact description of the variation required. The Contractor may suggest variations to the Builder or Owner In Writing.

25.  As soon as possible after receipt of a request for a variation or after having himself made a proposal for a variation, the Contractor shall notify the Builder and Owner In Writing whether and how the variation can be carried out, stating the resulting alteration to the Contract Price, the time for completion and other terms of the Contract. The Contractor shall also give such notice to the Builder and Owner when variations are required as a result of changes in laws, regulations and rules referred to in Clause 20.

26.  Intentionally Omitted

27.  Save as provided in Clause 21, the Contractor shall not be obliged to carry out variations required by the Builder until either the parties have agreed on

how the variations will affect the Contract Price, the time for completion and other terms of the Contract, or the dispute has been settled in accordance with Clause 77.

## PASSING OF RISK

28.  Any risk of loss or damage to the Works shall pass from Contractor to the Owner and Builder (as they may allocate) on the earlier of either taking-over of the Works or the beneficial use of the Works or part of it by the Owner or Builder. Any loss or damage to the System and Works after the risk has passed to the Owner or Builder shall be at the risk of the Owner or Builder (as they may allocate), unless such loss or damage results from the Contractor's gross negligence. Notwithstanding the foregoing, Builder shall be liable for any loss or damage to the Works that may occur at any time due to any act or omission of the Builder or Owner, or any of Builder's or Owner's employees, agents, contractors or subcontractors.

## TESTS ON COMPLETION

29.  Contractor shall define Tests on Completion In Writing prior to carrying out the tests

30.  When erection has been completed Tests on Completion shall unless otherwise agreed, be carried out to determine whether the Works are as required for taking-over according to the Contract.

   The Contractor shall notify the Builder and Owner In Writing that the Works are ready for taking-over He shall in this notice give a date for Tests on Completion, giving the Builder and Owner sufficient time to prepare for and be represented at these tests.

   The Owner shall bear all his costs of Tests on Completion, and in no event shall Contractor be responsible for such costs. The Contractor shall also bear all costs relating to his personnel and other representatives.

31. The Builder shall provide, free of charge, any power, lubricants, water, fuel, raw materials and other materials required for the Tests on Completion and for final adjustments in preparing for these tests. He shall also provide, free of charge, any test loads required and provide reasonable assistance necessary for carrying out the Tests on Completion.

32. If, after having been notified in accordance with Clause 30, the Builder fails to fulfill his obligations under Clause 31 or otherwise prevents the Tests on Completion from being carried out or does not participate, the tests shall be regarded as having been satisfactorily completed at the date for Tests on Completion stated in the Contractor's notice.

33. The Tests on Completion shall be carried out during normal working hours. If the Contract does not specify the technical requirements, the tests shall be carried out in accordance with the relevant industry standards, including FEM 9.222.

34. The Contractor shall prepare a test-report of the Tests on Completion. This report shall be sent to the Builder and Owner. If the Builder or Owner has not been represented at the Tests on Completion after having been notified in accordance with Clause 30, the test-report shall be deemed accepted as accurate unless Builder or Owner provide notice of any reasonable objections to the Tests on Completion within thirty (30) days after receiving the same. In this case the Builder will have the obligation to pay all cost for the repetition of the Test on Completion. Where any repetition of Test on Completion is caused due to Contractor's failure to meet acceptance criteria for a cause attributable to Contractor, Contractor shall bear its own costs of conducting such repetition.

35. If the Works fail to pass any Test on Completion, such test shall be repeated as soon as practical thereafter, provided that Contractor shall be entitled to a reasonable time to correct any condition requiring remedy in Contractor's sole judgment. Any adjustments and modifications shall be made by the Contractor with all reasonable speed and at its own expense.

If the Works are late for Taking Over, Builder shall be entitled to liquidated damages for delay as defined in clause 44 of this Contract. Such LD's shall be the Builder's and Owner's sole and exclusive remedy for delay, and Contractor shall have no further liability to Builder or Contractor for any damages arising from or relating to any claim of delay.

### TAKING-OVER

36. The construction of the System in accordance with the Specifications, as measured by the Demonstrable Performances, shall be the sole and exclusive performances to be achieved and fulfilled by Contractor.

37. Taking-over of the Works takes place when the Tests on Completion have been satisfactorily completed or are regarded under Clause 32 and 35 as having been satisfactorily completed. Minor deficiencies that do not materially affect the operation of the Works shall not prevent taking-over.

38. Except as the Owner, Builder, and Contractor shall all agree under this Section 38, the Owner and Builder are not entitled to use the Works or any part thereof before taking-over. Owner and Builder shall not use the Works or any part thereof without first executing a Conditional Taking Over Certificate and upon Contractor's permission in Writing. Any use without such permission shall be deemed a complete Taking Over. Upon the execution of a Conditional Taking Over certificate, Taking Over shall be deemed to have occurred for all parts of the Work identified in the Conditional Taking Over Certificate, except as to such portions of the Work as may be excluded by agreement of the Parties in Writing. .

39.    As soon as the Works have been taken over in accordance with Clauses 37 or 38, the period, referred to in Clause 53, shall start to run. The Builder or Owner shall at the Contractor's request In Writing issue a certificate stipulating when the Works have been taken over The Builder's or Owner's failure to issue a certificate shall not affect taking-over according to Clauses 37 and 38.

## COMPLETION, CONTRACTOR'S DELAY

40.    The Works shall be considered as completed when they are taken over in accordance with Clause 37 or 38.

41.    Intentionally Omitted.

42.    If the Contractor anticipates that he will not be able to complete the Works in accordance with the Time Schedule, he shall notify the Builder and Owner In Writing, stating the reason, and, if possible, when completion can be expected

43.  The Contractor shall be entitled to an extension of the time for completion if delay occurs:

a)    because of any of the circumstances referred to in Clause 71, or

b)    as a result of variation work under Clause 21, or

c)    as a result of variations under Clauses 23-27, or

d)    by an act or omission that is not legally attributable to the Contractor, or

e)    as a result of suspension under Clauses 17, 48 or 74.

        The extension shall be reasonable having regard to all of the circumstances. This provision applies regardless of whether the reason for the delay occurs before or after the agreed time for completion

44.    The Contractor is in delay when the Works are, due to its fault, not completed at the time for completion as

defined in Clauses 40. 41 and 43. The Contractor's delay entitles the Builder to liquidated damages from the date on which the Works should have been completed. Such liquidated damages ("Delay Liquidated Damages") shall be Builders sole and exclusive remedy, or Contractor's sole and exclusive liability, for any damage arising from or relating to any delay.

        The liquidated damages shall be payable at a rate of $3,000 for each day of delay in achieving Take Over occurring after February 8th, 2018 (subject to any adjustment permitted under this Contract). The maximum aggregate amount of Delay Liquidated Damages permitted under this agreement shall be one million dollars ($1,000,000)

        The Delay Liquidated Damages become due at the Builder's or Owner's request In Writing but not before ten (10) days after receiving such request.

45.    Contractor may conduct repeat tests at its discretion until it is satisfied that it cannot achieve a higher throughput result. If the Contractor is unable to complete the Works such that the Works achieve throughput results meeting ninety five (95%) of the specified throughput, the Parties shall negotiate in good faith to reduce the Contract Price commensurate with the reduced performance of the Work. In no event shall such reduction exceed, or cause the aggregate of Contractor's liability to exceed the limitation of liability set forth in Section 76.

## PAYMENT

46     Payment and any penalties for late payment shall be in accordance with this Contract.

47.    Intentionally Omitted.

48.    If the Purchaser fails to pay any amounts when required under this Contract, Contractor shall be entitled to interest at the rate of five percent per

annum on any unpaid amounts. In addition, Contractor may suspend or terminate performance upon nonpayment of any undisputed amounts following seven days notice. Builder shall be responsible for any additional cost or delay arising from such suspension or termination, and Contractor shall be entitled to an equitable adjustment of Contract Price and Schedule resulting from such nonpayment.

## RESERVATION OF TITLE

49. The System, and any components, fixtures. or parts thereof, shall remain the property of the Contractor until paid for in full, including payment for the erection of the System, to the extent that such retention of property is valid under the applicable law. Builder shall notify Owner of such reservation and shall not make any contradictory representation to Owner.

## LIABILITY FOR DAMAGE TO PROPERTY BEFORE TAKING OVER

50 The Contractor shall be liable for any damage to the Works that occurs before the risk has passed to the Builder. This applies irrespective of the cause of the damage, unless the damage is due to intentional acts, gross negligence or acts and emissions of the Builder or Owner or anyone for whom either is responsible

The Owner or Builder may require the Contractor to remedy the damage at the such Owner's or Builder's cost even if the Contractor is not liable for the damage to the Works in accordance with this Clause.

51. The Contractor shall be liable for damage to the Owner's property occurring before taking-over of the Works only if it is proved that such damage was caused by negligence or intentional acts on the part of the Contractor or anyone for whom he is responsible in connection with the performance of the Contract.

Contractor shall not be liable for such damages in case Owner has the respective insurance covering such damage in place The Contractor shall, however. under no circumstances be liable for loss of production, loss of profit or any consequential, special or indirect loss.

## LIABILITY FOR DEFECTS

52. Subject to the provisions of Clauses 53 - 67, the Contractor shall remedy any defect in the Works resulting from faulty design, materials or workmanship.

53. The Contractor's liability is limited to defects in the Works that appear within a period of 12 months from taking-over or from beneficial use, whatever occurs earlier. If taking-over has been delayed for reasons for which the Contractor is not responsible, the Contractor's liability for defects shall not, except as stated in Clause 54, be extended beyond 18 months after final delivery.

54. When a defect in a part of the Works has been remedied, the Contractor shall be liable for defects in the repaired or replaced part under the same terms and conditions as those applicable to the original Works for a period of 12 months. For the remaining parts of the Works the period mentioned in Clause 53 shall be extended only by a period equal to the period during which the Works have been out of operation as a result of the defect. However, Contractor's liability for defects in the Works shall in the aggregate including repair or replaced parts not extend beyond 12 (twelve) months from the delivery of the System.

55. The Owner shall, without undue delay, notify the Contractor In Writing of any defect that appears.

The notice shall contain a specific description of the defect, including but not limited to reference to the specification at issue, the manner in which the Works fail to meet such specification, and the date that such defect was discovered Where any

defect is such that it may cause damage, Contractor shall not be liable for any damage caused by a continuing condition that could have been remedied with prompt notice

56. On receipt of the notice under Clause 55 the Contractor shall remedy the defect without undue delay and at his own cost as stipulated in Clauses 53 - 67.

Repair or replacement (at Contractor's sole election) shall be carried out at the Site, unless the Contractor deems it appropriate that the defective part or the System is returned to him for repair or replacement

The Contractor is obliged to dismantle the Works to the extent necessary and to re-assemble the Works after repairing the same for such defects that cannot be reasonably done by a reasonably trained maintenance worker unless Owner agree in advance that Contractor may fulfill his obligations in respect of the defect when he delivers to the Owner a duly repaired part or a new part in replacement of the defective part.

57. If the Owner has notified the Contractor in accordance with Clause 55, and no defect is present for which Contractor is liable, the Contractor shall notify Builder and Owner of same If at any time or times after such notice, Owner notifies the Contractor in accordance with Clause 55 on the same or a related alleged defect, and no defect is present for which Contractor is liable, then Contractor shall be entitled to compensation from Builder for costs incurred as a result of such notice(s)

58. The Builder shall arrange for any dismantling and reassembly of equipment other than the Works, to the extent that this is necessary to remedy the defect.

59. Unless otherwise agreed, necessary transport of the System and/or parts thereof to and from the Contractor in connection with the remedying of defects for which the Contractor is liable

shall be at the risk and expense of the Contractor.

60. Defective parts that have been replaced shall be made available to the Contractor and shall be his property.

61. If, within five (5) days, the Contractor does not fulfill his obligations under Clause 56, the Owner may engage a third party. at Contractor's expense, for completion of the Contractor's obligations.

The Owner may himself undertake or employ a third party to undertake necessary remedial works at the expense of the Contractor if the Contractor fails to fulfill his obligations within such final time.

Reimbursement by the Contractor of all expenses incurred by the Owner shall be in full and final settlement of the Contractor's liabilities to Owner and to Builder for the said defect where remedial works have been undertaken by the Owner or a third party.

62. (not used)

63. The Contractor is not liable for defects arising out of materials provided by the Builder or Owner.

64. The Contractor is liable only for defects that appear under the conditions of operation provided for in the Contract and under proper use of the Works in accordance with Contractor's manuals or other instructions or in the absence of such manuals or instructions in accordance with good industry practice.

The Contractor's liability does not cover defects that are caused by bad maintenance or repair or replacement by the Builder, Owner or third parties, or by alterations carried out without the Contractor's consent In Writing. The Contractor's liability does not cover normal wear and tear.

65. Notwithstanding the provisions of Clauses 52 – 64, if Taking Over has been delayed for reasons for which

Contractor is not responsible, the Contractor's liability for defects shall not be extended beyond 12 months after delivery of the System.

66.   Save as stipulated in Clauses 52 - 65, the Contractor shall not be liable to Builder or Owner for defects. This applies to any loss the defect may cause including loss of production, loss of profit and any consequential, special or indirect loss.

67.   Contractor shall have no obligations for breach of warranty if the Builder and Owner fails to store, operate or maintain the equipment or Work in accordance with:

a) reasonable industry practice;
b) the provisions of the storage, operating or maintenance instructions furnished to the Builder or Owner, or
b) if the Owner fails to notify the Contractor in Writing of a defect in accordance with the provisions of the Contract.

68.   The express warranty set forth under clauses 52 - 66 is exclusive. No other warranties of any kind whether statutory, oral, written, express or implied, including any implied warranty of merchantability or fitness for a particular purpose or latent defects. shall apply. The Owner's and Builder's exclusive remedies and the Contractor's only obligations arising out of or in connection with faulty design materials or workmanship whether based on warranty, contract, tort (including negligence) or otherwise shall be those stated herein.

## INDEMNIFICATION

69.   Each Party to the Agreement shall be responsible for and indemnify the other from liability of third parties arising out of injuries or damages to third parties or property of third parties during the progress of the work and which may occur on the job site and that are caused by the negligent acts or omissions of the other Party, its

employees, agents and sub-contractors, provided, however, that the Contractor's liability to the Builder shall in no event extend to any consequential damages suffered by Owner In no event shall Contractor's liability extend to consequential damages suffered by any third parties (other than the Owner) except to the extent insurance coverage and proceeds are available and paid under a policy of insurance provided pursuant to the Contract to cover such loss.

## DIVISION OF LIABILITY FOR DAMAGE CAUSED BY THE WORKS

70.   Intentionally Omitted.

## FORCE MAJEURE

71.   Either Party shall be entitled to suspend performance of his obligations under the Contract to the extent that such performance is impeded or made unreasonably onerous by any of the following circumstances circumstance beyond the reasonable control of the parties such as but not limited to fire, war (whether declared or not), flood, hurricane, tornado, unusually severe weather. insurrection, embargo or Acts of God.

72.   The Party claiming to be affected by Force Majeure shall notify the other Party In Writing without delay on the intervention and on the cessation of such circumstance.

73.   Regardless of what might otherwise follow from these Conditions, either Party shall be entitled to terminate the Contract by notice In Writing to the other Party if performance of the Contract is suspended under Clause 71 for more than 30 consecutive days To the extent that Contractor's schedule of performance is materially affected by any Force Majeure event. Contractor shall be entitled to an equitable adjustment of Schedule To the extent that Contractor's cost of performance is materially affected by any Force Majeure event, Contractor shall provide notice In Writing to Builder of such

anticipated additional costs of performance, including reasonable options for proceeding. Following such notice, Builder may elect to (i) provide Contractor with an adjustment of the Contract Price in the amount proposed by Contractor, or (ii) waive Contractor's obligation to perform any portion of the Work affected by such Force Majeure event to the extent that such work cannot reasonably be performed without the work included within Contractor's proposal.

## ANTICIPATED NON-PERFORMANCE

74. Intentionally Omitted.

## CONSEQUENTIAL LOSSES

75. Notwithstanding anything to the contrary in the Contract, the Contractor shall not be liable towards the Owner or Builder for loss of production, loss of profit, loss of use, loss of contracts or for any consequential, economic, special or indirect loss whatsoever. Builder shall not be liable to Contractor for consequential damages.

## LIMITATION OF LIABILITY

76. The maximum aggregate liability of the Contractor, his agents, employees, sub-contractors and suppliers (whether to Builder, Owner, or both) with respect to any and all claims arising out of the performance or non-performance of obligations in connection with the design, manufacture, sale, delivery, storage or the rendition of other services in connection therewith whether based on contract, indemnification (excluding insurance proceeds for third party consequential damages other than those of the Owner under Clause 69), warranty, tort (including negligence), strict liability or otherwise shall not exceed, in the aggregate, twenty percent (20%) of the base Contract Price for the Works.

Notwithstanding the foregoing provisions of this Section 76, the Contractor's maximum aggregate liability may exceed the above

referenced aggregate if the Contractor shall either (i) delay in achieving completion for a duration exceeding the period within which Delay Liquidated Damages are to be assessed; or (ii) fail to achieve throughput results of at least eighty (80%) of the specified throughput performance, in which case Contractor's maximum aggregate liability as set forth in this Section 76 shall increase from twenty (20%) to a total maximum aggregate amount of forty (40%) of the Contract Price.

No claim shall be asserted against the Contractor, its agents, employees, sub-contractors or suppliers unless the injury, loss or damage giving rise to the claim is sustained prior to the expiration of the period stated in clause 53 and 54 and no suit or action thereon shall be instituted or maintained unless it is filed in a court of competent jurisdiction within one year after the date the cause of action accrues except as otherwise expressly stipulated in the Contract.

If this limitation of liability is in contradiction to any compulsory law or jurisdiction in any concerned country, it shall be replaced by a reasonable limitation of liability in accordance with the jurisdiction of such country.

To the extent permitted by law the Owner and the Contractor intend that their respective rights, obligations and liabilities, as provided for in the Contract, shall alone govern their rights under the Contract and in relation to the Works.

## APPLICABLE LAW

77. Intentionally Omitted.

78. The Contract shall be governed by the substantive law of the State of Nebraska, exclusive of any conflict of law provisions.

## COMING INTO FORCE

79. The Contract shall come into force upon signature by all parties.

15

## MISCELLANEOUS

80.  Any captions are for the convenience of the parties and shall not be used in the construction of any provisions

81.  Each Party has had the opportunity to have these Conditions reviewed by its counsel and to have input into the terms herein, and as such, each Party expressly agrees that the agreement shall not be construed against either Party.

82.  In order to be effective, any notice provided under these Terms and Conditions shall be directed via first class mail, prepaid, specifically toward the individual executing these Conditions, unless a Party instructs the other In Writing of a new contact person, and in such event, all notices shall be directed to that person.

Notices sent to Contractor shall be addressed to:

Markus Schmidt
Swisslog Logistics, Inc.
161 Enterprise Drive
Newport News, VA 23603

With a copy to:

Kenneth E. Rubinstein, Esq.

Preti Flaherty Beliveau & Pachios
57 North Main Street
Concord, NH 03301
krubinstein@preti.com

Notices sent to Builder shall be addressed to.

Erik Gunderson
8294 Highway 92, Suite 210
Woodstock, GA 30189

With a copy to:

Stephen Wright
Taylor English Duma LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
swright@taylorenglish.com

Notices sent to Owner shall be addressed to:

Nick Roth
Beef Products, Inc.
891 Two Rivers Drive
Dakota Dunes, SD 57049

With a copy to:

Thomas F. Ackley
Koley Jessen P C , L.L O
1125 South 103rd Street, Suite 800
Omaha, Nebraska 68124
Thomas.Ackley@koleyjessen com

The above terms and conditions are hereby agreed upon by:

Primus Builders, Inc.

By: _____

Its: _____

Swisslog Logistics, Inc.

By: _____

Its: Markus Schmidt, President WDS Americas

By: _____

Its: Stephan Jutz, VP Finance and Controlling

{00801542.DOC /2 }17

# EXHIBIT II

# Project Specifications

4720 BPI V5 dated August 30, 2016

# EXHIBIT III

# Time Schedule

P-004720 Beef Products Schedule 2016-09-06 CONTRACTSCHEDULE.pdf

# Schedule Overview

| Task Name | Duration | Start | Finish |
|---|---|---|---|
| ⊿ Beef Products Project Realization Schedule | 440 days | Fri 4/8/16 | Wed 1/24/18 |
| Notice to Proceed with Engineering Design Order | 0 days | Fri 4/8/16 | Fri 4/8/16 |
| Finalize Building Layout Design Engineering | 8 wks | Fri 4/8/16 | Fri 6/3/16 |
| Submission of Automation Solution GMP | 0 days | Fri 6/17/16 | Fri 6/17/16 |
| Review of GMP, Execution of Contract | 9 days | Mon 6/20/16 | Thu 6/30/16 |
| Contract Award | 0 days | Tue 9/6/16 | Tue 9/6/16 |
| Finalize Detail Design Engineering and Procurement Phase | 167 days | Tue 9/20/16 | Fri 5/26/17 |
| Software Development & Testing | 185 days | Fri 9/9/16 | Tue 6/13/17 |
| Client Responsibilities | 10 days | Wed 3/15/17 | Tue 3/28/17 |
| SITE AVAILABLE FOR CONSTRUCTION | 0 days | Tue 3/28/17 | Tue 3/28/17 |
| Swisslog Site Mobilization | 5 days | Thu 3/23/17 | Wed 3/29/17 |
| ▷ INSTALLATION | 144 days | Fri 2/24/17 | Wed 9/20/17 |
| SOFTWARE INTEGRATION & TESTING | 45 days | Tue 9/12/17 | Mon 11/13/17 |
| BUILDING COOL DOWN PROCESS | 20 days | Mon 11/13/17 | Wed 12/13/17 |
| Provisional Acceptance Certificate / Work Take-Over | 0 days | Wed 12/13/17 | Wed 12/13/17 |
| Data cleanup, cutover for production | 1 day | Thu 12/14/17 | Thu 12/14/17 |
| GO LIVE | 0 days | Fri 12/15/17 | Fri 12/15/17 |
| Operational Run In Period | 4 wks | Mon 12/18/17 | Wed 1/24/18 |
| Final Acceptance / WORK ACCEPTANCE | 0 days | Wed 1/24/18 | Wed 1/24/18 |

# EXHIBIT IV

# Insurance Terms

Contractor will maintain, for the duration of the project, an insurance package that is materially in line with

the cover listed below.

| Type of Insurance | Limits of Coverage |
|---|---|
| Property | • $20,000,000 Property Damage |
| Inland Marine | Contractor's Equipment<br>• $550,000 Blanket for Equipment used in your business with $100,000 limit per item<br>• $100,000 Blanket on employee tools and work clothing with $5,000 limit per item and $5,000 limit per employee<br>• $50,000 Blanket on Short-Term Equipment Leased, Borrowed or Rented from Others with limit of $25,000 per item<br>• $700,000 Maximum limit per occurrence, any one loss<br>• $50,000 Named Storm sublimit per occurrence<br>• $50,000 Volcanic Eruption & Earthquake per occurrence sublimit<br>• $50,000 Flood sublimit per occurrence<br><br>Installation Floater<br>• $15,000,000 Any one covered jobsite and all covered jobsites in any one occurrence<br>• $1,000,000 While in transit to or from jobsites<br>• $2,000,000 At any one storage location awaiting installation at a covered jobsite<br>• $2,500,000 Per occurrence and annual aggregate for Earth Movement<br>• $2,500,000 Per occurrence and annual aggregate for Flood in Low Hazard Areas<br>• $1,000,000 Named Storm sublimit, except in Tier 1, 2 and 3 areas |
| General Liability | • $2,000,000 General Aggregate<br>• $2,000,000 Products/Completed Operations (extending also for three years after substantial completion)<br>• $1,000,000 Personal & Advertising Injury<br>• $1,000,000 Each Occurrence |
| Automobile Liability | • $2,000,000 Auto Liability Combined Single Limit (Bodily Injury/Property Damage)<br>• $5,000 Auto Medical Payments<br>• $1,000,000 Uninsured Motorists |
| Workers' Compensation | • $1,000,000 Bodily Injury by Accident – Each Accident<br>• $1,000,000 Bodily Injury by Disease – Each Employee<br>• $1,000,000 Bodily Injury by Disease – Policy Limit |
| Umbrella Liability | • $4,000,000 Each Occurrence<br>• $4,000,000 Aggregate |
| Manufacturers Errors & Omissions | • $5,000,000 Each Glitch<br>• $5,000,000 Aggregate<br>• Retroactive Date 07/02/2009 |
| Technology Errors & Omissions | • $1,000,000 Each Claim<br>• $1,000,000 Aggregate |
| Privacy & Security (Cyber) Liability | • $5,000,000 Maximum Policy Aggregate |

| Type of Insurance | Limits of Coverage |
|---|---|
| Cargo | • $5,000,000 Per Any One Conveyance/Connecting Conveyance<br>• $5,000,000 War Limit |
| Architect s E&O | • $5,000,000 Per Claim<br>• Claims Made Coverage |

EXHIBIT V

## PARTIAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Swisslog Logistics, Inc ("Contractor") has rendered services to, performed work for and/or furnished materials to Primus Builders, Inc. (hereinafter referred to as "Builder") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766 ("New Facility") as owned by Beef Products, Inc. (hereinafter referred to as "Owner");

NOW THEREFORE, Contractor does hereby, subject to the reservation set forth   hereinbelow and upon receipt of _____ dollars ($_____) waive and release all liens or rights of lien for work equal in the value to the amount so received, which rights of lien Contractor has pursuant to the laws of the State of Nebraska by virtue of  services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility. Nothing herein shall operate to waive Contractor's right to assert any mechanics lien for any payment other than the milestone identified as:_____(the "Current Milestone") and previous milestones to the extent Contractor has received payment for such  milestones. Contractor does hereby reserve, and does not hereby waive or release, any lien or right of lien which Contractor has pursuant to the laws of the State of Nebraska to the extent of any unapproved change order, or to the extent of any other disputed item as identified below:

Contractor does hereby, subject to the receipt of the aforementioned amount due and payable by Builder to Contractor agree to indemnify, hold harmless and defend Builder and Owner  from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Contractor in respect to services covered under the waiver set forth in the preceding paragraph.

