IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EMPIRICAL FOODS, INC., | |
| Plaintiff, | **8:19CV457** |
| vs. | |
| PRIMUS BUILDERS, INC., | **MEMORANDUM AND ORDER** |
| Defendant and Third-Party Plaintiff, | |
| vs. | |
| SWISSLOG LOGISTICS, INC., | |
| Third-Party Defendant | |

Defendant Primus Builders, Inc. ("Primus") moved for a temporary restraining order and preliminary injunction to enjoin Plaintiff empirical foods, inc. f/k/a Beef Products, Inc. ("empirical") from removing the $14 million automated storage and retrieval system ("ASRS System") installed at empirical's meat processing facility in South Sioux City, Nebraska (the "Facility"). (Filing No. 47). Primus argues the court must halt the removal of the ASRS System until Primus can:

1)   review and analyze information and materials recently disclosed by empirical, including 37 alleged and additional defects within the ASRS System not previously identified, along with assessing whether additional testing is needed to address these new allegations;

2)   receive and review information and materials which empirical is withholding but Primus must examine before the ASRS System is further dismantled; and

3)      to the extent still possible, complete integrated (end-to-end) testing of all four (4) subsystems within the ASRS System.

([Filing No. 47](#)).

Recognizing the issues presented are discovery-related, the presiding district judge, Robert F. Rossiter, Jr., referred the matter to the undersigned magistrate judge.

For the reasons discussed below, the undersigned magistrate judge finds the issues presented are not governed by the legal standards applied to temporary restraining orders and preliminary injunctions. Instead, the parties' dispute is a discovery issue—a motion for preservation of evidence and expedited discovery.[1] Upon review of the evidence, the motion will be granted, in part.

## STATEMENT OF FACTS

Plaintiff's lawsuit alleges Primus breached a contract to design and install an ASRS System for the receipt, storage, processing, and distribution of beef at the Facility. The ASRS System is part of the construction needed to expand the Facility to include frozen storage areas with supporting logistic systems ("Freezer Facility"). ([Filing No. 63-3, at CM/ECF p. 2](#)).

Beginning as early as January 2015 and continuing to April 2016, empirical, Third Party Defendant Swisslog Logistics, Inc. ("Swisslog"), and Primus collaborated on how to build empirical's Freezer Facility. ([Filing Nos. 63-2, at CM/ECF p. 4](#); [63-3, at CM/ECF p. 2](#)). In the spring of 2016, empirical decided to

---

[1] Judge Rossiter may disagree with my analysis of the applicable law. So, I have written the findings of fact consistent with the thoroughness he may need to understand the facts, apply the Dataphase factors, and decide whether to enter a preliminary injunction. See [Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)](#) (en banc)

build a new Freezer Facility adjacent to its processing plant in South Sioux City, Nebraska. The facility was to serve as the primary storage facility for raw material used by empirical to process beef and finished product for shipment. ([Filing No. 61-1, at CM/ECF p. 3](#)).

In 2016, Primus, Swisslog and empirical executed a tri-party contract ("Tri-Party Contract") under which Primus was to design and construct the freezer warehouse, with Swisslog designing and installing the ASRS System within the Facility. ([Filing No. 49-1, at CM/ECF p. 2](#)). In April 2016, empirical executed a design agreement with Swisslog, the Swisslog/empirical Agreement, to design and prepare technical specifications for the ASRS System. Primus and empirical executed a separate agreement, wherein Primus agreed to design and prepare specifications for the Freezer Facility structure which would house the ASRS System. ([Filing Nos. 63-2, at CM/ECF p. 4](#); [63-3, at CM/ECF p. 3](#)). Primus entered into a Base Contract with Swisslog for the project. ([Filing No. 1, at CM/ECF pp. 62-64](#)). On September 2, 2016, empirical and Primus entered into a Guaranteed Maximum Sum Contract (the "GMS Contract"). ([Filing Nos. 61-1, at CM/ECF p. 4](#); [63-2, at CM/ECF p. 5](#)) to build the Facility.

**Overview of Facility**



The ASRS System within the Facility is an automated robotic system composed of a mechanical system designed and installed by Swisslog, the

3

operation and functionality of which is controlled by software subsystems provided or guided by either empirical or Swisslog. (Filing No. 49-2, at CM/ECF p. 3). As designed, the ASRS System would use Swisslog's proprietary software, SynQ, to provide a Warehouse Management System for empirical's Facility. SynQ sends commands to programmable logic controllers ("PLCs") which control the mechanical function of their assigned "smart" components and equipment (i.e., cranes, shuttles, scanners, sensors, conveyors, etc.).

Upon receiving commands from SynQ via the PLCs, the equipment (e.g., conveyors and mini-load cranes) carries out the commands for automated storage, tracking, and retrieval of both raw material and finished goods.

**Drawing of Four Mini-Load Cranes with Cases in Storage Racks**



Upon completion of a task, SynQ reports the status back to a host database, (Filing No. 49-2, at CM/ECF p. 6), thereby keeping the host database apprised of the raw and finished product inventory, its storage location, and the storage and retrieval functions being carried out by SynQ.

The host database was designed and implemented by Swisslog, with input from empirical. (Filing No. 61-28, at CM/ECF pp. 16-17). It serves as a buffer between SynQ and empirical's systems to avoid any risk of direct communication between them. All transaction and event data related to the messages exchanged between empirical's systems and SynQ is captured and stored in the host database. (Filing No. 61-28, at CM/ECF pp. 17-18).

empirical's software—SQL, ERP and iFIX—also communicate with the host database.

- SQL tracks the inventory of finished product coming off the production line and via the SynQ host database, communicates storage commands (freezer or fresh) to SynQ. SynQ then forwards the necessary commands to the equipment PLCs, and the equipment carries out the command as instructed to store and add the finished product to empirical's inventory.

- ERP accepts and initiates data about orders placed, and it supplies and maintains master and transactional data related to purchasing. ERP receives and forwards customer orders to SynQ, via the host database, and SynQ retrieves the finished product from storage for shipping to the customer. Transactional and master data records and the associated transaction confirmations and error messages are all logged and stored in the host database. (Filing No. 49-2, at CM/ECF p. 5).

- iFIX is a customized version of GE Digital software and allows empirical personnel to monitor the movement and storage of inventory to assist with troubleshooting. (Filing No. 49-2, at CM/ECF p. 5). It provides a visual representation of the equipment on empirical's production floor. iFIX also contains highly confidential data related to empirical's production operations, including proprietary recipes for empirical's product blends. (Filing No. 61-28, at CM/ECF p. 15). Event or alarm logs from iFIX would not be captured in that database, but they could be pulled separately for certain dates and times. (Filing No. 61-28, at CM/ECF pp. 17-18).

Through integrated functioning of Swisslog and empirical software, the ASRS System was designed to robotically perform the following four functions:

1) Recording and automatically storing raw materials (boxed beef and pork) until needed for production.
Upon arrival, a unique tracking number is assigned to each box. The number is scanned, and the arrival and contents are recorded by SynQ and shared with the host database. **SynQ↔Host Database**.
Commands sent by SynQ to the conveyer PLCs direct each box to one of four mini-load cranes for storing the boxes in racks. (Filing No. 61-28, at CM/ECF pp. 3-7).

2) Retrieving raw materials needed for a production order and automatically sending the correct raw material to the production line.
SynQ matches the amount and type of raw material requested with the stored data regarding raw material in stock. Upon selection of the raw material to be used, the box is scanned and the information sent to SynQ. SynQ forwards the information to the host database to notify the system that the raw material is no longer available for production. **SynQ↔Host Database**.
(Filing No. 61-28, at CM/ECF pp. 3, 7-8).



3) Record the delivery of finished goods from the production line, track its movement, and store it appropriately until shipment to customers. (**SQL↔Host Database**).
Every box of finished product is labelled and scanned at the production line, with the scanned data stored in the SQL database and shared with host database. SynQ then issues commands to the conveyers to send boxes destined for fresh storage to the mini-load cranes, and boxes destined for frozen storage to a staging area known as the goods-to-person area. (Filing No. 61-28, at CM/ECF pp. 3, 8-9).

4) Retrieve finished goods when necessary to complete a sales order and automatically send the finished goods to shipping. (**ERP↔Host Database**).
Once a sales order is received in the Dynamics ERP, the information is transmitted to the host database, which, in turn, communicates with SynQ to locate and via commands to the PLCs, direct the equipment to pull the correct finished goods from the racks. The data indicating that the sales order has been fulfilled is stored in SynQ and the host database. (Filing No. 61-28, at CM/ECF pp. 3, 10-11)

6

To properly trigger physical and electronic actions within the ASRS System, the empirical software, Swisslog software, host database, and PLCs must seamlessly communicate in an integrated fashion, accurately creating, transforming, and transmitting a wide variety of data based on an array of pre-determined rules and procedures. (Filing No. 49-2, at CM/ECF pp. 3, 7)

Throughout 2017, empirical and Swisslog modified the plans and features of the ASRS System, with accompanying changes made to the contract documents. (Filing Nos. 63-2, at CM/ECF p. 8; 63-3, at CM/ECF p. 5). See, e.g., Filing Nos. 61-2, 61-4, 61-14, 61-15, 61-16, and 61-17). Additional changes were made in 2018 and 2019. (Filing Nos. 63-2, at CM/ECF pp. 9-10; 63-3, at CM/ECF pp. 6-7; 61-18).

