IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EMPIRICAL FOODS, INC.,<br><br>    Plaintiff and<br>    Counterclaim-Defendant,<br><br>    v.<br><br>PRIMUS BUILDERS, INC.,<br><br>    Defendant, Counterclaimant,<br>    and Third-Party Plaintiff,<br><br>    v.<br><br>SWISSLOG LOGISTICS, INC.,<br><br>    Third-Party Defendant | No. CV: 8:19-cv-00457<br><br>**SWISSLOG LOGISTICS, INC.'S CROSS CLAIM AGAINST EMPIRICAL FOODS, INC. AND U.S. BANK TRUST, N.A.** |

COME NOW Third-Party Defendant Swisslog Logistics, Inc. ("Swisslog"), pursuant to Fed. R. Civ. P. 14(a)(2)(D), and for its Claim against empirical foods, inc. ("empirical") and U.S. Bank Trust, N.A. f/k/a First Trust, N.A. ("U.S. Bank") states and alleges as follows:

**PARTIES**

1. Swisslog is a Virginia corporation with its principal place of business at 161 Enterprise Drive, Newport News, Virginia 23603.

2. Primus Builders, Inc. ("Primus") is a Georgia corporation with its principal place of business at 8294 Highway 92, Suite 210, Woodstock, Georgia 30189.

3. empirical is a Nebraska corporation with its principal place of business at 891 Two Rivers Drive, Dakota Dunes, South Dakota 57049.

4835-3040-4029.12

4. U.S. Bank is a nationally-chartered bank with its principal place of business in Wilmington, Delaware.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this third-party complaint pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Parties, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over this third-party complaint pursuant to 28 U.S.C. § 1367 as the claims raised herein are so related to claims in the action within the original jurisdiction that the form part of the same case or controversy under Article III of the United Sates Constitution.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the actions complained of herein are alleged to have occurred within this judicial district.

## STATEMENT OF FACTS

**A. The GMS Contract and the Base Contract**

7. On September 2, 2016, Primus and empirical entered into a Guaranteed Maximum Sum Contract (the "GMS Agreement") whereby Primus agreed to construct a new facility (the "New Facility") for empirical located at 360 164th Street, South Sioux City, Nebraska 68776 (the "Property").

8. On September 2, 2016, Primus and Swisslog entered into the Base Contract for "Project BPI" (hereinafter, the "Base Contract"), that provided Swisslog was to "design, manufacture, and install" an automated storage and retrieval system (the "ASRS System") at the Facility in accordance with the Project Specifications, 4720 BPI V5 dated August 30, 2016" (the "Specifications").

2

9. Pursuant to the General Terms and Conditions, the "sole and exclusive performances to be achieved by [Swisslog]" under the Base Contract were "[t]he construction of the System in accordance with the Specifications, as measured by the Demonstrable Performances", and as defined in the Tests on Completion, to be defined by Swisslog and in the Specifications.

10. Pursuant to the General Terms and Conditions, if "the Works fail[ed] to pass any Test on Completion, such test shall be repeated as soon as practical thereafter, provided that [Swisslog] shall be entitled to a reasonable time to conduct any condition requiring remedy in [Swisslog's] sole judgment."

11. The General Terms and Conditions also provide that during the Project, Swisslog was "entitled to an equitable adjustment to the Contract Price and schedule to reflect any additional costs, time or both required due to [Primus'] or [empirical's] delays." Swisslog also was entitled to an "extension of the time for completion if delay occur[ed] . . . as a result of variation of work . . . or . . . by an act or omission that is not legally attributable to [Swisslog]."

12. The General Conditions further provide that Taking-over of the works takes place when the Tests on Completion have been satisfactorily completed or are regarded as having been satisfactorily completed.

13. Pursuant to the Base Contract, Primus agreed to pay Swisslog $14,213,200 for its work on the ASRS system in a series of payments, including the final 10% payment upon Provision Acceptance. Agreed written change orders increased the amount to be paid to Swisslog under the Base Contract to $15,743,940.16.

