# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EMPIRICAL FOODS, INC. <br><br>            Plaintiff and Counter-Defendant, <br><br> vs. <br><br> PRIMUS BUILDERS, INC., <br><br>            Defendant, Counterclaimant, and Third-Party Plaintiff, <br><br> vs. <br><br> SWISSLOG LOGISTICS, INC., <br><br>            Third-Party Defendant. | **CASE NO. 8:19-CV-00457** |

## EMPIRICAL FOODS, INC.'S BRIEF IN RESPONSE TO DEFENDANTS' MOTIONS FOR SANCTIONS

## **INTRODUCTION**

Admittedly, the parties could have done a better job of communicating about Westfalia's assertion of confidentiality over certain documents empirical was producing pursuant to the Court's December 22, 2020 Order (the "Order"). However, empirical had no intention of hiding the ball or undermining the mediation, which it hoped would be successful. empirical was not "attempt[ing] to hoodwink the Court," nor was it "planning on having an escape hatch so that [empirical] really didn't need to provide" the Westfalia documents it was ordered to produce. empirical was simply trying to balance its contractual obligations to Westfalia with its need to produce documents pursuant to the Order. empirical respectfully requests that the Court consider the circumstances set forth below—which it may not have been aware of before—and reconsider its order that empirical will be sanctioned for honoring Westfalia's request that it maintain the confidentiality of certain documents until the Court had ruled on the issue of AEO protection.

The situation with the Westfalia documents arose for two main reasons. *First*, after Primus and Swisslog said they would agree to an AEO protective order for the protection of the Westfalia documents, they changed their mind and ignored empirical's request that the parties submit a joint motion asking the Court to enter the order in advance of its production of Westfalia documents. empirical had been asking Primus and Swisslog to agree to an AEO protective order since November 5, 2020. empirical also raised the need for an AEO protective order for Westfalia documents during the hearing on December 8, 2020. At that hearing, Primus and Swisslog indicated they were amenable to such an order, provided there was an exception for in-house experts. However, once the Court had entered the Order requiring production of Westfalia documents on December 22, 2020, Primus and Swisslog reneged and disregarded empirical's request on December 23, 2020 that the parties file a joint motion for entry of an agreed AEO protective order. As a result, an AEO protective order was never entered.

*Second*, once it became clear that Primus and Swisslog would no longer voluntarily agree to an AEO protective order, Westfalia told empirical that it planned to seek its own protective order in early January 2021, weeks before the mediation. But Westfalia did not follow through with that plan. While empirical was waiting for Westfalia to seek a protective order, empirical agreed to maintain the confidentiality of certain documents pursuant to its contract with Westfalia. empirical believed this was a temporary measure intended to give Westfalia time to file a motion for a protective order with the Court. However, Westfalia did not file its motion until the issue came to a head on the weekend before the mediation. During this time, empirical was primarily focused on producing tens of thousands of other documents pursuant to the Order, so it did not press Westfalia to make sure it followed through on its plan to seek a protective order. empirical also knew that Primus and Swisslog were well aware of Westfalia's position on AEO protection, based on the fact that Westfalia and empirical had been asking Primus and Swisslog for an AEO protective order for two months. While it is unfortunate that the Westfalia issue was not resolved until the morning of the mediation, empirical tried to resolve it much earlier.

In addition to the Westfalia issue, which was the basis of the Court's sanctions order, Primus and Swisslog have now thrown in a variety of other ways they claim empirical has violated the Court's Order. This is a good example of Primus's and Swisslog's current litigation strategy, which is to vilify empirical on discovery issues and avoid the merits. Defendants' factually inaccurate assertions and frivolous arguments are themselves sanctionable. However, empirical is not filing a motion pursuant to Rule 11 because it does not want this litigation to devolve into a war of sanctions motions. empirical respectfully suggests that the parties recommit themselves to cooperating to address any discovery issues that may arise. Most if not all of the issues raised in the motions for sanctions could have been avoided with a phone call by any party.

Finally, while it is disappointing that the parties did not reach a settlement, the Westfalia redactions had no impact on the outcome of the mediation. The mediation was the culmination of over a month and a half of non-stop work to prepare for two long days of negotiation. Throughout most of December and January, the parties reviewed and produced tens of thousands of documents, they drafted and submitted multiple briefs to the mediators and each other, they met and spoke with the mediators on numerous occasions, and they even had their experts talk directly with the mediators. At the mediation itself, all of the parties, their attorneys, their experts, their insurers, and the mediators themselves worked extremely hard for two days to explore if a deal could get done. The parties' offers to one another were based on many factors, but the unredacted Westfalia documents were not among them. The mediation failed and the litigation is proceeding because the parties disagree about the merits, not because Westfalia redacted some confidential information. Accordingly, ordering empirical to pay all costs incurred by all parties in connection with the mediation would be terribly unjust.

## FACTUAL BACKGROUND

### A.    Empirical Seeks An AEO Protective Order For Westfalia Documents.

Westfalia is the contractor that empirical has retained to replace the defective automated storage and retrieval system ("ASRS") that Primus and Swisslog designed and built. empirical has a contract with Westfalia to design and build a portion of the new ASRS (the "Westfalia Contract"). Under the Westfalia Contract, "[a]ll technical information…furnished by [Westfalia] during the performance of the work will be solely for [empirical's] use in operating and maintaining the [ASRS]." (Ex. A, Declaration of David D. Pope ("Pope Decl.") ¶ 3, Ex. 1 at ¶ 12(B).) Further, "[s]uch technical information shall not be disclosed to a third party without [Westfalia's] prior written consent…." (*Id.*) In addition, empirical "agree[d] to maintain all confidential and technical, contractual and business information, including, without limitation the

3

Contract Price and System designs and drawings, and not to disclose such information…without the prior written consent of [Westfalia]." (*Id.* at ¶ 12(C).) Finally, the Westfalia Contract provides that "[s]hould either party be required by law or legal process to disclose any information protected by this Article, the party subject to disclosure shall notify the other party of such event in accordance with this Agreement and with as much advance notice as reasonably possible, to permit the party owning the confidential information to protect its rights." (*Id.* at ¶ 12(H).)

On November 5, 2020, in response to an informal request by Swisslog that empirical produce the Westfalia Contract, empirical explained as follows:

> empirical acknowledges Swisslog's request for the production of empirical's contract with Westfalia for the replacement system. However, empirical has concerns about producing this contract without certain protections in place. As Primus and Swisslog have acknowledged, Westfalia is a competitor of Primus/Swisslog in the automation space, and a contract with Westfalia will contain confidential and proprietary information.

> Accordingly, empirical would like to amend the Protective Order entered by the court on January 10, 2020, to include multiple levels of confidentiality, including "Highly Confidential" and/or "Attorneys' Eyes Only." We would like to know if Primus and Swisslog are agreeable to such an amendment to the Protective Order. If not, empirical will seek leave from the court to amend. Please let us know at your earliest convenience.

(Pope Decl. ¶ 4, Ex. 2.) On November 16, 2020, Swisslog served Westfalia with a subpoena for documents. On November 30, 2020, Westfalia objected to the subpoena on the grounds that, among other things, it sought confidential and/or proprietary information. Westfalia cited the lack of a protective order with an AEO provision as one of the reasons for its objection. (Pope Decl. ¶ 5, Ex. 3.) Westfalia asked that Swisslog "please update the current confidentiality order to include an AEO designation and confirm the remainder of the parties are in agreement with the same." (Pope Decl. ¶ 6, Ex. 4.)

4

At the same time, Swisslog was seeking Westfalia documents from empirical in discovery. Because of its non-disclosure obligations under the Westfalia Contract, empirical consulted Westfalia about whether it would object to empirical's production of its confidential documents to Primus and Swisslog, which are Westfalia's direct competitors. (Pope Decl. ¶ 21.) Westfalia indicated that it would need at least an AEO provision in the protective order. (*Id.*) Accordingly, on November 16, 2020, counsel for empirical followed up with counsel for Primus and Swisslog and asked whether they would agree to use the District of Nebraska's standard form AEO protective order. (Pope Decl. ¶ 22.) On November 24, 2020, counsel for Swisslog agreed to use the District of Nebraska's AEO protective order. (*Id.*) However, counsel for Primus did not respond. empirical's counsel then followed up with counsel for Primus again on December 7, 2020. (*Id.*) Primus's counsel still did not respond.