This Partial Waiver of Liens and Indemnity Agreement shall be binding upon Contractor and  the successors and assigns of Contractor and shall inure to the benefit of Builder and Owner and the respective successors and assigns of Builder and Owner.

IN WITNESS WHEREOF Contractor has executed this Partial Waiver of Liens and Indemnity Agreement this _____ day of_____, 20    .

Swisslog Logistics, Inc.

By:_____

Its:_____

COMMONWEALTH OF VIRGINIA    )
                                ) ss.
County of _____               )

On _____ day of _____, 2016, then personally appeared the above-named
_____, _____ of Swisslog
Logistics, Inc., and acknowledged the foregoing instrument to be the free act and deed of
Swisslog Logistics, Inc. before me.

                                    Notary Public
                                    My commission expires:

<u>FINAL WAIVER OF LIENS AND INDEMNITY AGREEMENT</u>

KNOW ALL MEN BY THESE PRESENTS THAT Swisslog Logistics, Inc. ("Contractor") has rendered services to, performed work for and/or furnished materials to Primus Builders, Inc. (hereinafter referred to as "Builder") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766 ("New Facility") as owned by Beef Products, Inc. (hereinafter referred to as "Owner");

NOW THEREFORE, upon receipt of _____ dollars ($_____) representing the final payment due and payable by Builder to Contractor for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, waive and release all liens or rights of lien which Contractor has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

Contractor does hereby, subject to the receipt of the aforementioned final payment due and payable by Builder to Contractor for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, agree to indemnify, hold harmless and defend Builder and Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Contractor in respect to services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility

This Final Waiver of Liens and Indemnity Agreement shall be binding upon Contractor and the successors and assigns of Contractor and shall inure to the benefit of Builder and Owner and the respective successors and assigns of Builder and Owner.

IN WITNESS WHEREOF Contractor has executed this Final Waiver of Liens and Indemnity Agreement this _____ day of _____, 20 ____ .

Swisslog Logistics, Inc.

By:_____
Its:_____
            Hereunto duly authorized

COMMONWEALTH OF VIRGINIA        )
                                ) ss.
County of_____           )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Swisslog Logistics, Inc. and acknowledged the foregoing instrument to be the free act and deed of Swisslog Logistics, Inc., before me.

Notary Public
My commission expires:

## GUARANTEED MAXIMUM SUM CONTRACT

dated as of September 2, 2016

by and between

## BEEF PRODUCTS, INC.

and

## PRIMUS BUILDERS, INC.



Exhibit B

# TABLE OF CONTENTS

Page

1. Duties and Status of Builder ........................................................................................... 1
2. Work, Guaranteed Maximum Sum, Time of Completion ................................................. 1
3. Savings and Cost of the Work ....................................................................................... 3
4. Progress Payments ........................................................................................................ 5
5. Final Payment ............................................................................................................... 6
6. Correction of Work; Warranty ........................................................................................ 7
7. Permits and Regulations ............................................................................................... 7
8. Protection of Persons and Property .............................................................................. 8
9. Inspection of Work ........................................................................................................ 8
10. Supervision ................................................................................................................... 9
11. Changes in the Work ..................................................................................................... 9
12. Allowances and Claims ............................................................................................... 10
13. Subcontractors ............................................................................................................ 11
14. Mutual Responsibility of Contractors ......................................................................... 12
15. Separate Contracts ..................................................................................................... 12
16. Use of Premises .......................................................................................................... 12
17. Cleaning Up ................................................................................................................. 12
18. Site Representations .................................................................................................... 12
19. Concealed, Unknown and/or Unforseeable Conditions ............................................. 13
20. Title to Work ................................................................................................................. 13
21. Liability of Builder; Liquidated Damages ..................................................................... 13
22. Waiver of Breach .......................................................................................................... 13
23. Insurance ..................................................................................................................... 14
24. Accounting Records ..................................................................................................... 16
25. Contract Documents .................................................................................................... 16
26. Right of Owner to Terminate Contract ......................................................................... 16
27. Right of Builder to Stop Work or Terminate Contract ................................................. 17
28. Contract Modifications ................................................................................................. 17
29. Notices ........................................................................................................................ 18
30. Assignment .................................................................................................................. 18
31. Headings ...................................................................................................................... 18
32. Applicable Law ............................................................................................................. 18
33. Succession of Rights and Obligations ......................................................................... 18
34. Additional Documents .................................................................................................. 18

Exhibit "A"    Plans, Specifications and Automation Documents
Exhibit "B"    SwissLog Contract Documents
Exhibit "C"    Location of New Facility
Exhibit "D"    Design Services
Exhibit "E"    Construction Schedule
Exhibit "F"    Cost of Work
Exhibit "G"    Form of Partial Waiver of Lien and Indemnity Agreement
Exhibit "H"    Final Form of Partial Waiver of Lien and Indemnity Agreement
Exhibit "I"    Form of Warranty

## GUARANTEED MAXIMUM SUM CONTRACT

THIS GUARANTEED MAXIMUM SUM CONTRACT (the "Contract") is made as of the 2nd day of September 2016, by and between Beef Products, Inc. (hereinafter referred to as "Owner"), a corporation organized under the laws of the State of South Dakota with a principal place of business at 891 Two Rivers Drive, Dakota Dunes, SD 57049, and Primus Builders, Inc. (hereinafter referred to as "Builder"), a corporation organized under the laws of the State of Georgia with a principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189.

WHEREAS, Owner owns and operates a meat packing facility consisting of various intake facilities, slaughter areas, processing facilities, refrigeration and freezer facilities, shipping areas and other improvements necessary for the operation of Owner's full-service processing plant (the "Current Facility");

WHEREAS, Owner desires to expand the Current Facility by adding a freezer building (with rack supported structure) and a cooler building (with non-structural racking) (collectively, the "New Facility");

WHEREAS, Builder is experienced in the design and construction of the type of New Facility desired by Owner and has submitted to Owner a certain proposal to perform said design and construction work, all as more fully set forth hereinbelow;

WHEREAS, Builder has entered into an agreement with Swisslog Logistic, Incorporated, a Virginia corporation, with its principal address at 161 Enterprise Drive, Newport News, Virginia 23603 (hereinafter referred to as "Swisslog"), whereby Builder shall utilize Swisslog for installing certain equipment in the New Facility; and

WHEREAS, Owner desires to engage Builder to construct the New Facility, all in accordance with the terms set forth in this Contract, and Builder desires to construct the New Facility for Owner, all in accordance with the terms of this Contract.

NOW, THEREFORE, in consideration of the above recitals and the agreements and covenants hereinafter contained, Owner and Builder agree as follows:

1.     Duties and Status of Builder.   Builder accepts the contractual relationship established between Builder and Owner by this Contract, and Builder covenants with Owner to furnish reasonable skill and judgment in furthering the interests of Owner to build the New Facility, all in accordance with the Plans and Specifications (as defined herein). Builder agrees to furnish efficient business administration and superintendence and to use reasonable efforts at all times to cause the Work (as defined herein) to be performed in a sound, expeditious and economical manner consistent with the interests of Owner.

2.     Work, Guaranteed Maximum Sum, Time of Completion.

a.     Work. The term "Work" as used herein shall mean the construction of the New Facility, all in accordance with the plans and specifications set forth on Exhibit "A" attached hereto (the "Plans and Specifications") and made a part hereof. The Work shall include all labor necessary to produce the design and construction required by the Contract Documents (as defined in Paragraph 25) and all materials and equipment incorporated or to be incorporated in such design and construction of the New Facility. The New Facility described in the Plans and Specifications is or is to be located at the

north end of the Current Facility, all as shown on Exhibit "C" attached hereto. Unless otherwise expressly stipulated, Builder shall, in accordance with the Contract Documents, perform all Work and pay for all materials, labor, tools and equipment necessary for the proper execution and completion of the Work.

Builder has retained Primus Design Services, LLC (hereinafter referred to as "Engineer") to perform the design services required to build the New Facility as described in this Contract, and it is specifically understood and agreed that the Guaranteed Maximum Sum, as hereinafter defined, includes all fees payable by Builder to Engineer for design services required to be performed to build said New Facility. Design fees payable to Engineer are $430,746. Builder has also retained Swisslog to perform the design and construction of the automated components, the cranes, the racking and associated support for a complete operation system to be installed in the New Facility, and it is specifically understood and agreed that the Guaranteed Maximum Sum includes all fees payable by Builder to Swisslog. The fees payable to Swisslog are $14,200,000, all as set forth and described in the Swisslog contract documents listed on Exhibit "B" attached hereto.

As used herein the term "subcontractor" shall mean any party who has a direct contract with Builder to perform any of the Work, including without limitation Engineer; Primus Panels Division, and Swisslog, and it is specifically understood and agreed that Builder shall be responsible for the acts and omissions of all parties retained by, through or under Builder in connection with the design and construction of the Work.

Unless otherwise specified, all materials incorporated into the Work shall be new and both workmanship and materials incorporated into the Work shall be of first class quality. Builder shall, if requested by Owner, furnish satisfactory evidence as to the kind and quality of materials incorporated into the Work.

     b.    Guaranteed Maximum Sum. Builder agrees that the maximum sum that Owner shall be obligated to pay to Builder for the performance hereunder of the Work is thirty three million eight hundred ninety nine thousand seven hundred eighty dollars ($33,845,991), as such sum shall be increased or decreased as set forth herein (said sum as so increased or decreased hereinafter referred to as the "Guaranteed Maximum Sum"), and it is specifically understood and agreed that Owner shall pay to Builder for the performance hereunder of the Work the Guaranteed Maximum Sum less any savings as set forth in Paragraph 3.

     c.    Time of Completion. Builder has prior to the date hereof proceeded with the design services required to build the New Facility described in Exhibit "D" and Builder shall complete said design services and proceed with the construction of the Work with due diligence, due regard being given to interruptions resulting from any cause beyond the reasonable control of Builder, and Builder agrees to substantially complete the construction of all of the Work required hereunder to be performed by Builder on or before December 13, 2017, as said date may be extended for such periods of time as Builder is prevented from proceeding with or completing the Work for any cause beyond the reasonable control of Builder or not reasonably foreseen by Builder.

A schedule setting forth the expected dates for commencement and completion of each of the various stages of the design and construction of the Work required to build the New Facility described in this Contract is annexed hereto as Exhibit "E" and made a part hereof (the "Construction Schedule"). In the event that Builder determines, at any

time, that the Construction Schedule, in the aggregate, will be delayed by more than one (1) week, Builder shall provide prompt written notice of the same to Owner, along with an explanation for any such delays. Similarly, in the event that the Construction Schedule is accelerated, Builder shall notify Owner in writing of any anticipated changes to such Construction Schedule. In either such case, the Construction Schedule shall be updated by Builder as necessary, and revisions in said schedule shall be furnished to Owner, Engineer and Swisslog, it being specifically understood and agreed that Owner shall be entitled to rely upon and shall utilize said Construction Schedule as said Construction Schedule is revised from time to time to determine final dates upon which to make decisions Owner must make with respect to the Work.

In the event that the performance and/or completion of the Work is delayed at any time by any act or omission of Owner or of any employees, agents or tenants of Owner, by any separate contractor employed by Owner, by changes or alterations in the Work not caused by any fault or omission of Builder, by strikes, by lockouts, by fire, by embargoes, by windstorm, by flood, by earthquake, by acts of war, by changes in public laws, regulations or ordinances enacted after the date of execution of this Contract, by acts of public officials not caused by any fault or omission of Builder, by an inability to obtain materials or equipment not caused by any fault or omission of Builder, by concealed, unknown and/or unforeseeable conditions as described in Paragraph 19 or by any other cause beyond the reasonable control of or not reasonably foreseeable by, Builder, the aforesaid date for substantial completion of construction of the Work shall be extended for a reasonable period as a consequence of such delay.

The terms "substantial completion", "substantially complete" and "substantially completed" as used herein shall mean completed in such fashion as to enable Owner, upon performance of any separate work to be done by Owner, to take possession of the New Facility described in this Contract and to commence operations therein with minimal interference from either Builder or any party retained by, through or under Builder in connection with the design or construction of the Work and that the design and construction of the Work is completed except for so-called punch list items of a minor nature. The terms "full completion" and "fully completed" as used herein shall mean that the Work, including punch list items, has been completed in accordance with the Contract Documents.

3.    Savings and Cost of the Work. In the event that the sum of the Cost of the Work, as hereinafter defined, and Builder's Fee, as hereinafter defined, is less than the Guaranteed Maximum Sum, as finally adjusted, ninety percent (90%) of the difference shall be deemed to be a savings hereunder, and ten percent (10%) shall be paid to Builder as a bonus for creating such savings. Any said savings shall be determined at the time of final payment hereunder and shall decrease the Guaranteed Maximum Sum payable hereunder by Owner to Builder as set forth in Paragraph 2(b), it being specifically understood and agreed that, if and to the extent that any said savings shall exceed such final payment such excess shall be paid promptly by Builder to Owner.

The term "Cost of the Work" as used herein shall mean costs reasonably and necessarily incurred in the proper performance of the Work and paid or to be paid by Builder. Such costs shall be at rates not higher than the standard paid in the locality of the Work, except with the consent of Owner, and shall include the items set forth hereinbelow in items (a) through (p):

a. compensation paid for labor in the direct employ of Builder in the performance of the Work, including such welfare or other benefits, if any, as may be payable with respect thereto;

b. compensation of employees of Builder working on the project and/or when stationed at the field office in whatever capacity employed, it being specifically understood and agreed that employees of Builder, including the general managers, project executives, program managers and the project manager of Builder, engaged in planning, estimating, programming, scheduling, purchasing, managing, administering or accounting for the Work or in expediting the production or transportation of materials or equipment incorporated into the Work shall be considered as a cost of work and their compensation paid for;

c. cost of contributions, assessments or taxes for such items as unemployment compensation and social security insofar as such cost is based on compensation or other remuneration paid to employees of Builder included in the Cost of the Work;

d. reasonable transportation, traveling, meal and hotel expenses of Builder or of the employees of Builder incurred in discharging duties connected with the Work;

e. cost of all materials, supplies and equipment incorporated into the Work, including reasonable costs of transportation thereof;

f. expenses incurred pursuant to this Contract by Builder in respect to subcontractors, materialmen and/or other parties retained by, through or under Builder for Work required to be performed to design or construct the New Facility described in this Contract;

g. cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities and hand tools which are not owned by workmen and which are consumed in the performance of the Work, and cost less salvage value in respect to such items which are used but not consumed and which remain the property of the Builder;

h. rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from Builder or others, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area of the Work;

i. the cost of liability insurance that Builder is required hereunder to purchase and/or maintain in order to carry out the Work and the additional cost of all builders risk insurance if Owner has requested is included, bonds, guarantees and/or warranties which Builder is required hereunder to obtain in connection with the design and/or construction of the Work; provided, however, in no event shall such liability insurance costs exceed 0.55% of the costs of the Work;

j. sales, use or similar taxes related to the Work and for which Builder is liable imposed by any governmental authority;

k.    overhead allocations of 1.15% of the cost of work are included for home office support personnel working on the project;

l.    permit fees, royalties, damages for infringement of patents and costs of defending suits therefor and deposits lost for causes other than the negligence of Builder;

m.    expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such expenses and/or costs have resulted from causes other than the fault or omission of Builder, it being specifically understood and agreed that such expenses and/or costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war-risk";

n.    cost of removal of all debris;

o.    cost incurred due to an emergency affecting the safety of persons and property, unless such emergency was caused by Builder not following the applicable laws, rules or regulations applicable to the construction site for the New Facility in performance of the Work; and

p.    other costs incurred in the performance of the Work if and to the extent such costs are approved in writing by Owner.

Each item set forth above for the Costs of Work is further delineated on Exhibit "F" attached hereto.

Except as otherwise provided herein, the term "Cost of the Work" shall not include any of the items set forth hereinbelow in items (q) through (t):

q.    salaries or other compensation of the marketing executives, general managers or auditors of Builder at the principal office or branch offices of Builder, along with any other salaries or compensation of other employees, officers or agents of Builder unless specifically set forth in items (a) through (p) above;

r.    expenses of the principal or branch offices of Builder other than the field office at the site of the Work;

s.    any part of the capital expenses of Builder, including interest on capital of Builder employed for the Work; and

t.    general administrative or other indirect overhead expenses of any kind, except as may be expressly included hereinabove in items a through p.

The term "Builder's Fee" as used herein shall mean an amount equal to four percent (4%) of the Cost of the Work (excluding Swisslog), as finally adjusted, including without limitation any Cost of the Work attributable to any change in the Work. The Builder's Fee for Swisslog costs is two percent (2%).

All cash discounts received by Builder shall accrue for the benefit of Owner as a credit against the Cost of the Work. All trade discounts, rebates and refunds and all returns from the sale of surplus materials and equipment shall accrue to Owner as a credit against the Cost of the Work, and Builder shall secure such discounts, rebates, refunds and returns if and to the extent commercially available.

4.    Progress Payments.  Progress payments shall be made by Owner to Builder upon receipt by Owner of an application for payment therefor, as follows:

a.    Except as otherwise provided in this Paragraph 4 as to Swisslog, Builder shall submit to Owner on or about the fifth day of each month an application for payment covering all labor, materials and other Work furnished during the preceding month, including a reasonable portion of Builder's Fee earned as a result of the performance of such Work, based upon the schedule of values of the various parts of the Work annexed hereto as Exhibit "F" and made a part hereof. Except for any items objected to by Owner in accordance with Paragraph 4(d) below, ninety-five percent (95%) of all Work included in any such application for payment and attributable to construction performed by subcontractors retained by Builder, and one hundred percent (100%) of all other Work included in any such application for payment, shall be paid to Builder within twenty (20) days after the receipt of any such application for payment by Owner.

b.    Builder shall certify as to the actual cost incurred by Builder for labor, materials and other Work included in any application for payment under this Contract.

c.    Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner. Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Partial Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "G" or in such other form as may be required by Owner's lender and/or any title company involved in confirming lien waivers and making payments from Owner to Builder.

d.    All applications for payment under this Contract, including the application for final payment, shall be subject to the approval of Owner and/or, if required by Owner, to the approval of Owner's representatives.  Owner shall cause all applications for payment under this Contract, including the application for final payment, which such applications for payment are reasonably in accordance with the Contract Documents to be approved by Owner and, if required by Owner, to be approved by Owner's representatives forthwith upon receipt thereof by Owner, it being specifically understood and agreed that Owner and Owner's representatives shall not be entitled to withhold any approval of any application for payment under this Contract if such application for payment is reasonably in accordance with the Contract Documents and payment of the amount shown in such application for payment is due to Builder pursuant to the terms and provisions of this Contract.  To the extent Owner does not agree with any portion of Work and/or fees charged for such Work in an application for payment, Owner may withhold such portion and make written objection to Builder with regard to the same.

-6-

Builder and Owner shall then work in good faith to resolve any issues with regard to the portion of Work questioned by Owner with regard to the payment request.

    e.    A schedule of values of the various parts of the Work aggregating the Guaranteed Maximum Sum is annexed hereto as Exhibit "F" and made a part hereof, and it is specifically understood and agreed that Builder shall use said schedule in calculating the amount of any progress payment required to be made by Owner in accordance with this Paragraph 4 except with respect to payment requests submitted by Swisslog.

    f.    As an exception to other payment procedures set forth in this Paragraph 4, amounts to be paid to Swisslog shall be handled as set forth in this subparagraph. Swisslog will invoice Builder upon achievement of certain milestones and amounts as set forth in the Swisslog Base Contract dated July 9, 2016, paragraph 11 and the schedule therein. Builder will forward to Owner all Swisslog invoices and Owner shall pay to Builder via wire transfer the entire invoice amount plus Builder's corresponding fee, as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract. Retainage that may otherwise apply to payment to be made to Builder shall not apply as to amounts invoiced by Swisslog.

    5.    **Final Payment.** Builder shall submit to Owner a final application for payment immediately after substantial completion of construction of the Work. Except as otherwise provided in this Paragraph 5 as to Swisslog, final payment is due and payable by Owner within forty-five (45) days after substantial completion of construction of the Work in accordance with the Contract Documents unless Builder has failed to fully complete the Work within such forty-five (45) day period, in which case final payment shall be due and payable by Owner in two installments, the first installment being equal to such final payment less an amount equivalent to 150% of the value of any uncompleted Work and being due and payable by Owner upon the expiration of such forty-five (45) day period, and the second installment being equal to the balance of such final payment and being due and payable by Owner promptly upon full completion of construction of the Work.

Except as to final payment to Swisslog, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner. Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Final Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "H."

Upon receipt of invoice from Swisslog upon the occurrence of Provisional Acceptance or start of beneficial use by Owner of the systems furnished by Swisslog as set forth in the Swisslog Base Contract dated July 9, 2016, Builder shall forward such invoice to Owner. Owner shall make payment to Builder for the entire amount of Swisslog's invoice plus Builder's fee as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract. Final payment to Swisslog shall be treated and made as separate from other conditions of final payment to Builder as set forth elsewhere in this Contract.

6. **Correction of Work; Warranty**. No payment hereunder by Owner and no provision in the Contract Documents shall relieve Builder of responsibility for faulty materials or workmanship incorporated into the Work. Builder warrants that all Work done under this Contract shall be free of faulty materials and workmanship and agrees, immediately upon discovery such faulty materials or workmanship, or receiving notification from Owner, to remedy, repair or replace all defects or imperfections which may appear as a result of faulty materials or workmanship, at any time, or from time to time, during a period beginning with commencement of construction of the Work and ending twelve months after the construction of the Work has been substantially completed. Builder shall provide Owner with a signed warranty in the form attached hereto as Exhibit "I" after completion of the New Facility (the "Warranty"). The foregoing warranty of Builder applies to the remedy, repair or replacement of defects or imperfections which may appear as a result of faulty designs prepared by Builder and/or by any party retained by, through or under Builder in connection with the design of the Work, but the foregoing warranty of Builder does not guarantee against damage to or defects in the Work arising out of or resulting from abuse, lack of normal maintenance and/or improper operation of the Work by Owner and/or by any agents, employees or tenants of Owner or as a result of changes or additions to the Work made or done by persons not directly responsible to Builder, except where such changes or additions are made in accordance with the directions of Builder. Except as set forth hereinabove or as set forth on Exhibit "I", no guarantee furnished by a party other than Builder with respect to equipment manufactured or supplied by such party shall relieve Builder from the obligations of Builder in respect to the foregoing warranty. The warranty period set forth hereinabove shall not apply to latent defects, and with respect to such defects, the applicable statute of limitations shall apply.