There are probably in excess of a million separate components, both hardware and software, that need to work together and properly integrate to operate as a single ASRS System. (Filing No. 63-2, at CM/ECF p. 12). During the course of the project, empirical changed the ASRS System design and performance requirements, often wanting increased performance after having initially rejected certain features to cut costs. When dealing with the complexity of the ASRS System, ongoing changes can have unintended consequences and cause failures to subsystem components or assemblies that previously tested as acceptable. (Filing No. 63-2, at CM/ECF p. 14). Modifications of prepackaged software can introduce problems that ripple throughout the operation and functionality of the overall ASRS System, requiring extensive debugging. (Filing No. 63-2, at CM/ECF p. 2).

Provisional Acceptance for Operational Use (PAC) testing was performed from March 18, 2019 through March 27, 2019. empirical asserts that as of those dates, the ASRS System was not operating with "demonstrable performance" as

7

defined under the contract. It requested a meeting to discuss the problems and determine when the ASRS System would be complete. (Filing No. 61-19).

PAC testing was performed on July 23 and 24, 2019. At that time, Swisslog concluded the ASRS System met the requirements of both a second "provisional acceptance test" and "trial operational testing." Swisslog claims empirical did not fully cooperate or participate in the ASRS System testing. empirical disagrees, asserting the ASRS System was not substantially complete and was not operating properly. (Filing Nos. 61-21; 61-22; 61-23; 61-24; 63-2, at CM/ECF p. 12).

On August 8, 2019, empirical notified Primus that it considered Primus in default. (Filing Nos. 61-1, at CM/ECF p. 4; 63-3, at CM/ECF p. 9). The following day, Primus notified Swisslog of Primus' intent to terminate its subcontract with Swisslog. (Filing No. 61-6).

empirical filed the above-captioned lawsuit against Primus on October 18, 2019. The complaint alleges the ASRS System is defective in that Swisslog failed to:

a)   demonstrate the execution of sending raw materials for one production order for one production line;

b)   execute an entire empirical production schedule delivered to one production line;

c)   execute an entire empirical production schedule delivered to multiple production lines;

d)   execute one single-SKU sales order on a one-stop shipment;

e)   execute one multi-SKU sales order on a one-stop shipment;

f)   execute one multi-stop shipment with multiple sales orders containing multiple SKU's;

g)   execute a full-days' worth of sales orders;

8

h)   induct and/or retrieve one load of ground beef using ASN receiving into the System;

i)   induct and retrieve full-pallet quantities of blast-freeze product;

j)   induct and retrieve full-pallet quantities of KC Steak boxes without data errors;

k)   induct and retrieve full-pallet quantities of taco meat, including failing to put the pallet on the conveyor to go to the cranes;

l)   retrieve full-pallet quantities of finished steak boxes without data errors and crane errors;

m)   induct one load of finished primals;

n)   execute certain inventory adjustments, including the ability to split case for sample order;

o)   execute a hard hold and hold release for pallets in the System;

p)   execute a grade update for cooked and ground beef inventory;

q)   correct UFOs from the induction process;

r)   execute a full-days' worth of quality assurance and/or operational support orders; and

s)   execute error recovery trials.

(Filing No. 1, at CM/ECF pp. 6-7, ¶ 25). On November 8, 2019, three weeks after filing suit, empirical sent a waiver of service to Primus. (Filing No. 13)

On November 20, 2019, empirical notified Primus that it had retained a new contractor, Westfalia Technologies, Inc., to begin work on the ASRS System. On November 22, 2019, empirical stated that it was willing to give Primus "an opportunity to inspect the ASRS equipment on a mutually agreeable day prior to December 9, 2019." At that time, Westfalia was scheduled to begin its work on December 10. (Filing Nos. 61-29, at CM/ECF pp. 2-3; 61-31 at CM/ECF p. 2).

On November 25, 2019, Primus objected, stating it was very premature to begin changing the work performed by Primus/Swisslog at the project site, and it could not gather evidence regarding the ASRS System and other relevant aspects of the work performed at the project site before December 9, 2019. empirical extended the deadline for an onsite inspection to December 31, 2019. (Filing Nos. 49-12 at CM/ECF p. 2; 61-29, at CM/ECF p. 3; 61-32, at CM/ECF p. 2).

On December 4, 2019, Primus confirmed it was preparing to inspect the site for the purpose of preserving evidence, and it hoped to present a proposed evidence collection plan to empirical before Christmas. (Filing Nos. 61-29, at CM/ECF p. 4; 61-34, at CM/ECF p. 2). The following day, empirical objected to the delayed delivery of the proposed evidence collection plan, claiming that further delay would not provide enough time for empirical to consider and implement reasonable recommendations for a facility inspection to be completed by December 31, 2019. (Filing Nos. 61-29, at CM/ECF p. 4; 61-35, at CM/ECF p. 2). That same day, December 5, 2019, empirical identified various part numbers of ASRS Equipment that would be removed in "Phase 1" of its intended dismantling of the ASRS System. (Filing No. 49-1, at CM/ECF pp. 23-24).

On December 10, 2019, Primus stated it was not able to inspect the facility before December 31, 2019. Primus proposed doing an onsite inspection, with Swisslog, for five consecutive days beginning on Monday, January 13, 2020. Primus stated five days were needed to inspect, operate, gather operational data, and video record the mechanical and software operation of the ASRS System, explaining it would outline the inspection details, tasks, and necessary personnel in the protocol it was currently preparing. (Filing Nos. 61-29, at CM/ECF p. 4; 61-36). empirical promptly agreed to allow an onsite inspection by Primus and Swisslog from January 13-17, 2020. (Filing Nos. 61-29, at CM/ECF p. 4; 61-37).

empirical requested a copy of Primus' proposed inspection protocol on December 19 and December 27, 2019 and January 2, 2020. Each time, Primus assured empirical that the protocol would be available soon. (Filing Nos. 61-29, at CM/ECF p. 5; 61-39, at CM/ECF pp. 2-3; 61-40, at CM/ECF pp. 2-3). Primus provided empirical with its proposed inspection protocol on January 3, but the protocol did not list the tests Primus intended to run during the inspection. Instead, it addressed logistical issues for the inspection that Primus and Swisslog wanted to address. (Filing Nos. 61-29, at CM/ECF p. 5; 61-46; 61-48).

On January 7, 2020, Primus filed its Answer and Counterclaim, (Filing No. 18), and a Third-Party Complaint against Swisslog. (Filing No. 20). Primus also sent a waiver of service to Swisslog (Filing No. 33). At the parties' request, and to accommodate the onsite inspection, the court entered a protective order on January 10, 2020. (Filing No. 25).

The inspection began on January 13, 2020 as scheduled, but testing disputes arose soon after Primus and Swisslog arrived at the site. Those disputes led to a telephonic hearing before the undersigned magistrate judge on January 15, 2020. The court ordered the parties to cooperate throughout the testing, including allowing access to empirical's computer system as needed to perform the tests and prohibiting the use of spyware by empirical to track the testing conducted by Swisslog. (Filing Nos. 30; 49-1, at CM/ECF p. 7; 61-55; 61-92).

Prior to January 13, 2020, empirical captured true and accurate copies of databases relevant to the inspection and the litigation. The databases captured included "BPI_HOST_DB (as of 1/12/20), BPIDB (as of 1/12/20), and BPIDWHDB (as of 1/15/20)." Copies of these databases were provided to counsel for both

Primus and Swisslog on January 15, 2020 by an empirical consultant from Ankura Consulting.[2] (Filing Nos. 61-29, at CM/ECF p. 18; 49-6; 61-86, at CM/ECF p. 2).

Twelve people attended the January site inspection on behalf of Primus, including four experts: 21 people attended for Swisslog, including sixteen employees, three experts, and two attorneys. Primus was onsite for 74 hours and Swisslog was onsite for 77 hours. During the onsite inspection, Swisslog conducted isolated testing of the components it contributed to the ASRS System (i.e. ASRS Equipment and WMS(SynQ) software) to determine if its equipment and software caused the alleged defects identified by empirical in its Complaint. (Filing No. 49-1, at CM/ECF p. 7).

empirical permitted Primus and Swisslog to access all locations and equipment in the facility, granted them access to all necessary databases and PLCs, and did not obstruct them from performing any test they deemed necessary. Primus and Swisslog had access to the approximately five terminals in the facility where they could have accessed SynQ or iFIX. empirical provided five laptops along with user login credentials for accessing the relevant servers and SynQ software. It generated production orders and helped with troubleshooting problems encountered during testing, and it provided raw material and finished goods for use during testing, monitoring the inspection to ensure safety and the absence of damage to equipment. (Filing No. 61-29, at CM/ECF pp. 6-8). At the end, Primus and Swisslog declined empirical's offer to conduct additional inspections on

---

[2] Both Primus and Swisslog again requested database copies on June 23, 2020. empirical immediately made these database copies available. (Filing No. 61-29, at CM/ECF p. 18). Although empirical states it independently conducted testing in late-February, and empirical claims it has provided databases with its test results, the database copies provided to Primus show no data for tests conducted after February 7, 2020. (Filing No. 63-1, at CM/ECF p. 7).

January 19 through 24. ([Filing No. 61-29, at CM/ECF p. 9](#)). empirical watched and videotaped (from multiple angles) all testing conducted by Swisslog between January 15 and January 19. ([Filing No. 49-1, at CM/ECF p. 21](#)).

Primus and Swisslog conducted an additional inspection from February 4 through February 6, 2020. Twelve people attended the inspection on behalf of Primus, including six experts; 12 people attended on behalf of Swisslog, including nine employees, one expert, and two attorneys. During this inspection, both Primus and Swisslog were onsite for over 32 hours. ([Filing No. 61-29, at CM/ECF pp. 11-12](#)).