**B.  Interference with Swisslog's Work and Changes to the Project Caused Delay and Additional Costs in the Performance of Completing the ASRS**

4835-3040-4029.12

14. During the course of the Project empirical, acting with the knowledge of Primus, significantly interfered with Swisslog's performing its work pursuant to the Base Contract, including by dictating various functionalities of the system, and unreasonably requiring re-work of portions of completion portions of the ASRS System (including sometimes requiring re-work and then requiring the system to be changed back to its original configuration).

15. Primus frequently advised Swisslog during the project that Swisslog should take direction from empirical regarding Swisslog's performance of the Base Contract, including as to changes to the work under the Base Contract. Primus was aware of subsequent directions to Swisslog from empirical regarding Swisslog's performance of the Base Contract with Primus, some of which resulted in signed change orders between Swisslog and Primus pursuant to the Base Contract.

16. empirical's interference and changes, of which Primus was aware and authorized, caused Swisslog to perform additional work that was over and above and in addition to what was required under the Base Contract, delayed the project, and caused Swisslog to incur additional costs in completing the ASRS.

17. By way of example, empirical:

   a. demanded the use of specific vendor-supplied items not in the Specifications, such as Toshiba variable frequency drives (VFDs) for the pallet conveyors;

   b. demanded that both the raw goods inbound conveyor and finished goods outbound conveyor go through a hole in the wall separating empirical's production facility from the New Facility;

    c.    demanded that the functionality of the ASRS include the ability to bring raw materials (raw goods cases) from the fresh mini-load to the production area;

    d.    demanded several customizations to Swisslog's Warehouse Management System software (SynQ), including, for example, the ability to prioritize lines of all customer orders and then allocate each line instead of each order and its line;

    e.    demanded changes to the functionality of the ASRS System and SynQ from what was identified in the Swisslog Specifications including, for example: (i) adding functionality for the storage and retrieval of pallet stacks, egg crates, and tray stacks; (ii) creating a SynQ Intelligence Touch screen to display information to operators regarding which production line a case emerging from the box cutter needs to have its contents dumped; (iii) creating SynQ Intelligence Touch screens to support the operation of Case Picking, Blast Freezer Palletization and Consolidation at the Goods-to-Person workstation; (iv) creating SynQ Intelligence Portal screens to add additional functionality to Staging, Loading, and Shipping;

    f.    demanded periodic software demonstrations not required by the Contract. The demonstrations then resulted in additional changes which further delayed the project and increased its costs.

18. By way of further example, on March 3, 2017, empirical signed a Software Specification which describes the functional requirements for the warehouse management software (SynQ) to be provided by Swisslog. The purpose of the document was to provide detailed instructions for Swisslog's software architects to extend SynQ to the ASRS System.

5

19. Despite signing this Software Specification in March 2017, empirical demanded additional changes to the functionality of SynQ including above and beyond that required in the Software Specification. By way of example, empirical required that SynQ direct all production cases to the mini-load for storage to facilitate "better" case picks when pallets are needed at the goods-to-man and that SynQ be able to pause a production order at the request of the user.

20. Still further changes to the system were required through and continuing to the summer of 2019, including an agreement as to the requirements for receiving Non-BPI Finished Goods pallets to the freezer on a purchase order and changes to the palletizer.

21. These delays and interferences, and other issues that were not within Swisslog's responsibility or control, materially delayed the project and increased Swisslog's cost in completing its work under the Base Contract and added work above and beyond that required to be performed pursuant to the Specifications. For example, per the Time Schedule incorporated into the Base Contract, Code Development for the ASRS System was scheduled to begin on November 16, 2016. However, the numerous changes to the ASRS System demanded by empirical caused this deadline to be extended.

22. Primus was aware of the interference and changes demanded by empirical, was aware of the subsequent work performed by Swisslog, and received benefit from the extra work performed by Swisslog pursuant to the Base Contract as a result of the interference and changes directed by empirical.

**C.   The PAC/Contractual Taking-over Date**

23. In April of 2018, Primus and Swisslog negotiated a Change Order (No. 59) which changed the contractual Taking-over date to August 16, 2018.