### B. The Court Orders The Parties To Mediate In January 2021.

On December 8, 2020, the parties appeared before the Court for a status conference. (ECF #80.) The Court ordered the parties to participate in a mediation on or before January 31, 2021. (ECF #93.) The Court further ordered the parties to submit an order to the Court outlining the discovery necessary for informed settlement discussions. (*Id.*)

At the December 8, 2020 status conference, counsel for empirical again raised the issue of an AEO protective order, informing the Court that Swisslog had agreed to the District of Nebraska's form but that counsel for Primus had not yet responded. (Pope Decl. ¶ 24.) Counsel for Primus then indicated that Primus was amenable to an AEO provision, but Primus wanted a carve-out for a number of non-attorney "in-house experts" who would be exceptions to AEO protection. (*Id.*) Counsel for Swisslog followed suit, saying that Swisslog also wanted a carve-out for in-house experts. (*Id.*)

Later that same day, December 8, 2020, counsel for empirical followed up with counsel for Primus and Swisslog about who they wanted to identify as in-house experts:

> Following up on our discussion with the judge this morning, would Primus and Swisslog please provide a list of the in-house experts that they would like to be allowed to show AEO documents? Empirical will work on its own list too. If you have other ideas about how to address your concerns about the AEO form, please let us know. Thanks.

(Pope Decl. ¶ 4, Ex. 2.) Counsel for Primus and Swisslog did not respond. On December 14, 2020, counsel for empirical followed up again with counsel for Primus and Swisslog about their proposed in-house experts. (Pope Decl. ¶ 26.) Finally, they responded. Swisslog said it wanted to designate "initially" five in-house non-lawyers as exceptions to AEO protection. (*Id*.) Primus wanted to designate four in-house non-lawyers as exceptions to AEO protection. (*Id*.) Counsel for empirical said that he thought designating so many in-house non-attorneys would defeat the purpose of an "Attorneys Eyes Only" designation. (*Id*.) Nevertheless, empirical ultimately said it was willing to agree. (*Id.*)

On December 22, 2020, the Court entered the Order jointly drafted by the parties, setting forth the discovery that would be exchanged in connection with the mediation. (ECF #100.) empirical believed that the parties were in substantial agreement as to the form of the AEO protective order—which they had been discussing since the December 8, 2020 status conference—and thus it did not object to including Westfalia documents in the December 22, 2020 Order. (Pope Decl. ¶ 27.) Nor did empirical insist on putting anything in the Order about AEO protection because empirical had no reason to doubt that an agreed AEO protective order was about to be entered. (*Id*.) The following day, December 23, 2020, counsel for empirical emailed counsel for Primus and Swisslog asking for their approval of a final draft of the AEO protective order, so the parties could file a joint motion for its entry prior to the production of mediation documents. (Pope

Decl. ¶ 28.) Counsel for Primus and Swisslog never responded. As a result, no AEO protective order was entered before the parties' pre-mediation productions commenced.

### C.     Empirical Produces Tens Of Thousands Of Documents Under The Order.

On December 31, 2020, empirical began producing documents to Primus and Swisslog in connection with the mediation. Over the next three weeks, empirical produced over 87,000 pages of documents pursuant to the Court's Order. (Pope Decl. ¶ 31.) These documents included:

- The Westfalia Contract, including all contract documents that exist at this time;

- Any schedules empirical received from Westfalia regarding the replacement of the System;

- empirical's consulting contract with Sikich;

- Internal communications regarding the project or replacement of the system;

- External communications regarding the project or replacement of the system, including communications with Westfalia and Sikich; and

- A statement of damages with damages divided into general categories by claim.

empirical's extensive production of documents complied with the Court's Order in all material respects. empirical's production also complied with the parties' agreed ESI protocol. (Pope Decl. ¶ 7, Ex. 5.)

### D.     Westfalia Objects To The Production Of Certain Confidential Documents.

empirical's production included Westfalia documents, such as the Westfalia Contract for Phase I of the repair work. (Pope Decl. ¶ 33.) However, because no AEO protective order had been entered, and because Westfalia's objections to Swisslog's subpoena had not been resolved, Westfalia objected to empirical's production of certain confidential information contained in these documents. (*Id.*) At Westfalia's request, and consistent with its obligations under the Westfalia

Contract, empirical allowed Westfalia to review the Westfalia documents that empirical would be producing in connection with the mediation. (*Id.*) On December 28, 2020, shortly before empirical's first production, Westfalia's counsel explained:

> My client has had the opportunity to review the documents in empirical's intended production. There are two documents, attached hereto, that we object to being produced by empirical due to the highly confidential nature of these documents. Westfalia is concerned that there is too much proprietary information in these two documents that, even with the AEO designation in the current [draft] confidentiality order, it would fall into the hands of one of Westfalia's largest competitors. These documents specifically showcase designs and new technology that Westfalia's competitors are not otherwise aware of.

(Pope Decl. ¶ 8, Ex. 6.)

empirical found itself between a rock and a hard place: the Order required the production of certain Westfalia documents, but empirical's contract with Westfalia required it to "maintain all confidential and technical, contractual and business information, including, without limitation the Contract Price and System designs and drawings, and not to disclose such information…without the prior written consent of [Westfalia]." (Pope Decl. ¶ 3, Ex. 1 at ¶ 12(C).) On December 28, 2020, counsel for empirical explained the situation to counsel for Westfalia and suggested that Westfalia seek a protective order:

> We certainly understand Westfalia's reservations about the two documents you identified being produced. However, we've been ordered to produce these types of documents in advance of the mediation as they speak to empirical's damages in the case. So, I don't think we can just put them in a privilege log and punt on their production until your objections to Swisslog's subpoena are addressed. To be clear, we will not be producing these two documents on 12/31.
>
> We're wondering if you would be available for a call tomorrow to discuss some alternative options for handling these two documents in particular. For instance, we envision that Westfalia could file for a protective order as to these two documents that would allow for production of these documents in a redacted manner and potentially

8

> could limit those at Primus and Swisslog who could receive these redacted documents. empirical would, of course, support such a protective order. We may also be able to work with some sort of affidavit that covers some of the information in these two documents not being produced.

(Pope Decl. ¶ 8, Ex. 6.)

On December 29, 2020, counsel for Westfalia told counsel for empirical that Westfalia planned to file a motion for a protective order shortly after the New Year's holiday. (Pope Decl. ¶ 30.) Satisfied that Westfalia would be addressing the issue with the Court well in advance of the mediation, empirical allowed Westfalia to review and redact certain Westfalia documents that empirical would be producing to Primus and Swisslog in connection with the mediation. (*Id*.) However, for reasons that were not explained to empirical, Westfalia did not follow through with its plan to seek a protective order in early January 2021. (*Id*.)

### E.   Primus And Swisslog Object To Westfalia's Redactions.

On December 31, 2020, empirical produced an unredacted version of its contract with Westfalia. (Pope Decl. ¶ 33.) empirical continued producing Westfalia documents in January 2021. (*Id*.) On January 14, 2021, empirical produced its first redacted Westfalia document. Primus and Swisslog did not object these redactions until January 19, 2021, six days before the mediation. (*Id*.) Swisslog complained that empirical was hiding the ball and not participating in the mediation process in good faith. (*Id*.) However, at that time:

- empirical had already produced over 55,000 pages of documents in connection with the mediation;

- empirical had already met and spoken with the mediators on numerous occasions;

- empirical had allowed its expert witness to meet with the mediators without counsel present;

- empirical had submitted two extensive mediation submissions to the mediators, as well as to Primus and Swisslog;

9

- empirical had disclosed to Primus and Swisslog both the scope and estimated cost of both Phases of the Westfalia work.

(*Id*.) On January 20, 2021, empirical explained to counsel for Primus and Swisslog why certain Westfalia documents had been redacted:

> Westfalia objected to the production of this document, and prior versions of it, in unredacted form--even when treated as [in-house expert] AEO. The document has been redacted due to the confidential and proprietary information of Westfalia contained in the redacted portions of the proposal. empirical has an active contract with Westfalia for the replacement system, to which this proposal document relates. Under that contract, empirical has non-disclosure obligations it must abide by.

(Pope Decl. ¶ 9, Ex. 7.) This email merely reiterated what both empirical and Westfalia had been telling Swisslog since November 2020—that Westfalia required AEO protection for certain confidential information because Swisslog was a major competitor. (Pope Decl. ¶ 21.)