7. **Permits and Regulations**. Any building permits necessary for the construction of the Work and required to be obtained from any governmental authorities shall be secured and paid for by Builder, the cost of said permits being included in the Cost of the Work. It shall be the responsibility of Builder to make certain that the Work complies with all applicable building codes and all bulk and dimensional requirements set forth in any applicable zoning ordinances, provided however that it shall be the responsibility of Owner, and not of Builder and/or Engineer, to make certain that the New Facility described in this Contract is permitted to be used for the purpose intended in the zoning district in which said New Facility is situated.

Builder shall give all notices required by any governmental authorities in connection with the performance of the Work and shall comply with all laws, ordinances, rules, regulations and orders of any governmental authorities bearing on the performance of the Work. Without in any way limiting the responsibilities of Builder set forth herein, if Builder observes that any of the Contract Documents are at variance in any respect with any such laws, ordinances, rules, regulations or orders, Builder shall promptly notify Owner in writing and any necessary changes in the Work caused thereby shall be adjusted by appropriate modification. If Builder performs any Work knowing it to be contrary to such laws, ordinances, rules, regulations or orders and without notice to Owner, Builder shall assume full responsibility therefor and shall bear all costs attributable thereto.

8. **Protection of Persons and Property**. Builder shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the construction of the Work. Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

a. all employees on the Work and all other persons who may be affected thereby;

b.      all Work and all materials and equipment to be incorporated therein, whether in storage on or off the site of the Work, under the care, custody, or control of Builder or its subcontractors; and

c.      other property at the site of the Work or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Builder shall at all times enforce strict discipline and good order among those performing the Work and shall not permit any unfit person or anyone not skilled in the task assigned to be employed on the Work.

Builder shall comply with all applicable laws, ordinances, rules, regulations and orders of any governmental authorities having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. Builder shall maintain and implement, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, and shall promulgate and publish safety regulations pertaining to the Work. Builder shall designate a responsible employee of Builder stationed at the site of the Work whose duty shall be the prevention of accidents. Such person shall be the superintendent of Builder unless otherwise designated in writing by Builder to Owner.

In any emergency affecting the safety of persons or property, Builder shall act at its discretion to prevent threatened damage, injury or loss. Any additional compensation or extension of time claimed by Builder on account of any such emergency shall be determined by mutual agreement between Owner and Builder.

9.      Inspection of Work. Owner and Owner's representatives shall at all times have access to the Work wherever it is in preparation or progress, and Builder shall provide proper facilities for such access and for inspection of the Work.

If the drawings, the specifications, the timely-given instructions of Owner or any governmental authorities shall require any Work to be specially tested or approved, Builder shall give Owner timely notice of its readiness for inspection and, if the inspection is to be performed by a party other than Owner, of the date fixed for such inspection. Inspections by Owner shall be promptly made, and, where practicable, shall be at the source of supply. If any Work required to be inspected by the drawings, the specifications, the timely-given instructions of Owner or any governmental authority should be covered up without the approval or consent of Owner, it must, if required by Owner, be uncovered for examination at the expense of Builder.

Re-examination and/or replacement of questioned Work may be ordered by Owner and if so ordered, the Work shall be uncovered and replaced by Builder. If such Work is found to be in accordance with the Contract Documents or if such Work is not in accordance with the Contract Documents but such nonconformity has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work, Owner shall pay the cost of such re-examination and replacement in addition to the Guaranteed Maximum Sum. If such Work is not in accordance with the Contract Documents, Builder shall pay the cost of such re-examination and replacement unless such nonconformity in the Work has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work.

10.  Supervision.  Builder shall keep at the New Facility during progress of the Work a competent project manager and any necessary assistants, all reasonably satisfactory to Owner. Such project manager shall represent Builder and all directions given by Owner to such project manager shall be as binding as if given to Builder. Important directions by Owner to Builder shall be confirmed in writing to Builder. Other directions by Owner to Builder shall be so confirmed upon written request of Builder in each case.

Builder shall give efficient supervision to the Work, using reasonable skill and attention, and shall cause working drawings and specifications pertaining to the Work to be carefully prepared and promptly submitted to Owner. Following acceptance by Owner of said working drawings and specifications, Builder shall perform the Work described in said working drawings and specifications in accordance with Contract Documents. Notwithstanding the foregoing, Builder may from time to time make minor and insignificant changes in said working drawings and specifications and perform the Work in accordance with such changed drawings and specifications without the consent of the Owner, provided that (i) Builder shall provide such changed drawings and specifications to Owner for review and (ii) any such Work performed by Builder in accordance with such changed drawings and specifications shall be consistent with that specifically required to be performed by Builder under the Contract Documents.

11.  Changes in the Work.  Owner, without invalidating this Contract, may order extra Work or make changes by altering, adding to, or deducting from the Work, the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, being equitably adjusted accordingly.  Unless otherwise specified, all such Work shall be executed under the conditions of this Contract and any claim for extensions of time caused thereby shall be equitably adjusted at the time of ordering such change.

Any change in the Guaranteed Maximum Sum resulting from a change in the Work shall be determined in one or more of the following ways:

a.  by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

b.  by unit prices stated in the Contract Documents or subsequently agreed upon;

c.  by cost to be determined in a manner agreed upon by Owner and Builder and by an increase or decrease in the Guaranteed Maximum Sum based upon such cost and an adjustment in Builder's Fee consistent with that contemplated by Paragraph 3 in the event of a change in Work; or

d.  by the method provided hereinbelow in this Paragraph.

If Owner requests that a change be made in the Work and none of the first three methods set forth hereinabove in items (a), (b) or (c) for determining any change in the Guaranteed Maximum Sum resulting from such change in the Work is mutually agreed upon, then Builder, provided Builder receives a written change order signed by Owner, shall promptly proceed to cause the change in the Work requested to be performed.  The change in the Guaranteed Maximum Sum shall then be determined on the basis of the sum of any increase and/or decrease in the Cost of the Work attributable to the change and any increase and/or decrease in Builder's Fee attributable to the change.  In such case, Builder shall keep and present to Owner an itemized accounting, together with appropriate supporting data, of the Cost

of the Work attributable to the change. Unless otherwise provided herein, the Cost of the Work attributable to the change shall include and be limited to the Cost of the Work directly attributable to the change. Pending final determination of the change in the Guaranteed Maximum Sum, payments on account of the change shall be made based upon an application for payment covering actual expenditures of Builder attributable to the change. The amount of credit to be allowed by Builder to Owner for any deletion or change which results in a net decrease in the Guaranteed Maximum Sum shall be determined on the basis of a reasonable estimate of the Cost of the Work deleted or changed. When both additions and credits covering related Work or substitutions are involved in any one change which results in a net increase in the Guaranteed Maximum Sum, the change in the Guaranteed Maximum Sum shall include an increase in Builder's Fee computed only upon the basis of the net increase in the Cost of the Work attributable to the change.

The Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 should Builder incur costs of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such costs have resulted from causes other than the fault or neglect of Builder or anyone for whom Builder may be liable. Such expenses and costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war risk". In the event that any such reconstruction, replacement and/or repair is required and Builder is placed in charge thereof, Builder shall be paid for said reconstruction, replacement and/or repair services and work a reasonable Builder's Fee consistent with that set forth in Paragraph 3, said Builder's Fee on account of said reconstruction, replacement and/or repair services and work being payable by Owner to Builder in addition to the Guaranteed Maximum Sum.

12.    Allowances and Claims. If Builder claims that any instructions provided by Owner and/or any act or omission of Owner or of any employee, agent or tenant of Owner involve extra cost and/or that, in accordance with Paragraph 11, the Guaranteed Maximum Sum should be increased as a result of Builder having incurred expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies, and/or that, in accordance with Paragraph 19, concealed, unknown and/or unforeseeable conditions have been encountered, Builder shall give written notice and explanation thereof within a reasonable time after the receipt of such instructions, the occurrence of such act or omission and/or the incurring of such expenses and/or costs and, provided that such claim is reasonable and supported by clear evidence, such claim shall be treated as a change in the Work for which the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, shall be equitably adjusted. No such claim shall be valid unless so made. Notwithstanding the foregoing provisions of this Paragraph 12, Builder acknowledges and agrees that it shall not incur and pay any additional expenses and/or costs which fall outside of the Guaranteed Maximum Sum without Owner's prior written consent.

Builder has included within the Guaranteed Maximum Sum all allowances stated in the Contract Documents. Items covered by said allowances shall be supplied for such amounts and by such parties as Owner may direct, but Builder shall not be required to employ any parties against whom Builder makes a reasonable objection. Unless otherwise expressly provided:

a.    said allowances do not include a Builder's Fee attributable to items covered by said allowances, but, in determining the Guaranteed Maximum Sum, a

Builder's Fee consistent with that set forth in Paragraph 3 on account of said allowances has been included in the Guaranteed Maximum Sum; and

b.      whenever the Cost of the Work attributable to items covered by an allowance differs from the specific allowance, the difference shall be treated as a change in the Work and the Guaranteed Maximum Sum and Builder's Fee shall be adjusted in respect to such difference as set forth in Paragraph 11.

13.     Subcontractors.  Unless otherwise specified or unless the Contract Documents state that a specific party has been designated to perform a certain portion of the Work, Builder shall cause bidding documents with respect to each major portion of the Work to be submitted to qualified parties for the purpose of obtaining bids in connection with the performance of each such portion of the Work.  As soon as practicable thereafter Builder shall furnish to Owner in writing the names of those parties from whom bids with respect to each such portion of the Work were elicited, the amounts of any bids received and the names of those parties proposed for each such portion of the Work.  Owner, within seven (7) days after receiving the name of any party proposed for any portion of the Work, shall notify Builder in writing if Owner has any objection to and does not accept such party.  Failure of Owner to make objection to any party as set forth hereinabove shall constitute acceptance of such party.  Builder shall not let any contract in connection with the construction of a principal portion of the Work if the party proposed for such portion of the Work has been rejected by Owner as set forth hereinabove, and Builder shall not make any substitution for any party who has been accepted by Owner unless the substitution is reasonably acceptable to Owner.  Builder shall not be required hereunder to contract with any party against whom Builder has a reasonable objection.

If Owner refuses to accept any party proposed by Builder as a subcontractor, Builder shall submit an acceptable substitute, and the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such substitution, provided however that no such increase in the Guaranteed Maximum Sum shall be allowed hereunder for any such substitution unless Builder has acted properly and responsively in submitting to Owner for acceptance the name of such party.  If Owner requires a change of any proposed party who has been previously accepted by Owner, the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such change.

14.     Mutual Responsibility of Contractors.  Should Builder cause damage to the work or property of any other contractor employed by Owner in connection with the construction of the Work, Builder shall, upon receipt of written notice thereof, settle with such other contractor by agreement, if such other contractor will so settle.  If such other contractor sues Owner on account of any damage alleged to have been so sustained as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Owner shall promptly notify Builder in writing of such suit.  If and to the extent that any such other contractor has been damaged as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Builder shall indemnify, hold harmless and defend Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from any such fault or omission.

15.     Separate Contracts.  Owner reserves the right to let other contracts in connection with the construction of portions of the Work the construction of which are not being performed hereunder by Builder.  Builder shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall properly connect and coordinate the Work with the work of such other contractors.

If the proper execution of any part of the Work depends upon the work of any such other contractor, Builder shall inspect and promptly report to Owner any apparent discrepancies in such work that render it unsuitable for such proper execution and results. Failure of Builder so to inspect and report shall constitute an acceptance of such other contractor's work as fit and proper to receive the Work, except as to latent defects and defects which may develop in such work after the execution of such work.

16. Use of Premises. Builder shall confine operations at the site of the Work to areas permitted by law, ordinances, permits and the Contract Documents and shall prevent the site of the Work from being unreasonably encumbered with any materials or equipment. Builder shall not permit any part of the Work to be loaded with a weight so as to endanger the safety of persons or property at the site of the Work. Builder acknowledges that Owner shall maintain operations in the Current Facility while Builder is performing the Work on the New Facility. Accordingly, Builder shall work in good faith to minimize any disruption to the Current Facility when constructing the New Facility in order to allow Owner to continue utilizing the Current Facility to the greatest extent possible.

17. Cleaning Up. Builder shall at all times keep the site of the Work free from accumulations of waste material or rubbish caused by the performance of the Work by Builder, and at the completion of construction of the Work, Builder shall remove from the site of the Work all rubbish and all tools, scaffolding and surplus materials caused by, used in or resulting from the Work and shall leave the Work "broom clean", or its equivalent, unless more exactly specified hereunder.

18. Site Representations. Owner warrants and represents that Owner has, and will continue to retain at all times during the course of construction of the Work, legal title to the land upon which the New Facility is to be constructed and that such land is properly subdivided and zoned so as to permit the construction and use of said New Facility. Owner further warrants and represents that such land is free of any easements, conditions, limitations, special permits, variances, agreements or restrictions which would prevent, limit or otherwise restrict the construction or use of said New Facility. Owner has provided all necessary site information to Builder, including information with respect to soil conditions, existing buildings and structures, easements, restrictions and utility locations, and Builder has relied upon such information as well as the aforementioned representations in designing said New Facility and determining the Guaranteed Maximum Sum. Owner shall indemnify and hold harmless Builder from any losses, expenses or damages Builder may sustain in connection with the design or construction of said New Facility because of differences between existing conditions and those conditions represented hereinabove to Builder.

19. Concealed, Unknown and/or Unforseeable Conditions. Should concealed, unknown and/or unforeseeable conditions below the surface of the ground or in an existing structure encountered in the performance of the Work be at variance with the conditions indicated by the Contract Documents or differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents, the Guaranteed Maximum Sum and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 upon claim within a reasonable time after the first observance of such conditions.

20. Title to Work. Title to all Work completed or in the course of construction and paid for by Owner and title to all materials on account of which payment has been made by Owner shall vest in Owner. Builder agrees that any drawings or specifications prepared hereunder by Builder or Engineer or Swisslog to be used in connection with the design or

construction of the New Facility described in this Contract or in connection with the design or construction of the New Facility are the property of Owner, and Owner may utilize such Plans and Specifications in the future as desired by Owner without the prior written approval of Builder or Engineer or Swisslog; provided, however, Owner acknowledges that any future use of the Plans and Specifications are at Owner's own risk (except to the extent Owner relies on the same when maintaining or repairing the New Facility and references the Plans and Specifications for information about the materials or equipment located in the New Facility).

21.     Liability of Builder; Liquidated Damages.     Builder shall indemnify and hold harmless Owner and the agents and employees of Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (a) is attributable to Builder's breach of the terms of this Contract, (b) is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property related to the Work and (c) is caused in whole or in part by any negligent act, intentional act or omission of Builder, anyone directly employed by Builder or anyone for whose acts Builder may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. In the event that any attachments or liens shall be placed upon the property of Owner to secure or enforce any such claims arising as aforesaid, Builder shall forthwith upon written request of Owner cause such attachments or liens to be dismissed or discharged. Notwithstanding anything to the contrary set forth herein, neither Builder nor Owner shall be liable to the other for any indirect or consequential losses or damages, whether arising in contract, warranty, tort, strict liability or otherwise, arising out of or in connection with this Contract and/or the Work.

If Builder has not substantially completed the Work within the time set forth in this Contract, Builder agrees to pay to Owner liquidated damages, being understood this is Owner's sole and exclusive remedy, in the amount of $3,000 per day for each day after January 1, 2018, that Builder has not substantially completed the Work. The maximum damage assessed will be $1,000,000. This amount of liquidated damages represents the parties' good faith estimate of the damages which Owner will suffer as a result of the failure of Builder to substantially complete the Work by said date, is not a penalty, and is lieu of all other damages recoverable by Owner from Builder as a result of such delay. The February 15, 2018 deadline for substantial completion of the Work shall be extended for certain matters as set forth in this Contract.

22.     Waiver of Breach.     The failure of Owner or Builder at any time to require performance of any provision of this Contract with respect to a particular matter shall in no way affect the right of Owner or Builder to enforce such provision at a later date with respect to another matter; nor shall the waiver by Owner or Builder of any breach of any provision hereof be taken or held to be a waiver with respect to any succeeding breach of such provision or as a waiver of the provision itself unless such waiver with respect to such succeeding breach or such waiver of such provision itself shall be in writing and signed by the party making such waiver. Notwithstanding the foregoing, the making of final payment hereunder shall constitute a waiver of all claims by Owner except those arising from:

a.     unsettled liens,

b.     faulty or defective Work appearing after the date of substantial completion of construction of the Work,

c.     failure of the Work to comply with the requirements of the Contract Documents,

      d.     terms of any special guarantees required by the Contract Documents,

      e.     terms of the warranty set forth in Paragraph 6 or Exhibit "I", or

      f.     latent defects,

and the acceptance of final payment shall constitute a waiver of all claims by Builder except those previously made in writing and still unsettled.

23.    <u>Insurance</u>.

      a.    <u>Builder's Liability Insurance</u>.  Builder shall maintain such insurance as will protect Builder and Owner from those claims set forth hereinbelow which may arise out of or result from the operations of Builder under this Contract, whether such operations be by Builder, by anyone directly or indirectly employed by Builder or by anyone for whose acts Builder may be liable:

      i.     claims under workmen's compensation, disability benefit and other similar employee benefit acts;

      ii.    claims for damages because of bodily injury, occupational sickness, disease or death of any employees of Builder;

      iii.   claims for damages because of bodily injury, sickness, disease or death of any person other than an employee of Builder;

      iv.   claims for damages because of injury to or destruction of tangible property (including the Work itself);

      v.    claims for damages arising after the construction of the Work is completed; and

      vi.   claims for damages arising out of any negligent acts, errors and/or omissions committed in connection with the design of the Work by Builder, Engineer or Swisslog.

The aforesaid insurance required to be maintained by Builder shall not be written for less than any limits of liability specified in the Contract Documents or less than any limits required by law, whichever limits are greater.  The worker's compensation insurance required hereunder to be maintained by Builder shall be in an amount not less than any amount required by law and the employer's liability insurance required hereunder to be maintained by Builder, the commercial general liability insurance, including without limitation coverage for premises operations, independent contractors and completed operations, required hereunder to be maintained by Builder and the automobile liability insurance required hereunder to be maintained by Builder shall be in an amount not less than $2,000,000 on account of any one occurrence and not less than $2,000,000 on account of annual aggregate occurrences.  The aforesaid insurance required hereunder to be maintained by Builder may be written under an umbrella form.

Certificates evidencing that Builder has obtained the aforesaid insurance required to be maintained by Builder shall be provided to Owner prior to commencement of construction of the Work.  Such certificates shall be in form and substance reasonably

satisfactory to Owner, shall indicate that Owner has been named as an additional insured with respect to all of such coverages, other than coverages relating to employer's liability, worker's compensation and professional errors and omissions insurance, and shall contain a provision that coverages afforded by the aforesaid insurance shall not be materially changed or canceled until at least thirty (30) days prior written notice has been given to Owner.

      **b.**    <u>Owner's Liability Insurance</u>.  Owner shall be responsible for purchasing and maintaining its own liability insurance and, at its option, may purchase and maintain such insurance as will protect it against claims which may arise from operations under this Contract.

      **c.**    <u>Property Insurance</u>.   Owner shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof.  Such insurance shall include the interests of Owner, Builder and all parties retained by, through or under Builder as insureds in respect to the Work, shall insure against all perils normally covered in an "all risk" form and shall contain an acknowledgment by the insurer which bars all rights of subrogation against the parties insured, it being specifically understood and agreed that all rights of Builder and Owner against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Paragraph 23(c) are waived and that Owner shall pay in addition to the Guaranteed Maximum Sum any costs not covered because of any minimum deductible contained in any property insurance policy required hereunder to be maintained by Owner.

      Owner shall have the right to adjust and settle any loss covered by the aforesaid property insurance unless Builder shall object, in which case Owner and Builder shall work in good faith to jointly adjust and settle any such loss.  Any proceeds received on account of a loss covered by the aforesaid property insurance shall be paid to Owner as trustee for the insureds, as their interests may appear, and shall, after receipt by Owner, be deposited in a segregated bank account established for the purpose of holding such proceeds and be distributed promptly to the insureds, as their interests may appear and as such interests are determined by Owner.

      A certificate evidencing that Owner has obtained the aforesaid property insurance and, if requested by Builder, a copy of such property insurance policy shall be provided to Builder prior to commencement of construction of the Work.  Such certificate and policy shall be in form and substance reasonably satisfactory to Builder and shall contain a provision that coverages afforded under such policy shall not be materially changed or canceled until at least thirty days prior written notice has been given to Builder.  If Owner does not intend to purchase the aforesaid property insurance, Owner shall inform Builder in writing prior to commencement of the Work, and Builder may then effect such property insurance as will protect the interests of Builder, subcontractors and sub-subcontractors in the Work, the cost of such property insurance in such case being payable by Owner to Builder in addition to the Guaranteed Maximum Sum.  If Builder is damaged by the failure of Owner to purchase or maintain the aforesaid property insurance, then Owner shall bear all damages, loss and expenses properly attributable thereto.

      24.    <u>Accounting Records</u>.  Builder shall check all materials, equipment and labor entering into the Work and shall keep such full and detailed accounts as may be necessary for proper financial management under this Contract.  Owner and/or Owner's representatives shall be afforded access at all reasonable times to all of the records, books, correspondence,

instructions, drawings, receipts, vouchers, memoranda and similar data of Builder relating to this Contract, and Builder shall (i) provide copies of the same to Owner after construction of the New Facility is complete and (ii) preserve all such records for a period of two (2) years after Owner has made the final payment hereunder.

25.  <u>Contract Documents</u>.  The "Contract Documents" which form the entire Contract by and between Owner and Builder consist of this Guaranteed Maximum Sum Contract, Exhibit "A", Exhibit "B", Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F", Exhibit "G", Exhibit "H" and Exhibit "I" and that certain Contract for Owner, dated concurrently herewith, by and among Owner, Builder and Swisslog.

The Contract Documents shall be executed, and/or initialed as appropriate, in duplicate by Owner and Builder. The Contract Documents are complementary, and what is required by any one shall be as binding as if required by all. The intention of the Contract Documents is to include all labor and materials reasonably necessary for the proper execution of the Work. Builder shall supply hereunder only that Work which is either specifically required to be supplied by Builder in accordance with the Contract Documents or is reasonably inferable from the Contract Documents as being necessary to produce the intended results. Any instruments with respect to changes in the Work ordered by Owner in accordance with Paragraph 11, which such changes in the Work are required hereunder to be performed by Builder shall be deemed to be annexed to this Contract and made a part hereof. Words which have well-known technical or trade meanings are used herein in accordance with such recognized meanings. Mutual agreement shall be reached with respect to words which do not have a well-known technical or trade meaning and the definition of which come into question.

Should the drawings conflict with the specifications, the drawings shall govern. In the case of discrepancies between any of the drawings and/or the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog and approved by Owner, those approved drawings or specifications bearing the latest date shall govern. All changes to the drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be dated and sequentially recorded. The drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be interpreted in conformity with this Contract, which shall govern, unless otherwise specified herein.

26.  <u>Right of Owner to Terminate Contract</u>.  If Builder should be adjudged bankrupt, or if Builder should make a general assignment for the benefit of creditors, or if Builder persistently or repeatedly refuses or fails, except in cases for which an extension of time is provided hereunder, to supply enough properly skilled workmen or proper materials, or if Builder should fail without reasonable cause to make prompt payment either to subcontractors or for labor, materials or other Work, or if Builder persistently disregards laws or ordinances or the instructions of Owner given in a valid manner pursuant to the Contract Documents or if Builder is otherwise guilty of a substantial violation of a provision of the Contract Documents, then Owner may, without prejudice to any other right or remedy of Owner and after giving Builder seven (7) days written notice, terminate the employment of Builder and take possession of the Work and of all materials, tools and appliances at the site of the Work and finish the Work by whatever method Owner may deem expedient. In such case Builder shall not be entitled to receive any further payment until the Work is finished. If the expense incurred by Owner to complete the Work exceeds the unpaid balance of the Guaranteed Maximum Sum, Builder shall promptly pay the difference to Owner upon demand. If requested by Builder, the costs incurred by Owner as herein provided shall be certified by an independent certified public accountant.

Notwithstanding the foregoing provisions of this Paragraph 26, Owner shall also have the right to terminate this Contract, including termination of the Builder, Engineer and/or Swisslog, and take possession of the Work in its then-current form for any (or no) reason desired by Owner. In the case of any such termination, Owner shall pay Builder a final fee equal to (i) any Work completed by Builder prior to Owner's termination of this Contract, plus (ii) the Builder's Fee based upon the entire Guaranteed Maximum Sum, minus a credit for any such Builder's Fee previously paid by Owner to Builder. By entering into this Contract, Builder acknowledges and agrees that any early termination by Owner shall not result in Builder having any additional rights under this Contract except for payment of any Work then performed and full payment of the Builder's Fee.