During the February inspection, Swisslog conducted isolated testing of the components it contributed to the ASRS System (i.e. ASRS Equipment and WMS(SynQ) software), again focusing on the alleged defects identified by empirical in its Complaint. ([Filing No. 49-1, at CM/ECF p. 7](#)) It also completed testing of the mechanical subsystem at the Facility on February 6, 2020. Once again, empirical observed and videotaped (from multiple angles) all testing conducted by Swisslog between February 4 and February 6. ([Filing No. 49-1, at CM/ECF p. 21](#)).

On February 6, 2020, Primus participated in testing of the ERP ↔ host database subsystem at empirical's office in Dakota Dunes, South Dakota. In isolation, it appeared to function properly. ([Filing No. 49-2, at CM/ECF p. 8](#)). And along with empirical, it conducted three hours of isolated testing of the ERP software that empirical had contributed to the ASRS System. ([Filing No. 49-1, at CM/ECF pp. 7](#), 21). At the request of Primus' counsel, empirical was willing to assist Primus with entering data into the ERP, which empirical controls, so Primus could observe how the data flows from the ERP to the host database, and from host database to SynQ (the Swisslog software). empirical's IT team was available

to discuss empirical's ERP with Primus' consultants. empirical entered several transactions, provided by Primus, into the empirical ERP. empirical allowed Primus' ERP consultants to ask questions of empirical's personnel as to how the ERP and iFIX interacted with other aspects of the ASRS System, including Swisslog's software, SynQ. (Filing No. 61-29, at CM/ECF p. 13).

Prior to February 6, 2020, Primus did not conduct end-to-end testing (also referred to as integrated testing)—that is, testing to assess the operation of the entire ASRS System integrated as a whole as opposed to the isolated subsystems. This type of testing of the ASRS System at the empirical Facility would include the input of data on the front-end of the ASRS System (i.e. the empirical software to host database flow of data), tracing the flow of data through to the back-end of the ASRS System (i.e., PLC's in the ASRS Equipment), observing the performance of tasks by the ASRS Equipment, and then tracing the flow of data back to the front end of the ASRS System. (Filing No. 6, at CM/ECF p. 6). Primus states such testing was premature until after it verified that each of the four subsystems functioned properly in isolation. On February 13, 2020, mere days after being informed that three of the four subsystems were operating and functioning properly in isolation, Primus asked for a third onsite inspection to perform end-to-end testing. (Filing Nos. 49-1, at CM/ECF p. 34; 61-69). empirical responded the next day, February 14, indicating that it would consider Primus' request but asked for a protocol regarding how the "end-to-end" testing would be conducted. (Filing Nos. 61-29, at CM/ECF p. 14; 61-70).

In a letter to Primus dated February 18, 2020, Swisslog states "there have already been end-to-end demonstrations of [the] System" and "end-to-end functioning of the System already has been demonstrated." (Filing Nos. 61-29, at CM/ECF p. 15; 61-71). Read without context, it appears the testing Primus is requesting has already been performed by Swisslog. But read in context, Swisslog

14

was stating further attempts at end-to-end testing would be a waste of time given empirical's resistance to assisting and granting the access needed for end-to-end testing. Moreover, Primus has sued Swisslog. They are opposing parties. Primus is not bound by Swisslog's statement that end-to-end testing is complete, and Primus cannot speak directly to Swisslog's employees and experts without the consent of Swisslog and its counsel.

Primus provided a proposed protocol for end-to-end testing to empirical on February 21, 2020. (Filing No. 61-72). At the end of February, empirical conducted its own testing of the ASRS System with its expert over the course of two days. (Filing No. 61-29, at CM/ECF p. 15). Primus and Swisslog were not given notice of this onsite testing or an opportunity to observe and record it. (Filing No. 49-1, at CM/ECF p. 21).

On March 2, 2020, more than two weeks after Primus requested an opportunity for end-to-end testing, empirical offered Primus the week of March 23 to conduct its third inspection, including end-to-end testing if so desired. (Filing Nos. 49-1, at CM/ECF pp. 34-35; 61-29, at CM/ECF p. 15; 61-73, at CM/ECF p. 2). On March 5, 2020, Primus responded that the week of March 23 would not work because a key person from Swisslog was not available. (Filing Nos. 61-29, at CM/ECF p. 15; 61-74, at CM/ECF p. 2). On March 6, empirical offered the week of March 30. (Filing Nos. 49-3, at CM/ECF p. 26; 61-29, at CM/ECF p. 15).

On March 11, 2020, the World Health Organization announced that "the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States." See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. The following day, empirical disclosed that it had conducted its own "end-to-end testing" of the ASRS System,

the results of which would not be disclosed to Primus and Swisslog until formal discovery began. It also sent notice to Primus and Swisslog that the ASRS System equipment identified on December 5, 2020 would be removed by April 13, 2020. (Filing Nos. 49-1, at CM/ECF pp. 21, 23-24; 49-3, at CM/ECF pp. 41-42; 61-29, at CM/ECF p. 16).

On March 13, 2020, President Trump signed the Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak.

On March 16, 2020, empirical informed Primus that it would also make the facility available for inspection the week of April 6. (Filing Nos. 61-29, at CM/ECF p. 16; 61-77, at CM/ECF p. 2).

Unfortunately, the COVID-19 pandemic reached Dakota County, Nebraska by March 18, 2020.[3] Primus notified empirical that onsite testing was not possible due to travel restrictions, stay at home orders, and the ever worsening COVID-19 global pandemic. (Filing Nos. 49-1, at CM/ECF p. 35; 49-3, at CM/ECF pp. 34-36; 61-29, at CM/ECF p. 16). Primus' onsite testing would require the presence of employees and consultants from Arizona, Colorado, Georgia, Florida, and Virginia, all of whom were subject to stay at home orders by their states of residence, (Filing No. 49-1, at CM/ECF p. 37), along with employees and consultants in Canada and Europe who were prohibited from travelling to the United States. (Filing Nos. 49-1, at CM/ECF p. 37; 49-3, at CM/ECF pp. 34-36). In addition, between March 23 and April 13, 2020, Primus still lacked information as to how the software contributed by empirical interacted with the subsystems contributed by Swisslog.

---

[3]    See,    https://siouxcityjournal.com/news/local/govt-and-politics/dakota-county-courthouse-temporarily-closes-due-to-covid-19/article_be375f16-eb5f-560e-a208-a4f4aac85561.html

On April 4, 2020, empirical again stated Primus could conduct onsite testing the week of April 6, assuring Primus that empirical would "make every accommodation to ensure that the testing is done consistent with social distancing." (Filing Nos. 61-29, at CM/ECF p. 16; 59-6, at CM/ECF pp. 32-33). On April 11, 2020, empirical offered to assist Primus in conducting integrated testing from a remote platform, presumably in recognition of the health and safety concerns raised by the pandemic. (Filing No. 49-1, at CM/ECF p. 36). While Primus and its consultants were considering the possibility of remote integrated testing between April 11 and 13, empirical rescinded its offer to allow remote testing and affirmed that it was proceeding with removal of the ASRS System on April 14, 2020. (Filing No. 49-1, at CM/ECF p. 36).

Knowing Primus had not yet completed its onsite testing, empirical began to dismantle the ASRS System on April 14, 2020. empirical removed several pallet conveyors and other equipment beginning on April 14, 2020, placing everything removed in large storage containers.[4]

empirical did not consider the pandemic to be a valid reason for failing to perform the site inspection before April 13, 2020 because neither Primus nor Swisslog were under executive orders that prevented them from conducting business and traveling: Construction activities, like legal services and food service, were identified as "essential services." (Filing No. 61-8, at CM/ECF p. 5). In support of this claim, empirical cites Swisslog's April 22, 2020 website which noted its people "stood on the front lines of critical supply chains." (Filing No. 61-27, at CM/ECF p. 3).

---

[4] empirical paid over $23,000 for four storage containers purchased outright. It rented five other containers for $140 per month. empirical believes it will need to rent at least two more storage containers as additional equipment is removed. (Filing No. 61-97, at CM/ECF p. 10).

As of April 19, 2020, the number of COVID-19 cases in Dakota, County, Nebraska had doubled in one day.[5] By April 27, 2020, Dakota County, Nebraska was one of the top five counties in the entire United States for per capita rates of COVID-19 infections,[6] with a rate 40 times higher than Douglas County, Nebraska.[7] Tyson Fresh Meats at Dakota City, located two blocks from empirical, shut down production on April 30, 2020, due to the pervasive and deadly spread of COVID-19.[8] On a pro rata basis, Dakota County still far exceeds all other Nebraska counties in the number of COVID-19 infections.[9]

On May 11, 2020, empirical notified Primus and Swisslog that it had finished removing the equipment identified on December 5, 2019, and it intended to remove two pallet cranes in Phase 2 of the dismantling, starting on June 25, 2020. (Filing Nos. 49-1, at CM/ECF pp. 23-24; 59-3; 59-4, at CM/ECF p. 1; 61-29, at CM/ECF p. 17). Primus again requested that empirical and Swisslog assist and cooperate in integrated testing of the subsystems provided by both empirical and Swisslog within the ASRS System. (Filing Nos. 49-1, at CM/ECF pp. 7-8; 61-78; 61-80).

On June 1, 2020, Primus asked empirical to answer the following questions:

1)   What does empirical claim is defective with the ASRS System?

2)   What testing has empirical performed upon the ASRS System?

---

[5] See https://siouxcityjournal.com/news/local/covid-19-count-in-dakota-county-nearly-doubles-sunday-woodbury-also-sees-increase/article_d5f5414e-020c-523b-9224-1216f3ff019c.html. (last visited on August 23, 2020).

[6] https://www.1011now.com/content/news/Nebraska-county-cracks-Top-5-for-highest-rates-of-COVID-19-in-the-US-569997961.html (last visited on August 23, 2020).