24. Even after the execution of Change Order No. 59, empirical made additional demands to change the functionality and specifications for the ASRS system, such as changes to the host interface between SynQ and empirical's own internal software (Dynamics and iFix) which required an extension of the contractual Taking-over date and additional work beyond the requirements of the Base Contract and the Specifications, including as the result of continued interference and direction from empirical of which Primus was aware.

25. empirical (with Primus' knowledge) further failed to reasonably cooperate with Swisslog in the development and integration of the Host Database.

26. The additional changes and interference with Swisslog's work caused the date for Taking-over and PAC to be significantly extended. Such changes and interferences were continuing through August 2019.

**D.  Tests on Completion/PAC**

27. The Base Contract provides that the Demonstrable Performances to be achieved by Swisslog were to be specified in the Tests on Completion, which were to be defined by Swisslog. The Specifications state the Tests on Completion were also to be termed as the Provisional Acceptance Test.

28. The Specifications outline the technical requirements of the Tests on Completion/Provisional Acceptance Test.

29. On March 2, 2019, Swisslog delivered to Primus and empirical a System Acceptance Testing Package which outlined the Tests on Completion/PAC tests.

30. The System Specifications provide that "Swisslog shall provide the test plans: methods, procedures and data record forms etc. for various tests to customer 15 days before the respective tests, Customer shall confirm the test plan within 7 days after receiving it from Swisslog.

7

If Customer is not able provide comments for the same within 7 days of receipt, such procedure shall be deemed approved."

31. Primus and empirical did not provide any additional comments to the System Acceptance Testing Package within 7 days as provided in the System Specification.

32. On March 12, 2019, Swisslog notified empirical and Primus of its intent to start PAC the following week.

33. Swisslog performed the Tests on Completion/PAC tests in on or about March 27, 2019 and satisfied those tests to the extent possible based on issues that were not the responsibility of Swisslog, including continuing changes and adjustments to the project such as regarding the palletizer.

34. On or about March 27, 2019, Swisslog informed empirical and Primus that it had completed all Tests on Completion leading to PAC and Takeover and provided a PAC (Takeover) Certificate to empirical.

35. empirical, however, refused to proceed to Taking-over and a trial operation of the ASRS System.

**E.   July Testing**

36. On April 11, 2019, empirical demanded additional tests which were not required under the Base Contract. empirical indicated that it would not sign off on PAC unless Swisslog performed certain additional tests set forth in a "Trial Operations Document."

37. Although not contractually specified to achieve PAC, Swisslog performed certain of the tests at empirical's request in July 2019 as part of user acceptance testing (UAT). The tests performed by Swisslog in July 2019 confirmed that the Tests on Completion/PAC had been achieved to the extent possible based on issues that were not the responsibility of Swisslog.

8

38. empirical again refused Taking-over of the Project and a trial operation in July 2019.

**F. Termination**

39. On August 9, 2019, counsel for Primus sent a letter to Markus Schmidt, President of Swisslog (the "Swisslog Termination Letter"). In the Swisslog Termination Letter, Primus gave "notice of its intent to terminate and rescind its contract with Swisslog . . . [on] Friday, August 19, 2016" unless specified conditions outlined in the letter were met which were not part of the requirements of the Base Contract.

40. Primus' termination of Swisslog was wrongful and was made despite the fact that the ASRS System met the Tests on Completion/PAC and therefore was ready for Taking-over. Following Takeover, Swisslog would have made final testing, punch-list and software adjustments (including adjustments caused by changes to the scope of the works agreed to in the Base Contract) which Swisslog was ready, willing and able to perform but was not allowed to perform.

41. Primus has not paid Swisslog the balance of the Base Contract price, including the 10 percent due at PAC, the amount of signed change orders, as well as additional scope changes, and has been damaged in the amount of these unpaid amounts, which amount is due and owing to Swisslog.