On January 22, 2021, Primus and Swisslog insisted that the mediators intervene in the matter of Westfalia's redactions. (Pope Decl. ¶ 34.) In an effort to find a solution, empirical's counsel put the mediators directly in touch with Westfalia's counsel. (*Id*.) On Saturday, January 23, 2021, after speaking with the mediators, Westfalia's counsel agreed to produce unredacted documents if Primus and Swisslog would agree to treat them as AEO materials, sharing them only with their outside counsel and outside experts, which would be consistent with the District of Nebraska's form AEO protective order. (*Id*.) But the agreement obtained by the mediators was not acceptable to Primus and Swisslog. Rather than accepting Westfalia's unredacted documents and using them in the mediation, Swisslog told the mediators, empirical, and Westfalia that it would be seeking an order from this Court. (*Id*.)

On Sunday, January 24, 2021, Westfalia's counsel reached out directly to Swisslog's counsel and offered to show Swisslog's outside attorneys and experts unredacted copies of the documents in order to allow Swisslog to determine whether any of the redacted portions were even

relevant and worth arguing about. (Pope Decl. ¶ 10, Ex. 8.) Swisslog's counsel rejected this offer and refused Westfalia's counsel's invitation to discuss the matter further. (*Id.*) Westfalia then filed its motion for a protective order that evening. (ECF #109.) empirical filed a joinder in that motion in order to explain the history leading up to Westfalia's motion, but empirical made clear that it had no dog in the Westfalia fight and that "[r]egardless of how the Court rules, empirical looks forward to complying and getting on with the mediation." (ECF #110 at p. 6.)

### F.   The Court Rules Empirical Will Be Sanctioned And Denies Westfalia's Motion For A Protective Order.

On January 25, 2021, the Court called the parties and Westfalia in for a virtual hearing on Westfalia's motion for a protective order. Primus and Swisslog argued that empirical violated the Court's December 22, 2020 Order by complying with Westfalia's request that empirical maintain the confidentiality of certain documents until the Court addressed the AEO protective order issue. (ECF #114; Pope Decl. ¶ 11, Ex. 9 at p. 11-12.) In response, empirical explained to the Court that "the redactions were done at Westfalia's direction." (*Id.* at 21:4-6.) empirical further explained that "we [empirical] don't take a position on whether or not the information should be redacted or not redacted, only that that information is Westfalia's trade secrets, according to Westfalia, and we cannot give that information over to their competitors without Westfalia's consent." (*Id.* at 21:20-22:1.)

Westfalia's counsel expressed its concern about the production of its confidential documents to a direct competitor without a true AEO protective order in place. Westfalia's counsel explained that Swisslog's counsel's "understanding of an AEO is that his clients, who are direct competitors of Westfalia, would get access to review those AEO documents, and that's where my client [Westfalia] says we -- you know, we can't do that." (*Id.* at 36:4-8.) Counsel for Westfalia further explained that Westfalia had been willing since November 2020 to "provide these

documents, [subject to] AEO -- true AEO, to [counsel for Swisslog] and to his outside experts, who should be able to analyze them," but Swisslog was not interested in receiving Westfalia's documents subject to that restriction. (*Id.* at 36:12-16.)

The Court denied Westfalia's motion for a protective order. But before doing so, the Court held as follows:

> Number 1, Empirical, you are in violation of my court order. You had every right at the time we were discussing this to say everything was subject to what Westfalia was going to say. You never mentioned that before. You didn't put it in the order that you drafted, or at least contributed to in drafting, and jointly submitted to have me sign. I signed that order on December 22nd. Nothing in here allows you to at -- allowed you at this point to redact or to look to Westfalia for its permission to comply with my order. Nothing. You're in violation of that order. For that, you will be sanctioned.

(*Id.* at 40:11-22.)

Counsel for Swisslog asked the Court whether the parties should proceed with the mediation, which was to begin that morning. (*Id.* at 42:17-20.) The Court gave Primus and Swisslog the option to forego the mediation because of the Westfalia issue, but they chose to proceed anyway. (*Id.* at 42:21-43:1.) Later that same morning, pursuant to the Court's order denying Westfalia's motion for a protective order, empirical produced unredacted copies of the Westfalia documents at issue to Primus and Swisslog. (Pope Decl. ¶ 48.)

### G.    The Parties Mediate For Two Days But Do Not Reach A Settlement.[1]

On January 25 and 26, 2021, the parties mediated the dispute using two experienced mediators. (Pope Decl. ¶ 50.) In attendance for empirical were its President, its General Counsel,

---

[1]    Statements by the parties made only in mediation are not admissible in evidence in the trial of the case, but this "does not preclude admissibility in other contexts…such as pertaining to a motion for sanctions regarding the mediation." Mediation Plan of the United States District Court for the District of Nebraska, at ¶ 4(d).

its Project Manager, two outside experts (ASRS and software), and four outside attorneys. (*Id*.) empirical's legal team at the mediation consisted of three partners and an associate. (*Id*.) Primus and Swisslog negotiated jointly. (Pope Decl. ¶ 51.) On their side were four outside attorneys, several outside experts, several business executives, and several insurance representatives—at least a dozen people in total. (*Id*.) All parties worked extremely hard for two long days of mediation, both of which extended well beyond regular business hours. (*Id*.)

Day 1 of the mediation consisted mainly of discussions about liability issues and testing. (Pope Decl. ¶ 52.) Westfalia's work was not a part of those discussions. (*Id*.) Day 2 focused mainly on damages. (*Id*.) However, Defendants' offers to empirical were not based on Westfalia's work. (*Id*.) In fact, Primus and Swisslog did not offer empirical any money in settlement of empirical's claims. (*Id*.) Instead, Primus and Swisslog demanded that empirical pay them several million dollars. (*Id*.) empirical's settlement demands also were not based on the cost of Westfalia's work, but rather on other evidence and metrics. (*Id*.) The parties did not reach a settlement and were still quite far apart at the end of the second day. (Pope Decl. ¶ 53.) Nevertheless, the parties left open the possibility of continuing settlement discussions after the conclusion of the mediation. (*Id*.)

## LEGAL STANDARD

"[T]he imposition of sanctions is a serious matter and should be approached with some circumspection." *Vallejo v. Amgen, Inc.*, 2017 WL 3037391, at *5 (D. Neb. May 30, 2017) (Zwart, M.J.) (internal quotation omitted). "A court must exercise its inherent powers [to order sanctions] with restraint and discretion, and a primary aspect of that discretion is the ability to fashion an appropriate sanction." *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005) (citing *Harlan v. Lewis*, 982 F.2d 1255, 1262 (8th Cir. 1993)). "Any award should be 'remedial' in nature; that is, it should compensate the opposing parties for the fees they incurred *as a result of the…misconduct*." *Vallejo*, 2017 WL 3037391, at *5 (emphasis added). "While the

13

district court has broad discretion in crafting an appropriate remedy, that discretion narrows as the severity of the proposed sanction increases." *Lopez v. Keeshan*, 2012 WL 2343415, at *3 (D. Neb. June 20, 2012) (Zwart, M.J.).

Additionally, "in invoking its inherent power, a court must comply with the mandates of due process." *Baycol*, 419 F.3d at 802 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). "Thus, before a district court may impose sanctions, the individual must receive notice that sanctions against her *are being considered* and an opportunity to be heard." *Id.* (emphasis added) (citing *In re Clark*, 223 F.3d 859, 864 (8th Cir. 2000)). "An opportunity to be heard" requires at least "the opportunity to fully brief the issue." *Neb. Data Ctrs., LLC v. Khayet*, 2018 WL 10757614, at *1 (D. Neb. July 6, 2018) (Zwart, M.J.). "Case-specific consideration is required when deciding a motion for sanctions, and any sanctions awarded under the court's inherent power must be based on careful scrutiny and specific factual findings." *Id.*

In their motions for sanctions, Primus and Swisslog rely on Rule 16(f) and Rule 37(b) of the Federal Rules of Civil Procedure, which provide for the award of sanctions for failing to obey a discovery order. However, both rules provide that an award of reasonable expenses caused by the failure is *not* appropriate where the failure was "substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f), 37(b)(2)(C). "In determining whether a party's refusal or failure to timely provide discovery responses is 'substantially justified,' . . . the court looks to whether or not there was a good reason to withhold the discovery." *Mensah v. Rent-A-Center, Inc.*, 2005 WL 8176032, at *2 (D. Neb. Oct. 28, 2005). "There is no bright line standard for 'substantial justification,'" but courts have focused on whether "an impartial observer would agree that a party had good reason to withhold discovery." *Id.* (internal quotation omitted).