27. Right of Builder to Stop Work or Terminate Contract. Notwithstanding anything to the contrary set forth in this Contract, if the Work should be stopped under an order of any court or other governmental authority for a period of thirty (30) days or more through no fault or omission of Builder or of anyone employed by Builder, or if Owner should fail to pay Builder for any uncontested Work within thirty (30) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may, upon fifteen (15) days written notice to Owner, stop the Work or terminate this Contract and recover from Owner payment for all Work executed and for any proven loss sustained upon any materials, equipment, tools, construction equipment and machinery, including reasonable profit and damages. Further, in the event that Owner has failed to pay Builder for any uncontested Work within forty-five (45) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may assess a late charge against Owner equal to one and one-half percent (1.5%) of said payment for each month, or portion thereof, for which said payment is delinquent, said assessment being in addition to the Guaranteed Maximum Sum. Should Owner for any reason breach this Contract by failing to pay any application for payment submitted in accordance with the Contract Documents and should Builder be required to retain an attorney to collect such payment, Owner shall indemnify Builder for and on account of any attorneys' fees expended by Builder in connection with the collection of such payment.

Notwithstanding the foregoing provisions of this Paragraph 27, Builder acknowledges that Owner may dispute all or any portion of an application for payment as set forth in Paragraph 4(d) above, and Builder's right to stop the Work or terminate the Contract shall not apply to any unpaid Work from Owner if such unpaid Work is subject to a dispute between Owner and Builder.

28. Contract Modifications. No waiver, alteration or modification of any of the provisions of this Contract shall be binding upon either Owner or Builder unless the same shall be in writing and signed by both Owner and Builder.

29. Notices.

All communications in writing between Owner and Builder, including without limitation, applications for payment, shall be deemed to have been received by the addressee if delivered to the person for whom such communications are intended or if sent by certified mail, return receipt requested, or by telegram or by an express mail service addressed as follows:

If to Owner:       Beef Products, Inc.
               891 Two Rivers Drive
               Dakota Dunes, SD 57049
               Attention: Mr. David Berghult

With a copy to:      Koley Jessen P.C., L.L.O.
                        One Pacific Place, Suite 800
                        1125 South 103rd Street
                        Omaha, NE 68124
                        Attention: Thomas F. Ackley

If to Builder:        Primus Builders, Inc.
                        8294 Highway 92, Suite 210
                        Woodstock, Georgia 30189
                        Attention: Mr. Erik Gunderson

For the purpose of directions, the representative of Builder shall be Erik Gunderson and the representative of Owner shall be David Berghult unless otherwise specified in writing.

      30.    Assignment. Neither Owner nor Builder shall assign this Contract or sublet obligations hereunder in respect to the Work as a whole without the written consent of the other.

      31.    Headings. The headings contained herein are inserted only as a matter of convenience and reference and are not meant to define, limit or describe the scope or intent of the Contract Documents or in any way to affect the terms and provisions set forth herein.

      32.    Applicable Law. The terms and provisions of this Contract shall be construed in accordance with the laws of the state in which the New Facility is to be situated.

      33.    Succession of Rights and Obligations. All rights and obligations under this Contract shall inure to and be binding upon the respective successors and assigns of Owner and Builder.

      34.    Additional Documents. Builder agrees to execute and deliver a conditional assignment of this Contract and whatever reasonable additional documents which any lender or governmental authority may require from time to time in order to effectuate, confirm and/or implement the terms of this Contract and/or any loan made to Owner in connection with the Work required to be performed hereunder by Builder.

**[The Remainder of This Page Intentionally Left Blank; and Signature Page Follows]**

IN WITNESS WHEREOF, Owner and Builder have, by their duly authorized representatives, executed this Contract, in duplicate, as of the day, month and year first above written.

OWNER:

Beef Products, Inc.

By:
Its:  PRESIDENT

BUILDER:

Primus Builders, Inc.

By: Erik Gunderson
Its: Executive Vice President

EXHIBIT "A"

PLANS, SPECIFICATIONS, AND AUTOMATION DOCUMENTS

The specifications and the drawings listed hereinbelow are by reference annexed to and made a part of a Guaranteed Maximum Sum Contract dated as of September 2, 2016 between Beef Products, Inc. and Primus Builders, Inc.


Specifications:

The facility will be designed and built around the Preliminary Outline Specifications dated August 24, 2016.

Drawings:


- Reference Drawing C-1.0     Conceptual Site Plan
- Reference Drawing A-1.0     Overall Floor Plan
- Reference Drawing A-1.1     Mezzanine Floor Plan
- Reference Drawing A-2.1     Exterior Elevations
- Reference Drawing A-3.0     Roof Plan
- Reference Drawing S-1.1     Conceptual foundation
- Reference Drawing S-2.       Conceptual framing

## EXHIBIT "B"

## SWISSLOG CONTRACT DOCUMENTS

Swisslog General terms and conditions version 1.1, dated August 30, 2016.

Swisslog Base Contract dated August 6, 2016.

Swisslog proposal 4720 Ver. 5.0 dated August 30, 2016 including the following:

| | |
|---|---|
| Design Data | Chapter 01 |
| Description of Operation | Chapter 02 |
| Scope of Supply | Chapter 03 |
| Warehouse Management | Chapter 04 |
| Project Implementation | Chapter 05 |
| Acceptance Procedures | Chapter 06 |
| Customer Support | Chapter 07 |
| Investment | Chapter 08 |
| | |
| Vectura SRM | Appendix 01 |
| Tornado SRM | Appendix 02 |
| ProMove Conveyor | Appendix 03 |
| Case Conveyor | Appendix 04 |
| Palletizing System | Appendix 05 |
| Freezer & Fresh Racking | Appendix 06 |
| System Drawings | Appendix 07 |
| Division of Work | Appendix 08 |
| Codes and Standards. | Appendix 09 |
| Transport & Load Units...............Enclosure C1 | |

## EXHIBIT "C"

## LOCATION OF NEW FACILITY

360 164th St, South Sioux City, NE 68776

EXHIBIT "D"

## DESIGN SERVICES

The design work will be performed by Primus Design Services, LLC and will consist of design drawings and specifications prepared using the latest CADD technology.  In addition the design team will review submittal documents and will conduct periodic site inspections and a final site inspection prior to occupancy.  The design disciplines include the following:

- Site Planning, Civil and Utility Engineering Design
- Architectural Design
- Structural Engineering Design
- Industrial Engineering and Material Handling Design by Swisslog.
- Mechanical Engineering Design – through Design/Build trade contractors.
- Plumbing Engineering Design – through Design/Build trade contractors.
- Fire Protection Engineering Design – through Design/Build trade contractors.
- Refrigeration Engineering Design – through Design/Build trade contractors.
- Electrical Engineering Design – through Design/Build trade contractors.

EXHIBIT "E"

CONSTRUCTION SCHEDULE

Expected Dates for Commencement and Completion of Each of the Various Stages of the
Design and Construction of the Work

See attached schedule dated September 2, 2016 titled: pro.sched.BPI.09.02.16



EXHIBIT 1

PRIMUS swisslog

4815-6275-5890.4

EXHIBIT 1

-2-

EXHIBIT "F"

COST OF THE WORK

Schedule of Values of the Various Parts of the Work Aggregating the Guaranteed Maximum Sum

See attached 3 page pricing summary dated August 13, 2016 and named est.BPI.08.13.16

8/13/2016 10:48 AM                                                                1 of 3

## ₽ PRIMUS swisslog

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 30, 2016 GMP Proposal

| | | |
|---|---|---|
| PALLET POSITIONS: | | |
| NUMBER OF CRANES: | | 6 |
| ABILITY TO EXPAND: | | Yes |
| | | |
| BUILDING AREAS: | | |
| DRY WAREHOUSE | | 0 |
| FREEZERS - AS/RS & BLAST FREEZING | | 29,841 |
| COOLERS: | | 12,964 |
| COOLER DOCK, CONVEYOR AND MEZZANINES: | | 23,267 |
| OFFICE: | | 0 |
| SUPPORT/ENGINE ROOM: | | 0 |
| TOTAL SF: | | 63,312 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| 1 | **GENERAL REQUIREMENTS** | |
| | SUPERVISION | 850,575 |
| | GENERAL CONDITIONS | 87,727 |
| | OVERHEAD | 338,440 |
| | **TOTAL DIVISION 1** | 1,276,742 |
| 1a | **INSURANCE** | 228,653 |
| 1b | **PERMITS - Not Included** | 0 |
| 2 | **SITEWORK** | |
| | EARTHWORK | 434,201 |
| | INTERIOR DEMOLITION | 10,000 |
| | STORM DRAINAGE | 95,750 |
| | SANITARY SEWER | 18,750 |
| | DOMESTIC WATER | 0 |
| | EXTERIOR FIRE PROTECT | 150,000 |
| | LANDSCAPING ALLOWANCE | 20,000 |
| | SITE CONCRETE AND PAVING | 350,650 |
| | **TOTAL DIVISION 2** | 1,079,351 |
| 3 | **CONCRETE** | |
| | DEEP FOUNDATIONS | 1,017,960 |
| | FOUNDATIONS | 446,209 |
| | CONCRETE SLABS | 1,734,843 |
| | PRECAST CONCRETE | 0 |
| | TILT-UP CONCRETE | 0 |
| | **TOTAL DIVISION 3** | 3,199,013 |
| 4 | **MASONRY** | 0 |
| 5 | **METALS** | |
| | STRUCTURAL STEEL | 1,555,998 |
| | MISC STEEL | 156,000 |
| | **TOTAL DIVISION 5** | 1,712,998 |
| 6 | **WOODS & PLASTICS** | |
| | ROUGH CARPENTRY | 0 |
| | FINISH CARPENTRY | 0 |
| | **TOTAL DIVISION 6** | 0 |

estLBPI.08.13.16-FINAL GMP

## ₱ PRIMUS swisslog

beef
products
inc.

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 29, 2018 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| OCLER DOCK, CONVERYOR AND MEZZANINES: | 22,387 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 44,312 |

| Div | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **7** | **THERMAL & MOISTURE** | |
| | WATERPROOFING | 0 |
| | CAULKING | 49,928 |
| | FIREPROOFING | 0 |
| | DRYVIT SYSTEMS | 0 |
| | METAL SIDING | 0 |
| | INSULATED WALL PANELS AND UNDER FLOOR INSULATION | 1,761,044 |
| | ROOFING | 670,542 |
| | **TOTAL DIVISION 7** | **2,481,514** |
| **8** | **DOORS AND WINDOWS** | |
| | COLD STORAGE DOORS | 259,910 |
| | INDUSTRIAL DOORS | 6,500 |
| | SMALL DOORS | 0 |
| | WINDOW SYSTEMS | 0 |
| | **TOTAL DIVISION 8** | **344,410** |
| **9** | **FINISHES** | |
| | DRYWALL SYSTEMS | 0 |
| | ACOUSTICAL CEILING | 0 |
| | TILE AND COATINGS | 0 |
| | CARPET & FLOORING | 0 |
| | PAINT & WALL COVER | 11,491 |
| | **TOTAL DIVISION 9** | **11,491** |
| **10** | **SPECIALTIES** | **0** |
| **11** | **DOCK EQUIPMENT+BLAST RACK** | **78,509** |
| **12** | **FURNISHINGS** | **0** |
| **13** | **SPECIAL CONSTRUCT** | **0** |
| **14** | **CONVEYING SYSTEMS - SWISSLOG** | |
| | COSTS INCLUDED FOR SWISSLOG | 14,200,000 |
| | **TOTAL DIVISION 14** | **14,200,000** |

c:ALBP1 08.13.16-FINAL GMP

8/13/2016 10:48 AM                                                                    3 of 3

## P PRIMUS swisslog

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 20, 2016 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| COOLER DOCK, CONVEYOR AND MEZZANINES: | 23,287 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 65,512 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| 15 | **MECHANICAL** | |
| | FIRE PROTECTION | 1,030,925 |
| | PLUMBING | 25,000 |
| | H.V.A.C. | 6,500 |
| | REFRIGERATION | 4,822,900 |
| | **TOTAL DIVISION 15** | **5,885,325** |
| 16 | **ELECTRICAL ALLOWANCE** | 1,503,057 |
| 17 | **MISCELLANEOUS** | 0 |
| | **SUBTOTAL SITE** | 1,079,551 |
| | **SUBTOTAL BUILDING** | 29,636,619 |

| **RECAP** | | |
|---|---|---|
| **SUBTOTAL BUILDING & SITE (C.O.W.)** | | 30,716,170 |
| **TOTAL BUILDING, SITE & GENERAL REQUIREMENTS** | | 32,221,585 |
| 0.0% | Winter Conditions Allowance | 300,000 |
| 2.75% | FEE | 894,344 |
| **SUBTOTAL PROJECT** | | **33,415,928** |
| 1.2% | ENGINEERING | 390,944 |
| 10% | ENGINEERING REIMBURSABLES | 39,019 |
| 0.0% | ENGINEERING - CONSULTANTS | 0 |
| | SUB-TOTAL | 430,063 |
| **GRAND TOTAL PROJECT (Building Only)** | | **33,845,991** |

ess BPI 06 13.16-FINAL GMP

Exhibit "G"

## PARTIAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, subject to the reservation set forth hereinbelow and upon receipt of _____ dollars ($_____) representing the amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the period commencing _____ and ending _____, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby reserve, and does not hereby waive or release, any lien or right of lien which Builder has pursuant to the laws of the State of _____ to the extent of _____ dollars ($_____) representing retainage applicable to services rendered, work performed and/or materials furnished by Builder prior to and during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the aforementioned period, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

This Partial Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Partial Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____

Its:_____

4815-6275-5890.4

STATE OF GEORGIA       )
                       ) ss.
County of _____    )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Builder, and acknowledged the foregoing instrument to be the free act and deed of Builder, before me.


_____
Notary Public
My commission expires:

4815-6275-5890.4         -2-

## Exhibit "H"

### FINAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, upon receipt of _____ dollars ($_____) representing the final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of _____ by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

This Final Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Final Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____
Its:_____
Hereunto duly authorized

STATE OF GEORGIA    )
                    ) ss.
County of _____ )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Builder, and acknowledged the foregoing instrument to be the free act and deed of Builder, before me.

_____
Notary Public
My commission expires:

4815-6275-5890.4

EXHIBIT "I"

FORM OF WARRANTY

All workmanship, materials and equipment are guaranteed for a period of one year after the date established as the date of substantial completion of the Work for any defects which may appear or arise as a result of faulty materials, equipment or workmanship.  In addition to the one year warranty on all workmanship, materials and equipment the following extended warranties are included:

- The roofing warranty is for a period of thirty (30) years.
- Equipment Warranties provided with more than 1 year will be extended to Owner

## BASE CONTRACT FOR "PROJECT BPI"

This Base Contract for "Project BPI" (called the "Contract") is made the 2nd day of September, 2016, by and between Primus Builders, Inc., a Georgia corporation, with its principal place of business at 8294 Highway 92, Suite 210, Woodstock, GA 30189 ("Builder") and Swisslog Logistics, Inc., a Virginia corporation with its principal address at 161 Enterprise Drive, Newport News, VA 23603 ("Swisslog" or "Contractor").

WHEREAS, Beef Products, Inc., a South Dakota corporation ("Owner") has entered into that certain Guaranteed Maximum Sum Contract (the "GMS Agreement"), dated concurrently herewith, by and between Owner and Builder, whereby Builder has agreed to construct a New Facility (as defined in the GMS Agreement) for Owner in accordance with the terms thereof;

WHEREAS, as part of the New Facility, Owner has contracted with Builder to have Builder provide an automated distribution facility (the "System") designed, manufactured, delivered, installed, tested and warranted by Contractor at the New Facility;

WHEREAS, in accordance with the GMS Agreement, Builder shall utilize Contractor to design and install the System in the New Facility;

WHEREAS, Owner and Builder have approved the attached specifications (the "Specifications") of Contractor for the design, manufacture, delivery to site, installation, testing and completion of the System as part of the New Facility;

WHEREAS, Contractor has agreed to contract with Builder to design, manufacture, and install the System at the New Facility, test and remedy any defects in the System in accordance with the terms and conditions of this Contract (including the Terms and Conditions attached hereto), in exchange for payment of the amounts set forth herein by Builder in accordance with the schedule set forth in the Terms and Conditions; and

WHEREAS, the Builder has agreed to assume all obligations and responsibilities of the Owner to the extent set forth in this Contract.

NOW, THEREFORE, in consideration of the above recitals and the other promises and agreements set forth herein, the parties hereby agree as follows:

1.  Contractor acknowledges and agrees that it shall work as a subcontractor for Builder and perform certain work for Builder with regard to the System in accordance with the Specifications, all as set forth in this Contract.

2.  The following Exhibits are a material part of this Contract:

    | | |
    |---|---|
    | EXHIBIT I | The General Terms and Conditions |
    | EXHIBIT II | The Project Specifications, 4720 BPI V5 dated August 30, 2016 |
    | EXHIBIT III | Time Schedule |
    | EXHIBIT IV | Insurance Terms |
    | EXHIBIT V | Interim lien waiver form |



Exhibit C

3.    The Contract hereby incorporates the insurance terms as set forth in the Exhibit IV.
      Such Insurance Terms shall be the sole and exclusive insurance obligation upon
      Contractor.

4.    The System shall be constructed and/or assembled at the New Facility, all as
      defined in the Specifications.

5.    Any notice to be provided by Builder or Contractor to each other shall be at the
      addresses set forth in the opening paragraph of this Contract.

6.    Builder shall, in consideration for Contractor's promise to design and construct
      the System in accordance with the Specifications and to perform its obligations
      hereunder, Builder shall pay Contractor the sum of US *$14,213,200* (AMOUNT
      US-dollars) (hereafter called "the Contract Price"), all in accordance with the
      terms and provisions of this Contract.

7.    The Payment Schedule set forth in the Terms and Conditions apply with detail
      milestones as defined below.

      Contractor will invoice the Builder as Contractor reaches each of the following
      milestones toward the completion of the System to be paid on a net 30 basis with
      exception of the down payment that is paid on net 10 days. Notwithstanding the
      forgoing, if Owner withholds payment from Builder based upon any act or
      omission of Contractor, Builder may withhold an equivalent payment from
      Contractor (to the extent that such deduction would otherwise be permitted under
      this Agreement).

| Incremental Percentage | Payments of the contract price | Payments due within |
|---|---|---|
| 30% | Down payment upon execution of this Contract | 10 days |
| 20% | Upon submittal of detailed engineering documents | 30 days |
| 20% | Upon first major receipt of material to site | 30 days |
| 10% | Upon substantial completion of mechanical installation | 30 days |
| 10% | Upon start of Integration testing | 30 days |
| 10% | Upon Provisional Acceptance (PAC, Taking Over) or start of Beneficial Use | 30 days |

**[The Remainder of This Page Intentionally Left Blank; Signature Page Follows]**

IN WITNESS whereof, the parties hereto have caused this Contract to be entered into in the manner required by their respective constitutions or by-laws.

Primus Builders Inc.

By:

Name: Erik Gunderson
Title: Executive Vice President

Swisslog Logistics, Inc.

By:

Name: Markus Schmidt
Title: President WDS Americas

By:

Name: Stephan Jutz
Title: VP Finance and Controlling

# Exhibit I

# General Terms and Conditions

## Terms and Conditions

### PREAMBLE

1. The following Terms and Conditions (the "Conditions") shall apply to all contracts between Contractor and Builder, including but not limited to any sales of goods and/or services. Any modifications of or deviations from these Conditions shall not be valid unless mutually agreed to in writing by Contractor and Builder. The Builder assumes all obligations and responsibilities of the Owner to the extent set forth expressly or impliedly in this Contract.

### DEFINITIONS

2. In these Conditions the following terms shall have the meanings herein assigned to them.

**"Builder"** shall mean Primus Builders, Inc.

**"Contract"** shall mean the written contract between the parties concerning the supply and erection of the System (as that term is defined herein) including these Conditions and all appendices, and including agreed amendments and additions to the said documents. No document shall be deemed a part of this Contract unless Contractor and Builder have agreed to such document in writing.

In the event of any conflict between any documents relating to the Contract, such conflict shall be resolved in favor of the following documents in order of precedence:

a) The parties' written and executed document incorporating these Conditions and the Specifications,

b) The Project Specifications, 4720 BPI V5 dated August 30, 2016,

c) These General Terms and Conditions

d) Time Schedule set forth in Exhibit III

e) Insurance Terms set forth in Exhibit IV.

Notwithstanding the foregoing, in the event that any Contract document (including appendices) expressly states that that the parties intend for such document to take precedence over any other document, such expression shall be honored.

**"Contractor"** shall mean Swisslog Logistics Incorporated.

**"Contract Price"** shall mean the payment to be made for the Works (as that term is defined herein). The Contract Price shall be reasonably adjusted in case the Work (as defined in the Specification) is changed due to conditions found at the New Facility which were not reasonably foreseeable by Contractor when developing the Specifications.

**"Cost"** shall mean that whenever by the Contract Contractor is entitled to be paid cost, such cost shall be properly incurred and shall include overhead charges. Contractor shall, in addition, be entitled to be paid a reasonable profit.

**"Demonstrable Performances"** shall mean the performances to be demonstrated after installation of the System and before Taking Over as defined in the Test on Completion.

**"Final Delivery"** is the date upon which Contractor has delivered all required Works (including documentation) in compliance with the Contract's Specifications

**"GMS Agreement"** shall mean that certain Guaranteed Maximum Sum Contract, dated concurrently herewith, by and between Owner and Builder.

**"In Writing"** shall mean either by document signed by the parties or by letter, telefax, telegram or telex, identifying the sender.

"Owner" shall mean Beef Products, Inc

"Parties" shall mean Primus Builders, Inc. and Swisslog Logistics, Inc., each of whom individually shall be referred to herein as a "Party."

"Site" shall mean the place where the System is to be erected, including as much of the surrounding area as is necessary for unloading, storage and internal transport of the System and erection equipment.

"Specifications" shall mean the technical specification of the System included as Exhibit II to the Contract and any later modification thereof in accordance with the Contract

"System" shall mean all machinery, apparatus, materials and articles to be supplied by the Contractor under the Contract in accordance with the Specifications.

"Tests on Completion" shall mean the tests to be performed before the Works are taken over by the Owner which shall demonstrate that the Works achieved the Demonstrable Performances.

"Time Schedule" shall mean the Time Schedule as per Exhibit III to the Contract.

"Works" shall mean the Specifications and System, including the erection and other work to be carried out by the Contractor under the Contract If the Works according to the Contract shall be taken over by separate sections intended to be used independently from each other, these conditions shall apply to each section separately The term "Works" shall then refer to the section in question.

## PRODUCT INFORMATION

3.    All information and data contained in product brochures and price lists are binding only to the extent that they are by reference expressly included in the Contract.

## SOIL CONDITIONS

4.    Contractor shall under no circumstances be responsible for any subsoil and other unforeseen conditions at Owner's Site.

Should conditions encountered in performance of the Work which could not have been reasonably anticipated by Contractor; or which are at variance with the conditions indicated by the Contract, including but not limited to any subsurface conditions, utilities, or other conditions as be encountered which differ materially from those expected by Contractor or recognized as inherent in the Work of the character provided for in this Contract The schedule for completion and the Contract Price due to Contractor shall be equitably adjusted by change order upon claim by Contractor, which equitable adjustment shall be made within a reasonable time after the first observance of such differing conditions. Contractor, however, shall under no circumstances be responsible for the removal of any contaminated soil, spoil, waste, etc.

## DRAWINGS AND DESCRIPTIONS

5.    Contractor, at its own expense, shall defend any suit that is brought against the Builder in a court of competent jurisdiction and is based on a claim that any equipment used in the Works or any part thereof constitutes an infringement of any patent issued As a condition precedent to such indemnification, the Builder shall give the Contractor prompt written notice of the institution of any suit and shall provide information and assistance that the Contractor reasonably deems necessary for the defense thereof. The Contractor shall pay any judgment for damages rendered against the Builder in such suit and if the equipment or any part thereof is held to constitute an infringement and its use is enjoined Contractor at its option shall:

a)    procure for the Owner the right to continue using the equipment, or

b)    replace it with non-infringing equipment; provided, however, any such replacement equipment shall be consistent with the Specifications and of equal or better quality than the previously infringing equipment, or

c) modify it so it becomes non-infringing, provided, however, any such modifications shall be consistent with the intent of the Specifications

The Contractor does not assume any liability for infringement due to:

i) changes in the equipment made by or at the request of the Owner or Builder, or

ii) engineering designs furnished by the Owner or Builder, or

iii) the particular use of the equipment by the Owner (if such use is not as contemplated by Owner when Contractor developed the Specifications), or

iv) operation of the equipment not in accordance with the Contractor instructions.