[7] https://norfolkdailynews.com/news/dakota-county-among-highest-rates-of-covid-19-in-the-u-s/article_7bb7ae32-898a-11ea-bf5e-e7b4386e028f.html (last visited on August 23, 2020).

[8] https://www.reuters.com/article/us-health-coronavirus-tyson-foods-idUSKBN22C067 (last visited on August 23, 2020).

[9] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html (last visited on August 23, 2020).

3)    What ASRS equipment is being removed and when?

4)    What software interfacing directly, or indirectly, with the ASRS System will be modified, removed, or replaced?

5)    What does iFIX do and how does it interact with the ASRS System?

6)    What is empirical doing with the equipment and software removed from the ASRS System?

([Filing No. 49-1, at CM/ECF p. 9](#)). Primus also asked for copies of:

1)    the ERP, iFIX, WMS(SynQ), and Host DB software and databases;

2)    the transaction and event logs generated by the ERP, iFIX, WMS(SynQ), and Host DB; and

3)    documents defining how iFIX interacts with the ASRS Equipment.

Primus states it needs this information to properly plan, conduct, and evaluate the results of integrated testing of the subsystems within the ASRS System. empirical has sole possession of this information. ([Filing Nos. 49-1, at CM/ECF pp. 9-10](#), 25-26; [61-29, at CM/ECF p. 17](#); [61-83](#)).

empirical responded on June 5, 2020, but Primus was dissatisfied with the responses. As relevant to the pending motion, empirical stated the requested information had already been provided by production of the host database copies, or would be provided only during formal discovery, and empirical had stated all alleged defects within the ASRS System in its Complaint. ([Filing Nos. 49-1, at CM/ECF pp. 10](#), 26, 28; [49-8](#); [61-84, at CM/ECF p. 5](#)).

On June 15, 2020, empirical notified Primus and Swisslog that the pallet crane removal would begin on July 26, 2020, removal of the spiral conveyor would begin on June 20, 2020, and removal of the mezzanine equipment would begin on June 27, 2020. ([Filing Nos. 49-1, at CM/ECF pp. 23-24](#); [49-7](#)). On June 17, 2020, Primus notified empirical that it would seek relief from this court unless empirical

19

provided the information requested and thereafter allowed Primus to complete integrated testing before empirical continued to dismantle the ASRS System. (Filing Nos. 49-1, at CM/ECF p. 10; 61-93). empirical conceded, agreeing it would not resume dismantling of the ASRS System until the parties could discuss the issues. (Filing Nos. 49-1, at CM/ECF p. 10, 23-24; 49-5, at CM/ECF p. 3).

During the meet and confer sessions held on June 25 and 26, 2020, empirical indicated the start date for the pallet crane removal was now extended to August 2, 2020; the spiral conveyor would be removed in two weeks (mid-July), and the server hosting the WMS(SynQ) was being repurposed. (Filing No. 49-1, at CM/ECF pp. 10, 23-24; 49-8, at CM/ECF p. 3). Counsel for Primus explained it needed expedited disclosure of information and materials within the possession of empirical because empirical will have removed substantial parts of the ASRS System before the start of formal discovery. Counsel for both Primus and Swisslog requested copies of tests, opinions or reports rendered by consultants or experts retained by empirical, so that their findings could be investigated, evaluated, validated, or refuted before the ASRS System is further dismantled. Counsel for Swisslog requested information as to how the iFIX software tracks inventory that is moved from empirical's meat processing facility into the warehouse and from the warehouse into empirical's meat processing facility. (Filing Nos. 49-1, at CM/ECF p. 11; 59-6, at CM/ECF pp. 3-5). Counsel for empirical indicated they would reconsider the requests made by Primus on June 1, 2020 and provide empirical's position as to each request. (Filing No. 49-1, at CM/ECF p. 11).

On July 7, 2020, empirical sent a letter identifying the following 37 alleged defects within the ASRS System:

➢ The ASRS system is defective in failing to properly, reliably, and consistently induct, store and/or retrieve raw materials and/or finished

20

product to fulfill production or sales orders. This includes but is not limited
to:

- Cases not being properly conveyed from induction or production to
  the mini-load cranes.
- The mini-load cranes not being able to deliver cases to the fresh
  storage racks.
- The mini-load cranes not being able to retrieve cases from the fresh
  storage racks.
- Cases not being properly conveyed from the mini-load cranes to the
  production line.
- Cases not being properly conveyed from production to the goods-to-
  man station for palletizing.
- The large freezer cranes not being able to deliver pallets to the frozen
  storage racks.
- The large freezer cranes not being able to retrieve pallets from the
  frozen storage racks.
- Pallets not properly being conveyed to or from the area for transport
  to the blast freezer.
- Cases not properly being conveyed from induction to the production
  line.
- Throughput for induction, storage and retrieval of product.

➢ The ASRS system has a variety of components, machinery and/or
equipment that are defective. These components either do not work
properly individually, or do not work properly in combination with one
another, such that they made induction problematic. We believe there
are both software defects and mechanical defects associated with the
function of these components with one another, including but not limited
to:

- Photo eyes at the induction area.
- Justification rollers at induction area.
- Light curtain at induction area.
- Hydraulic lift at induction area.
- Pallet stacker.
- Suction device at the mezzanine.
- Pallet conveyors at induction area.

➢ The ASRS system has a variety of components, controls and/or equipment that are defective in that each does not work properly to allow the reliable and consistent storage and/or retrieval of cases and/or pallets in and out of the fresh and frozen storage racks, including but not limited to:

- Throughput for induction, storage and retrieval of product.
- Mini-load and large freezer cranes not operating properly, and many not even functioning. For example, the mini-load and freezer cranes would regularly go into an error state while storing or retrieving cases/pallets.
- Mini-load cranes improperly going into warm-up mode and inhibiting throughput.
- Case conveyors not operating properly. For example, cases are improperly sent to the reject destination, and/or cases get stuck at multiple locations on the case conveyors throughout the system.

➢ The ASRS system has a variety of components, controls and/or equipment that are defective in that each does not work properly, reliably, and consistently to allow the palletizing of cases, including but not limited to:

- Non-functioning palletizer.

22

- Not properly wrapping pallets and not processing the pallets at an acceptable throughput.

➢ The ASRS system is defective in the SynQ software failing to properly capture and track data related to raw materials or finished product that is either inducted or retrieved from the fresh and frozen storage racks. This includes but is not limited to:

- SynQ does not process product labeled with non-GS1 Standard labels.
- SynQ does not properly process case information resulting in "UFOs" in the system, and does not properly communicate to the user the reason why a case is inducted as a UFO.
- SynQ makes it unreasonably difficult for a user to remedy a UFO in the system.
- SynQ does not properly identify and/or enunciate errors related to cranes.
- SynQ does not properly identify and/or enunciate errors related to case conveyors.
- SynQ does not properly and/or consistently maintain inventory data integrity.
- SynQ does not properly execute database maintenance functionalities.
- These issues with SynQ result in the system failing to properly automate and interact with the equipment used to induct, store and retrieve raw materials and finished product.

➢ The ASRS system is defective in its overall design in failing to function to meet the specification requirements and certain performance criteria, including but not limited to:

23

- Throughput for induction, storage and retrieval of product.
- Induction of raw material product cases with non-GS1 Standard labels.
- Pairing of raw material product cases via the mini-load cranes for storage and retrieval.
- Pairing of finished product cases via the pairing station for storage.
- Ability to perform simultaneous operations, such as induction and production processes.
- Ability to run the ASRS system through the Swisslog HMI exclusively, as opposed to needing to manually manipulate the system to complete certain functions.

(Filing No. 61-85, at CM/ECF pp. 4-7). empirical reserves and maintains all rights under the Federal Rules of Civil Procedure. (Filing No. 61-85, at CM/ECF p. 7).

Primus claims this extensive list was not disclosed to Primus before the contract was terminated and goes significantly beyond the 19 alleged defects outlined within the Complaint. (Filing Nos. 61-85; 63-2, at CM/ECF p. 14; 63-3, at CM/ECF pp. 9-10). empirical states the 37 itemized defects are not new; that it has merely provided further detail as to the allegations in its Complaint.

empirical advised Primus and Swisslog that the ERP and iFIX programs will remain in the Facility. Pointing out that iFIX does not create orders, empirical explained, in general terms, that empirical's software creates production orders by creating boxes or cases, applying label information generated in a PLC, and passing the boxes to a label printer and to a SQL database. The information about each case in the SQL database can be viewed on a screen in iFIX. (Filing No. 49-1, at CM/ECF pp. 27-28). empirical further stated:

Swisslog should be fully aware of the way in which these systems interact. Specifically, Steven Doster, Ted Graham, and Steve Thorn were heavily involved in discussions regarding iFix, as well as several other Swisslog employees. There are also architecture documents publicly available on iFix that Primus and Swisslog can utilize to better understand the system.

(Filing No. 61-85, at CM/ECF p. 9).

Primus states empirical's July 7, 2020 response is insufficient: Primus is not Swisslog, Swisslog is the opposing party as to the Third-Party Complaint, and Primus cannot ask Swisslog's employees to answer its questions without the consent of Swisslog's counsel. Primus further states that empirical's response does not explain how ERP and iFIX contribute to the operation and functionality of the ASRS System, (Filing No. 49-1, at CM/ECF p. 27), and although empirical produced a drawing on July 7, 2020, claiming it shows the "architecture of how these various systems interact," the drawing identifies ERP but does not identify iFIX or otherwise identify how iFIX contributes to the system architecture. (Filing No. 49-1, at CM/ECF p. 29).