**G. Swisslog's Construction Lien**

42. Empirical is the owner of real property legally described as Part SE 1/4 NW 1/4 Unplatted 4-28-9 4.60 Acres commonly known as 360 164th Street, South Sioux City, NE 68776 (hereinafter, the "Property").

43. Swisslog provided services and materials for the improvement to the Property pursuant to a contract with Primus. Swisslog furnished services or materials for the project through at least August 15, 2019.

44. The reasonable value of the labor, supplies, equipment, services and materials furnished by Swisslog pursuant to its contract with Primus and resulting in improvements to the Property for which Swisslog remains unpaid is no less than $3,071,492.00.

45. On December 4, 2019, Swisslog caused to be recorded a Construction Lien, Instrument No. 19-046407, against the Property with the Register of Deeds of Dakota County, Nebraska related to its work under the Base Contract.

46. U.S. Bank has or may claim some interest in the Property by virtue of that Assignment of Deed of Trust and Substitution of Trustee recorded with the office of the Register of Deeds for Dakota County, Nebraska on November 9, 1995 at Book 149, Page 514 and Book 149, Page 512, respectively.

## COUNT I
## Foreclosure of Mechanics' Lien – Nebraska Construction Lien Act (NCLA)

47. Swisslog repeats and realleges the allegations set forth in Paragraphs 1 through 46 as set forth above.

48. The Base Contract is a real estate improvement contract as defined by Neb. Rev. Stat. § 52-130(1).

49. The Construction Lien was recorded while there was no notice of commencement covering the improvements on the Property.

50. Visible commencement of work on the Property as defined by Neb. Rev. Stat. § 52-137 occurred prior to recording of the Construction Lien. Under the Nebraska Construction Lien Act, the Construction Lien attaches to the Property at the earlier of visible commencement or recording of the Construction Lien.

10

51. Swisslog has properly filed and perfected the Construction Lien on the Property for the unpaid amount of labor and materials furnished and incorporated into the Property and/or provided under the Base Contract.

52. Swisslog has performed all of the conditions on its part to be performed or was prevented from doing so as a result of Primus' wrongful termination of the Base Contract.

53. Swisslog has a valid, perfected Construction Lien under the NCLA in an amount no less than $3,071,492.00.

54. Swisslog is entitled to foreclosure of the Construction Lien and the extinguishment of all junior and inferior liens on the Property.

WHEREFORE, Swisslog prays that the Court find in its favor and enter a decree as follows:

(a) That Swisslog has a valid construction lien against whatever interest empirical has in the Property;

(b) That the lien is in the amount of $3,071,492.00 plus applicable prejudgment and post-judgment interest and costs of suit, or such other amount as may be established at trial;

(c) That empirical be foreclosed of all right, title, and interest it has in the Property and all equity of redemption in the Property;

(d) That the Court adjudicate Swisslog's lien and determine the relative priority between Swisslog's lien and the other interested parties claiming an interest in the Property;

(e) That a writ of assistance be issued to the Sheriff of Dakota County, Nebraska, to put Swisslog in possession of the Property to the extent of Swisslog's interest in the Property; and

(f) That the foreclosed interest in the Property be sold at a Sheriff's sale as provided by law; and

(g) For such other and further relief as the Court finds just and equitable;

**DEMAND FOR JURY TRIAL**

Swisslog respectfully requests a trial by jury on all claims triable.

Dated this 4th day of December, 2020.

          SWISSLOG LOGISTICS, INC., Third-Party Defendant, Counterclaimant, and Third-Party Plaintiff

By: */s/ Jeremy Fitzpatrick*
    Jeremy Fitzpatrick, Bar No. 21943
    Joshua S. Weiner, Bar No. 25565
    Kutak Rock LLP
    The Omaha Building
    1650 Farnam Street
    Omaha, NE 68102-2103
    (402) 346-6000
    jeremy.fitzpatrick@kutakrock.com
    joshua.weiner@kutakrock.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certified that on December 4, 2020 he electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which sent notification of filing to all CM/ECF participants of record.

/s/ *Jeremy Fitzpatrick*
Jeremy Fitzpatrick