## ARGUMENT

**I.    Empirical's Production Of Westfalia Documents Complied With The Order.**

Primus and Swisslog argue that empirical failed to comply with the Order because some of the Westfalia documents empirical produced pursuant to the Order were partially redacted. (ECF #121, at p. 8; ECF #125 at p. 4-5.) As shown below, empirical's production of Westfalia documents substantially complied with the Order. Furthermore, empirical was substantially justified in honoring Westfalia's request to maintain the confidentiality of its information until the Court had ruled on Westfalia's anticipated motion for a protective order.

**A.    Empirical Produced The Westfalia Contract Documents And Hundreds Of Emails With Westfalia.**

The Order required empirical to produce, among other things, "empirical's contract with Westfalia for repair/replacement of the existing ASRS System" and "communications between empirical and Westfalia" for four specified custodians. (ECF #100.) empirical complied with these provisions of the Order by producing:

- Westfalia contract signed by empirical and Westfalia

- Westfalia contract documents, including:

  - Proposal dated January 31, 2020

  - D-48559 Drawings

  - Approval Drawings

  - Responsibility Matrix

  - Project Schedules

- Over 300 communications between Westfalia and empirical

(Pope Decl. ¶ 36.) In addition, empirical produced a PowerPoint presentation that Westfalia prepared regarding its proposal for Phase II of the repair work, even though no contract or specifications have been prepared yet for that phase. (*Id*.)

Primus argues (inaccurately) that "[i]t may surprise and possibly trouble the Court that even as of this date, <u>empirical has still not provided</u> Primus and Swisslog with full and complete copies of all the exhibits that comprise the Westfalia Contract as required by the 12/22/20 Order." (ECF #121, at p. 12.) This is the first time Primus is raising this issue. If Primus had bothered to ask empirical about the contract documents it claims are missing, empirical would have told it that all contract documents that currently exist were produced. Some anticipated contract documents have yet to be created because the project is still in its infancy. (Pope Decl. ¶ 37.) Those non-existent documents are the ones that Primus claims are missing. (ECF #121, at p. 12.) The following would-be contract documents listed in the Westfalia Contract do not yet exist because of the early stage of the Westfalia project:

- Software Specifications developed between Westfalia and empirical, and signed and adopted by both parties

- Software Maintenance and Support Services Agreement

- Preventative Maintenance Inspection and Service Agreement

- Three-Party Escrow Agreement

(Pope Decl. ¶ 37.)

Primus misleadingly claims that empirical did not produce the Westfalia Contract "as an individual PDF." (ECF #121, at p. 5.) Primus did not raise this issue prior to the mediation. Regardless, the parties agreed to a production format in an ESI protocol signed by Primus's and empirical's counsel and dated December 28, 2020. empirical's production complied with this ESI protocol, and empirical provided a link for Primus to download the production. This was the most

efficient way to provide productions, and Primus and Swisslog likewise provided productions via a download link. (Pope Decl. ¶ 38.) In any event, empirical specifically identified in its production letters the bates numbers of the Westfalia Contract and proposals, so that Primus and Swisslog could more easily retrieve them from the production. (Pope Decl. ¶¶ 12-15, Exs. 10-13.) If either Primus or Swisslog had asked empirical to email them a separate PDF of these particular documents, of course it would have done so. (Pope Decl. ¶ 40.) Indeed, empirical promptly emailed the Westfalia proposal to Swisslog when it asked for it. (*Id.*)

Primus also takes issue with the fact that—prior to the documents being unredacted pursuant to the Court's order—certain Westfalia pricing information was redacted. (ECF #121, at p. 20.) It is not surprising that Westfalia would want to protect its detailed pricing information from disclosure to business executives at its major competitor. But in any event, empirical's January 8, 2021 mediation submission (provided to both Primus and Swisslog) disclosed the contract price for Phase I and the estimate for Phase II of Westfalia's work. Thus, Primus and Swisslog were never in the dark about the cost of the Westfalia work or their exposure in the case.

### B.    Empirical Was Substantially Justified In Complying With Westfalia's Request To Maintain The Confidentiality Of Its Most Sensitive Information.

Under Rule 16(f), Rule 37(b), and the relevant case law, empirical was "substantially justified" in complying with Westfalia's request that it maintain the confidentiality of its most sensitive commercial information for numerous reasons.

#### 1.    Empirical Was Maintaining The Confidentiality Of Westfalia's Documents Only Until The Court Ruled.

Based on its discussions with Westfalia, empirical understood that it was maintaining the confidentiality of certain Westfalia documents for only a limited time, until Westfalia could seek a protective order. Courts have found that a party is "substantially justified in withholding

disclosure of sensitive…information and documents until a confidentiality order [has been] entered." *Stiffler v. Frontline Asset Strategies, LLC*, 2019 WL 2612726, at *5 (M.D. Pa. June 26, 2019). Even where the party "fail[s] to seek a protective order, there is authority that a party is substantially justified…in withholding documents covered by a confidentiality agreement until the court rules on the matter." *Transp. Alliance Bank, Inc. v. Arrow Trucking Co.*, 2011 WL 4964034, at *3 (N.D. Okla. Oct. 19, 2011). Here, empirical understood that this was a temporary accommodation until the issue could be resolved by the Court when Westfalia sought its protective order, which Westfalia said would be soon. empirical was substantially justified in giving Westfalia time to protect its rights.

### 2. Primus Itself Has Asserted That It May Withhold Documents On The Basis Of Third-Party Confidentiality Obligations.

When the party seeking sanctions hypocritically "took the position that a confidentiality clause prevented discovery of [information] in a similar situation," sanctions are even less appropriate. *Transp. Alliance*, 2011 WL 4964034, at *3. Here, in its responses to empirical's Requests for Production, Primus itself objected that it "has various documents and information in its possession, custody, or control that are subject to third-party confidentiality restrictions." (Pope Decl. ¶ 16, Ex. 14 at p. 2.) Further, Primus stated that "[i]f any information is withheld from disclosure on the basis of third-party confidentiality restrictions, Primus will identify the third party, begin discussions with the third party regarding disclosure of the information, and advise Plaintiff of its efforts relating to same." (*Id.*) In light of this objection, Primus cannot seriously argue that empirical should be sanctioned for having "withheld [documents] from disclosure on the basis of third-party confidentiality restrictions." Similarly, Swisslog included in its contract with Primus that "[d]rawings, technical documents or other technical information" may not be disclosed outside the project "without the consent of the submitting Party." (Pope Decl. ¶ 17, Ex.

15 at General Terms and Conditions ¶ 6.)  So Swisslog likewise cannot argue that empirical deserves to be sanctioned for seeking Westfalia's consent before producing its confidential technical information and drawings.

### 3. Empirical Was Bound By A Confidentiality Agreement That Expressly Applied To The Information At Issue.

Courts have recognized that a party is justified in withholding information that is covered by a confidentiality agreement. *See, e.g.*, *Grupo Petromex, S.A. De C.V. v. Polymetrix AG*, 2019 WL 2241862, at *4, 7 (D. Minn. May 24, 2019) (party could redact a third-party's confidential "technical, engineering, and manufacturing drawings and specifications" if it could "show an express written obligation of confidentiality applicable to that information"); *Cook v. Med. Savs. Ins. Co.*, 2006 WL 687126, at *2 (W.D. Okla. Mar. 17, 2006) (denying sanctions because a party's "confidential settlement [agreement]…substantially justified its nondisclosure of…information"). In this case, empirical was required by the Westfalia Contract "to maintain all confidential and technical, contractual and business information, including, without limitation the Contract Price and System designs and drawings, and not to disclose such information…without the prior written consent of [Westfalia]." (Pope Decl. ¶ 3, Ex. 1 at ¶ 12(C).) In addition, empirical was required to notify Westfalia if disclosure was required by legal process and "permit the party owning the confidential information [Westfalia] to protect its rights." (*Id.* at ¶12(H).) empirical was substantially justified in abiding by these clear contractual obligations of confidentiality. *Cook*, 2006 WL 687126, at *2.