6. All drawings and technical documents relating to the Works submitted by one Party to the other, prior or subsequent to the formation of the Contract, shall remain the property of the submitting Party

Drawings, technical documents or other technical information received by one Party shall not, without the consent of the other Party, be used for any other purpose than erection of the System and commissioning, operation or maintenance of the Works. They may not, without the consent of the submitting Party, otherwise be used or copied, reproduced, transmitted or communicated to a third party other than the Owner.

7. At the start of the period referred to in Clause 53 the Contractor shall, if so requested by the Builder, free of charge provide information and drawings which are necessary to permit the Owner to commission, operate and maintain the System in accordance with the Specifications. Such information and drawings shall be supplied in the number of copies agreed upon or at least one copy of each. The Contractor shall not be obliged to provide manufacturing drawings for the System or spare parts or to provide the source code of any software

Conditioned upon payment of all sums due hereunder, Owner shall be granted a non-exclusive royalty free single site license to use the software delivered by Contractor under this Contract. Such license may be revoked by Contractor if Owner shall attempt to decompile, reverse engineer, or make any use of the Software other than the operation of the System as specified, or otherwise breach any obligation placed upon it under this Contract. The use of such software shall be restricted exclusively to the use in relation to the intended use of the Works. All and any rights, including all proprietary rights shall always remain with the Contractor. Owner is not entitled to copy, reproduce, transmit or otherwise communicate or disclose such software and related information to any third party.

## TESTS BEFORE SHIPMENT

8. If tests before shipment are provided for in the Contract they shall, unless otherwise agreed, be carried out at the place of manufacture during normal working hours. If the Contract does not specify the technical requirements, the tests shall be carried out in accordance with general practice of the Contractor

9. The Contractor shall notify the Owner of these tests in sufficient time to permit the Owner to be represented at the tests. If the Owner is not represented, the test report shall be sent to the Owner and shall be deemed accepted as accurate by both Builder and Owner unless an objection is made by Owner within thirty (30) days after receiving such test report.

10. If the tests show the System not to be in accordance with the Specifications, the Contractor shall remedy any material deficiencies in order to ensure that the System materially complies with the Specifications. New tests shall then be carried out to confirm that the deficiency was remedied.

11. If tests before shipment are agreed in the Contract, the Contractor shall bear all costs for tests carried out at the place of manufacture. The Owner shall however bear all traveling and living expenses for Owner's representatives in connection with such tests or repeat tests

## PREPARATORY WORK AND WORKING CONDITIONS

12. The Contractor shall provide drawings showing the manner in which the System is to be erected, together with all information reasonably required for preparing suitable foundations, for providing access to the New Facility and any necessary equipment to the point where the System is to be erected, and for making the necessary connections to the Works The Builder shall promptly provide the Contractor with any information necessary for such drawings, and Builder shall ensure that other contractors, subcontractors, and employees cooperate with any reasonable request from Contractor for information.

13. The Builder shall within the Time Schedule provide all installations, and make available the conditions necessary for the erection of the System and for the correct operation of the Works This shall not apply to preparatory work that according to the Contract shall be expressly performed by the Contractor. In the event that the Builder or Owner delays in providing any necessary information to Contractor, Contractor shall provide written notice to Builder with regard to any adjustment to the Time Schedule or Contract Price. Contractor shall be entitled to an equitable adjustment to the Contract Price and schedule to reflect any additional costs, time or both required due to the Builder's or Owner's delays

14. The preparatory work, including civil work where applicable, shall be carried out by the Builder in accordance with the drawings, information and the time schedule provided by the Contractor

under Clause 12. The work shall be completed on time. In any case, the Builder shall ensure that the foundations are structurally sound. The Contractor is responsible for transporting the System to the Site.

15. If an error or omission in the drawings or information referred to in Clause 12 is discovered and notified to the Contractor promptly following discovery, the cost of any necessary remedial work shall be borne by the Contractor. Builder shall inspect and review any drawings presented to it by Contractor and shall promptly notify Contractor of any perceived problems and/or deficiencies; provided, however, in the event that Builder does not detect any errors or omissions in the drawings. Contractor will remain responsible for the Specifications and System being properly designed and constructed.

16. The Builder shall ensure that the following conditions are satisfied

a) The Contractor's personnel shall be able to start work in accordance with the agreed time schedule and to work during normal working hours. Work may be performed outside normal working hours to the extent deemed necessary by the Contractor provided that the Builder has been given notice in reasonable time.

b) Before erection is started, the Builder shall inform the Contractor of all relevant safety regulations in force at the Site. The erection shall not be carried out in unhealthy or dangerous surroundings. All the necessary safety and precautionary measures shall have been taken before erection is started and shall be maintained by Builder Contractor shall notify Builder if it is aware of any violations of any safety laws or regulations with the surroundings where the Works shall take place and any safety or precautionary measures it might require to address the same.

c) If not agreed otherwise the Builder shall, free of charge, make available to the

Contractor at the proper time on the Site all necessary electricity, heating, and lighting.

d)   Contractor shall be allowed to store any equipment and material necessary for the Works at the New Facility; Builder shall be responsible for any theft or damage occurring to such materials.

e)   The access routes to the Site shall be suitable for the required transport of the System, or parts of it, and equipment.

f)   The Builder shall ensure adequate security such that any Works in progress are not damaged or disturbed prior to completion and Owner's acceptance of same.

g)   Builder shall perform its obligations under the Contract strictly as per the Time Schedule.

## BUILDERS OR OWNER'S DEFAULT

17.   If the Builder or Owner (as applicable) anticipates that it will be unable to comply with the conditions of Clauses 13, 14 and/or 16 or to receive the System on the Site and/or to allow the Works to be completed in time, it shall promptly notify the Contractor, In Writing, stating the reason and, if possible, the time when it will be able to comply with its obligations. The provisions of Clause 18 shall apply.

18.   If the Owner or Builder fails to materially comply with Clauses 13, 14 and/or 16, unless completion of the Works is prevented by any such circumstance as mentioned in Clause 71, the Contractor may, by notice In Writing, require the Builder to remedy his default within a final reasonable period and shall be entitled to an equitable extension of time and cost.

   If, for any reason for which the Contractor is not responsible, the Owner or Builder fails to materially remedy its default under Clauses 13, 14 and/or 16 within such period, the Contractor shall notify the Builder and Owner of such continuing default. If Builder and Owner

(i) fail to cure any such continuing default within forty-five (45) days after receiving notice from Contractor, or (ii) for defaults which reasonably cannot be cured within forty-five (45) days, fail to commence and diligently pursue a cure within such forty-five (45) day period, Contractor may, by notice In Writing, terminate the Contract

   If the Contractor terminates the Contract pursuant to this Paragraph 19, or pursuant to Paragraph 48 below, The Contractor shall then be entitled to compensation for the loss he suffers because of the default hereunder of the Builder, Owner or both, which loss shall be (i) costs incurred as of the date of such Notice of termination, minus amounts paid to Contractor as of such date; and (ii) any anticipated profit for the project in the amount of ten percent (10%) of the Contract Price remaining unpaid at the time of the Notice of termination. The compensation shall not exceed the Contract Price.

19.   Intentionally Omitted.

## LOCAL LAWS AND REGULATIONS

20.   The Contractor shall ensure that the Works are carried out and are in accordance with any laws, regulations and rules that are applicable to the Works at the date of Contractor's execution of this Contract.

21.   The Contractor shall carry out any variation work caused by changes in laws, regulations and rules referred to in Clause 20, or in their generally accepted interpretation, after the date of Contractor's execution. The Builder shall bear the costs and other consequences resulting from such changes, including variation work, and Contractor shall be entitled to an equitable adjustment of the Contract Price and Schedule. Notwithstanding the foregoing, Contractor shall not be required to undertake any change that would constitute a cardinal change in the project or that would substantially alter the nature or scope of the project.

22. If the parties are unable to agree on the extra costs and other consequences of changes in laws, regulations and rules, referred to in Clause 20, the Contractor shall be compensated on a time basis for any variation work until the dispute has been settled in accordance with Clause 77.

**VARIATIONS**

23. Subject to the provisions of Clause 27, the Builder is entitled to require reasonable variations to the scope, design and construction of the Works until the Works have been taken over. Such reasonable variations shall not require Contractor to perform additional work where Contractor estimates that the cost would exceed 10% of the original Contract Price (exclusive of any change orders). In the event that Builder requests variations that the Contractor estimates would exceed 10% of the original Contract Price, the parties shall negotiate in good faith to reach an equitable solution.

24. Requests for variations shall be submitted to the Contractor In Writing and shall contain an exact description of the variation required. The Contractor may suggest variations to the Builder or Owner In Writing.

25. As soon as possible after receipt of a request for a variation or after having himself made a proposal for a variation, the Contractor shall notify the Builder and Owner In Writing whether and how the variation can be carried out, stating the resulting alteration to the Contract Price, the time for completion and other terms of the Contract. The Contractor shall also give such notice to the Builder and Owner when variations are required as a result of changes in laws, regulations and rules referred to in Clause 20.

26. Intentionally Omitted

27. Save as provided in Clause 21, the Contractor shall not be obliged to carry out variations required by the Builder until either the parties have agreed on how the variations will affect the Contract Price, the time for completion and other terms of the Contract, or the dispute has been settled in accordance with Clause 77.

**PASSING OF RISK**

28. Any risk of loss or damage to the Works shall pass from Contractor to the Owner and Builder (as they may allocate) on the earlier of either taking-over of the Works or the beneficial use of the Works or part of it by the Owner or Builder. Any loss or damage to the System and Works after the risk has passed to the Owner or Builder shall be at the risk of the Owner or Builder (as they may allocate), unless such loss or damage results from the Contractor's gross negligence. Notwithstanding the foregoing, Builder shall be liable for any loss or damage to the Works that may occur at any time due to any act or omission of the Builder or Owner, or any of Builder's or Owner's employees, agents, contractors or subcontractors.

**TESTS ON COMPLETION**

29. Contractor shall define Tests on Completion In Writing prior to carrying out the tests

30. When erection has been completed Tests on Completion shall unless otherwise agreed, be carried out to determine whether the Works are as required for taking-over according to the Contract.

The Contractor shall notify the Builder and Owner In Writing that the Works are ready for taking-over He shall in this notice give a date for Tests on Completion, giving the Builder and Owner sufficient time to prepare for and be represented at these tests.

The Owner shall bear all his costs of Tests on Completion, and in no event shall Contractor be responsible for such costs. The Contractor shall also bear all costs relating to his personnel and other representatives.

31. The Builder shall provide, free of charge, any power, lubricants, water, fuel, raw materials and other materials required for the Tests on Completion and for final adjustments in preparing for these tests. He shall also provide, free of charge, any test loads required and provide reasonable assistance necessary for carrying out the Tests on Completion.

32. If, after having been notified in accordance with Clause 30, the Builder fails to fulfill his obligations under Clause 31 or otherwise prevents the Tests on Completion from being carried out or does not participate, the tests shall be regarded as having been satisfactorily completed at the date for Tests on Completion stated in the Contractor's notice.

33. The Tests on Completion shall be carried out during normal working hours. If the Contract does not specify the technical requirements, the tests shall be carried out in accordance with the relevant industry standards, including FEM 9 222.

34. The Contractor shall prepare a test-report of the Tests on Completion This report shall be sent to the Builder and Owner. If the Builder or Owner has not been represented at the Tests on Completion after having been notified in accordance with Clause 30, the test-report shall be deemed accepted as accurate unless Builder or Owner provide notice of any reasonable objections to the Tests on Completion within thirty (30) days after receiving the same In this case the Builder will have the obligation to pay all cost for the repetition of the Test on Completion. Where any repetition of Test on Completion is caused due to Contractor's failure to meet acceptance criteria for a cause attributable to Contractor, Contractor shall bear its own costs of conducting such repetition.

35. If the Works fail to pass any Test on Completion, such test shall be repeated as soon as practical thereafter, provided that Contractor shall be entitled to a reasonable time to correct any condition requiring remedy in Contractor's sole judgment. Any adjustments and modifications shall be made by the Contractor with all reasonable speed and at its own expense

If the Works are late for Taking Over, Builder shall be entitled to liquidated damages for delay as defined in clause 44 of this Contract. Such LD's shall be the Builder's and Owner's sole and exclusive remedy for delay, and Contractor shall have no further liability to Builder or Contractor for any damages arising from or relating to any claim of delay.

### TAKING-OVER

36. The construction of the System in accordance with the Specifications, as measured by the Demonstrable Performances, shall be the sole and exclusive performances to be achieved and fulfilled by Contractor.

37. Taking-over of the Works takes place when the Tests on Completion have been satisfactorily completed or are regarded under Clause 32 and 35 as having been satisfactorily completed. Minor deficiencies that do not materially affect the operation of the Works shall not prevent taking-over.

38. Except as the Owner, Builder, and Contractor shall all agree under this Section 38, the Owner and Builder are not entitled to use the Works or any part thereof before taking-over. Owner and Builder shall not use the Works or any part thereof without first executing a Conditional Taking Over Certificate and upon Contractor's permission in Writing. Any use without such permission shall be deemed a complete Taking Over. Upon the execution of a Conditional Taking Over certificate, Taking Over shall be deemed to have occurred for all parts of the Work identified in the Conditional Taking Over Certificate, except as to such portions of the Work as may be excluded by agreement of the Parties in Writing. .

10

39. As soon as the Works have been taken over in accordance with Clauses 37 or 38, the period, referred to in Clause 53, shall start to run. The Builder or Owner shall at the Contractor's request In Writing issue a certificate stipulating when the Works have been taken over The Builder's or Owner's failure to issue a certificate shall not affect taking-over according to Clauses 37 and 38.

## COMPLETION, CONTRACTOR'S DELAY

40. The Works shall be considered as completed when they are taken over in accordance with Clause 37 or 38.

41. Intentionally Omitted.

42. If the Contractor anticipates that he will not be able to complete the Works in accordance with the Time Schedule, he shall notify the Builder and Owner In Writing, stating the reason, and, if possible, when completion can be expected

43. The Contractor shall be entitled to an extension of the time for completion if delay occurs:

a) because of any of the circumstances referred to in Clause 71, or

b) as a result of variation work under Clause 21, or

c) as a result of variations under Clauses 23-27, or

d) by an act or omission that is not legally attributable to the Contractor, or

e) as a result of suspension under Clauses 17, 48 or 74.

   The extension shall be reasonable having regard to all of the circumstances. This provision applies regardless of whether the reason for the delay occurs before or after the agreed time for completion

44. The Contractor is in delay when the Works are, due to its fault, not completed at the time for completion as

defined in Clauses 40, 41 and 43. The Contractor's delay entitles the Builder to liquidated damages from the date on which the Works should have been completed. Such liquidated damages ("Delay Liquidated Damages") shall be Builders sole and exclusive remedy, or Contractor's sole and exclusive liability, for any damage arising from or relating to any delay.

The liquidated damages shall be payable at a rate of $3,000 for each day of delay in achieving Take Over occurring after February 8th, 2018 (subject to any adjustment permitted under this Contract). The maximum aggregate amount of Delay Liquidated Damages permitted under this agreement shall be one million dollars ($1,000,000)

The Delay Liquidated Damages become due at the Builder's or Owner's request In Writing but not before ten (10) days after receiving such request.

45. Contractor may conduct repeat tests at its discretion until it is satisfied that it cannot achieve a higher throughput result. If the Contractor is unable to complete the Works such that the Works achieve throughput results meeting ninety five (95%) of the specified throughput, the Parties shall negotiate in good faith to reduce the Contract Price commensurate with the reduced performance of the Work. In no event shall such reduction exceed, or cause the aggregate of Contractor's liability to exceed the limitation of liability set forth in Section 76.

## PAYMENT

46. Payment and any penalties for late payment shall be in accordance with this Contract.

47. Intentionally Omitted.

48. If the Purchaser fails to pay any amounts when required under this Contract, Contractor shall be entitled to interest at the rate of five percent per

annum on any unpaid amounts. In addition, Contractor may suspend or terminate performance upon nonpayment of any undisputed amounts following seven days notice. Builder shall be responsible for any additional cost or delay arising from such suspension or termination, and Contractor shall be entitled to an equitable adjustment of Contract Price and Schedule resulting from such nonpayment.

## RESERVATION OF TITLE

49. The System, and any components, fixtures. or parts thereof, shall remain the property of the Contractor until paid for in full, including payment for the erection of the System, to the extent that such retention of property is valid under the applicable law. Builder shall notify Owner of such reservation and shall not make any contradictory representation to Owner.

## LIABILITY FOR DAMAGE TO PROPERTY BEFORE TAKING OVER

50. The Contractor shall be liable for any damage to the Works that occurs before the risk has passed to the Builder. This applies irrespective of the cause of the damage, unless the damage is due to intentional acts, gross negligence or acts and emissions of the Builder or Owner or anyone for whom either is responsible

   The Owner or Builder may require the Contractor to remedy the damage at the such Owner's or Builder's cost even if the Contractor is not liable for the damage to the Works in accordance with this Clause.

51. The Contractor shall be liable for damage to the Owner's property occurring before taking-over of the Works only if it is proved that such damage was caused by negligence or intentional acts on the part of the Contractor or anyone for whom he is responsible in connection with the performance of the Contract.

Contractor shall not be liable for such damages in case Owner has the respective insurance covering such damage in place. The Contractor shall, however. under no circumstances be liable for loss of production, loss of profit or any consequential, special or indirect loss.

## LIABILITY FOR DEFECTS

52. Subject to the provisions of Clauses 53 - 67, the Contractor shall remedy any defect in the Works resulting from faulty design, materials or workmanship.

53. The Contractor's liability is limited to defects in the Works that appear within a period of 12 months from taking-over or from beneficial use, whatever occurs earlier. If taking-over has been delayed for reasons for which the Contractor is not responsible, the Contractor's liability for defects shall not, except as stated in Clause 54, be extended beyond 18 months after final delivery.

54. When a defect in a part of the Works has been remedied, the Contractor shall be liable for defects in the repaired or replaced part under the same terms and conditions as those applicable to the original Works for a period of 12 months. For the remaining parts of the Works the period mentioned in Clause 53 shall be extended only by a period equal to the period during which the Works have been out of operation as a result of the defect. However, Contractor's liability for defects in the Works shall in the aggregate including repair or replaced parts not extend beyond 12 (twelve) months from the delivery of the System.

55. The Owner shall, without undue delay, notify the Contractor In Writing of any defect that appears.

   The notice shall contain a specific description of the defect, including but not limited to reference to the specification at issue, the manner in which the Works fail to meet such specification, and the date that such defect was discovered Where any

defect is such that it may cause damage, Contractor shall not be liable for any damage caused by a continuing condition that could have been remedied with prompt notice

56. On receipt of the notice under Clause 55 the Contractor shall remedy the defect without undue delay and at his own cost as stipulated in Clauses 53 - 67.

Repair or replacement (at Contractor's sole election) shall be carried out at the Site, unless the Contractor deems it appropriate that the defective part or the System is returned to him for repair or replacement

The Contractor is obliged to dismantle the Works to the extent necessary and to re-assemble the Works after repairing the same for such defects that cannot be reasonably done by a reasonably trained maintenance worker unless Owner agree in advance that Contractor may fulfill his obligations in respect of the defect when he delivers to the Owner a duly repaired part or a new part in replacement of the defective part.

57. If the Owner has notified the Contractor in accordance with Clause 55, and no defect is present for which Contractor is liable, the Contractor shall notify Builder and Owner of same If at any time or times after such notice, Owner notifies the Contractor in accordance with Clause 55 on the same or a related alleged defect, and no defect is present for which Contractor is liable, then Contractor shall be entitled to compensation from Builder for costs incurred as a result of such notice(s)

58. The Builder shall arrange for any dismantling and reassembly of equipment other than the Works, to the extent that this is necessary to remedy the defect.

59. Unless otherwise agreed, necessary transport of the System and/or parts thereof to and from the Contractor in connection with the remedying of defects for which the Contractor is liable

shall be at the risk and expense of the Contractor.

60. Defective parts that have been replaced shall be made available to the Contractor and shall be his property.

61. If, within five (5) days, the Contractor does not fulfill his obligations under Clause 56, the Owner may engage a third party. at Contractor's expense, for completion of the Contractor's obligations.

The Owner may himself undertake or employ a third party to undertake necessary remedial works at the expense of the Contractor if the Contractor fails to fulfill his obligations within such final time.

Reimbursement by the Contractor of all expenses incurred by the Owner shall be in full and final settlement of the Contractor's liabilities to Owner and to Builder for the said defect where remedial works have been undertaken by the Owner or a third party.

62. (not used)

63. The Contractor is not liable for defects arising out of materials provided by the Builder or Owner.

64. The Contractor is liable only for defects that appear under the conditions of operation provided for in the Contract and under proper use of the Works in accordance with Contractor's manuals or other instructions or in the absence of such manuals or instructions in accordance with good industry practice.

The Contractor's liability does not cover defects that are caused by bad maintenance or repair or replacement by the Builder, Owner or third parties, or by alterations carried out without the Contractor's consent In Writing. The Contractor's liability does not cover normal wear and tear.

65. Notwithstanding the provisions of Clauses 52 – 64, if Taking Over has been delayed for reasons for which

Contractor is not responsible, the Contractor's liability for defects shall not be extended beyond 12 months after delivery of the System.

66. Save as stipulated in Clauses 52 - 65, the Contractor shall not be liable to Builder or Owner for defects. This applies to any loss the defect may cause including loss of production, loss of profit and any consequential, special or indirect loss.

67. Contractor shall have no obligations for breach of warranty if the Builder and Owner fails to store, operate or maintain the equipment or Work in accordance with:

    a) reasonable industry practice;
    b) the provisions of the storage, operating or maintenance instructions furnished to the Builder or Owner, or

b) if the Owner fails to notify the Contractor in Writing of a defect in accordance with the provisions of the Contract.

68. The express warranty set forth under clauses 52 - 66 is exclusive. No other warranties of any kind whether statutory, oral, written, express or implied, including any implied warranty of merchantability or fitness for a particular purpose or latent defects. shall apply. The Owner's and Builder's exclusive remedies and the Contractor's only obligations arising out of or in connection with faulty design materials or workmanship whether based on warranty, contract, tort (including negligence) or otherwise shall be those stated herein.

## INDEMNIFICATION

69. Each Party to the Agreement shall be responsible for and indemnify the other from liability of third parties arising out of injuries or damages to third parties or property of third parties during the progress of the work and which may occur on the job site and that are caused by the negligent acts or omissions of the other Party, its

employees, agents and sub-contractors, provided, however, that the Contractor's liability to the Builder shall in no event extend to any consequential damages suffered by Owner In no event shall Contractor's liability extend to consequential damages suffered by any third parties (other than the Owner) except to the extent insurance coverage and proceeds are available and paid under a policy of insurance provided pursuant to the Contract to cover such loss.

## DIVISION OF LIABILITY FOR DAMAGE CAUSED BY THE WORKS

70. Intentionally Omitted.

## FORCE MAJEURE

71. Either Party shall be entitled to suspend performance of his obligations under the Contract to the extent that such performance is impeded or made unreasonably onerous by any of the following circumstances: circumstance beyond the reasonable control of the parties such as but not limited to fire, war (whether declared or not), flood, hurricane, tornado, unusually severe weather. insurrection, embargo or Acts of God.

72. The Party claiming to be affected by Force Majeure shall notify the other Party In Writing without delay on the intervention and on the cessation of such circumstance.

73. Regardless of what might otherwise follow from these Conditions, either Party shall be entitled to terminate the Contract by notice In Writing to the other Party if performance of the Contract is suspended under Clause 71 for more than 30 consecutive days To the extent that Contractor's schedule of performance is materially affected by any Force Majeure event. Contractor shall be entitled to an equitable adjustment of Schedule To the extent that Contractor's cost of performance is materially affected by any Force Majeure event, Contractor shall provide notice In Writing to Builder of such

**MISCELLANEOUS**

80. Any captions are for the convenience of the parties and shall not be used in the construction of any provisions

81. Each Party has had the opportunity to have these Conditions reviewed by its counsel and to have input into the terms herein, and as such, each Party expressly agrees that the agreement shall not be construed against either Party.