As to disclosure of its expert's opinions, empirical explains that after Primus and Swisslog completed their inspections and testing, empirical conducted its own testing of the ASRS System to see if cases and pallets could properly be introduced into the racks, stored, and retrieved from the racks. It has preserved the databases from that testing and will provide copies of the underlying data, but it will not provide an expert report except when required during formal discovery, and it will not be producing any attorney work product at this time. (Filing Nos. 49-1, at CM/ECF pp. 21-22; 61-85, at CM/ECF p. 7). Primus responds that at the pace of the current dismantlement of the ASRS System, nothing will be left to test once the reports are disclosed.

On July 7, 2020, empirical provided additional copies of the relevant databases, and it provided copies of the SynQ application server on July 9, 2020. (Filing No. 61-29, at CM/ECF p. 19). It stated the spiral conveyor will be removed starting July 15, and the two pallet cranes and mezzanine equipment will be removed the last week of July. The date for repurposing the host server is unknown. (Filing No. 49-1, at CM/ECF pp. 23-24).

Swisslog claims the ASRS System is substantially complete, the equipment and software it provided function properly, the ASRS System performs in accordance with its design, and the ASRS System would be fully operational but for empirical's refusal to allow Swisslog to debug and commission the ASRS System. (Filing No. 49-1, at CM/ECF p. 3).

Primus has retained Third Stage Consulting Group ("Third Stage") to evaluate the software systems (including empirical's) that are integrated within or communicate with the ASRS System, and the alleged defects within the ASRS System that have been identified to date by empirical. (Filing Nos. 49-2, at CM/ECF p. 2; 63-1, at CM/ECF p. 2). Third Stage specializes in the selection, validation, implementation, evaluation, investigation, integration, trouble shooting, and digital transformation of ERP software systems used throughout various manufacturing, warehousing and industrial environments. (Filing No. 63-1, at CM/ECF p. 2).

Third Stage states that end-to end testing is critical to a proper investigation and evaluation of the alleged defects within the ASRS System because such testing will either: 1) establish the ASRS System functions and operates as designed when all subsystems are integrated together, or 2) identify what, where and why faults are occurring among the integrated subsystems. An error or defect in any subsystem can cause cascading errors or failures that system and in other systems. End-to-end testing will identify whether and to what extent empirical is

responsible for any alleged defects within the operation and functionality of the ASRS System at the Facility. ((Filing Nos. 49-1, at CM/ECF p. 5; 49-2, at CM/ECF p. 8).

ANALYSIS

Primus requests an injunction to halt further dismantling of the ASRS System until Primus can complete a third onsite inspection of the Facility and perform end-to-end testing of the software subsystems in the existing digital environment. To facilitate that inspection, it requests written responses to questions and production of documents. Primus argues that a further inspection may reveal: 1) whether the alleged defects identified by empirical truly exist, or whether the ASRS System operates and functions as designed; 2) if the alleged defects identified by empirical do exist, whether they are attributable to problems within the subsystems for which empirical is responsible, or within subsystems for which Swisslog is responsible; and 3) if alleged defects identified by empirical are found to exist within a subsystem of the ASRS System, what the costs would be to remedy the defect (without regard to responsibility) compared to the cost of fully replacing the ASRS System (Filing No. 49-1, at CM/ECF pp. 3-4). As described by Primus, its investigation will include:

1) understanding how the Swisslog and empirical subsystems interact with the integrated ASRS System;

2) obtaining and preserving exact copies of software that empirical and Swisslog contributed, used during all prior testing, and resides on the empirical servers;

3) planning proper testing (whether end-to-end or targeted testing) based upon the alleged defects empirical identifies;

4)      preparing test scripts that identify the proper flow of data through the subsystem for the applicable test, including whether the input of data produces the proper anticipated output; and

5)      conducting the proper testing to either validate or refute the alleged defects empirical has identified.

(Filing No. 62, at CM/ECF p. 13).

Primus states empirical's hasty dismantling of the ASRS System has and continues to prejudice Primus' ability to defend this lawsuit. Primus explains that if the dismantling continues, the ability to conduct end-to-end testing will no longer be possible and Primus' ability to investigate and evaluate alleged defects within the ASRS System will be lost forever. (Filing Nos. 49-2, at CM/ECF p. 9; 49-2, at CM/ECF p. 9). As relevant to the matters currently before me, Primus argues that empirical should have:

1)      identified all alleged defects within the ASRS System long before July 7, 2020,

2)      disclosed all testing, findings and opinions, whether from a consultant or expert, that identified any alleged defects,

3)      notified Primus as to what ASRS equipment would be ripped out and when, so that proper and logical planning could take place,

4)      provided information and materials required to analyze the software systems that empirical contributed to the ASRS System, and

5)      released information and materials required for integrated testing of the subsystems within the ASRS System, whether such subsystems were contributed by empirical or Swisslog.

(Filing No. 49-1, at CM/ECF pp. 40-41).

empirical objects to entry of an injunction to halt the dismantling the ASRS System, arguing its inability to promptly replace the nonoperational ASRS System will further harm its business. empirical states the ASRS System is nonoperational,

28

incomplete, defective, and must be replaced, and that Primus, who designed and constructed the Facility, is responsible for all costs associated with removal and replacement of the ASRS System designed and installed by Swisslog. empirical states that until that replacement occurs, raw materials and finished goods that were supposed to be stored in the Facility must now be stored elsewhere. empirical claims it is incurring costs totaling $564,000 per month for storage and product management services the Facility was intended to provide. empirical states that since November 2019, it has incurred approximately $4,512,000 in costs that would have been avoided had the Facility been functional. (Filing No. 61-97, at CM/ECF pp. 3-7). empirical further claims it must proceed quickly with dismantling, explaining that Westfalia must install its new freezer cranes during the next 30 days to avoid a two- to three-month delay for completion of phase one of the replacement project. (Filing No. 61-97, at CM/ECF p. 7).

empirical argues additional early discovery is not warranted under the facts presented and that Primus is not entitled to a third onsite inspection for end-to-end testing because it had already had a chance to perform such testing and it chose not to. empirical further argues that Primus cannot credibly argue that before scheduling end-to-end testing, it needed or needs information regarding the empirical and Swisslog software within and connecting to Swisslog's ASRS System, along with transaction and event logs. (Filing No. 60, at CM/ECF pp. 31, 33, 42).

A. Standard of Review

1)      Preliminary Injunction.

"Courts in the Eighth Circuit apply the factors set forth in Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc), when determining

29

whether to issue a preliminary injunction or temporary restraining order." Farm Credit Services of America, FLCA v. Mens, 2019 WL 285962, at *3 (D. Neb. Jan. 18, 2019) (slip copy). "Those factors are: '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" Id. (quoting Dataphase, 640 F.2d at 114). "No single factor is determinative." Id. (quoting WWP, Inc. v. Wounded Warriors, Inc., 566 F. Supp. 2d 970, 974 (D. Neb. 2008)).

The Supreme Court has held that a preliminary injunction is appropriate to grant relief of the "same character as that which may be granted finally." De Beers Consol. Mines v. U.S., 325 U.S. 212, 220 (1945). A court may not issue an injunction in "a matter lying wholly outside the issues in the suit." Id. "[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994). When resolution of the motion before the court "has nothing to do with the merits of the underlying controversy," it renders the Dataphase factors "inapposite" and the court need not apply them as it would in a traditional TRO analysis. Nw. Airlines, Inc. v. Am. Airlines, Inc., 989 F.2d 1002, 1004 (8th Cir. 1993). "The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of plaintiff's suit[.]" 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.3 (3d ed. 2008).

The current motion does not lend itself to a traditional Dataphase analysis. Per the above, preliminary injunctions seek relief "of the same character" the moving party wants the court to, in the end, permanently enjoin or enforce. Parties seeking preliminary injunction argue that they will be irreparably harmed if certain activity continues during the pendency of the underlying case and that the court

should preliminarily enjoin the alleged wrongful behavior while the parties prepare for a final ruling on the same conduct. Stated another way, a motion for preliminary injunction asks for the relief requested in the moving party's complaint while the case is pending.

"That situation does not exist here," as noted by Primus. (Filing No. 48 at CM/ECF p. 38). Primus does not seek to permanently enjoin empirical from any conduct. Rather, it seeks "the opportunity to obtain the expedited disclosure of information and material" which it believes it needs to support its defense to empirical's claims. (Id). Because this relief is of a different character than the ultimate substantive issues to be resolved, the court cannot effectively evaluate the "probability that movant will succeed on the merits," as required by the third Dataphase factor.

While labelled a motion for temporary restraining order and preliminary injunction, the court need not resolve the pending motion under that standard. The court is permitted to read the parties' briefing and recharacterize a motion so that it is resolved based on the actual relief requested and on a standard of review appropriate for that relief. See Am. Airlines, Inc., 989 F.2d at 1004 (rejecting movant's characterization of the pending motion as a TRO, declining to apply the Dataphase factors, and resolving the motion as pursuant to the "first-filed" action rule).