At the January 25, 2021 hearing, the Court questioned why empirical did not include anything in the December 22, 2020 Order about its confidentiality obligations to Westfalia. (ECF #114; Pope Decl. ¶ 11, Ex. 9 at 23:18-22.) The reason is that empirical believed at that time that the parties were in agreement about the entry of an AEO protective order, so it had no reason for

19

concern. The omission of the Westfalia AEO issue from the Order was not bad faith, but rather a good faith belief that AEO protection would be addressed in the anticipated agreed protective order that the parties had drafted.

### 4. Third-Party Confidential Information Is Routinely Protected.

Where, as here, the confidential information belongs to a third party rather than a litigant, courts have been even more mindful of protecting confidentiality rights in discovery. *See*, *e.g.*, *Gulf S. Lithotripsy, LLC v. N. River Ins. Co.*, 2008 WL 11353646, at *2 (E.D. La. Feb. 6, 2008) ("Because the requested materials involve third parties…and contain a confidentiality provision, plaintiff was substantially justified in objecting to the request for production and opposing this motion"); *Texarkana Behavioral Assocs., L.C. v. Universal Health Servs., Inc.*, 2009 WL 10707954, at *1 (W.D. Ark. May 12, 2009) ("Defendants are not required to produce documents containing confidential information of third parties subject to confidentiality agreements"); *Grupo Petromex*, 2019 WL 2241862, at *4 ("there is confidential technical information of [the litigant's] business partners intertwined with [its] own contributions, and it is not difficult to believe that there is at least an implied understanding that the proprietary technical contributions of those partners will be kept confidential"). Because judicial protection of third-party confidential information is so routine, empirical never expected that maintaining the confidentiality of Westfalia's information until the Court could rule would be controversial.

### 5. Third-Party Confidential Information Is Entitled To AEO Protection.

Beyond that, this Court has recognized that the existence of third-party confidentiality rights may also justify AEO protection. *See Aurora Co-op. Elevator Co. v. Aventine Renewable Energy - Aurora W., LLC*, 2013 WL 6628631 (D. Neb. Dec. 15, 2013) (Zwart, M. J.) ("If upon review of those documents, the defendants discover disclosure may violate the confidentiality of

potentially interested third party buyers, the documents shall be designated 'Attorney Eyes Only'"). Consistent with this principle, empirical had been trying *since November 5, 2020* to get Primus and Swisslog to agree to an AEO protective order to safeguard Westfalia's confidential documents. empirical followed up with Primus and Swisslog about AEO protection on no less than ten occasions. Westfalia's need for AEO protection was therefore no surprise to Primus and Swisslog. Any suggestion that Primus and Swisslog were shocked to learn in mid-January 2021 that Westfalia was continuing to insist on AEO protection is unbelievable.

> **6.     Primus And Swisslog Reneged On Their Agreement To The Entry Of An AEO Protective Order.**

Whether intentionally or not, Primus and Swisslog pulled what amounted to a bait and switch. When empirical raised the need for AEO protection for Westfalia at the December 8, 2020 hearing, Primus and Swisslog said they were amenable to such an order if it had a carve-out for in-house experts. (Pope Decl. ¶ 24.) Based on that representation—as well as the two weeks of AEO negotiation that followed—empirical agreed to include Westfalia documents in the pre-mediation discovery Order entered by the Court on December 22, 2020. (Pope Decl. ¶ 27.) However, the day after the Order was entered, Primus and Swisslog reneged and would not agree to the entry of the protective order after all. (Pope Decl. ¶ 28.) Worse yet, they changed their mind without even notifying empirical, so empirical waited for a response for several days before realizing Primus and Swisslog were no longer going to cooperate in the entry of an AEO order. (*Id*.) That left empirical with an obligation to produce Westfalia documents, but without an AEO order in place to protect Westfalia. Rather than running back to the Court to complain about Primus and Swisslog reneging, empirical reached out to the party that was insisting on the protection of the information, Westfalia, and suggested that it seek its own protective order. (Pope Decl. ¶ 29.)

### 7.   Westfalia Told Empirical It Would Be Seeking A Protective Order In Early January 2021.

As soon as it became clear that Primus and Swisslog had changed their mind about AEO protection, empirical informed Westfalia that Primus and Swisslog would not agree to an AEO order, even with carve-outs for in-house experts. (Pope Decl. ¶ 29.) Westfalia then said it planned to file its own motion for a protective order in early January 2021. (Pope Decl. ¶ 30.) Based on that representation, empirical agreed to maintain the confidentiality of Westfalia's documents until it had a chance to file the motion. (*Id*.) But Westfalia did not follow through with its motion as planned. (*Id*.) And because the parties were so busy producing tens of thousands of other documents, the issue did not reach the Court until the weekend before the mediation. While the timing of all this was unfortunate—empirical would have preferred to resolve the Westfalia AEO issue in November, when it first raised it—empirical was "substantially justified…in withholding documents covered by a confidentiality agreement until the court rule[d] on the matter." *Transportation Alliance*, 2011 WL 4964034, at *3.

*      *      *

In sum, empirical should not be sanctioned for abiding by its contract with Westfalia and maintaining the confidentiality of certain Westfalia documents until the Court had ruled on the AEO issue. Courts routinely protect confidential information in discovery, especially when it belongs to a third party, including by entering AEO orders. Here, empirical and Westfalia had been trying since November to get Primus and Swisslog to enter to such an order, and they even agreed for a period of time—that is, until the Court entered the pre-mediation discovery Order. Once that Order was entered, Primus and Swisslog stopped cooperating on the AEO issue. Yet they still knew that Westfalia required an AEO order to protect its confidential information, so they could not have been genuinely surprised when Westfalia redacted certain documents in January 2021.

This issue could have been resolved in November 2020, when empirical and Westfalia first raised it, but Primus and Swisslog skirted the issue for two months, only to come back and complain that it was not resolved until the eve of the mediation. Sanctioning empirical because Primus and Swisslog intentionally avoided the AEO issue would be plainly unjust.

## II.      Empirical Otherwise Complied With The Provisions Of The Order.

In addition to claiming that the redaction of Westfalia documents violated the Court's Order, Primus and Swisslog further argue (for the first time) that empirical disobeyed the Order in a multitude of other ways. These baseless attacks are an attempt to cast empirical as a villain that actually "enjoys defying your [the Court's] orders" and "disrespecting this Court." (ECF #114; Pope Decl. ¶ 11, Ex. 9 at 12:11-13; ECF #121, at p. 21.) The phoniness of these arguments, mostly attributable to Primus, should be plain to see.

### A.      Empirical Produced All Non-Privileged Internal Communications.

Primus argues (and Swisslog likewise suggests) that "empirical has wrongfully withheld and failed to produce the internal emails it was obligated to produce in the 12/22/20 Order." (ECF #121, at p. 18; ECF #125, at p. 6.) The basis for this argument is that "empirical produced only approximately 400 internal emails (including calendar invitations)." (ECF #125, at p. 6). As an initial matter, it is worth noting that Swisslog initially accused empirical of producing only *three* internal emails. (Pope Decl. ¶ 18, Ex. 16.) empirical then explained to Primus and Swisslog that they were apparently searching for internal emails using the wrong email domain name and there were in fact over 400 internal emails that had been produced. (*Id.*) Regardless, even after empirical informed Primus and Swisslog of their mistake, they have still argued—based on nothing but their own supposition—that 400 internal emails is too few to be true. The argument is inaccurate and absurd.

*First*, the agreed number of custodians for the pre-mediation discovery required by the Order was four. empirical pushed for the parties to produce internal emails from several more custodians prior to the mediation, but both Primus and Swisslog resisted. (Pope Decl. ¶ 23.) When additional custodians are agreed upon in discovery, empirical expects to produce many more internal emails. *Second*, at the insistence of Primus and Swisslog, the date range for the pre-mediation production excluded 2015 and 2016, which was the lead-up to the project before Primus and Swisslog had been retained. (*Id.*) Once Primus and Swisslog were hired to manage the project, it makes far more sense for empirical personnel to be emailing Primus and Swisslog, rather than discussing the project internally amongst themselves. *Third*, empirical was the owner, not the contractor, on this construction project. Not surprisingly, *empirical produced over 11,000 communications* between itself and the contractors responsible for the project, Primus and Swisslog. (Pope Decl. ¶ 42.) empirical was not trying to hide the ball. *Finally*, Primus itself says it produced only 626 internal emails, compared to empirical's approximately 400. (ECF #121, at p. 18.) If the project manager itself has only 626 internal emails for these four custodians, why would it think that the owner would have anything even close to that? Defendants' argument is a baseless accusation intended to cast doubt on even the most unremarkable discovery issue.