82. In order to be effective, any notice provided under these Terms and Conditions shall be directed via first class mail, prepaid, specifically toward the individual executing these Conditions, unless a Party instructs the other In Writing of a new contact person, and in such event, all notices shall be directed to that person.

Notices sent to Contractor shall be addressed to:

Markus Schmidt
Swisslog Logistics, Inc.
161 Enterprise Drive
Newport News, VA 23603

With a copy to:

Kenneth E. Rubinstein, Esq.

Preti Flaherty Beliveau & Pachios
57 North Main Street
Concord, NH 03301
krubinstein@preti.com

Notices sent to Builder shall be addressed to.

Erik Gunderson
8294 Highway 92, Suite 210
Woodstock, GA 30189

With a copy to:

Stephen Wright
Taylor English Duma LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
swright@taylorenglish.com

Notices sent to Owner shall be addressed to:

Nick Roth
Beef Products, Inc.
891 Two Rivers Drive
Dakota Dunes, SD 57049

With a copy to:

Thomas F. Ackley
Koley Jessen P C , L.L O
1125 South 103rd Street, Suite 800
Omaha, Nebraska 68124
Thomas.Ackley@koleyjessen com

The above terms and conditions are hereby agreed upon by:

Primus Builders, Inc.

By: _____

Its: _____

Swisslog Logistics, Inc.

By: _____

Its: Markus Schmidt, President WDS Americas

By: _____

Its: Stephan Jutz, VP Finance and Controlling

# EXHIBIT II

# Project Specifications

4720 BPI V5 dated August 30, 2016

# EXHIBIT III

# Time Schedule

P-004720 Beef Products Schedule 2016-09-06 CONTRACTSCHEDULE.pdf

# Schedule Overview

| Task Name | Duration | Start | Finish |
|---|---|---|---|
| ⊿ Beef Products Project Realization Schedule | 440 days | Fri 4/8/16 | Wed 1/24/18 |
| Notice to Proceed with Engineering Design Order | 0 days | Fri 4/8/16 | Fri 4/8/16 |
| Finalize Building Layout Design Engineering | 8 wks | Fri 4/8/16 | Fri 6/3/16 |
| Submission of Automation Solution GMP | 0 days | Fri 6/17/16 | Fri 6/17/16 |
| Review of GMP, Execution of Contract | 9 days | Mon 6/20/16 | Thu 6/30/16 |
| Contract Award | 0 days | Tue 9/6/16 | Tue 9/6/16 |
| Finalize Detail Design Engineering and Procurement Phase | 167 days | Tue 9/20/16 | Fri 5/26/17 |
| Software Development & Testing | 185 days | Fri 9/9/16 | Tue 6/13/17 |
| Client Responsibilities | 10 days | Wed 3/15/17 | Tue 3/28/17 |
| SITE AVAILABLE FOR CONSTRUCTION | 0 days | Tue 3/28/17 | Tue 3/28/17 |
| Swisslog Site Mobilization | 5 days | Thu 3/23/17 | Wed 3/29/17 |
| ▷ INSTALLATION | 144 days | Fri 2/24/17 | Wed 9/20/17 |
| SOFTWARE INTEGRATION & TESTING | 45 days | Tue 9/12/17 | Mon 11/13/17 |
| BUILDING COOL DOWN PROCESS | 20 days | Mon 11/13/17 | Wed 12/13/17 |
| Provisional Acceptance Certificate / Work Take-Over | 0 days | Wed 12/13/17 | Wed 12/13/17 |
| Data cleanup, cutover for production | 1 day | Thu 12/14/17 | Thu 12/14/17 |
| GO LIVE | 0 days | Fri 12/15/17 | Fri 12/15/17 |
| Operational Run In Period | 4 wks | Mon 12/18/17 | Wed 1/24/18 |
| Final Acceptance / WORK ACCEPTANCE | 0 days | Wed 1/24/18 | Wed 1/24/18 |

# EXHIBIT IV

# Insurance Terms

Contractor will maintain, for the duration of the project, an insurance package that is materially in line with the cover listed below.

| Type of Insurance | Limits of Coverage |
|---|---|
| Property | • $20,000,000 Property Damage |
| Inland Marine | **Contractor's Equipment**<br>• $550,000 Blanket for Equipment used in your business with $100,000 limit per item<br>• $100,000 Blanket on employee tools and work clothing with $5,000 limit per item and $5,000 limit per employee<br>• $50,000 Blanket on Short-Term Equipment Leased, Borrowed or Rented from Others with limit of $25,000 per item<br>• $700,000 Maximum limit per occurrence, any one loss<br>• $50,000 Named Storm sublimit per occurrence<br>• $50,000 Volcanic Eruption & Earthquake per occurrence sublimit<br>• $50,000 Flood sublimit per occurrence<br><br>**Installation Floater**<br>• $15,000,000 Any one covered jobsite and all covered jobsites in any one occurrence<br>• $1,000,000 While in transit to or from jobsites<br>• $2,000,000 At any one storage location awaiting installation at a covered jobsite<br>• $2,500,000 Per occurrence and annual aggregate for Earth Movement<br>• $2,500,000 Per occurrence and annual aggregate for Flood in Low Hazard Areas<br>• $1,000,000 Named Storm sublimit, except in Tier 1, 2 and 3 areas |
| General Liability | • $2,000,000 General Aggregate<br>• $2,000,000 Products/Completed Operations (extending also for three years after substantial completion)<br>• $1,000,000 Personal & Advertising Injury<br>• $1,000,000 Each Occurrence |
| Automobile Liability | • $2,000,000 Auto Liability Combined Single Limit (Bodily Injury/Property Damage)<br>• $5,000 Auto Medical Payments<br>• $1,000,000 Uninsured Motorists |
| Workers' Compensation | • $1,000,000 Bodily Injury by Accident – Each Accident<br>• $1,000,000 Bodily Injury by Disease – Each Employee<br>• $1,000,000 Bodily Injury by Disease – Policy Limit |
| Umbrella Liability | • $4,000,000 Each Occurrence<br>• $4,000,000 Aggregate |
| Manufacturers Errors & Omissions | • $5,000,000 Each Glitch<br>• $5,000,000 Aggregate<br>• Retroactive Date 07/02/2009 |
| Technology Errors & Omissions | • $1,000,000 Each Claim<br>• $1,000,000 Aggregate |
| Privacy & Security (Cyber) Liability | • $5,000,000 Maximum Policy Aggregate |

| Type of Insurance | Limits of Coverage |
|---|---|
| Cargo | • $5,000,000 Per Any One Conveyance/Connecting Conveyance<br>• $5,000,000 War Limit |
| Architect s E&O | • $5,000,000 Per Claim<br>• Claims Made Coverage |

## EXHIBIT V

### PARTIAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Swisslog Logistics, Inc ("Contractor") has rendered services to, performed work for and/or furnished materials to Primus Builders, Inc. (hereinafter referred to as "Builder") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766 ("New Facility") as owned by Beef Products, Inc. (hereinafter referred to as "Owner");

NOW THEREFORE, Contractor does hereby, subject to the reservation set forth hereinbelow and upon receipt of _____ dollars ($_____) waive and release all liens or rights of lien for work equal in the value to the amount so received, which rights of lien Contractor has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility. Nothing herein shall operate to waive Contractor's right to assert any mechanics lien for any payment other than the milestone identified as:_____(the "Current Milestone") and previous milestones to the extent Contractor has received payment for such milestones. Contractor does hereby reserve, and does not hereby waive or release, any lien or right of lien which Contractor has pursuant to the laws of the State of Nebraska to the extent of any unapproved change order, or to the extent of any other disputed item as identified below:

Contractor does hereby, subject to the receipt of the aforementioned amount due and payable by Builder to Contractor agree to indemnify, hold harmless and defend Builder and Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Contractor in respect to services covered under the waiver set forth in the preceding paragraph.

This Partial Waiver of Liens and Indemnity Agreement shall be binding upon Contractor and the successors and assigns of Contractor and shall inure to the benefit of Builder and Owner and the respective successors and assigns of Builder and Owner.

IN WITNESS WHEREOF Contractor has executed this Partial Waiver of Liens and Indemnity Agreement this _____ day of _____, 20____ .

Swisslog Logistics, Inc.

By:_____

Its:_____

{00803984 DOCX / }

10953408.1

COMMONWEALTH OF VIRGINIA     )
                             ) ss.

County of_____                )

On _____ day of _____, 2016, then personally appeared the above-named
_____, _____ of Swisslog
Logistics, Inc., and acknowledged the foregoing instrument to be the free act and deed of
Swisslog Logistics, Inc. before me.

                                     Notary Public
                                     My commission expires:

## FINAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Swisslog Logistics, Inc. ("Contractor") has rendered services to, performed work for and/or furnished materials to Primus Builders, Inc. (hereinafter referred to as "Builder") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766 ("New Facility") as owned by Beef Products, Inc. (hereinafter referred to as "Owner");

NOW   THEREFORE,   upon   receipt   of _____ dollars (\$_____) representing the final payment due and payable by Builder to Contractor for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, waive and release all liens or rights of lien which Contractor has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

Contractor does hereby, subject to the receipt of the aforementioned final payment due and payable by Builder to Contractor for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, agree to indemnify, hold harmless and defend Builder and Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Contractor in respect to services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

This Final Waiver of Liens and Indemnity Agreement shall be binding upon Contractor and the successors and assigns of Contractor and shall inure to the benefit of Builder and Owner and the respective successors and assigns of Builder and Owner.

IN WITNESS WHEREOF Contractor has executed this Final Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____ .

Swisslog Logistics, Inc.

By:_____

Its:_____

Hereunto duly authorized

COMMONWEALTH OF VIRGINIA      )
                                                        ) ss.
County of_____                      )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Swisslog Logistics, Inc. and acknowledged the foregoing instrument to be the free act and deed of Swisslog Logistics, Inc., before me.

Notary Public
My commission expires:

**GUARANTEED MAXIMUM SUM CONTRACT**

dated as of September 2, 2016

by and between

**BEEF PRODUCTS, INC.**

and

**PRIMUS BUILDERS, INC.**



Exhibit D

# TABLE OF CONTENTS

**Page**

1.   Duties and Status of Builder ........................................................................ 1
2.   Work, Guaranteed Maximum Sum, Time of Completion ................................. 1
3.   Savings and Cost of the Work ..................................................................... 3
4.   Progress Payments .................................................................................... 5
5.   Final Payment ............................................................................................ 6
6.   Correction of Work; Warranty ...................................................................... 7
7.   Permits and Regulations ............................................................................. 7
8.   Protection of Persons and Property ............................................................. 8
9.   Inspection of Work ...................................................................................... 8
10.  Supervision ................................................................................................ 9
11.  Changes in the Work ................................................................................... 9
12.  Allowances and Claims ............................................................................... 10
13.  Subcontractors ........................................................................................... 11
14.  Mutual Responsibility of Contractors ........................................................... 12
15.  Separate Contracts ..................................................................................... 12
16.  Use of Premises ......................................................................................... 12
17.  Cleaning Up ................................................................................................ 12
18.  Site Representations .................................................................................... 12
19.  Concealed, Unknown and/or Unforseeable Conditions .................................. 13
20.  Title to Work ............................................................................................... 13
21.  Liability of Builder; Liquidated Damages ...................................................... 13
22.  Waiver of Breach ......................................................................................... 13
23.  Insurance .................................................................................................... 14
24.  Accounting Records ..................................................................................... 16
25.  Contract Documents ................................................................................... 16
26.  Right of Owner to Terminate Contract .......................................................... 16
27.  Right of Builder to Stop Work or Terminate Contract ..................................... 17
28.  Contract Modifications ................................................................................. 17
29.  Notices ....................................................................................................... 18
30.  Assignment ................................................................................................. 18
31.  Headings ..................................................................................................... 18
32.  Applicable Law ............................................................................................ 18
33.  Succession of Rights and Obligations .......................................................... 18
34.  Additional Documents .................................................................................. 18

Exhibit "A"   Plans, Specifications and Automation Documents

Exhibit "B"   SwissLog Contract Documents

Exhibit "C"   Location of New Facility

Exhibit "D"   Design Services

Exhibit "E"   Construction Schedule

Exhibit "F"   Cost of Work

Exhibit "G"   Form of Partial Waiver of Lien and Indemnity Agreement

Exhibit "H"   Final Form of Partial Waiver of Lien and Indemnity Agreement

Exhibit "I"   Form of Warranty

## GUARANTEED MAXIMUM SUM CONTRACT

THIS GUARANTEED MAXIMUM SUM CONTRACT (the "Contract") is made as of the 2nd day of September 2016, by and between Beef Products, Inc. (hereinafter referred to as "Owner"), a corporation organized under the laws of the State of South Dakota with a principal place of business at 891 Two Rivers Drive, Dakota Dunes, SD 57049, and Primus Builders, Inc. (hereinafter referred to as "Builder"), a corporation organized under the laws of the State of Georgia with a principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189.

WHEREAS, Owner owns and operates a meat packing facility consisting of various intake facilities, slaughter areas, processing facilities, refrigeration and freezer facilities, shipping areas and other improvements necessary for the operation of Owner's full-service processing plant (the "Current Facility");

WHEREAS, Owner desires to expand the Current Facility by adding a freezer building (with rack supported structure) and a cooler building (with non-structural racking) (collectively, the "New Facility");

WHEREAS, Builder is experienced in the design and construction of the type of New Facility desired by Owner and has submitted to Owner a certain proposal to perform said design and construction work, all as more fully set forth hereinbelow;

WHEREAS, Builder has entered into an agreement with Swisslog Logistic, Incorporated, a Virginia corporation, with its principal address at 161 Enterprise Drive, Newport News, Virginia 23603 (hereinafter referred to as "Swisslog"), whereby Builder shall utilize Swisslog for installing certain equipment in the New Facility; and

WHEREAS, Owner desires to engage Builder to construct the New Facility, all in accordance with the terms set forth in this Contract, and Builder desires to construct the New Facility for Owner, all in accordance with the terms of this Contract.

NOW, THEREFORE, in consideration of the above recitals and the agreements and covenants hereinafter contained, Owner and Builder agree as follows:

1.      Duties and Status of Builder.   Builder accepts the contractual relationship established between Builder and Owner by this Contract, and Builder covenants with Owner to furnish reasonable skill and judgment in furthering the interests of Owner to build the New Facility, all in accordance with the Plans and Specifications (as defined herein).  Builder agrees to furnish efficient business administration and superintendence and to use reasonable efforts at all times to cause the Work (as defined herein) to be performed in a sound, expeditious and economical manner consistent with the interests of Owner.

2.      Work, Guaranteed Maximum Sum, Time of Completion.

a.      Work.  The term "Work" as used herein shall mean the construction of the New Facility, all in accordance with the plans and specifications set forth on Exhibit "A" attached hereto (the "Plans and Specifications") and made a part hereof.  The Work shall include all labor necessary to produce the design and construction required by the Contract Documents (as defined in Paragraph 25) and all materials and equipment incorporated or to be incorporated in such design and construction of the New Facility. The New Facility described in the Plans and Specifications is or is to be located at the

north end of the Current Facility, all as shown on Exhibit "C" attached hereto. Unless otherwise expressly stipulated, Builder shall, in accordance with the Contract Documents, perform all Work and pay for all materials, labor, tools and equipment necessary for the proper execution and completion of the Work.

Builder has retained Primus Design Services, LLC (hereinafter referred to as "Engineer") to perform the design services required to build the New Facility as described in this Contract, and it is specifically understood and agreed that the Guaranteed Maximum Sum, as hereinafter defined, includes all fees payable by Builder to Engineer for design services required to be performed to build said New Facility. Design fees payable to Engineer are $430,746. Builder has also retained Swisslog to perform the design and construction of the automated components, the cranes, the racking and associated support for a complete operation system to be installed in the New Facility, and it is specifically understood and agreed that the Guaranteed Maximum Sum includes all fees payable by Builder to Swisslog. The fees payable to Swisslog are $14,200,000, all as set forth and described in the Swisslog contract documents listed on Exhibit "B" attached hereto.

As used herein the term "subcontractor" shall mean any party who has a direct contract with Builder to perform any of the Work, including without limitation Engineer; Primus Panels Division, and Swisslog, and it is specifically understood and agreed that Builder shall be responsible for the acts and omissions of all parties retained by, through or under Builder in connection with the design and construction of the Work.

Unless otherwise specified, all materials incorporated into the Work shall be new and both workmanship and materials incorporated into the Work shall be of first class quality. Builder shall, if requested by Owner, furnish satisfactory evidence as to the kind and quality of materials incorporated into the Work.

b.    Guaranteed Maximum Sum. Builder agrees that the maximum sum that Owner shall be obligated to pay to Builder for the performance hereunder of the Work is thirty three million eight hundred ninety nine thousand seven hundred eighty dollars ($33,845,991), as such sum shall be increased or decreased as set forth herein (said sum as so increased or decreased hereinafter referred to as the "Guaranteed Maximum Sum"), and it is specifically understood and agreed that Owner shall pay to Builder for the performance hereunder of the Work the Guaranteed Maximum Sum less any savings as set forth in Paragraph 3.

c.    Time of Completion. Builder has prior to the date hereof proceeded with the design services required to build the New Facility described in Exhibit "D" and Builder shall complete said design services and proceed with the construction of the Work with due diligence, due regard being given to interruptions resulting from any cause beyond the reasonable control of Builder, and Builder agrees to substantially complete the construction of all of the Work required hereunder to be performed by Builder on or before December 13, 2017, as said date may be extended for such periods of time as Builder is prevented from proceeding with or completing the Work for any cause beyond the reasonable control of Builder or not reasonably foreseen by Builder.

A schedule setting forth the expected dates for commencement and completion of each of the various stages of the design and construction of the Work required to build the New Facility described in this Contract is annexed hereto as Exhibit "E" and made a part hereof (the "Construction Schedule"). In the event that Builder determines, at any

time, that the Construction Schedule, in the aggregate, will be delayed by more than one (1) week, Builder shall provide prompt written notice of the same to Owner, along with an explanation for any such delays. Similarly, in the event that the Construction Schedule is accelerated, Builder shall notify Owner in writing of any anticipated changes to such Construction Schedule. In either such case, the Construction Schedule shall be updated by Builder as necessary, and revisions in said schedule shall be furnished to Owner, Engineer and Swisslog, it being specifically understood and agreed that Owner shall be entitled to rely upon and shall utilize said Construction Schedule as said Construction Schedule is revised from time to time to determine final dates upon which to make decisions Owner must make with respect to the Work.

In the event that the performance and/or completion of the Work is delayed at any time by any act or omission of Owner or of any employees, agents or tenants of Owner, by any separate contractor employed by Owner, by changes or alterations in the Work not caused by any fault or omission of Builder, by strikes, by lockouts, by fire, by embargoes, by windstorm, by flood, by earthquake, by acts of war, by changes in public laws, regulations or ordinances enacted after the date of execution of this Contract, by acts of public officials not caused by any fault or omission of Builder, by an inability to obtain materials or equipment not caused by any fault or omission of Builder, by concealed, unknown and/or unforeseeable conditions as described in Paragraph 19 or by any other cause beyond the reasonable control of or not reasonably foreseeable by, Builder, the aforesaid date for substantial completion of construction of the Work shall be extended for a reasonable period as a consequence of such delay.

The terms "substantial completion", "substantially complete" and "substantially completed" as used herein shall mean completed in such fashion as to enable Owner, upon performance of any separate work to be done by Owner, to take possession of the New Facility described in this Contract and to commence operations therein with minimal interference from either Builder or any party retained by, through or under Builder in connection with the design or construction of the Work and that the design and construction of the Work is completed except for so-called punch list items of a minor nature. The terms "full completion" and "fully completed" as used herein shall mean that the Work, including punch list items, has been completed in accordance with the Contract Documents.

3.  Savings and Cost of the Work. In the event that the sum of the Cost of the Work, as hereinafter defined, and Builder's Fee, as hereinafter defined, is less than the Guaranteed Maximum Sum, as finally adjusted, ninety percent (90%) of the difference shall be deemed to be a savings hereunder, and ten percent (10%) shall be paid to Builder as a bonus for creating such savings. Any said savings shall be determined at the time of final payment hereunder and shall decrease the Guaranteed Maximum Sum payable hereunder by Owner to Builder as set forth in Paragraph 2(b), it being specifically understood and agreed that, if and to the extent that any said savings shall exceed such final payment such excess shall be paid promptly by Builder to Owner.

The term "Cost of the Work" as used herein shall mean costs reasonably and necessarily incurred in the proper performance of the Work and paid or to be paid by Builder. Such costs shall be at rates not higher than the standard paid in the locality of the Work, except with the consent of Owner, and shall include the items set forth hereinbelow in items (a) through (p):

     a.     compensation paid for labor in the direct employ of Builder in the performance of the Work, including such welfare or other benefits, if any, as may be payable with respect thereto;

     b.     compensation of employees of Builder working on the project and/or when stationed at the field office in whatever capacity employed, it being specifically understood and agreed that employees of Builder, including the general managers, project executives, program managers and the project manager of Builder, engaged in planning, estimating, programming, scheduling, purchasing, managing, administering or accounting for the Work or in expediting the production or transportation of materials or equipment incorporated into the Work shall be considered as a cost of work and their compensation paid for;

     c.     cost of contributions, assessments or taxes for such items as unemployment compensation and social security insofar as such cost is based on compensation or other remuneration paid to employees of Builder included in the Cost of the Work;

     d.     reasonable transportation, traveling, meal and hotel expenses of Builder or of the employees of Builder incurred in discharging duties connected with the Work;

     e.     cost of all materials, supplies and equipment incorporated into the Work, including reasonable costs of transportation thereof;

     f.     expenses incurred pursuant to this Contract by Builder in respect to subcontractors, materialmen and/or other parties retained by, through or under Builder for Work required to be performed to design or construct the New Facility described in this Contract;

     g.     cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities and hand tools which are not owned by workmen and which are consumed in the performance of the Work, and cost less salvage value in respect to such items which are used but not consumed and which remain the property of the Builder;

     h.     rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from Builder or others, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area of the Work;

     i.     the cost of liability insurance that Builder is required hereunder to purchase and/or maintain in order to carry out the Work and the additional cost of all builders risk insurance if Owner has requested is included, bonds, guarantees and/or warranties which Builder is required hereunder to obtain in connection with the design and/or construction of the Work; provided, however, in no event shall such liability insurance costs exceed 0.55% of the costs of the Work;

     j.     sales, use or similar taxes related to the Work and for which Builder is liable imposed by any governmental authority;

k.      overhead allocations of 1.15% of the cost of work are included for home office support personnel working on the project;

l.      permit fees, royalties, damages for infringement of patents and costs of defending suits therefor and deposits lost for causes other than the negligence of Builder;

m.      expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such expenses and/or costs have resulted from causes other than the fault or omission of Builder, it being specifically understood and agreed that such expenses and/or costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war-risk";

n.      cost of removal of all debris;

o.      cost incurred due to an emergency affecting the safety of persons and property, unless such emergency was caused by Builder not following the applicable laws, rules or regulations applicable to the construction site for the New Facility in performance of the Work; and

p.      other costs incurred in the performance of the Work if and to the extent such costs are approved in writing by Owner.

Each item set forth above for the Costs of Work is further delineated on Exhibit "F" attached hereto.

Except as otherwise provided herein, the term "Cost of the Work" shall not include any of the items set forth hereinbelow in items (q) through (t):

q.      salaries or other compensation of the marketing executives, general managers or auditors of Builder at the principal office or branch offices of Builder, along with any other salaries or compensation of other employees, officers or agents of Builder unless specifically set forth in items (a) through (p) above;

r.      expenses of the principal or branch offices of Builder other than the field office at the site of the Work;

s.      any part of the capital expenses of Builder, including interest on capital of Builder employed for the Work; and

t.      general administrative or other indirect overhead expenses of any kind, except as may be expressly included hereinabove in items a through p.

The term "Builder's Fee" as used herein shall mean an amount equal to four percent (4%) of the Cost of the Work (excluding Swisslog), as finally adjusted, including without limitation any Cost of the Work attributable to any change in the Work.  The Builder's Fee for Swisslog costs is two percent (2%).

All cash discounts received by Builder shall accrue for the benefit of Owner as a credit against the Cost of the Work.  All trade discounts, rebates and refunds and all returns from the sale of surplus materials and equipment shall accrue to Owner as a credit against the Cost of the Work, and Builder shall secure such discounts, rebates, refunds and returns if and to the extent commercially available.