The court finds that Primus' request is more properly understood as a discovery motion. The court often deals with the need for early access to, preservation of, and testing on, important physical evidence. As a result, magistrate judges often issue proscriptive or permissive orders that require a party to provide demanded access to physical evidence. Monsanto Co. v. Woods, 250 F.R.D. 411, 413 (E.D. Mo. 2008) (granting request for expedited discovery in order

to perform testing on defendant's seed and crop residue where plaintiff showed that there was a spoliation risk); Pod-Ners, LLC v Northern Feed & Bean of Lucerne Ltd. Liability Co., 204 F.R.D. 675, 676 (D. Colo. 2002) (granting a motion to expedite discovery to allow for the inspection, sampling and testing of defendant's field beans); Antioch Co. v. Scrapbook Borders, Inc., 210 F.R.D. 645, 651 (D.Minn. 2002) (granting a motion to expedite discovery when a party requested expedited discovery to obtain and review data on a computer hard drive and the evidence suggested that the relevant data could be irretrievably overwritten with the passage of time). The court need not issue a formal injunction where the requested relief is available as a standard discovery directive. "Injunctive relief is not normally available in aid of or in lieu of discovery under Rule 34, Federal Rules of Civil Procedure." Humble Oil & Ref. Co. v. Harang, 262 F. Supp. 39, 44 (E.D. La. 1966); see also Jones v. Louisiana, No. CV 15-01816, 2016 WL 4059547, at *2 (W.D. La. June 17, 2016), report and recommendation adopted, No. CV 15-01816, 2016 WL 4059551 (W.D. La. July 28, 2016); It's A 10, Inc. v. Beauty Elite Grp., Inc., 932 F. Supp. 2d 1325, 1335 (S.D. Fla. 2013).

In sum, because the court finds that the issues raised are non-dispositive civil discovery issues, the undersigned will resolve this motion as a pretrial discovery matter governed by the Federal Rules of Civil Procedure, and will issue an order pursuant to the authority granted in 28 U.S.C.A. § 636.

2)      Expedited Discovery.

In this case, the parties have been engaged in early discovery – that is, discovery performed before the court has required a Rule 26(f) meeting and entered a formal discovery schedule. empirical moved to dismiss Primus' counterclaim on February 27, 2020. (Filing No. 34). Swisslog moved to dismiss Primus' third-party claims on March 9, 2020. (Filing No. 37). Due to those pending

motions, and the uncertainty regarding which claims will survive the 12(b)(6) motion process, the court has not, to date, required a Rule 26(f) meeting and report and has not entered a case progression schedule.

While in general, a party "may not seek discovery from any source" until the parties have conferred as required by Rule 26(f), (Fed. R. Civ. P. 26(d)), a party may request expedited discovery by demonstrating "good cause." See, e.g., Coram, Inc. v. Jesus, 2010 WL 584000, at *1 (D. Neb. Feb. 11, 2010); Strike 3 Holdings, LLC, v. Doe, 2018 WL 4210202, at *2 (D. Minn. Sept. 4, 2018); Nilfisk, Inc. v. Liss, 2017 WL 7370059, at *7 (D. Minn. June 15, 2017); Oglala Sioux Tribe v. Van Hannik, 298 F.R.D. 453, 455 (D.S.D. 2014); Mertitain Health, Inc. v. Express Scripts, Inc., 2012 WL 1320147, at *1 (E.D. Mo. Apr. 17, 2012); see also Progressive Cas. Ins. Co. v. F.D.I.C., 283 F.R.D. 556, 557 (N.D. Iowa 2012) ("[A] majority of courts use the good cause standard.").

Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery outweighs prejudice to the responding party. Progressive, 283 F.R.D. at 557 (quoting Monsanto, 250 F.R.D. at 413). Courts commonly consider the breadth and timing of the requests, their purpose, and the burden on the responding party. Id.

Motions for expedited discovery are typically granted if the requests are narrowly tailored. See, e.g., Express Scripts, Inc., 2012 WL 1320147, at *1 (expedited discovery granted when discovery needed was not overly burdensome); Nilfisk, 2017 WL 7370059, at *7 (noting that expedited discovery must be reasonable); St. Louis Group, Inc. v. Metals & Additives Corp., Inc., 275 F.R.D. 236, 240 (S.D. Tex. 2011) (finding that the discovery "should be narrowly tailored in scope.") Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 277 (N.D. Cal. 2002) (discovery requests were considered narrowly tailored where

Defendants' representative was not subjected to a "free ranging deposition"). Upon a sufficient showing of good cause, the court may allow the requesting party to obtain discovery in any traditional form. Wachovia Sec., L.L.C. v. Stanton, 571 F. Supp. 2d 1014, 1050 (N.D. Iowa 2008) (allowing expedited interrogatories and depositions); Monsanto, 250 F.R.D. at 413 (allowing expedited document production requests and expedited requests for physical samples); see also Fed. R. Civ. P. 26(d)(3)(A) (noting that the "methods of discovery may be used in any sequence").

### B.    Primus' Expedited Discovery Requests

1)    Third Onsite Inspection: "End-to-End" Testing.

Primus argues that it needs end-to-end testing to figure out if and why the four subsystems of the ASRS System are not working together as designed. It states that during the past two inspections, it tested the subsystems. Having concluded that three of the four are working properly, it now asks to see how those subsystems work as part of the ASRS System as a whole. empirical argues an additional inspection should not be granted because Primus has already been afforded this opportunity and therefore cannot meet its burden of showing a need, and any further inspection will unduly burden empirical's business.

empirical served its complaint with waiver of service on November 8, 2020, and it announced it had contracted with Westfalia to replace the system on November 22, 2020. It notified Primus to perform any inspection of the facility for litigation purposes by December 8, 2020 because dismantling would begin on December 9, 2020—nearly a month before Primus' answer was due and before Swisslog was a party. empirical then extended the start of dismantling to mid-January at Primus' request, and it granted Primus another opportunity for

inspection in early February. Both Swisslog and Primus attended both inspections, and Swisslog apparently performed an end-to-end inspection (to the extent allowed) during the February site inspection. empirical states Primus should have performed its end-to-end testing during these inspection times and cannot be afforded yet another chance to inspect.

empirical was willing to allow a third inspection—provided it occurred between March 23 and April 13, 2020, while COVID-19 exposure rates were rapidly escalating to nationally recognized heights in Dakota County, Nebraska. Yet, empirical states the pandemic provides no excuse for Primus' failure to perform the inspection during that timeframe because food services, like legal services, are "essential" and were never shut down. The court notes that the Nebraska federal district court was closed for in-person hearings during that time and it continues to hold both criminal and civil hearings remotely when possible.

There is nothing in the record explaining why empirical's desire to quickly dismantle the ASRS System should require Primus' experts and lawyers to risk exposure to COVID-19 during travel to and from, and while in, Dakota County, Nebraska during the escalating pandemic. But empirical nonetheless proceeded with dismantling a portion of the ASRS System on April 14, 2020. The dismantled portion is now in storage. Primus can now perform some, but not all, of the end-to-end testing it requested on February 13, 2020.

Then, on July 7, 2020, empirical sent Primus a list of 37 alleged defects in the ASRS System, most likely derived from the inspection done by its own expert(s) in late February. While empirical observed and video recorded all onsite testing done by Primus and Swisslog, Primus and Swisslog were not notified of, and did not observe or record, the testing done by empirical's expert(s). Primus states the list of 37 alleged defects far exceeds the scope of defects outlined in

the Complaint, or even reported to Primus before empirical terminated the construction contract. empirical states the listing of 37 defects merely expands upon the allegations within the Complaint. Upon comparison of the lists, I agree with Primus. And even if I assume everything in the 37-item list fits under at least one of the 19 categories of defects in the Complaint, Primus and Swisslog were entitled to a notice, with specificity, of the alleged defects before empirical began dismantling the ASRS System.

Under the totality of these circumstances, the court finds that Primus has shown a need for further onsite testing, particularly considering the 37-item list of alleged defects disclosed in June and empirical's demonstrated intent to dismantle and replace the ASRS System before formal discovery begins. While empirical claims it will be burdened by further delay if the court allows another inspection, as evident by its submissions to the court, empirical is able to quantify those damages and no doubt intends to request recovery for those damages as part of this lawsuit. Thus, I do not find its burden sufficient to overcome the prejudice to Primus if Primus cannot do end-to-end testing, to the extent still possible, before empirical fully dismantles the ASRS System at issue in this litigation.

The court will grant Primus' request to perform end-to-end testing, with Swisslog's assistance, as expedited discovery in this case. To that end, empirical will be ordered not to dismantle any more of the ASRS System before the end-to-end testing is done.

2)      Pre-Inspection Production of Documents and Answers to Questions

Primus requests, as expedited discovery:

- The identity of all alleged defects within the various subsystems of the ASRS System with sufficient documentation to effectively analyze and, where possible, reproduce each defect related to the alleged failures.

- Information regarding the methodology and results obtained during end-to-end testing performed by empirical upon the ASRS System, including any testing that identified alleged defects with sufficient documentation (such as test scripts, scenarios, conditions, prerequisites, data inputs, data outputs, expected results, and actual results) to effectively and reliably analyze the comprehensiveness and quality of the testing.

- The components and equipment within the subsystems of the ASRS System that have been removed and are to be removed as well as when such removal is scheduled to occur by piece of equipment and the date of planned removal.

- The identity of all modifications to the ERP, iFIX, WMS(SynQ) or HOSTDB that have been made since March of 2019 as well as any system which will be modified, removed or replaced in the near future.

- Information regarding what iFIX does and how it interacts with other subsystems within the ASRS System.

- Information regarding the location and storage conditions regarding the equipment and software removed from the ASRS System.

- Recent copies of the ERP, iFIX, WMS(SynQ) and the HOSTDB, that interface either directly, or indirectly with the ASRS System and control its operation and functionality.

- Copies of transactional data and event logs from the ERP, iFIX, WMS(SynQ) and Host DB.

- Copies of materials that identify the connectivity between iFIX and the ASRS Equipment.