### B.   Empirical Did Not Make A Blanket Assertion Of Attorney-Client Privilege.

Primus and Swisslog wrongly and baselessly accuse empirical of "claiming a blanket privilege over nearly every internal email that was sent to, sent by, or copied to" empirical's General Counsel, Rich Jochum, in order to withhold large swaths of emails from production in connection with the mediation. (ECF #121, at pp. 18-19; ECF #125, at pp. 6-7.) According to Primus, "[t]here is no other explanation for the utter paucity of internal emails among empirical personnel." (ECF #121, at pp. 19-20.) That is simply not true.

For starters, application of the attorney-client privilege to an in-house counsel's emails with the employees of his client is not exactly controversial. *See*, *e.g.*, *Bennie v. Munn*, 2013 WL 3766537, at *3 (D. Neb. July 16, 2013) (Zwart, M.J.) ("Each of the communications involves correspondence between an employee of LPL and an LPL in-house counsel…and are communications requesting or providing legal advice. Such communications are protected by the attorney/client privilege and are not discoverable"). Even where an in-house counsel wears two hats, functioning as both a lawyer and a business executive, the attorney-client privilege will often apply. For example, this district court has held that "documents deal[ing] with legal issues that arose during the construction project" were privileged where in-house counsel "was acting in his capacity as [the company's] attorney—not risk manager—at the time of the communications, and was included in the correspondence for the purpose of securing and facilitating legal advice." *Donald B. Murphy Contractors v. Travelers Cas. & Sur. Co. of Am.*, 2017 WL 3172754, at *1 (D. Neb. July 25, 2017).

In any event, before Primus and Swisslog filed their motions for sanctions, empirical informed them that it was *not* making a blanket assertion of privilege, but rather was evaluating privilege on a document by document basis. (Pope Decl. ¶ 18, Ex. 16.) Thereafter, empirical produced a privilege log of 23 documents for which empirical is currently asserting attorney-client and/or work product protection. empirical remains willing to meet and confer with Primus and Swisslog if they want to discuss the basis for its assertion of privilege. empirical is also willing to submit the documents for *in camera* review if necessary. empirical wants to be as transparent as possible without waiving any privilege. By no means was empirical using the attorney-client privilege as an "escape hatch" to avoid producing its emails in connection with the mediation.

(ECF #125, p. 7.) For Primus and Swisslog to maintain this argument even after empirical informed them that it was not making a blanket claim of privilege is frivolous.

### C.    Empirical Did Not Purposely Delay Its Production Of Documents.

Primus and Swisslog suggest that empirical purposely delayed the production of certain documents until the end of the pre-mediation production schedule in order to prevent them from being used at the mediation. (ECF #121, p. 11, ECF #125, p. 6.) This too is false. empirical produced its documents in the order of custodian priority requested by Primus and Swisslog (without objection by empirical). (Pope Decl. ¶ 43.) The basis for Swisslog's argument is that "empirical…produced 7,487 documents in its final production on January 20, 2021," and "[t]hree hundred of these documents identify Mr. [David] Berghult as the custodian," when Mr. Berghult was the top priority custodian in the Order. (ECF #125, at p. 6.) Swisslog further notes that "all 300 of these documents were emails to or from Westfalia or attachments thereto." (*Id.*) This is not a coincidence. The only reason that a small portion of Mr. Berghult's emails were produced later in the discovery schedule was that Westfalia was reviewing those emails for potential confidential information. (Pope Decl. ¶ 43.) As soon as Westfalia finished its review, empirical produced those emails. (*Id.*) empirical produced the vast majority of Mr. Berghult's documents—over 2,500 of them—on December 31, 2020. (*Id.*) empirical did not purposely delay its production of Mr. Berghult's documents in order to gain any kind of strategic advantage. empirical merely allowed Westfalia to review potentially confidential documents before producing them.

### D.    Empirical's Breakdown Of Damages Complied With The Order.

The Order required empirical to "furnish to the parties and mediators a statement of damages empirical seeks to recover divided into general categories." (ECF #100, ¶ 2(e).) Primus now argues that "Empirical has never quantified its damages into general categories as required

by the 12/22/20 Order." (ECF #121 at p. 17.) That is not true. On January 6, 2021, empirical

provided the following statement of damages divided into general categories:

| Basis for Damages | Damages Against Primus | Damages Against Swisslog |
|---|---|---|
| Rescission of GMS Contract — all amounts paid to Primus thereunder | $33,342,253 | N/A |
| Restitution for unjust enrichment — amounts unjustly received by Primus and Swisslog | $33,342,253 | $13,887,431 |
| Breach of GMS Contract — cost of repairing facility | $6,161,813.14 (Phase I Westfalia repair), plus cost of Phase II repair (TBD) | N/A |
| Breach of GMS Contract — difference between the value as constructed and the value if built according to contract | $15,743,940 | N/A |
| Breach of GMS Contract — difference between expense incurred to complete the Work and unpaid balance of the Guaranteed Maximum Sum | $6,161,813.14 (Phase I Westfalia repair), plus cost of Phase II repair (TBD), minus $2,192,571 | N/A |
| Breach of GMS Contract — storage costs caused by failure to deliver functional System | $564,000 per month from date of termination | N/A |
| Breach of GMS Contract — liquidated damages for failing | $1,000,000 | N/A |

| to meet substantial completion date | | |
|---|---|---|
| Loss incurred in reliance on promises — amount paid for the System, plus amounts paid as a result of not terminating | N/A | $13,887,431, plus $6,768,000 ($564,000 per month from substantial completion date to date of termination) |
| Loss incurred in reliance on negligent misrepresentations — difference between the value of the System received and the value given for it, plus the pecuniary loss suffered otherwise as a consequence of reliance on misrepresentations | N/A | $13,887,431, plus $6,768,000 ($564,000 per month from substantial completion date to date of termination) |

(Pope Decl. ¶ 19, Ex. 17. ) empirical provided the "TBD" amount two days later in its mediation submission. This was the estimated cost of the Phase II work, which was $9,700,000 to $20,000,000. (Pope Decl. ¶ 44.).

empirical's statement is more than sufficient under the Order. empirical broke down its damages (i) by defendant, (ii) by cause of action, (iii) by measure of damages, and (iv) by the specific losses incurred. This was more than enough damages information for Primus and Swisslog to understand their exposure and effectively mediate the case. Indeed, Swisslog's motion for sanctions has not even challenged the sufficiency of empirical's damages statement. Similarly, Primus has had empirical's damages statement since January 6, 2021—almost three weeks before the mediation—and Primus never complained about it until filing its motion for sanctions. Primus is just throwing in another issue to try to make its motion for sanctions seem more substantial.

28

In addition, Primus argues that empirical's statement of damages "identified previously un-plead causes of action (Rescission and Restitution)." (ECF #121 at p. 6.) Wrong again. Under Nebraska law, rescission and restitution are *remedies* for breach of contract and unjust enrichment—causes of action that empirical pleaded over 16 months ago. "[R]escission is the proper remedy where," as here, "a breach of contract is so substantial and fundamental as to defeat the object of the parties in making the agreement." *Eliker v. Chief Indus., Inc.* 498 N.W.2d 564, 570 (Neb. 1993). And "[u]njust enrichment requires restitution, which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain." *Trieweiler v. Sears*, 689 N.W.2d 807, 834 (Neb. 2004). In any event. empirical's statement of damages complied with the Order and provided Primus and Swisslog with more than enough information to mediate.

**E.     Empirical's Production Of Sikich Documents Complied With The Order.**

Primus (but not Swisslog) takes issue with empirical's production of Sikich documents pursuant to the Order. (ECF #121, at pp. 14-17.) The Order required empirical to produce its "consulting contract with Sikich LLP for services relating to iFix, Microsoft Dynamics, and the ASRS System" and certain "communications between empirical and…Sikich" to or from the four designated custodians. (ECF #100, ¶¶ 2(b), 2(d).) empirical produced exactly that. (Pope Decl. ¶ 31.) Primus speculates that there must be another more recent Sikich contract out there somewhere because the one empirical produced is from 2017. (ECF #121, at pp. 14-15.) However, the Professional Services Master Agreement with Sikich that empirical produced specifically states: "The 'Term' of this Master Agreement shall be for one (1) calendar year commencing on the Effective Date, *and will automatically be extended on an annual basis* unless Sikich or Client provides written notice of non-renewal at least thirty (30) days prior to the end of the then-effective Term." (Pope Decl. ¶ 20, Ex. 18 at p. 7, emphasis added.). Thus, Primus has no legitimate reason

to question why a more recent Sikich contract has not been produced. Moreover, if Primus had brought that question to empirical's attention, rather than throwing it into a motion for sanctions, empirical easily could have answered it and saved the parties and the Court some time. But Primus seems less interested in the answer than in insinuating to the Court that empirical must have done something wrong.