4.      Progress Payments.  Progress payments shall be made by Owner to Builder upon receipt by Owner of an application for payment therefor, as follows:

a.      Except as otherwise provided in this Paragraph 4 as to Swisslog, Builder shall submit to Owner on or about the fifth day of each month an application for payment covering all labor, materials and other Work furnished during the preceding month, including a reasonable portion of Builder's Fee earned as a result of the performance of such Work, based upon the schedule of values of the various parts of the Work annexed hereto as Exhibit "F" and made a part hereof. Except for any items objected to by Owner in accordance with Paragraph 4(d) below, ninety-five percent (95%) of all Work included in any such application for payment and attributable to construction performed by subcontractors retained by Builder, and one hundred percent (100%) of all other Work included in any such application for payment, shall be paid to Builder within twenty (20) days after the receipt of any such application for payment by Owner.

b.      Builder shall certify as to the actual cost incurred by Builder for labor, materials and other Work included in any application for payment under this Contract.

c.      Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner. Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make any progress payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Partial Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "G" or in such other form as may be required by Owner's lender and/or any title company involved in confirming lien waivers and making payments from Owner to Builder.

d.      All applications for payment under this Contract, including the application for final payment, shall be subject to the approval of Owner and/or, if required by Owner, to the approval of Owner's representatives.  Owner shall cause all applications for payment under this Contract, including the application for final payment, which such applications for payment are reasonably in accordance with the Contract Documents to be approved by Owner and, if required by Owner, to be approved by Owner's representatives forthwith upon receipt thereof by Owner, it being specifically understood and agreed that Owner and Owner's representatives shall not be entitled to withhold any approval of any application for payment under this Contract if such application for payment is reasonably in accordance with the Contract Documents and payment of the amount shown in such application for payment is due to Builder pursuant to the terms and provisions of this Contract.  To the extent Owner does not agree with any portion of Work and/or fees charged for such Work in an application for payment, Owner may withhold such portion and make written objection to Builder with regard to the same.

Builder and Owner shall then work in good faith to resolve any issues with regard to the portion of Work questioned by Owner with regard to the payment request.

e.    A schedule of values of the various parts of the Work aggregating the Guaranteed Maximum Sum is annexed hereto as Exhibit "F" and made a part hereof, and it is specifically understood and agreed that Builder shall use said schedule in calculating the amount of any progress payment required to be made by Owner in accordance with this Paragraph 4 except with respect to payment requests submitted by Swisslog.

f.    As an exception to other payment procedures set forth in this Paragraph 4, amounts to be paid to Swisslog shall be handled as set forth in this subparagraph. Swisslog will invoice Builder upon achievement of certain milestones and amounts as set forth in the Swisslog Base Contract dated July 9, 2016, paragraph 11 and the schedule therein. Builder will forward to Owner all Swisslog invoices and Owner shall pay to Builder via wire transfer the entire invoice amount plus Builder's corresponding fee, as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract. Retainage that may otherwise apply to payment to be made to Builder shall not apply as to amounts invoiced by Swisslog.

5.    **Final Payment.** Builder shall submit to Owner a final application for payment immediately after substantial completion of construction of the Work. Except as otherwise provided in this Paragraph 5 as to Swisslog, final payment is due and payable by Owner within forty-five (45) days after substantial completion of construction of the Work in accordance with the Contract Documents unless Builder has failed to fully complete the Work within such forty-five (45) day period, in which case final payment shall be due and payable by Owner in two installments, the first installment being equal to such final payment less an amount equivalent to 150% of the value of any uncompleted Work and being due and payable by Owner upon the expiration of such forty-five (45) day period, and the second installment being equal to the balance of such final payment and being due and payable by Owner promptly upon full completion of construction of the Work.

Except as to final payment to Swisslog, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, satisfactory evidence, including without limitation copies of bills, invoices, receipts, releases or waivers of lien, reflecting the proper payment by Builder of all indebtedness incurred for labor, materials and other Work the cost of which has been included in any application for payment submitted hereunder and paid by Owner. Further, Owner shall have the right to require, as a condition precedent to the obligation of Owner to make final payment hereunder, a waiver of liens and indemnity agreement issued by Builder in form and substance substantially identical to the Final Waiver of Liens and Indemnity Agreement annexed hereto and made a part hereof as Exhibit "H."

Upon receipt of invoice from Swisslog upon the occurrence of Provisional Acceptance or start of beneficial use by Owner of the systems furnished by Swisslog as set forth in the Swisslog Base Contract dated July 9, 2016, Builder shall forward such invoice to Owner. Owner shall make payment to Builder for the entire amount of Swisslog's invoice plus Builder's fee as specified elsewhere in this Contract, no later than three business days prior to the end of the time when payment to Swisslog is due as specified in paragraph 11 of the Swisslog Base Contract. Final payment to Swisslog shall be treated and made as separate from other conditions of final payment to Builder as set forth elsewhere in this Contract.

6.    Correction of Work; Warranty.  No payment hereunder by Owner and no provision in the Contract Documents shall relieve Builder of responsibility for faulty materials or workmanship incorporated into the Work.  Builder warrants that all Work done under this Contract shall be free of faulty materials and workmanship and agrees, immediately upon discovery such faulty materials or workmanship, or receiving notification from Owner, to remedy, repair or replace all defects or imperfections which may appear as a result of faulty materials or workmanship, at any time, or from time to time, during a period beginning with commencement of construction of the Work and ending twelve months after the construction of the Work has been substantially completed.  Builder shall provide Owner with a signed warranty in the form attached hereto as Exhibit "I" after completion of the New Facility (the "Warranty").  The foregoing warranty of Builder applies to the remedy, repair or replacement of defects or imperfections which may appear as a result of faulty designs prepared by Builder and/or by any party retained by, through or under Builder in connection with the design of the Work, but the foregoing warranty of Builder does not guarantee against damage to or defects in the Work arising out of or resulting from abuse, lack of normal maintenance and/or improper operation of the Work by Owner and/or by any agents, employees or tenants of Owner or as a result of changes or additions to the Work made or done by persons not directly responsible to Builder, except where such changes or additions are made in accordance with the directions of Builder. Except as set forth hereinabove or as set forth on Exhibit "I", no guarantee furnished by a party other than Builder with respect to equipment manufactured or supplied by such party shall relieve Builder from the obligations of Builder in respect to the foregoing warranty. The warranty period set forth hereinabove shall not apply to latent defects, and with respect to such defects, the applicable statute of limitations shall apply.

7.    Permits and Regulations.  Any building permits necessary for the construction of the Work and required to be obtained from any governmental authorities shall be secured and paid for by Builder, the cost of said permits being included in the Cost of the Work.  It shall be the responsibility of Builder to make certain that the Work complies with all applicable building codes and all bulk and dimensional requirements set forth in any applicable zoning ordinances, provided however that it shall be the responsibility of Owner, and not of Builder and/or Engineer, to make certain that the New Facility described in this Contract is permitted to be used for the purpose intended in the zoning district in which said New Facility is situated.

Builder shall give all notices required by any governmental authorities in connection with the performance of the Work and shall comply with all laws, ordinances, rules, regulations and orders of any governmental authorities bearing on the performance of the Work.  Without in any way limiting the responsibilities of Builder set forth herein, if Builder observes that any of the Contract Documents are at variance in any respect with any such laws, ordinances, rules, regulations or orders, Builder shall promptly notify Owner in writing and any necessary changes in the Work caused thereby shall be adjusted by appropriate modification.  If Builder performs any Work knowing it to be contrary to such laws, ordinances, rules, regulations or orders and without notice to Owner, Builder shall assume full responsibility therefor and shall bear all costs attributable thereto.

8.    Protection of Persons and Property.  Builder shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the construction of the Work.  Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

a.    all employees on the Work and all other persons who may be affected thereby;

b. all Work and all materials and equipment to be incorporated therein, whether in storage on or off the site of the Work, under the care, custody, or control of Builder or its subcontractors; and

c. other property at the site of the Work or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Builder shall at all times enforce strict discipline and good order among those performing the Work and shall not permit any unfit person or anyone not skilled in the task assigned to be employed on the Work.

Builder shall comply with all applicable laws, ordinances, rules, regulations and orders of any governmental authorities having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. Builder shall maintain and implement, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, and shall promulgate and publish safety regulations pertaining to the Work. Builder shall designate a responsible employee of Builder stationed at the site of the Work whose duty shall be the prevention of accidents. Such person shall be the superintendent of Builder unless otherwise designated in writing by Builder to Owner.

In any emergency affecting the safety of persons or property, Builder shall act at its discretion to prevent threatened damage, injury or loss. Any additional compensation or extension of time claimed by Builder on account of any such emergency shall be determined by mutual agreement between Owner and Builder.

9. Inspection of Work. Owner and Owner's representatives shall at all times have access to the Work wherever it is in preparation or progress, and Builder shall provide proper facilities for such access and for inspection of the Work.

If the drawings, the specifications, the timely-given instructions of Owner or any governmental authorities shall require any Work to be specially tested or approved, Builder shall give Owner timely notice of its readiness for inspection and, if the inspection is to be performed by a party other than Owner, of the date fixed for such inspection. Inspections by Owner shall be promptly made, and, where practicable, shall be at the source of supply. If any Work required to be inspected by the drawings, the specifications, the timely-given instructions of Owner or any governmental authority should be covered up without the approval or consent of Owner, it must, if required by Owner, be uncovered for examination at the expense of Builder.

Re-examination and/or replacement of questioned Work may be ordered by Owner and if so ordered, the Work shall be uncovered and replaced by Builder. If such Work is found to be in accordance with the Contract Documents or if such Work is not in accordance with the Contract Documents but such nonconformity has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work, Owner shall pay the cost of such re-examination and replacement in addition to the Guaranteed Maximum Sum. If such Work is not in accordance with the Contract Documents, Builder shall pay the cost of such re-examination and replacement unless such nonconformity in the Work has been caused by a party other than Builder or a party retained by, through or under Builder in connection with the design or construction of the Work.

10.     Supervision. Builder shall keep at the New Facility during progress of the Work a competent project manager and any necessary assistants, all reasonably satisfactory to Owner. Such project manager shall represent Builder and all directions given by Owner to such project manager shall be as binding as if given to Builder. Important directions by Owner to Builder shall be confirmed in writing to Builder. Other directions by Owner to Builder shall be so confirmed upon written request of Builder in each case.

Builder shall give efficient supervision to the Work, using reasonable skill and attention, and shall cause working drawings and specifications pertaining to the Work to be carefully prepared and promptly submitted to Owner. Following acceptance by Owner of said working drawings and specifications, Builder shall perform the Work described in said working drawings and specifications in accordance with Contract Documents. Notwithstanding the foregoing, Builder may from time to time make minor and insignificant changes in said working drawings and specifications and perform the Work in accordance with such changed drawings and specifications without the consent of the Owner, provided that (i) Builder shall provide such changed drawings and specifications to Owner for review and (ii) any such Work performed by Builder in accordance with such changed drawings and specifications shall be consistent with that specifically required to be performed by Builder under the Contract Documents.

11.     Changes in the Work. Owner, without invalidating this Contract, may order extra Work or make changes by altering, adding to, or deducting from the Work, the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, being equitably adjusted accordingly. Unless otherwise specified, all such Work shall be executed under the conditions of this Contract and any claim for extensions of time caused thereby shall be equitably adjusted at the time of ordering such change.

Any change in the Guaranteed Maximum Sum resulting from a change in the Work shall be determined in one or more of the following ways:

a.     by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

b.     by unit prices stated in the Contract Documents or subsequently agreed upon;

c.     by cost to be determined in a manner agreed upon by Owner and Builder and by an increase or decrease in the Guaranteed Maximum Sum based upon such cost and an adjustment in Builder's Fee consistent with that contemplated by Paragraph 3 in the event of a change in Work; or

d.     by the method provided hereinbelow in this Paragraph.

If Owner requests that a change be made in the Work and none of the first three methods set forth hereinabove in items (a), (b) or (c) for determining any change in the Guaranteed Maximum Sum resulting from such change in the Work is mutually agreed upon, then Builder, provided Builder receives a written change order signed by Owner, shall promptly proceed to cause the change in the Work requested to be performed. The change in the Guaranteed Maximum Sum shall then be determined on the basis of the sum of any increase and/or decrease in the Cost of the Work attributable to the change and any increase and/or decrease in Builder's Fee attributable to the change. In such case, Builder shall keep and present to Owner an itemized accounting, together with appropriate supporting data, of the Cost

of the Work attributable to the change.  Unless otherwise provided herein, the Cost of the Work attributable to the change shall include and be limited to the Cost of the Work directly attributable to the change.  Pending final determination of the change in the Guaranteed Maximum Sum, payments on account of the change shall be made based upon an application for payment covering actual expenditures of Builder attributable to the change.  The amount of credit to be allowed by Builder to Owner for any deletion or change which results in a net decrease in the Guaranteed Maximum Sum shall be determined on the basis of a reasonable estimate of the Cost of the Work deleted or changed.  When both additions and credits covering related Work or substitutions are involved in any one change which results in a net increase in the Guaranteed Maximum Sum, the change in the Guaranteed Maximum Sum shall include an increase in Builder's Fee computed only upon the basis of the net increase in the Cost of the Work attributable to the change.

The Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 should Builder incur costs of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies provided that Builder is not compensated for such expenses and/or costs by insurance or otherwise and that such costs have resulted from causes other than the fault or neglect of Builder or anyone for whom Builder may be liable.  Such expenses and costs shall include costs incurred as a result of any act or neglect of Owner or of any employee, agent or tenant of Owner, any act or neglect of any separate contractor employed by Owner and/or any casualty or so-called "war risk".  In the event that any such reconstruction, replacement and/or repair is required and Builder is placed in charge thereof, Builder shall be paid for said reconstruction, replacement and/or repair services and work a reasonable Builder's Fee consistent with that set forth in Paragraph 3, said Builder's Fee on account of said reconstruction, replacement and/or repair services and work being payable by Owner to Builder in addition to the Guaranteed Maximum Sum.

12.    <u>Allowances and Claims</u>.  If Builder claims that any instructions provided by Owner and/or any act or omission of Owner or of any employee, agent or tenant of Owner involve extra cost and/or that, in accordance with Paragraph 11, the Guaranteed Maximum Sum should be increased as a result of Builder having incurred expenses of reconstruction and/or costs to replace and/or repair damaged soils, materials and/or supplies, and/or that, in accordance with Paragraph 19, concealed, unknown and/or unforeseeable conditions have been encountered, Builder shall give written notice and explanation thereof within a reasonable time after the receipt of such instructions, the occurrence of such act or omission and/or the incurring of such expenses and/or costs and, provided that such claim is reasonable and supported by clear evidence, such claim shall be treated as a change in the Work for which the Guaranteed Maximum Sum, Builder's Fee and the date for substantial completion of construction of the Work, each set forth hereinabove, shall be equitably adjusted.  No such claim shall be valid unless so made.  Notwithstanding the foregoing provisions of this Paragraph 12, Builder acknowledges and agrees that it shall not incur and pay any additional expenses and/or costs which fall outside of the Guaranteed Maximum Sum without Owner's prior written consent.

Builder has included within the Guaranteed Maximum Sum all allowances stated in the Contract Documents.  Items covered by said allowances shall be supplied for such amounts and by such parties as Owner may direct, but Builder shall not be required to employ any parties against whom Builder makes a reasonable objection.  Unless otherwise expressly provided:

a.    said allowances do not include a Builder's Fee attributable to items covered by said allowances, but, in determining the Guaranteed Maximum Sum, a

Builder's Fee consistent with that set forth in Paragraph 3 on account of said allowances has been included in the Guaranteed Maximum Sum; and

b.       whenever the Cost of the Work attributable to items covered by an allowance differs from the specific allowance, the difference shall be treated as a change in the Work and the Guaranteed Maximum Sum and Builder's Fee shall be adjusted in respect to such difference as set forth in Paragraph 11.

13.   Subcontractors.  Unless otherwise specified or unless the Contract Documents state that a specific party has been designated to perform a certain portion of the Work, Builder shall cause bidding documents with respect to each major portion of the Work to be submitted to qualified parties for the purpose of obtaining bids in connection with the performance of each such portion of the Work.  As soon as practicable thereafter Builder shall furnish to Owner in writing the names of those parties from whom bids with respect to each such portion of the Work were elicited, the amounts of any bids received and the names of those parties proposed for each such portion of the Work.  Owner, within seven (7) days after receiving the name of any party proposed for any portion of the Work, shall notify Builder in writing if Owner has any objection to and does not accept such party.  Failure of Owner to make objection to any party as set forth hereinabove shall constitute acceptance of such party.  Builder shall not let any contract in connection with the construction of a principal portion of the Work if the party proposed for such portion of the Work has been rejected by Owner as set forth hereinabove, and Builder shall not make any substitution for any party who has been accepted by Owner unless the substitution is reasonably acceptable to Owner.  Builder shall not be required hereunder to contract with any party against whom Builder has a reasonable objection.

If Owner refuses to accept any party proposed by Builder as a subcontractor, Builder shall submit an acceptable substitute, and the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such substitution, provided however that no such increase in the Guaranteed Maximum Sum shall be allowed hereunder for any such substitution unless Builder has acted properly and responsively in submitting to Owner for acceptance the name of such party.  If Owner requires a change of any proposed party who has been previously accepted by Owner, the Guaranteed Maximum Sum shall be increased by any additional costs occasioned by such change.

14.   Mutual Responsibility of Contractors.  Should Builder cause damage to the work or property of any other contractor employed by Owner in connection with the construction of the Work, Builder shall, upon receipt of written notice thereof, settle with such other contractor by agreement, if such other contractor will so settle.  If such other contractor sues Owner on account of any damage alleged to have been so sustained as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Owner shall promptly notify Builder in writing of such suit.  If and to the extent that any such other contractor has been damaged as a result of the fault or omission of Builder or anyone for whom Builder may be liable, Builder shall indemnify, hold harmless and defend Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from any such fault or omission.

15.   Separate Contracts.  Owner reserves the right to let other contracts in connection with the construction of portions of the Work the construction of which are not being performed hereunder by Builder.  Builder shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall properly connect and coordinate the Work with the work of such other contractors.

If the proper execution of any part of the Work depends upon the work of any such other contractor, Builder shall inspect and promptly report to Owner any apparent discrepancies in such work that render it unsuitable for such proper execution and results. Failure of Builder so to inspect and report shall constitute an acceptance of such other contractor's work as fit and proper to receive the Work, except as to latent defects and defects which may develop in such work after the execution of such work.

16.     Use of Premises.   Builder shall confine operations at the site of the Work to areas permitted by law, ordinances, permits and the Contract Documents and shall prevent the site of the Work from being unreasonably encumbered with any materials or equipment. Builder shall not permit any part of the Work to be loaded with a weight so as to endanger the safety of persons or property at the site of the Work. Builder acknowledges that Owner shall maintain operations in the Current Facility while Builder is performing the Work on the New Facility. Accordingly, Builder shall work in good faith to minimize any disruption to the Current Facility when constructing the New Facility in order to allow Owner to continue utilizing the Current Facility to the greatest extent possible.

17.     Cleaning Up.   Builder shall at all times keep the site of the Work free from accumulations of waste material or rubbish caused by the performance of the Work by Builder, and at the completion of construction of the Work, Builder shall remove from the site of the Work all rubbish and all tools, scaffolding and surplus materials caused by, used in or resulting from the Work and shall leave the Work "broom clean", or its equivalent, unless more exactly specified hereunder.

18.     Site Representations.   Owner warrants and represents that Owner has, and will continue to retain at all times during the course of construction of the Work, legal title to the land upon which the New Facility is to be constructed and that such land is properly subdivided and zoned so as to permit the construction and use of said New Facility. Owner further warrants and represents that such land is free of any easements, conditions, limitations, special permits, variances, agreements or restrictions which would prevent, limit or otherwise restrict the construction or use of said New Facility. Owner has provided all necessary site information to Builder, including information with respect to soil conditions, existing buildings and structures, easements, restrictions and utility locations, and Builder has relied upon such information as well as the aforementioned representations in designing said New Facility and determining the Guaranteed Maximum Sum. Owner shall indemnify and hold harmless Builder from any losses, expenses or damages Builder may sustain in connection with the design or construction of said New Facility because of differences between existing conditions and those conditions represented hereinabove to Builder.

19.     Concealed, Unknown and/or Unforseeable Conditions.   Should concealed, unknown and/or unforeseeable conditions below the surface of the ground or in an existing structure encountered in the performance of the Work be at variance with the conditions indicated by the Contract Documents or differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents, the Guaranteed Maximum Sum and the date for substantial completion of construction of the Work shall be equitably adjusted in accordance with Paragraph 12 upon claim within a reasonable time after the first observance of such conditions.

20.     Title to Work.   Title to all Work completed or in the course of construction and paid for by Owner and title to all materials on account of which payment has been made by Owner shall vest in Owner. Builder agrees that any drawings or specifications prepared hereunder by Builder or Engineer or Swisslog to be used in connection with the design or

construction of the New Facility described in this Contract or in connection with the design or construction of the New Facility are the property of Owner, and Owner may utilize such Plans and Specifications in the future as desired by Owner without the prior written approval of Builder or Engineer or Swisslog; provided, however, Owner acknowledges that any future use of the Plans and Specifications are at Owner's own risk (except to the extent Owner relies on the same when maintaining or repairing the New Facility and references the Plans and Specifications for information about the materials or equipment located in the New Facility).

21. Liability of Builder; Liquidated Damages. Builder shall indemnify and hold harmless Owner and the agents and employees of Owner from and against all claims, damages, losses and expenses, including attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (a) is attributable to Builder's breach of the terms of this Contract, (b) is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property related to the Work and (c) is caused in whole or in part by any negligent act, intentional act or omission of Builder, anyone directly employed by Builder or anyone for whose acts Builder may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. In the event that any attachments or liens shall be placed upon the property of Owner to secure or enforce any such claims arising as aforesaid, Builder shall forthwith upon written request of Owner cause such attachments or liens to be dismissed or discharged. Notwithstanding anything to the contrary set forth herein, neither Builder nor Owner shall be liable to the other for any indirect or consequential losses or damages, whether arising in contract, warranty, tort, strict liability or otherwise, arising out of or in connection with this Contract and/or the Work.

If Builder has not substantially completed the Work within the time set forth in this Contract, Builder agrees to pay to Owner liquidated damages, being understood this is Owner's sole and exclusive remedy, in the amount of $3,000 per day for each day after January 1, 2018, that Builder has not substantially completed the Work. The maximum damage assessed will be $1,000,000. This amount of liquidated damages represents the parties' good faith estimate of the damages which Owner will suffer as a result of the failure of Builder to substantially complete the Work by said date, is not a penalty, and is lieu of all other damages recoverable by Owner from Builder as a result of such delay. The February 15, 2018 deadline for substantial completion of the Work shall be extended for certain matters as set forth in this Contract.

22. Waiver of Breach. The failure of Owner or Builder at any time to require performance of any provision of this Contract with respect to a particular matter shall in no way affect the right of Owner or Builder to enforce such provision at a later date with respect to another matter; nor shall the waiver by Owner or Builder of any breach of any provision hereof be taken or held to be a waiver with respect to any succeeding breach of such provision or as a waiver of the provision itself unless such waiver with respect to such succeeding breach or such waiver of such provision itself shall be in writing and signed by the party making such waiver. Notwithstanding the foregoing, the making of final payment hereunder shall constitute a waiver of all claims by Owner except those arising from:

    a.    unsettled liens,

    b.    faulty or defective Work appearing after the date of substantial completion of construction of the Work,

    c.    failure of the Work to comply with the requirements of the Contract Documents,

      d.      terms of any special guarantees required by the Contract Documents,

      e.      terms of the warranty set forth in Paragraph 6 or Exhibit "I", or

      f.      latent defects,

and the acceptance of final payment shall constitute a waiver of all claims by Builder except those previously made in writing and still unsettled.