(Filing No. 49-2, at CM/ECF pp. 9-10). Primus' expert states he needs this information before performing end-to-end testing. Primus presented iterations of these questions and requests to empirical on June 1, 2020. (Filing No. 49-1, at CM/ECF pp. 9-10). Primus' counsel also requests disclosure of empirical's schedule for removing or repurposing the software, components, and equipment within the ASRS System. (Filing No. 49-1, at CM/ECF p. 25, ¶ 57).

empirical argues Primus does not need this information. (Filing No. 60, at CM/ECF pp. 43-44). empirical claims Primus already has or should have this information as evidenced by the fact that it did not request the information until June 2020. (Filing No. 60, at CM/ECF p. 42). It argues that Primus had sufficient familiarity with the ASRS and its defects before empirical terminated the contract. (Filing No. 60, at CM/ECF pp. 43, 46). It has received copies of the databases, and therefore does not need copies of the software, transactions, or event logs. (Filing No. 60, at CM/ECF pp. 51, 53-56). empirical states the data, reports and opinions from the testing done by its consulting expert(s) is work product and therefore cannot be compelled. (Filing No. 60, at CM/ECF pp. 46-48). Finally, it argues the requests are "more appropriately flushed out later during the course of ordinary discovery." (Filing No. 60, at CM/ECF pp. 43-44, 46).

a)   Dismantling schedule.

Contrary to empirical's argument, (Filing No. 60, at CM/ECF p. 49), Primus is not asking for the right to inspect the ASRS System every time something is removed from it. But the court agrees that Primus need not be told empirical's intended schedule for dismantling the ASRS System. Since pursuant to this order, the ASRS System will not be further altered until Primus' inspection is complete, Primus need not know the schedule thereafter.

b)    List of defects.

Primus' expert requests the "identity of all alleged defects within the various
subsystems of the ASRS System with sufficient documentation to effectively
analyze and, where possible, reproduce each defect related to the alleged
failures." ([Filing No. 49-2, at CM/ECF p. 9](#), ¶ 31). Citing page 17 of Primus' brief,
empirical responds that "Primus' request for further details and the root cause of
the alleged defects should be denied as unreasonable, prejudicial and overly
burdensome." ([Filing No. 60, at CM/ECF p. 44](#)). Upon review of cited page of
Primus' brief, I see nothing asking empirical to explain the root cause of any alleged
defect.

Primus is asking for a listing of the known defects, with specificity, so it can
assure it performs onsite testing focused on the alleged defects. empirical states
that it "has already identified defects in the Complaint to give Primus adequate
notice." ([Filing No. 60, at CM/ECF p. 44](#)). "empirical's description of the defects in
the Complaint told Primus everything it needed to know to conduct its tests." ([Filing
No. 60, at CM/ECF p. 45](#)). "Primus already knows a great deal about the defects
with the ASRS and will receive more information during the course of formal
discovery." ([Filing No. 60, at CM/ECF p. 46](#)). "empirical already provided additional
detail on defects on July 7, 2020—in response to a request first made in June."
([Filing No. 60, at CM/ECF p. 46](#)). And Primus is "essentially asking for an expert
report," which empirical cannot provide at this time. ([Filing No. 60, at CM/ECF pp.
46-47](#)).

The court agrees that empirical provided additional information on July 7,
2020. But as I previously stated, that additional detail expanded the list of defects
beyond those outlined in the Complaint. Moreover, upon careful reading, empirical
is not stating that the July 7 letter lists all known defects. empirical's brief states:

The additional details provided by empirical are <u>some</u> of the reasons that the ASRS could not achieve satisfactory test results, provisional acceptance, and taking-over under the Base Contract. They are <u>some</u> of the reasons Primus failed to obtain substantial completion and Swisslog failed to complete the scope of work required by the Base Contract and provide an operational system.

([Filing No. 60, at CM/ECF p. 46](#)) (emphasis added). empirical's language indicates it is aware of more alleged defects than those recited in the July 7, 2020 letter. It needs to identify all the known defects. The burden of doing so does not outweigh its likely benefit. If empirical intends to raise an alleged defect at trial, it will have to disclose it at some point—either now or during formal discovery. Because it intends to dismantle the alleged defective system, it must make that disclosure before any further dismantling occurs so that Primus and Swisslog can inspect the facility and thereby be afforded a fair opportunity to defend against the allegations.

   c)      Testing and opinions of empirical's consulting expert(s)

Primus requests:

Information regarding the methodology and results obtained during end-to-end testing performed by empirical upon the ASRS System, including any testing that identified alleged defects with sufficient documentation (such as test scripts, scenarios, conditions, prerequisites, data inputs, data outputs, expected results, and actual results) to effectively and reliably analyze the comprehensiveness and quality of the testing.

([Filing No. 49-2, at CM/ECF p. 10](#)). It also requests copies of the opinions, or reports rendered by consultants or experts retained by empirical. ([Filing No. 49-1, at CM/ECF p. 11](#), ¶ 31).

Trial preparation materials are protected from disclosure by Fed. R. Civ. P. 26(b)(3) and Hickman v. Taylor, 329 U.S. 495 (1947).[10] Such materials may, however, be subject to discovery if the party seeking discovery has a "substantial need" of the materials and cannot acquire the equivalent information without undue hardship.

If empirical wants to delay further dismantling of the ASRS System until expert disclosures are due during formal discovery, it may continue to withhold the expert's testing data and methodology until it decides who its testifying expert will be, discloses that expert and the basis for his or her opinions, and allows Primus and Swisslog to perform further testing. The court will not compel empirical to produce its expert information so long as the ASRS System remains, without any further dismantling, available to Primus and Swisslog for additional testing after they obtain that information through formal discovery. But as it appears that empirical wants to proceed with removing the ASRS System prior to its formal expert disclosure deadline and prior to the subsequent testing to be conducted by Primus and Swisslog, the court must consider the exception to work product protection set forth in Rule 26 (b)(4)(D)(ii) of the Federal Rules of Civil Procedure.

Under Rule 26(b)(4)(D), facts and opinions of non-testifying, consulting experts are shielded from discovery, except upon a showing of exceptional circumstances. Exceptional circumstances exist:

> when it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by any other means; the object or condition at issue is destroyed or has deteriorated after the non-

---

[10] The court notes that empirical observed and video recorded all testing done by Primus and Swisslog. That testing was done with the databases for all subsystems connected and with all data used for testing and obtained during that testing stored on those databases. As such, with the exception of the expert reports and opinions, empirical has in its possession much of the same type of information it now withholds from Primus and Swisslog pending formal discovery.

testifying expert observed it but before the moving party's expert has an opportunity to observe it; or when it is possible to replicate the non-testifying expert's discovery, but the costs would be judicially prohibitive.

McBeath v. Tucson Tamale Co., 2017 WL 3118779, at *6 (D. Ariz. July 21, 2017) (citing Higher One, Inc. v. Touchnet Information Sys., 298 F.R.D. 82 86-87 (W.D.N.Y. Feb. 24, 2014).[11]

The parties agree that the ASRS System was uniquely designed for empirical, and it includes both proprietary Swisslog software and software owned by empirical and customized to its needs. Primus and Swisslog cannot perform tests on the ASRS System at any location other than empirical's Facility. If the ASRS System is fully dismantled before expert disclosures are due and served during formal discovery, the experts for Primus and Swisslog will not be able to test and either verify or refute the results obtained by empirical's expert(s) as to the previously undisclosed defects, or to test potential curative measures based on a full understanding of the ASRS System's end-to-end operation. In other words, it will be impossible for Primus (and Swisslog) to verify or refute empirical's testing methodology and results after the remaining components of the ASRS System are removed.

Assuming empirical wants to dismantle the ASRS System before expert disclosures are due and served in the ordinary course of litigation, Primus and

---

[11] Most case law on the "exceptional circumstances" exception discusses disclosure of consulting opinions and facts to level the playing field after a party has unilaterally destroyed crucial evidence. This case presents an odd twist. The question before this court is whether exceptional circumstances currently exist because empirical will dismantle of the ASRS System absent a court order prohibiting that conduct. Thus, empirical controls the outcome of the exceptional circumstances issue: empirical's anticipated and intentional dismantling of the ASRS System before Primus and Swisslog finish their inspections will cause the exceptional circumstances.

Swisslog have shown a substantial need for the testing data collected by empirical's experts, and exceptional circumstances warrant ordering the disclosure of the testing data work product of Plaintiff's consulting expert(s). Such information includes transaction and event logs identifying error messages recorded during the testing; a description of the resources (people, material, equipment, etc.) used or involved in the testing; details of the tests conducted, including any master data such as material numbers, customer or supplier number, equipment ID, IP address, etc., and details as to what happened during the test in terms of expected versus unexpected results. (Filing No. 63-1, at CM/ECF p. 4). This information, along with the results obtained during end-to-end testing performed by empirical, including "any testing that identified alleged defects with sufficient documentation (such as test scripts, scenarios, conditions, prerequisites, data inputs, data outputs)," (Filing No. 49-2, at CM/ECF p. 9), must be disclosed before further dismantling so that Primus can further inspect the ASRS System to effectively and reliably analyze the defect allegations raised by empirical and the comprehensiveness and quality of the testing performed by its experts. See Fed. R. Civ. P 26 (b)(4)(D)(ii).

However, I am not convinced that Primus and Swisslog are currently entitled the name of empirical's consulting expert(s) or the expert reports and opinions.[12] As with protocols governing destructive testing, if each party is allowed to fully test the ASRS System, and review (in that case, by personal observation and perhaps interaction) the other party's testing methodologies, data, and results, expert

---

[12] empirical must, however, disclose in detail a full and thorough listing of all defects it intends to present at trial, and it must do so before it further dismantles and removes all or part of the ASRS System. As with allegations not raised in response to interrogatories in the ordinary course of discovery, alleged defects that are not disclosed with specificity before dismantling and before Primus and Swisslog have an opportunity to finish their inspection will not be admissible at trial.

reports and opinions need not be disclosed prior to the inspections. See, e.g., White v. Cooper Tools, Inc., 2010 WL 1418244, at *3 (D.S.D. Apr. 6, 2010); Ostrander v. Cone Mills, Inc., 119 F.R.D. 417, 419 (D. Minn. 1988).