Primus also complains that empirical has not produced all of its purchase orders with Sikich. (ECF #121, at p.15-17.) But production of Sikich purchase orders is not what the Order required. (ECF #100, ¶ 2.) Nevertheless, empirical produced some Sikich purchase orders, and it is willing to produce any others in discovery. Of course, this is the first time Primus is raising the issue. If Primus had simply asked empirical to produce any other purchase orders with Sikich, empirical would have done so. Moreover, Primus has not explained how any of this allegedly missing Sikich discovery had any impact whatsoever on the mediation. It did not. Primus just added it to the motion to make its parade of horribles seem longer. The motions should be denied.

## III.    The Sanction Sought By Primus And Swisslog Is Unjust.

The award of expenses sought by Primus and Swisslog would be unjust and in violation of Rule 16(f) and Rule 37(b) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 16(f), 37(b)(2)(C) (award of reasonable expenses is not appropriate where the failure to comply was "substantially justified or other circumstances make an award of expenses unjust"). Primus and Swisslog claim that empirical should pay all of their attorneys' fees, expert fees, mediator fees, and all other costs associated with the mediation, between at least December 22, 2020 and January 26, 2021, plus the cost of the motions for sanctions they have filed. (ECF #121, at p. 21; ECF #125, at p. 9.) Such an award would be patently unjust under the circumstances.

As shown below, regardless of the Westfalia documents, the Court had ordered the parties to mediate. So Primus and Swisslog would have incurred the cost of mediation no matter what

happened with the Westfalia documents. Moreover, the Westfalia redactions (which were in place for eleven days before being unredacted) did not cause the mediation to fail. Defendants' legal theories and defenses do not even depend on the Westfalia repairs, and none of the parties' settlement offers were based on Westfalia's work. The parties devoted an extraordinary amount of time and resources to the mediation, including extensive pre-mediation discovery. They reviewed and produced tens of thousands of documents, submitted extensive briefs, and had numerous meetings with the mediators, even before the two-day mediation. All parties had more than enough information to negotiate, and they did their best to try to get a deal done. Unfortunately, the parties still strongly disagree about the merits, particularly as to liability, but the temporary redaction of Westfalia documents had nothing to do with the outcome of the mediation. Ordering empirical to pay for the entire mediation simply because it redacted certain documents at Westfalia's request until the Court could rule on AEO protection would be unjust.

### A.   The Court Ordered The Parties To Mediate Before It Ordered Empirical To Produce The Westfalia Documents.

Awarding Primus and Swisslog the cost of mediation would be unjust because the Court ordered the parties to mediate the case irrespective of the production of Westfalia documents. On December 8, 2020, the Court entered an order *sua sponte* providing that "[a] mediation or settlement conference will be held on or before January 31, 2021. All parties are required to participate in good faith." (ECF #93.) This was two weeks before the December 22, 2020 Order requiring empirical to produce certain Westfalia documents in connection with the mediation. With or without the production of Westfalia documents, the parties had still been ordered to mediate. Thus, Primus and Swisslog would have incurred the cost of the court-ordered mediation regardless of whether the Court ordered empirical to produce Westfalia documents, and regardless of whether empirical redacted them at Westfalia's request.

Primus and Swisslog may claim that they did not object to the Court's order requiring mediation because empirical had expressed a willingness to produce Westfalia documents. But empirical expressed a willingness to produce Westfalia documents *only because Primus and Swisslog expressed a willingness to agree to an AEO protective order*. empirical specifically raised this issue at the December 8, 2020 hearing, and Primus and Swisslog said they were amenable to an AEO protective order with in-house expert carve-outs. Yet immediately after the Court entered the pre-mediation discovery order on December 22, 2020, Primus and Swisslog became *un*willing to agree to an AEO protective order on December 23, 2020. Primus and Swisslog reneging on their agreement to enter an AEO protective order, knowing that such an order was a condition of empirical's agreement to produce Westfalia documents, constitutes "circumstances [that] make an award of expenses unjust." Fed. R. Civ. P. 16(f), 37(b)(2)(C).

## B.     The Westfalia Issue Did Not Cause The Mediation To Fail.

Awarding Primus and Swisslog the cost of the mediation would be unjust because the Westfalia issue did not cause the mediation to fail. Any award of sanctions "should compensate the opposing parties for the fees they incurred *as a result of the…misconduct*." *Vallejo*, 2017 WL 3037391, at *5 (emphasis added). Here, Primus itself concedes that it "cannot say with absolute certainty that the redacted Phase I and Phase II proposals (and other documents not produced) constituted the sole cause of the failure of the mediation." (ECF #121, at p. 13.) Indeed, Defendants' legal theories and defenses do not even depend on the Westfalia documents. Both Primus and Swisslog have alleged that *empirical* is liable to *them*, rather than the other way around, because, according to Primus and Swisslog, the ASRS functions as intended. (ECF #18; ECF #89.) Primus and Swisslog did not move off that position in the mediation, even for the sake of negotiation. (Pope Decl. ¶ 52.) The parties spent Day 1 of the mediation discussing liability issues,

which had nothing to do with Westfalia (*Id.*) The parties spent Day 2 discussing damages, but Primus's and Swisslog's joint offers to empirical were not based on the Westfalia work. (*Id.* ) In fact, Defendants offered empirical no money, and instead asserted that empirical should actually pay them several million dollars. (*Id.*) empirical's offers to Primus and Swisslog were not based on Westfalia work either. (*Id.*) Westfalia was simply a non-issue at the mediation.

Moreover, while it did not even come up at the mediation, Defendants' legal position on empirical's damages renders Westfalia's work irrelevant. (ECF #18, at p. 21) Primus has alleged that "empirical's decision to remove and replace most, if not all, of the ASRS System constitutes 'economic waste' for which empirical is solely responsible." (ECF #18, at p. 21). Notably, Primus was able to make this allegation over a year ago, subject to Rule 11, without the benefit of the unredacted Westfalia documents. So obviously Primus already knew more than a little about the scope and cost of the Westfalia repairs. But in any event, under Nebraska law, "the cost of repair"—*i.e.*, the cost of Westfalia's work—"supplies the default measure [of damages] *unless the breaching party shows that economic waste would result.*" *BLB Aviation South Carolina, LLC v. Jet Linx Aviation, LLC*, 808 F.3d 389, 393 (8th Cir. 2015) (emphasis added). In cases of economic waste, "the measure of damages is the difference between the value as constructed and the value if built according to the contract." *Moss v. Speck*, 306 N.W.2d 156, 157 (Neb. 1981). Here, because Primus and Swisslog contend that the Westfalia repairs constitute economic waste, the cost of those repairs is not relevant to their damages calculation. Rather, under Defendants' theory of economic waste, empirical's damages would be the difference between the value of the ASRS as constructed by Primus and Swisslog and the value of the ASRS if they had built it in accordance with the contract. Westfalia's repair work is not relevant to that calculation of damages, so the Westfalia redactions could not have impacted the success of the mediation.

C.     **Empirical Participated In The Mediation In Good Faith.**

Swisslog does not claim that the mediation failed because of the Westfalia redactions, but only that the redactions indicated that "empirical never planned to treat the mediation process seriously, despite the fact the other parties to this litigation spent considerable time and resources to prepare for the mediation to try to settle the case." (ECF #125, at p. 2.) Primus likewise accuses empirical of "a complete lack of seriousness in entering into the mediation with Primus and Swisslog." (ECF #121, at p. 21.) Nothing could be further from the truth.

empirical agreed to a two-day mediation with two mediators, as suggested by Primus. (Pope Decl. ¶ 54.) empirical devoted three litigation partners, two associates, an entire team of contract attorneys, and a paralegal to preparing for the mediation. (*Id*.) empirical had two experts analyzing testing and software issues throughout December and January. (*Id*.) empirical drafted and submitted three briefs to the mediators and Primus and Swisslog, totaling over 50 pages. (*Id*.) empirical spoke with the mediators (together and separately) on numerous occasions in December and January, even before the mediation commenced. (*Id*.) empirical made its ASRS expert available to discuss the case directly with the mediators without counsel present. (*Id*.) empirical sent three executives (including both its President and its General Counsel), four outside attorneys, and two expert witnesses to the mediation itself. (*Id*.) empirical was obviously serious about mediating, and it sincerely wanted the mediation to succeed, so it can get on with its business.

empirical is not aware of any case in which a court has ordered a party to pay the costs of mediation when it participated in the mediation in good faith. To the contrary, courts have denied sanctions in such cases. *See*, *e.g.*, *Factory Mut. Ins. Co., Inc. v. Rasmussen Mech., Inc.*, 2014 WL 12577026, at *2 (D. Neb. May 6, 2014) (the court was "unable to conclude that an assessment of costs is warranted" where a party "prepared a mediation statement, sent an individual with

settlement authority to the mediation, and incurred costs in connection with the mediation"). Where, as here, "the reason for the unsuccessful mediation was not in fact bad faith, but rather was a culmination of factors, such as a vast divergence of the estimate of the value of the claims," sanctions should be denied. *Bauerlein v. Equity Residential Prop. Mgmt. Corp.*, 2007 WL 1521606, at *1 (D. Ariz. May 22, 2007).

### D.     Primus And Swisslog Had More Than Enough Information To Negotiate.

At the January 25, 2021 hearing, after the Court ordered the Westfalia documents to be unredacted, counsel for Swisslog asked the Court whether the parties should still proceed with mediation. (ECF #114; Pope Decl. ¶ 11, Ex. 9 at 42:17-20.) The Court responded: "If you can. If you cannot, you may include, in your motion for sanctions, the sanctions are appropriate for being unable to mediate as scheduled." (*Id.* at 42:21-43:1) Primus and Swisslog decided, based on the information they already had, that they could still proceed with the mediation. This information included empirical's production of over 20,000 documents, 449 internal communications, 344 communications with Westfalia, 90 communications with Sikich, the partially redacted Westfalia contract documents, the Sikich contract, and the statement of damages. (Pope Decl. ¶ 39.) Having agreed to proceed with the mediation with all that information, Primus and Swisslog cannot honestly say that empirical should have to pay for everything because the Westfalia documents were unredacted later that morning. With or without the unredacted documents, Primus and Swisslog had sufficient information with which to mediate, or else they would not have gone forward with the mediation that day.

Furthermore, once empirical provided Primus and Swisslog with the unredacted versions on the morning of January 25, 2021, all of their in-house and outside experts and attorneys—a total of over a dozen people—had a day and a half to review the unredacted pages during the

mediation. The mediators were also available to convey any questions Primus and Swisslog might have about the documents to empirical in real time. Moreover, empirical indicated that it was willing to continue discussing settlement even after the conclusion of the mediation. Over a month has passed since Primus and Swisslog received the unredacted Westfalia documents, and neither of them has indicated that their in-depth analysis of the documents has changed their settlement analysis in any way. Therefore, having the unredacted Westfalia documents earlier would not have made a difference in the outcome of the mediation.

In fact, Primus and Swisslog could have received unredacted versions of the documents from Westfalia itself on January 23, 2021, but they declined. After speaking with the mediators that day, Westfalia's counsel agreed to produce the unredacted documents if Primus and Swisslog would agree to treat them as true AEO materials, sharing them only with their outside counsel and outside experts. Considering how important Primus and Swisslog now claim these documents were to the mediation, it is inconceivable how they could flat-out *refuse* to have their outside experts and attorneys review the documents when offered. Primus and Swisslog appear to have been less interested in receiving the unredacted documents before the mediation than they were in complaining to the Court that empirical had wrongfully redacted them.

### E.   The Mediation And Related Discovery Have Value Regardless Of Settlement.

Awarding Primus and Swisslog the costs of the mediation would be unjust because, despite the outcome, the mediation was still valuable for all parties. "Good faith participation in ADR does not require settlement; in fact, an ADR conference conducted in good faith can be helpful, even if settlement is not reached." *Perkins-Moore v. Wilkie*, 2020 WL 5517678, at *1 (E.D. Mo. Sept. 14, 2020) (denying plaintiff's motion for sanctions where defendant participated in the mediation in good faith). Regardless of the Westfalia redactions, the court-ordered mediation was not a waste

of time. Over the course of two days of mediation, the parties learned about each other's positions and evidence, and they began to zero in on some of the most important issues in the case. This information will allow the parties to be more focused and efficient in discovery, and it will also aid in any future mediation or settlement discussions, which the parties agreed was a possibility.

In addition, the substantial document discovery that the parties accomplished in connection with the mediation will be valuable throughout the case. The parties have now made a very good start on discovery. This progress is especially important because the case has been pending since October 2019. Unless this case was certain to settle but for the Westfalia redactions—and the parties can safely say it was not—Primus and Swisslog would have had to do all this discovery anyway. Even if Primus and Swisslog would have refused to mediate had they known earlier that Westfalia would be redacting certain documents, they still would have had to do this discovery. Primus and Swisslog should not get a month of free discovery because of the Westfalia redactions. Shifting the cost of a substantial portion of discovery in the case onto empirical because it allowed a third party to redact some confidential information would be highly unjust.

**F.      Sanctions Would Not Promote Future Cooperation Between The Parties.**

Finally, awarding sanctions here would be counterproductive to the ongoing litigation. This case has been pending since October 2019, and the parties have only just begun discovery. The parties are going to have to find a way to get along for at least another year before discovery is complete. Respectfully, kicking off discovery with an award of sanctions against the plaintiff in connection with a court-ordered mediation will encourage more sanctions motions and less genuine cooperation between the parties in the future. *See GP Indus., LLC v. Bachman*, 2007 WL 4245786, at *7 (D. Neb. Nov. 29, 2007) ("The court wishes to impose a moratorium on the escalating incivility and gamesmanship that is occurring in this case. With that goal in mind, I do

37

not believe it would be constructive to impose sanctions on any party at this time and, in my discretion, I decline to do so"). The parties should lay down their swords and recommit themselves to working cooperatively to get this matter resolved efficiently on the merits.

## CONCLUSION

For all these reasons, Defendants' motions for sanctions should be denied. empirical was substantially justified in maintaining the confidentiality of Westfalia's information until this Court could rule on the whether AEO protection was appropriate. Moreover, Primus and Swisslog had no reason to be surprised when some of the documents produced by empirical were redacted to protect Westfalia's confidential information. Since November 2020, Primus and Swisslog have known that Westfalia was insisting upon an AEO order for the protection of its confidential information, whether that information was in empirical's or Westfalia's possession. Finally, an award of sanctions would be unjust because the Westfalia redactions had no actual impact on the parties' court-ordered mediation.

Dated:  March 2, 2021

EMPIRICAL FOODS, INC.,
*Plaintiff/Counter-Defendant*

By: *s/ J. Erik Connolly*

Michael C. Cox, #17588
J. Daniel Weidner, #23738
John V. Matson, #25278
KOLEY JESSEN P.C., L.L.O.
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124-1079
(402) 390-9500;
(402) 390-9005 (facsimile)
Daniel.Weidner@koleyjessen.com
John.Matson@koleyjessen.com

J. Erik Connolly (*pro hac vice*)
Nicole E. Wrigley (*pro hac vice*)
David D. Pope (*pro hac vice*)
Kathryn E. Clausing (*pro hac vice*)
BENESCH, FRIEDLANDER,
    COPLAN & ARONOFF, LLP
71 S. Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 212-4949
(312) 767-9192 (facsimile)
econnolly@beneschlaw.com
nwrigley@beneschlaw.com
dpope@beneschlaw.com
kclausing@beneschlaw.com

*Attorneys for empirical foods, inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is less than 13,000 words as contemplated by NECivR 7.1(d)(3). I further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word 2016 and contains 12,008 words.

*s/ J. Erik Connolly*
J. Erik Connolly

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 2nd day of March, 2021, I electronically filed

the foregoing with the Clerk of the Court by using the CM/ECF system which sent notification of

such filing to all CM/ECF participants.


_____*s/ J. Erik Connolly*_____
J. Erik Connolly