23.     <u>Insurance</u>.

      a.     <u>Builder's Liability Insurance</u>.  Builder shall maintain such insurance as will protect Builder and Owner from those claims set forth hereinbelow which may arise out of or result from the operations of Builder under this Contract, whether such operations be by Builder, by anyone directly or indirectly employed by Builder or by anyone for whose acts Builder may be liable:

      i.      claims under workmen's compensation, disability benefit and other similar employee benefit acts;

      ii.     claims for damages because of bodily injury, occupational sickness, disease or death of any employees of Builder;

      III.    claims for damages because of bodily injury, sickness, disease or death of any person other than an employee of Builder;

      iv.    claims for damages because of injury to or destruction of tangible property (including the Work itself);

      v.     claims for damages arising after the construction of the Work is completed; and

      vi.    claims for damages arising out of any negligent acts, errors and/or omissions committed in connection with the design of the Work by Builder, Engineer or Swisslog.

The aforesaid insurance required to be maintained by Builder shall not be written for less than any limits of liability specified in the Contract Documents or less than any limits required by law, whichever limits are greater.  The worker's compensation insurance required hereunder to be maintained by Builder shall be in an amount not less than any amount required by law and the employer's liability insurance required hereunder to be maintained by Builder, the commercial general liability insurance, including without limitation coverage for premises operations, independent contractors and completed operations, required hereunder to be maintained by Builder and the automobile liability insurance required hereunder to be maintained by Builder shall be in an amount not less than $2,000,000 on account of any one occurrence and not less than $2,000,000 on account of annual aggregate occurrences.  The aforesaid insurance required hereunder to be maintained by Builder may be written under an umbrella form.

Certificates evidencing that Builder has obtained the aforesaid insurance required to be maintained by Builder shall be provided to Owner prior to commencement of construction of the Work.  Such certificates shall be in form and substance reasonably

satisfactory to Owner, shall indicate that Owner has been named as an additional insured with respect to all of such coverages, other than coverages relating to employer's liability, worker's compensation and professional errors and omissions insurance, and shall contain a provision that coverages afforded by the aforesaid insurance shall not be materially changed or canceled until at least thirty (30) days prior written notice has been given to Owner.

      **b.**    Owner's Liability Insurance.  Owner shall be responsible for purchasing and maintaining its own liability insurance and, at its option, may purchase and maintain such insurance as will protect it against claims which may arise from operations under this Contract.

      **c.**    Property Insurance.   Owner shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof.  Such insurance shall include the interests of Owner, Builder and all parties retained by, through or under Builder as insureds in respect to the Work, shall insure against all perils normally covered in an "all risk" form and shall contain an acknowledgment by the insurer which bars all rights of subrogation against the parties insured, it being specifically understood and agreed that all rights of Builder and Owner against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Paragraph 23(c) are waived and that Owner shall pay in addition to the Guaranteed Maximum Sum any costs not covered because of any minimum deductible contained in any property insurance policy required hereunder to be maintained by Owner.

      Owner shall have the right to adjust and settle any loss covered by the aforesaid property insurance unless Builder shall object, in which case Owner and Builder shall work in good faith to jointly adjust and settle any such loss.  Any proceeds received on account of a loss covered by the aforesaid property insurance shall be paid to Owner as trustee for the insureds, as their interests may appear, and shall, after receipt by Owner, be deposited in a segregated bank account established for the purpose of holding such proceeds and be distributed promptly to the insureds, as their interests may appear and as such interests are determined by Owner.

      A certificate evidencing that Owner has obtained the aforesaid property insurance and, if requested by Builder, a copy of such property insurance policy shall be provided to Builder prior to commencement of construction of the Work.  Such certificate and policy shall be in form and substance reasonably satisfactory to Builder and shall contain a provision that coverages afforded under such policy shall not be materially changed or canceled until at least thirty days prior written notice has been given to Builder.  If Owner does not intend to purchase the aforesaid property insurance, Owner shall inform Builder in writing prior to commencement of the Work, and Builder may then effect such property insurance as will protect the interests of Builder, subcontractors and sub-subcontractors in the Work, the cost of such property insurance in such case being payable by Owner to Builder in addition to the Guaranteed Maximum Sum.  If Builder is damaged by the failure of Owner to purchase or maintain the aforesaid property insurance, then Owner shall bear all damages, loss and expenses properly attributable thereto.

      24.    Accounting Records.  Builder shall check all materials, equipment and labor entering into the Work and shall keep such full and detailed accounts as may be necessary for proper financial management under this Contract. Owner and/or Owner's representatives shall be afforded access at all reasonable times to all of the records, books, correspondence,

instructions, drawings, receipts, vouchers, memoranda and similar data of Builder relating to this Contract, and Builder shall (i) provide copies of the same to Owner after construction of the New Facility is complete and (ii) preserve all such records for a period of two (2) years after Owner has made the final payment hereunder.

25.   Contract Documents.   The "Contract Documents" which form the entire Contract by and between Owner and Builder consist of this Guaranteed Maximum Sum Contract, Exhibit "A", Exhibit "B", Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F", Exhibit "G", Exhibit "H" and Exhibit "I" and that certain Contract for Owner, dated concurrently herewith, by and among Owner, Builder and Swisslog.

The Contract Documents shall be executed, and/or initialed as appropriate, in duplicate by Owner and Builder. The Contract Documents are complementary, and what is required by any one shall be as binding as if required by all. The intention of the Contract Documents is to include all labor and materials reasonably necessary for the proper execution of the Work. Builder shall supply hereunder only that Work which is either specifically required to be supplied by Builder in accordance with the Contract Documents or is reasonably inferable from the Contract Documents as being necessary to produce the intended results. Any instruments with respect to changes in the Work ordered by Owner in accordance with Paragraph 11, which such changes in the Work are required hereunder to be performed by Builder shall be deemed to be annexed to this Contract and made a part hereof. Words which have well-known technical or trade meanings are used herein in accordance with such recognized meanings.   Mutual agreement shall be reached with respect to words which do not have a well-known technical or trade meaning and the definition of which come into question.

Should the drawings conflict with the specifications, the drawings shall govern.  In the case of discrepancies between any of the drawings and/or the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog and approved by Owner, those approved drawings or specifications bearing the latest date shall govern.  All changes to the drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be dated and sequentially recorded.  The drawings and the specifications prepared hereunder by Builder and/or Engineer and/or Swisslog shall be interpreted in conformity with this Contract, which shall govern, unless otherwise specified herein.

26.   Right of Owner to Terminate Contract.   If Builder should be adjudged bankrupt, or if Builder should make a general assignment for the benefit of creditors, or if Builder persistently or repeatedly refuses or fails, except in cases for which an extension of time is provided hereunder, to supply enough properly skilled workmen or proper materials, or if Builder should fail without reasonable cause to make prompt payment either to subcontractors or for labor, materials or other Work, or if Builder persistently disregards laws or ordinances or the instructions of Owner given in a valid manner pursuant to the Contract Documents or if Builder is otherwise guilty of a substantial violation of a provision of the Contract Documents, then Owner may, without prejudice to any other right or remedy of Owner and after giving Builder seven (7) days written notice, terminate the employment of Builder and take possession of the Work and of all materials, tools and appliances at the site of the Work and finish the Work by whatever method Owner may deem expedient.  In such case Builder shall not be entitled to receive any further payment until the Work is finished.  If the expense incurred by Owner to complete the Work exceeds the unpaid balance of the Guaranteed Maximum Sum, Builder shall promptly pay the difference to Owner upon demand.  If requested by Builder, the costs incurred by Owner as herein provided shall be certified by an independent certified public accountant.

Notwithstanding the foregoing provisions of this Paragraph 26, Owner shall also have the right to terminate this Contract, including termination of the Builder, Engineer and/or Swisslog, and take possession of the Work in its then-current form for any (or no) reason desired by Owner. In the case of any such termination, Owner shall pay Builder a final fee equal to (i) any Work completed by Builder prior to Owner's termination of this Contract, plus (ii) the Builder's Fee based upon the entire Guaranteed Maximum Sum, minus a credit for any such Builder's Fee previously paid by Owner to Builder. By entering into this Contract, Builder acknowledges and agrees that any early termination by Owner shall not result in Builder having any additional rights under this Contract except for payment of any Work then performed and full payment of the Builder's Fee.

27.    Right of Builder to Stop Work or Terminate Contract. Notwithstanding anything to the contrary set forth in this Contract, if the Work should be stopped under an order of any court or other governmental authority for a period of thirty (30) days or more through no fault or omission of Builder or of anyone employed by Builder, or if Owner should fail to pay Builder for any uncontested Work within thirty (30) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may, upon fifteen (15) days written notice to Owner, stop the Work or terminate this Contract and recover from Owner payment for all Work executed and for any proven loss sustained upon any materials, equipment, tools, construction equipment and machinery, including reasonable profit and damages. Further, in the event that Owner has failed to pay Builder for any uncontested Work within forty-five (45) days after receipt of any application for payment submitted in accordance with the Contract Documents, then Builder may assess a late charge against Owner equal to one and one-half percent (1.5%) of said payment for each month, or portion thereof, for which said payment is delinquent, said assessment being in addition to the Guaranteed Maximum Sum. Should Owner for any reason breach this Contract by failing to pay any application for payment submitted in accordance with the Contract Documents and should Builder be required to retain an attorney to collect such payment, Owner shall indemnify Builder for and on account of any attorneys' fees expended by Builder in connection with the collection of such payment.

Notwithstanding the foregoing provisions of this Paragraph 27, Builder acknowledges that Owner may dispute all or any portion of an application for payment as set forth in Paragraph 4(d) above, and Builder's right to stop the Work or terminate the Contract shall not apply to any unpaid Work from Owner if such unpaid Work is subject to a dispute between Owner and Builder.

28.    Contract Modifications. No waiver, alteration or modification of any of the provisions of this Contract shall be binding upon either Owner or Builder unless the same shall be in writing and signed by both Owner and Builder.

29.    Notices.

All communications in writing between Owner and Builder, including without limitation, applications for payment, shall be deemed to have been received by the addressee if delivered to the person for whom such communications are intended or if sent by certified mail, return receipt requested, or by telegram or by an express mail service addressed as follows:

If to Owner:          Beef Products, Inc.
                      891 Two Rivers Drive
                      Dakota Dunes, SD 57049
                      Attention: Mr. David Berghult

|                |                                          |
|----------------|------------------------------------------|
| With a copy to: | Koley Jessen P.C., L.L.O.              |
|                 | One Pacific Place, Suite 800           |
|                 | 1125 South 103rd Street           |
|                 | Omaha, NE 68124                        |
|                 | Attention:  Thomas F. Ackley           |
|                |                                          |
| If to Builder:  | Primus Builders, Inc.                  |
|                 | 8294 Highway 92, Suite 210             |
|                 | Woodstock, Georgia 30189               |
|                 | Attention: Mr. Erik Gunderson          |

For the purpose of directions, the representative of Builder shall be Erik Gunderson and the representative of Owner shall be David Berghult unless otherwise specified in writing.

30.   Assignment.   Neither Owner nor Builder shall assign this Contract or sublet obligations hereunder in respect to the Work as a whole without the written consent of the other.

31.   Headings.   The headings contained herein are inserted only as a matter of convenience and reference and are not meant to define, limit or describe the scope or intent of the Contract Documents or in any way to affect the terms and provisions set forth herein.

32.   Applicable Law.   The terms and provisions of this Contract shall be construed in accordance with the laws of the state in which the New Facility is to be situated.

33.   Succession of Rights and Obligations.   All rights and obligations under this Contract shall inure to and be binding upon the respective successors and assigns of Owner and Builder.

34.   Additional Documents.   Builder agrees to execute and deliver a conditional assignment of this Contract and whatever reasonable additional documents which any lender or governmental authority may require from time to time in order to effectuate, confirm and/or implement the terms of this Contract and/or any loan made to Owner in connection with the Work required to be performed hereunder by Builder.

**[The Remainder of This Page Intentionally Left Blank; and Signature Page Follows]**

IN WITNESS WHEREOF, Owner and Builder have, by their duly authorized representatives, executed this Contract, in duplicate, as of the day, month and year first above written.

OWNER:

Beef Products, Inc.

By:
Its: PRESIDENT

BUILDER:

Primus Builders, Inc.

By: Erik Gunderson
Its: Executive Vice President

## EXHIBIT "A"

### PLANS, SPECIFICATIONS, AND AUTOMATION DOCUMENTS

The specifications and the drawings listed hereinbelow are by reference annexed to and made a part of a Guaranteed Maximum Sum Contract dated as of September 2, 2016 between Beef Products, Inc. and Primus Builders, Inc.

Specifications:

The facility will be designed and built around the Preliminary Outline Specifications dated August 24, 2016.

Drawings:

* Reference Drawing C-1.0      Conceptual Site Plan
* Reference Drawing A-1.0      Overall Floor Plan
* Reference Drawing A-1.1      Mezzanine Floor Plan
* Reference Drawing A-2.1      Exterior Elevations
* Reference Drawing A-3.0      Roof Plan
* Reference Drawing S-1.1      Conceptual foundation
* Reference Drawing S-2.       Conceptual framing

## EXHIBIT "B"

## SWISSLOG CONTRACT DOCUMENTS

Swisslog General terms and conditions version 1.1, dated August 30, 2016.

Swisslog Base Contract dated August 6, 2016.

Swisslog proposal 4720 Ver. 5.0 dated August 30, 2016 including the following:

| | |
|---|---|
| Design Data | Chapter 01 |
| Description of Operation | Chapter 02 |
| Scope of Supply | Chapter 03 |
| Warehouse Management | Chapter 04 |
| Project Implementation | Chapter 05 |
| Acceptance Procedures | Chapter 06 |
| Customer Support | Chapter 07 |
| Investment | Chapter 08 |
| | |
| Vectura SRM | Appendix 01 |
| Tornado SRM | Appendix 02 |
| ProMove Conveyor | Appendix 03 |
| Case Conveyor | Appendix 04 |
| Palletizing System | Appendix 05 |
| Freezer & Fresh Racking | Appendix 06 |
| System Drawings | Appendix 07 |
| Division of Work | Appendix 08 |
| Codes and Standards. | Appendix 09 |
| Transport & Load Units | Enclosure C1 |

<u>EXHIBIT "C"</u>

<u>LOCATION OF NEW FACILITY</u>

360 164th St, South Sioux City, NE 68776

EXHIBIT "D"

DESIGN SERVICES

The design work will be performed by Primus Design Services, LLC and will consist of design drawings and specifications prepared using the latest CADD technology.  In addition the design team will review submittal documents and will conduct periodic site inspections and a final site inspection prior to occupancy.  The design disciplines include the following:

- Site Planning, Civil and Utility Engineering Design
- Architectural Design
- Structural Engineering Design
- Industrial Engineering and Material Handling Design by Swisslog.
- Mechanical Engineering Design – through Design/Build trade contractors.
- Plumbing Engineering Design – through Design/Build trade contractors.
- Fire Protection Engineering Design – through Design/Build trade contractors.
- Refrigeration Engineering Design – through Design/Build trade contractors.
- Electrical Engineering Design – through Design/Build trade contractors.

## EXHIBIT "E"

## CONSTRUCTION SCHEDULE

**Expected Dates for Commencement and Completion of Each of the Various Stages of the Design and Construction of the Work**

See attached schedule dated September 2, 2016 titled: pro.sched.BPI.09.02.16



EXHIBIT 1

4815-6275-5890.4

4815-6275-5890.4

**EXHIBIT 1**

## EXHIBIT "F"

## COST OF THE WORK

Schedule of Values of the Various Parts of the Work Aggregating the Guaranteed Maximum Sum

See attached 3 page pricing summary dated August 13, 2016 and named est.BPI.08.13.16

## ₽ PRIMUS swisslog

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 30, 2016 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,341 |
| COOLERS: | 12,964 |
| COOLER DOCK, CONVERYOR AND MEZZANINES: | 23,267 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 63,312 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **1** | **GENERAL REQUIREMENTS** | |
| | SUPERVISION | 850,575 |
| | GENERAL CONDITIONS | 87,727 |
| | OVERHEAD | 338,460 |
| | **TOTAL DIVISION 1** | **1,276,762** |
| 1a | **INSURANCE** | 228,653 |
| 1b | **PERMITS - Not Included** | 0 |
| | | |
| **2** | **SITEWORK** | |
| | EARTHWORK | 434,201 |
| | INTERIOR DEMOLITION | 10,000 |
| | STORM DRAINAGE | 95,750 |
| | SANITARY SEWER | 18,750 |
| | DOMESTIC WATER | 0 |
| | EXTERIOR FIRE PROTECT | 150,000 |
| | LANDSCAPING ALLOWANCE | 20,000 |
| | SITE CONCRETE AND PAVING | 350,650 |
| | **TOTAL DIVISION 2** | **1,079,351** |
| | | |
| **3** | **CONCRETE** | |
| | DEEP FOUNDATIONS | 1,017,960 |
| | FOUNDATIONS | 446,209 |
| | CONCRETE SLABS | 1,734,843 |
| | PRECAST CONCRETE | 0 |
| | TILT-UP CONCRETE | 0 |
| | **TOTAL DIVISION 3** | **3,199,013** |
| | | |
| **4** | **MASONRY** | **0** |
| | | |
| **5** | **METALS** | |
| | STRUCTURAL STEEL | 1,555,998 |
| | MISC STEEL | 156,000 |
| | **TOTAL DIVISION 5** | **1,712,998** |
| | | |
| **6** | **WOODS & PLASTICS** | |
| | ROUGH CARPENTRY | 0 |
| | FINISH CARPENTRY | 0 |
| | **TOTAL DIVISION 6** | **0** |

**Ƥ PRIMUS swisslog**

**beef
products
inc**

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 29, 2018 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| OCLER DOCK, CONVERYOR AND MEZZANINES: | 22,387 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 64,312 |

| Div | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| **7** | **THERMAL & MOISTURE** | |
| | WATERPROOFING | 0 |
| | CAULKING | 49,928 |
| | FIREPROOFING | 0 |
| | DRYWIT SYSTEMS | 0 |
| | METAL SIDING | 0 |
| | INSULATED WALL PANELS AND UNDER FLOOR INSULATION | 1,761,046 |
| | ROOFING | 670,542 |
| | **TOTAL DIVISION 7** | **2,481,416** |
| **8** | **DOORS AND WINDOWS** | |
| | COLD STORAGE DOORS | 259,910 |
| | INDUSTRIAL DOORS | 6,500 |
| | SMALL DOORS | 0 |
| | WINDOW SYSTEMS | 0 |
| | **TOTAL DIVISION 8** | **266,410** |
| **9** | **FINISHES** | |
| | DRYWALL SYSTEMS | 0 |
| | ACOUSTICAL CEILING | 0 |
| | TILE AND COATINGS | 0 |
| | CARPET & FLOORING | 0 |
| | PAINT & WALL COVER | 11,691 |
| | **TOTAL DIVISION 9** | **11,691** |
| **10** | **SPECIALTIES** | **0** |
| **11** | **DOCK EQUIPMENT+BLAST RACK** | **78,609** |
| **12** | **FURNISHINGS** | **0** |
| **13** | **SPECIAL CONSTRUCT** | **0** |
| **14** | **CONVEYING SYSTEMS - SWISSLOG** | |
| | COSTS INCLUDED FOR SWISSLOG | 14,200,000 |
| | **TOTAL DIVISION 14** | **14,200,000** |

cotLBPI 08.13.18-FINAL GMP

**beef products inc**

**P PRIMUS** *swisslog*

AS/RS Expansion for Beef Products, Inc.
South Sioux City, NE
June 29, 2016 GMP Proposal

| | |
|---|---|
| PALLET POSITIONS: | |
| NUMBER OF CRANES: | 6 |
| ABILITY TO EXPAND: | Yes |
| | |
| BUILDING AREAS: | |
| DRY WAREHOUSE: | 0 |
| FREEZERS - AS/RS & BLAST FREEZING: | 29,241 |
| COOLERS: | 12,984 |
| COOLER DOCK, CONVEYOR AND MEZZANINES: | 23,287 |
| OFFICE: | 0 |
| SUPPORT/ENGINE ROOM: | 0 |
| TOTAL SF: | 65,512 |

| DIV | COST SUMMARY CATEGORY | TOTAL |
|---|---|---|
| 15 | **MECHANICAL** | |
| | FIRE PROTECTION | 1,030,925 |
| | PLUMBING | 25,000 |
| | H.V.A.C. | 6,500 |
| | REFRIGERATION | 4,822,900 |
| | **TOTAL DIVISION 15** | **5,885,325** |
| 16 | **ELECTRICAL ALLOWANCE** | **1,502,057** |
| 17 | **MISCELLANEOUS** | **0** |
| | **SUBTOTAL SITE** | **1,079,551** |
| | **SUBTOTAL BUILDING** | **29,636,819** |

| **RECAP** | |
|---|---|
| SUBTOTAL BUILDING & SITE (C.O.W.) | 30,714,170 |
| TOTAL BUILDING, SITE & GENERAL REQUIREMENTS | 32,221,585 |
| 0.0% | Winter Conditions Allowance | 300,000 |
| 2.79% | FEE | 894,344 |
| **SUBTOTAL PROJECT** | **33,415,928** |
| 1.2% | ENGINEERING | 390,966 |
| 10% | ENGINEERING REIMBURSABLES | 39,097 |
| 0.0% | ENGINEERING - CONSULTANTS | 0 |
| | SUB-TOTAL | 430,063 |
| **GRAND TOTAL PROJECT (Building Only)** | **33,845,991** |

<u>Exhibit "G"</u>

<u>PARTIAL WAIVER OF LIENS AND INDEMNITY AGREEMENT</u>

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, subject to the reservation set forth hereinbelow and upon receipt of _____ dollars ($_____) representing the amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the period commencing _____ and ending _____, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of Nebraska by virtue of services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby reserve, and does not hereby waive or release, any lien or right of lien which Builder has pursuant to the laws of the State of _____ to the extent of _____ dollars ($_____) representing retainage applicable to services rendered, work performed and/or materials furnished by Builder prior to and during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned amount due and payable by Owner to Builder, less any applicable retainage, for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility during the aforementioned period, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished during the aforementioned period in connection with the design and/or construction of the aforesaid New Facility.

This Partial Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Partial Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____
Its:_____

4815-6275-5890.4

STATE OF GEORGIA    )
           ) ss.
County of _____   )

On _____ day of _____, 2016, then personally appeared the above-named
_____, _____ of Builder, and
acknowledged the foregoing instrument to be the free act and deed of Builder, before me.

               _____

               Notary Public
               My commission expires:

8:19-cv-00457-RFR-CRZ   Doc # 20   Filed: 01/07/20   Page 274 of 275 - Page ID # 475

## Exhibit "H"

### FINAL WAIVER OF LIENS AND INDEMNITY AGREEMENT

KNOW ALL MEN BY THESE PRESENTS THAT Primus Builders, Inc. (hereinafter referred to as "Builder") has rendered services to, performed work for and/or furnished materials to Beef Products, Inc. (hereinafter referred to as "Owner") in connection with the design and/or construction of a cold storage warehouse and distribution facility situated at 360 16th Street, South Sioux City, NE 68766.

NOW THEREFORE, for one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Builder does hereby, upon receipt of _____ dollars ($_____) representing the final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, waive and release all liens or rights of lien which Builder has pursuant to the laws of the State of _____ by virtue of services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

Builder does hereby, subject to the receipt of the aforementioned final payment due and payable by Owner to Builder for services rendered, work performed and/or materials furnished by Builder in connection with the design and/or construction of the aforesaid New Facility, agree to indemnify, hold harmless and defend Owner from and against any liens affecting the aforesaid New Facility and filed by any party retained by, through or under Builder in respect to services rendered, work performed and/or materials furnished in connection with the design and/or construction of the aforesaid New Facility.

This Final Waiver of Liens and Indemnity Agreement shall be binding upon Builder and the successors and assigns of Builder and shall inure to the benefit of Owner and the successors and assigns of Owner.

IN WITNESS WHEREOF Builder has executed this Final Waiver of Liens and Indemnity Agreement this _____ day of _____, 20_____.

Primus Builders, Inc.

By:_____
Its:_____
Hereunto duly authorized

STATE OF GEORGIA     )
                     ) ss.
County of _____ )

On _____ day of _____, 2016, then personally appeared the above-named _____, _____ of Builder, and acknowledged the foregoing instrument to be the free act and deed of Builder, before me.

_____
Notary Public
My commission expires:

4815-6275-5890.4

## EXHIBIT "I"

### FORM OF WARRANTY

All workmanship, materials and equipment are guaranteed for a period of one year after the date established as the date of substantial completion of the Work for any defects which may appear or arise as a result of faulty materials, equipment or workmanship.  In addition to the one year warranty on all workmanship, materials and equipment the following extended warranties are included:

- The roofing warranty is for a period of thirty (30) years.
- Equipment Warranties provided with more than 1 year will be extended to Owner