In this case, the expedited discovery ordered herein will allow all parties to currently obtain and preserve a factual basis for expert opinions as to the defects identified by empirical before the ASRS System is fully dismantled. That goal can be accomplished without currently disclosing the reports and opinions themselves or identifying the expert.

d)    Software and components information; event and transaction data

In addition to the previously discussed information, Primus' expert states he or she needs to review the following information before performing end-to-end testing:

- A listing of the components and equipment within the subsystems of the ASRS System that have been removed and are to be removed as well as when such removal is scheduled to occur by piece of equipment and the date of planned removal.

- The identity of all modifications to the ERP, iFIX, WMS(SynQ) or host database that have been made since March of 2019 as well as any system which will be modified, removed or replaced in the near future.

- Information regarding what iFIX does and how it interacts with other subsystems within the ASRS System.

- Information regarding the location and storage conditions regarding the equipment and software removed from the ASRS System.

- Recent copies of the ERP, iFIX, WMS(SynQ) and the host database, that interface either directly, or indirectly with the ASRS System and control its operation and functionality.

44

- Copies of transactional data and event logs from the ERP, iFIX, WMS(SynQ) and Host DB

- Copies of materials that identify the connectivity between iFIX and the ASRS Equipment.

(Filing No. 49-2, at CM/ECF pp. 9-10).

As was previously discussed, having concluded that the ASRS System cannot be further dismantled before Primus performs end-to-end testing, I find Primus has no current need to know what equipment and components of the ASRS System will be removed and the future schedule for that removal. I also find Primus has no current need to know about future anticipated modifications, removals, or replacements of the host database or the ERP, iFIX, and WMS(SynQ) software.

As to Primus' remaining requests for early discovery of software, components, event logs and transaction data, empirical argues Primus already has copies of the databases and therefore has already received a source of the information requested. empirical further argues that ERP and iFIX are used for several functions beyond interactions with the ASRS System, and therefore contain confidential information that is wholly irrelevant to this case. empirical argues Primus has already had access to test empirical's software and how it integrates into and communicates within the ASRS System. Finally, it argues Primus can get some of the information from sources other than empirical and should be required to do so.

The court entered a protective order in January 2020, thus both addressing and resolving empirical's concerns over disclosing confidential information.

While empirical claims Primus could buy and examine an off-the-shelf version of iFIX instead of requesting a copy of empirical's iFIX software, empirical

acknowledges that it has used the iFIX software for a decade and has customized it. (Filing No. 60, at CM/ECF p. 53). Primus is entitled to inspect the version interacting with the ASRS System to discern whether that version of iFIX software, with its customizations and any corruptions, is a cause of the defects described by empirical.

As to the Swisslog proprietary software (SynQ) and any event logs for that software, empirical states it does not have a copy of that software or access to the event logs. (Filing No. 60, at CM/ECF p. 56). As with all document requests, empirical cannot produce what it does not and cannot possess.

But in the same vein, empirical strictly controls all possession and access to the software it hosts. While empirical argues that during the prior two inspections, Primus already had access to the servers hosting the three software subsystems controlling the ASRS System, Primus was not previously granted access to any of the software at issue, either during the prior onsite inspections or during installation of the ASRS System. (Filing No. 62, at CM/ECF p. 17).

empirical argues that its production of the database copies dispenses with any need to produce copies of empirical's ERP and iFIX software. Moreover, Primus' underlying knowledge of these systems and access to them during prior testing undermines its claim that it needs the information now. I disagree. Swisslog installed the ASRS System, not Primus. And if anyone, it was Swisslog, not Primus, that assessed the databases during prior testing. While empirical has produced multiple copies of the host and SQL databases, these databases show only the data that has come out of ERP or iFIX. (Filing No. 63-4, at CM/ECF p. 6, ¶ 11). And while the databases may contain software transaction and event logs, the software itself will identify all changes, modifications and updates thereto. Providing the software will dispense with the need for Primus and Swisslog to sift

46

through 2.1 GB of information on the host database, a potential three-week process, to find information that is readily found on the software itself. (Filing No. 62, at CM/ECF pp. 16-17).

   e)    Modifications, location, and storage.

Finally, Primus requests information identifying all modifications to the ERP, iFIX and WMS(SynQ) software or host database that have been made since March 2019, and information regarding the location and storage conditions regarding the equipment and software removed from the ASRS System. The court presumes the March date was chosen because empirical asserts that as of those dates, the ASRS System was not operating correctly.

The purpose of this request is to assure that testing is done on the equipment and software as it existed at or near the time empirical terminated the contract. In addition, disclosing any modifications that were made or that may or have occurred will allow Primus' experts to take those changes into consideration during the testing and when interpreting the testing results. The court will order empirical to fully and thoroughly respond to these requests to the extent it possesses or has access to the information.

CONCLUSION

If empirical intends to further dismantle the ASRS System, expedited discovery is necessary to the extent set forth in this memorandum and order, and empirical cannot further dismantle the ASRS System until that expedited discovery is complete. If empirical believes formal discovery must be pursued first, it must delay additional removal and modification of the ASRS System until the necessary discovery, including expert disclosures, is complete.

47

The court had not entered a scheduling order pending the outcome of two motions to dismiss. But no such motion has been filed as to Plaintiff's Complaint. While the undersigned magistrate judge prefers to avoid Rule 26(f) Reports and progression orders for cases in this posture, empirical is claiming time is of the essence. So, I will begin the scheduling process on Plaintiff's claims against Primus. And I note that many of the documents empirical will need to produce to comply with this order will also be subject to disclosure as part of empirical's mandatory disclosures.

Accordingly,

IT IS ORDERED that Defendant Primus' Motion for Preliminary Injunction, construed as a motion to preserve discovery and for expedited discovery, (Filing No. 47), is granted in part and denied in part as follows:

1)      Primus, along with Swisslog, is permitted to perform an additional onsite inspection, to include end-to-end testing of the ASRS System.

2)      empirical shall not dismantle, remove, or modify any software, databases, components or equipment that are part of, receive data from, or send information to the ASRS System before Primus and Swisslog completes the additional inspection granted under this order.

3)      At least three weeks prior to Primus' and Swisslog's additional onsite inspection, empirical shall serve the following information on Primus and Swisslog:

a)      a full, thorough and detailed listing of all defects it intends to present at trial. Defects that are not disclosed with specificity before further

dismantling or modification of the ASRS System and before Primus and Swisslog have an opportunity to finish their inspection will not be admissible at trial.

b) the information and data related to inspection performed by empirical's consulting expert(s), including transaction and event logs identifying error messages recorded during the testing; a description of the resources (people, material, equipment, etc.) used or involved in the testing; details of the tests conducted, including any master data such as material numbers, customer or supplier number, equipment ID, IP address, etc.; details as to what happened during the test in terms of expected versus unexpected results; and documentation (such as test scripts, scenarios, conditions, prerequisites, data inputs, data outputs) to describe the testing methodology and procedures implemented.

c) a listing of the components and equipment within the subsystems of the ASRS System that have been removed and the date of removal.

d) a listing of all modifications to the ERP, iFIX, WMS(SynQ) or host database that have been made since March of 2019, and the date of those modifications.

e) information regarding what iFIX does and how it interacts with other subsystems within the ASRS System.

f) information regarding the location and storage conditions regarding the equipment and software removed from the ASRS System.

g) recent copies of the ERP, iFIX, and the host database, that interface either directly, or indirectly with the ASRS System and/or control its operation and functionality.

h) copies of transactional data and event logs from the ERP, iFIX, and the host database,

      i)      copies of materials that identify and explain the connectivity between iFIX and the ASRS.

    4)     Primus' request to receive the future schedule of any modifications, removals, or replacements of the ERP and iFIX software, and the databases, components and equipment, that are part of, send data to, or receive data from the ASRS System, is denied as moot.

    5)     Primus' requests for the expert reports and opinions of empirical's consulting expert(s) as part of expedited discovery is denied.

    6)     The parties and their counsel shall cooperatively interpret and conduct this order, and all discovery and proceedings conducted in this case in a manner that secures the just, speedy, and inexpensive determination of the merits. Failure to do so will result in sanctions, either upon motion or sua sponte.

    7)     The parties shall review the Nebraska magistrate judges' practices posted at the court's Civil Case Management website page.

    8)     Counsel for Primus and empirical shall confer and as to Plaintiff's claims in the Complaint, and on or before September 14, 2020, they shall jointly file a Rule 26(f) Report, a copy of which can be found at http://www.ned.uscourts.gov/forms. Unless the parties agree otherwise, Plaintiff(s) shall prepare the initial draft of the Report and then forward it to Defendant(s) for further additions or revisions.

    9)     On or before September 9, 2020, a party shall contact the chambers of the undersigned magistrate judge to set a conference call if:

a)      One or more of the parties believes a planning conference is needed to complete the Rule 26(f) Report; or

b)      The parties cannot agree on one or more of the deadlines identified or case progression issues raised in the Rule 26(f) Report; or

c)      The parties are currently and actively pursuing settlement and believe preparing and filing a Rule 26(f) Report may be unnecessary.

10)     As to the claims in Plaintiff's complaint, empirical and Primus shall serve mandatory disclosures by September 25, 2020.

August 27, 2020.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge